# EXHIBIT A



# MIAMI-DADE COUNTY CLERK OF THE COURTS
## HARVEY RUVIN

<u>Contact Us</u>   <u>My Account</u>   

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

**◀◀ BACK TO SEARCH**

### X-RAY DIAGNOSTIC AND ULTRASOUND CONSULTANTS, LTD. VS GENERAL ELECTRIC COMPANY ET AL

| | | | |
|---|---|---|---|
| Local Case Number: | 2020-017291-CA-01 | Filing Date: | 08/13/2020 |
| State Case Number: | 132020CA017291000001 | Judicial Section: | CA31 |
| Consolidated Case No.: | N/A | Case Type: | Contract & Indebtedness |
| Case Status: | OPEN | | |

## 👥 Parties
Total Of Parties: 3 **—**

**➥ EXPORT TO CSV**

| Party Description | Party Name | Attorney Information | Other Attorney(S) |
|---|---|---|---|
| Plaintiff | X-Ray Diagnostic and Ultrasound Consultants, Ltd. | **B#:  (Bar Number)**430005 <br> **N:  (Attorney Name)**Walters, Hanton Halex | |
| Defendant | General Electric Company | | |
| Defendant | GE Healthcare, Inc. | | |

## 🔧 Hearing Details
Total Of Hearings: 0 **—**

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| | | | | |

## 📶 Dockets
Total Of Dockets: 14 **—**

**➥ EXPORT TO CSV**

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 12 | 10/01/2020 | | Affidavit of: | Event | **AFFIDAVIT OF SERVICE ON DONNA MOCH.** |
| 📄 | 11 | 10/01/2020 | | Affidavit of: | Event | **AFFIDAVIT OF SERVICE ON DONNA MOCH.** |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 10 | 09/15/2020 | | Receipt: | Event | **RECEIPT#:2680290 AMT PAID:$20.00 NAME:WALTERS, HANTON HALEX PO BOX 1224 ORLANDO FL 32802-1224 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:** |
| | | 09/14/2020 | | 20 Day Summons Issued | Service | |
| 📄 | 9 | 09/14/2020 | | ESummons 20 Day Issued | Event | Parties: GE Healthcare Inc. |
| | | 09/14/2020 | | 20 Day Summons Issued | Service | |
| 📄 | 8 | 09/14/2020 | | ESummons 20 Day Issued | Event | Parties: General Electric Company |
| 📄 | 7 | 09/14/2020 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 6 | 09/14/2020 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| | 5 | 08/15/2020 | | Receipt: | Event | **RECEIPT#:2600141 AMT PAID:$401.00 NAME:WALTERS, HANTON HALEX PO BOX 1224 ORLANDO FL 32802-1224 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:E-FILING ACH TENDER AMT:$401.00 RECEI** |
| 📄 | 4 | 08/13/2020 | | Copy of: | Event | **SUMMONS FOR GE HEALTHCARE, INC.** |
| 📄 | 3 | 08/13/2020 | | Copy of: | Event | **SUMMONS FOR GENERAL ELECTRIC COMPANY** |
| 📄 | 2 | 08/13/2020 | | Complaint | Event | |
| 📄 | 1 | 08/13/2020 | | Civil Cover Sheet - Claim Amount | Event | |

**◀◀ BACK TO SEARCH**

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer

## General

Online Case Home     Civil / Family Courts Information     Login



**HARVEY RUVIN**

Miami-Dade County
Clerk of the Courts

## Help and Support

Clerk's Home     Privacy Statement     ADA Notice     Disclaimer     Contact Us

73 W. Flagler Street
Miami, Florida 33130

About Us

305-275-1155

©2020 Clerk of the Courts. All rights reserved.





**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting <u>data</u> pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.     CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>X-Ray Diagnostic and Ultrasound Consultants, Ltd.</u>
 Plaintiff
       vs.
<u>General Electric Company, GE Healthcare, Inc.</u>
Defendant

**II.     AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim rounded to the nearest dollar $<u>500,000</u>

**III.     TYPE OF CASE**     (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence – other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability – commercial
    ☐ Premises liability – residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions
☐ Professional malpractice
    ☐ Malpractice – business
    ☐ Malpractice – medical

    ☐ Malpractice – other professional
☐ Other
    ☐ Antitrust/Trade Regulation
    ☐ Business Transaction
    ☐ Circuit Civil - Not Applicable
    ☐ Constitutional challenge-statute or ordinance
    ☐ Constitutional challenge-proposed amendment
    ☐ Corporate Trusts
    ☐ Discrimination-employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

☐ County Civil
    ☐ Small Claims up to $8,000
    ☐ Civil
    ☐ Replevins
    ☐ Evictions
    ☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒  Monetary;
☐  Non-monetary declaratory or injunctive relief;
☐  Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:**
(Specify)

8

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ Yes
☒ No

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ No
☐ Yes – If "yes" list all related cases by name, case number and court:

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ Yes
☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature:   s/ HANTON WALTERS
        Attorney or party
FL Bar No.: 0430005
        (Bar number, if attorney)
        HANTON WALTERS
        (Type or print name)
   Date:  08/14/2020

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT AND
FOR MIAMI-DADE COUNTY, FLORIDA

X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,

Plaintiff,                                    CASE NO.:

vs.

GENERAL ELECTRIC COMPANY, a foreign corporation,
GE HEALTHCARE, INC. a foreign corporation.,

Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, X-Ray and Diagnostic Ultrasound Consultants Limited, a foreign corporation, organized under the laws of Jamaica, by and through its attorneys, brings this action for damages exceeding $30,000 against General Electric Company; a foreign profit corporation registered to do business in Florida; and GE Healthcare, Inc., a foreign profit corporation registered to do business in Florida. In support thereof, Plaintiff X-Ray and Diagnostic Ultrasound Consultants Limited states as follows:

## PARTIES

1.      Plaintiff, X-Ray and Diagnostic Ultrasound Consultants Limited ("X-RAY"), is a foreign corporation, organized under the laws of Jamaica, West Indies.

2.      Defendant General Electric Company ("GE") is a foreign for-profit corporation incorporated in New York and registered to do business in Florida, with its principal address at 5 Necco Street, Boston, MA and with offices in Florida.

1

3.     Defendant General Electric Healthcare, Inc. ("GE Healthcare") is a foreign for-profit corporation, incorporated in New York and registered to do business in Florida, with its principal address at 251 Locke Dr., Marlborough, MA and with offices in Florida.

4.     GE and GE Healthcare are related corporations with officers, directors, and shareholders in common, and they share common offices.

5.     GE Healthcare is a mere instrumentality of GE, and the corporation operates as alter egos of one another.  For purposes of the Complaint, the two corporations shall collectively be referred to as "GE Entities."

## JURISDICTION AND VENUE

6.     This is an action for damages in excess of $30,000.00, exclusive of interest, costs, and attorney's fees.

7.     Jurisdiction and venue are proper in Florida because the parties entered into an International Financial Sales Agreement ("Agreement") for the sale and purchase of medical equipment and supplies in Miami, Florida, which included a choice of law provision designating Florida law as the governing law over the terms of the Agreement.  The parties also agreed to submit to the jurisdiction of the courts of Florida.  A copy of the subject Agreement is attached to this Complaint as Exhibit A and is incorporated herein by reference.

8.     The parties negotiated the sale of the medical equipment and entered into the contract for the sales of the medical equipment in the State of Florida.

9.     The dispute giving rise to this action relates to an obligation arising out of a transaction involving, in the aggregate, more than $250,000.00.

10.     Furthermore, the GE Entities conduct substantial and not isolated business and ongoing business throughout the State of Florida. The GE Entities are also registered corporations

authorized to do business in the State of Florida. The GE Entities own and lease real property in the State of Florida. The GE Entities further maintain business offices in the State of Florida. The GE Entities markets and sells its services in the State of Florida. The GE Entities have offices where they conduct customary business in the State of Florida.

## GENERAL ALLEGATIONS

11.     Since 1981, X-RAY is a recognized major provider of diagnostic radiology services to Jamaica and the English-speaking population/areas of the Caribbean, offering and utilizing cutting-edge technologies in both equipment and procedure.

12.     X-RAY has developed a reputation for being a leader in the radiology sector, having pioneered several imaging technologies in Jamaica and the Caribbean region.

13.     As a part of its pioneering thrust and with a view of providing to Jamaica and the wider Caribbean the latest available diagnostic equipment, techniques, and treatment, in the mid-2010s, X-RAY conceptualized and took steps to establish a molecular imaging center and nuclear laboratory located at 3 Ripon Road, Kingston 5, St. Andrew, Jamaica ("Laboratory").

14.     The creation of the Laboratory was a significant project and undertaking requiring the design, construction and maintenance of a custom-built facility to house the Laboratory, which had to be completed in a specified period as time was of the essence ("Project"). The Project consisted of general, structural, architectural, mechanical, heating, ventilating, air conditioning, and electrical work for the construction and housing of the Laboratory, including foundations, and site work. It further consisted of the furnishing and installation of certain custom and high-tech equipment.

15.     One of the main purposes of the Laboratory was to produce radioactive isotopes with the use of a cyclotron ("Cyclotron"). These isotopes, when introduced into the human body,

can reveal various abnormalities, such as cancer, lymphoma, occult infection, heart disease, and degenerative/cognitive brain disorders, using Posetron Emission Tomography (PET)/CT technology.

16.     The Laboratory is comprised of four (4) main component areas, specifically they are:

a)      Cyclotron Room: where the Cyclotron is located and operates to produce those radioactive isotopes which are radiopharmaceuticals;

b)      Hot Lab: where those radiopharmaceuticals are delivered, stored and prepared for dispensing for use with patients at the Laboratory or elsewhere;

c)      Quality Control ("QC") Lab: where the radiopharmaceuticals so produced are tested to ensure they comply with all quality and other specifications; and,

d)      Airlock: a room that permits the passage of people and objects between the pressure room and its surroundings while minimizing the change of pressure in the room and loss of air from it, thereby restricting escape of any radioactive emissions.

17.     Some of the pertinent equipment costs for the Laboratory, including the Cyclotron and Positron-Emission Tomography computed tomography scanner ("PET/CT scanner"), are as follows:

| **Equipment** | **Costs** |
|---|---|
| Hotlab equipment, Fastlab, Radiopharmacy Trace Center Equipment: US $1,009,800.00 | |
| Cyclotron: | US$827,000.00 |
| PET/CT Scanner: | US$1,150,000.00 |
| **TOTAL**: | **US$2,986,800.00** |

These specific pieces of equipment are collectively referred to as "Equipment."

18.     X-RAY considered a variety of companies to complete the Project, construct the Laboratory, and provide the Equipment.

19.     Following a lengthy negotiation and based on many representations by the GE Entities, X-RAY reached an agreement with the GE Entities to complete the Project, including for the GE Entities to build the Laboratory and supply the necessary Equipment identified above.

20.     A portion of the sale of the Equipment from GE to X-Ray was financed through GE's financing subsidiary, General Electric Capital, based on the recommendation of GE.

21.     To carry out the agreement, X-RAY and the GE Entities entered into additional agreements, including for the sale and purchase of the Equipment to be used in the Laboratory. Some of these agreements included, but are not limited to:

a)      Modification of International Financed Sales Agreement, dated September 29, 2016,

b)      Modification of International Financed Sales Agreement, dated December 22, 2016,

c)      Credit Agreement between X-RAY and GE HFS, LLC,

d)      Modification of Credit Agreement, dated September 29, 2016,

e)      Promissory Note between X-RAY and GE,

f)      International Sales Agreement, dated January 16, 2019.

These additional agreements are attached as "Composite Exhibit B."

22.     The parties entered into several other contractual documents for matters relating to the plans, specifications, and building standards, which are too voluminous to attach as exhibits hereto but are incorporated by reference. They do not necessarily bear on the issues pertaining to this lawsuit.

23.     GE was to supply and install the quality control component of the Laboratory, and certify that the installation and commissioning of the Laboratory was completed to the requisite commercial standard with all its components including certification that the Laboratory met all specifications of the International Atomic Energy Agency ("IAEA") and all other relevant local and international standards.

24.     As a part of the Project, in November 2015, GE undertook to provide equipment as well as installation and commissioning services in respect to the heating, ventilation, and air conditioning ("HVAC") for the Laboratory.

25.     Pertinent specifications of which the Laboratory had to meet and/or comply with include required pressures, temperatures, and humidity in the different component areas of the Laboratory ("Specifications").

26.     At all times material, GE represented to X-RAY that it knew the required standard for the Specifications and the importance of the Specifications being met and consistently maintained in the Laboratory.

27.     On August 20, 2015, the first site meeting was held with GE at X-RAY's business location, 1 Ripon Rd, Kingston 5, St. Andrew, Jamaica, to discuss the Project design, installation, building out and commissioning of the Laboratory.

28.     At this first site meeting, Richard Wentz was introduced and identified to X-RAY as the GE Project Manager assigned to organize and supervise the entire Project through completion.

29.     During this meeting, GE was made aware and fully understood that X-RAY lacked the expertise to handle the construction or design of the Laboratory, the purchase of the Equipment necessary to operate the Laboratory, installation of said Equipment in the Laboratory, or the

maintenance of said Equipment and Laboratory, which is one of the reasons it was contracting with GE to perform each of these tasks.

30.    GE assured X-RAY it would coordinate, hire and supervise all necessary contractors and suppliers in order to ensure the Project was completed properly and within a specified time period as time was of the essence.

31.    X-RAY relied on the representations and assurances made by GE, both documented through the agreements between the parties and verbalized between the parties' representatives at the first site meeting and during other various conversations.

32.    In a letter dated October 28, 2015, GE provided its first quotation for the HVAC component of the Laboratory build-out. X-Ray subsequently received a revised quotation for the HVAC component, dated January 20, 2016.

33.    One of the requirements for the HVAC system to function properly and meet the requisite Specifications is for 100% of outside air or fresh air to be supplied via the air conditioning system for the Laboratory ("Outside Air Requirement").

34.    Further and more importantly, the Outside Air Requirement is a condition of the International Atomic Energy Agency ("IAEA") whose certification of the laboratory is required. The IAEA is an international organization created to promote the peaceful use of nuclear energy by promulgating standards and requirements for the use of nuclear energy.

35.    By entering into various agreements with X-RAY, some of which are attached as Exhibits hereto, and vocalizing its understanding and agreement to undertake the Project and construction of the Laboratory, GE, accepted the responsibility to complete the Project and build and furnish/supply the Laboratory consistent with all governing standards and Specifications, and at all times material, owed to X-RAY a duty of care to reasonably and adequately complete the

Project and Laboratory and perform all obligations under their contracts, agreements and understandings, including a duty of care to ensure the air condition system used in the Laboratory was designed in order for the Laboratory to meet the Outside Air Requirement as required by the IAEA.

36.     The Project began in September 2015 and GE led X-RAY to believe it was completed in/by March 2017.

37.     At the time of the Project and Laboratory's supposed completion, the GE Entities assured X-RAY the Laboratory was designed, constructed and completed such that it operated using 100% outside air or fresh air and met the Outside Air Requirement as is required by the IAEA, and that it met all other governing standards and Specifications.

38.     Nonetheless, X-RAY was denied certification by IAEA, as during certification testing by IAEA, the Laboratory consistently operated below the 100% outside air or fresh air threshold required by the Outside Air Requirement.

39.     X-RAY notified GE of the failure and shortcomings in this regard and requested that GE take steps to solve the problem, but GE failed to solve, and continues to fail in solving, the Laboratory issue relating to the Outside Air Requirement. To date, the Laboratory remains uncertified by the IAEA due to the shortcomings in this regard.

40.     GE failed to supply equipment, which is adequate, appropriate, and/or fit for the purpose required for attaining and consistently maintaining the Specifications, including the Outside Air Requirement.

41.     GE failed to use reasonable care and proper steps, methods, procedures, or safeguards, to ensure that the Laboratory attains and can consistently maintain the Specifications, including the Outside Air Requirement.

42.     Due to high levels of condensation in the Laboratory, caused by humidity levels higher than the upper limit required by the Specifications and the failure to meet the Outside Air Requirement, several pieces of equipment in the Laboratory have been damaged by water from condensation.

43.     For example, sometime between January and March 2018, the Multi-Channel Analyzer had to be replaced. A multichannel analyzer is an instrument used in a laboratory to analyze an input signaling consisting pulses. The multichannel was damaged due to conditions in the Laboratory resulting from the failure to attain and consistently maintain the Specifications and the Outside Air Requirement in the Laboratory.

44.     Additionally, the Cyclotron was damaged by water from the excess humidity and, as a result, had to be repaired.  A Cyclotron is a type of particle accelerator.  Cyclotrons accelerate charged particles to increase their kinetic energy.  These high energy particles are used to obtain radioactive preparations for medical and diagnostic purposes.

45.     GE's failure to attain and consistently maintain the Specifications in the Laboratory has caused severe harm to X-RAY, the harm of which includes but is not limited to precluding X-RAY from obtaining the requisite certifications needed to operate the Laboratory, precluding X-RAY from opening or being able to use the Laboratory for its intended purposes, causing X-RAY to incur expenses related to the repair and/or installation of damaged equipment, and hindering X-RAY's ability to repair and/or install new equipment to replace the damaged equipment as any repaired or new equipment would only continue to be damaged unless and until GE has corrected the deficiencies discussed herein and brought the Laboratory in compliance with all Specifications, including Outside Air Requirement.

46.     Furthermore, the unacceptable humidity and temperature levels in the Laboratory caused by GE's failure to meet the Outside Air Requirement and Specifications has prevented X-RAY from obtaining the necessary accreditation to enable X-RAY to market its PET/CT services globally.

47.     It has also prevented X-RAY from accessing payment from United States based health insurance carriers.

48.     GE fell short in fulfilling its duties and satisfying its obligations in several other manners.

49.     Following the initial construction of the Laboratory, the Cyclotron purchased by X-RAY from GE, as a part of the Project and per the agreements, arrived in Jamaica to be installed in the Laboratory.

50.     In order for the Cyclotron to be installed into the Laboratory, GE specifically required custom flooring be created designed and installed to accommodate the Cyclotron.

51.     GE assumed and accepted the responsibility to design, construct and install the custom flooring for the Cyclotron as a part of its duties in completing the Project and the Laboratory.

52.     As a part of the custom floor design, a special epoxy was identified by GE and imported from Italy by GE, and it was installed to cover the floor where the Cyclotron would be situated.

53.     When the Cyclotron was lowered onto the floor, the epoxy that GE chose and installed collapsed under the weight of the Cyclotron.

54.     As a result, GE had the Cyclotron removed and ordered a different epoxy.

10

55.     The issues with the custom flooring required by GE and the failure to choose and install an adequate and sufficient epoxy for the custom flooring, resulting in the ultimate removal of and inability to install the Cyclotron, resulted in wasted time and delayed months before the Cyclotron could be properly placed in the Laboratory and extended the completion of the Project.

56.     Additionally, GE informed X-RAY that the acquisition of pure specialized gases must also be installed in the Laboratory to ensure proper operation.

57.     GE agreed to identify the supplier and coordinate the procurement of the pure specialized gases.

58.     GE nonetheless failed to identify a supplier, causing additional delays to the Project.

59.     To avoid further delays than those caused by GE's shortcomings in this regard, X-RAY had no choice but to source said gases on its own and incur additional expense associated with same.

60.     A similar issue arose with the procurement of a custom air compressor required for use in the Laboratory.

61.     GE assured X-RAY it would identify and procure the specialized custom air compressor, but also failed to do. This failure substantially delayed the completion of the Project and Laboratory.

62.     Left with no other choice, and in order to mitigate the delay to the completion of the Project and Laboratory, X-RAY, at great financial expense, identified and procured the custom air compressor on its own, despite it being the responsibility of GE.

63.     In addition to the foregoing, in order to ensure X-RAY would be able to properly run and operate the new Laboratory with its specialized equipment installed, GE required X-

RAY's employees undergo specialized and specific training on similar equipment located in the country of Panama, which was to be provided as a part of the agreement. Despite repeated demands by X-Ray, to date, the specialized training has not been provided by GE.

64.     Also, as a part of the Project, GE required X-RAY to purchase a Picture Archiving and Communication System ("PACS") for the electronic storage of images and agreed to provide remote access to the same to X-RAY staff and referring doctors globally.  The PACS system has failed to operate in a commercially proper manner, causing a major loss of business to X-RAY, as X-RAY's customers have had to take their business to other facilities who offer a similar functioning technology.

65.     After countless attempts by X-RAY to decipher why the PACS system it purchased from GE has failed to operate properly, X-RAY discovered by its own efforts and at additional expense that the software installed in the PACS system at the time of purchase had already expired at the time it was sold and was no longer supported to receive the requisite software updates needed to function properly.

66.     GE owed X-RAY a duty of care, which duty included but was not limited to a duty to, ensure that the Laboratory buildings and the equipment/components parts installed within were designed and installed in a condition so that the Specifications could be duly attained and consistently maintained to ensure proper operation.

67.     GE failed to properly install and commission the equipment required in order for the Laboratory to function properly.

68.     The gas chromatography machines also still does not operate properly.

69.     GE assured X-RAY the Project would have been completed by January 2017.  This deadline was not met.

70.     Although GE later represented the project was complete, X-RAY still has not had the opportunity to have the Laboratory operate in a commercially acceptable manner.

71.     To date, the Laboratory is unable to operate in a commercially acceptable manner in accordance with governing and requisite standards and Specifications.

72.     In August 2018, X-RAY received additional equipment it had purchased for the Laboratory as a result of GE's shortcomings and failures. This additional equipment cost US$355,000.00. These items of equipment, when installed and commissioned, would have made the Laboratory the first in the western hemisphere, outside of North America, with such technologies.

73.     As a result of the shortcomings, failures, and breaches by GE Entities described above, X-RAY has incurred financial, economic and reputational harm, which it continues to accrue with each passing day.

## COUNT I - NEGLIGENCE OF GENERAL ELECTRIC COMPANY

74.     X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

75.     At all material times, GE owed and continues to owe a duty to its customers and all persons and companies with which it contracts, and more particularly X-RAY, including but not limited to the duty to ensure that it reasonably and adequately satisfies all projects and tasks for which it owes and/or contracts with its customers and those with whom it contracts. Specifically here, GE owed and continues to owe a duty to X-RAY, including but not limited to the duty to reasonably and adequately complete the Project and the Laboratory and ensure that the equipment/components parts installed within were designed and put in a condition so that the Specifications could be duly attained and consistently maintained to ensure proper operation.

76.     As discussed herein, GE breached its duty owed to X-RAY by, including but not limited to:

a.      failing to ensure the air condition system used in the Laboratory was designed in order for the Laboratory to meet the Outside Air Requirement as required by the IAEA;

b.      failing to use reasonable care and proper steps, methods, procedures, or safeguards, to ensure that the Laboratory attains and could consistently maintain the Specifications, including the Outside Air Requirement;

c.      failing to ensure that the Laboratory buildings and the equipment/components parts installed within were designed and installed in a condition so that the Specifications could be duly attained and consistently maintained to ensure proper operation;

d.      failing to properly install and commission the equipment required in order for the Laboratory to function properly;

e.      failing to procure specialized equipment such as, but not limited to, the specialized custom air compressor and specialized gases required for the Laboratory;

f.      failing to choose and install an adequate and sufficient epoxy for the custom flooring, resulting in the ultimate removal of and inability to install the Cyclotron added additional months to the placement of the Cyclotron in the Laboratory and extended the completion of the Project;

g.      failing to coordinate, hire and supervise all necessary contractors and suppliers in order to ensure the Project was completed properly and within a specified time period as time was of the essence;

h.      failing to provide and install a commercially operational PACS system;

14

i.      failing to provide specialized training.

77.     Due solely to GE's breaches and negligence, the Laboratory has failed to attain and/or maintain the Specifications, or otherwise comply with governing requisite standards, preventing X-RAY from operating the Laboratory in a commercially viable manner, thereby causing X-RAY significant financial loss as well as economic and reputational harm.

78.     GE knew, or in the exercise of reasonable care should have known, that its failure to properly perform complete and supervise the Project would result in the Laboratory not operating in a commercially viable manner, thereby causing X-RAY significant damage.

79.     As a direct and proximate result of the aforesaid negligence and breaches of GE, X-RAY has suffered and continues to suffer substantial financial, economic and reputational harm and damages for the continued delayed inoperability of the Laboratory and expenses associated with the breaches as identified herein, such as those related to repair and/or replacement of damaged equipment and the hiring of other individuals or companies to correct and/or explore GE's deficiencies.

WHEREFORE, X-RAY requests judgment against GE for compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## COUNT II – NEGLIGENCE OF GE HEALTHCARE

80.     X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

81.     At all material times, GE HEALTHCARE owed and continues to owe a duty to its customers, and all persons and companies with which it contracts, and more particularly X-RAY, including but not limited to the duty to, ensure that it reasonably and adequately satisfies all projects and tasks for which is owed and/or contracts with its customers and those with whom it

contracts. Specifically here, GE HEALTHCARE owed and continues to owe a duty to X-RAY, including but not limited to the duty to reasonably and adequately complete the Project and the Laboratory and ensure that the equipment/components parts installed within were designed and put in a condition so that the Specifications could be duly attained and consistently maintained to ensure proper operation.

82.     As discussed herein, GE HEALTHCARE breached its duty owed to X-RAY, including but not limited to:

j.      failed to ensure the air condition system used in the Laboratory was designed in order for the Laboratory to meet the Outside Air Requirement as required by the IAEA;

k.      failed to use reasonable care and proper steps, methods, procedures, or safeguards, to ensure that the Laboratory attains and could consistently maintain the Specifications, including the Outside Air Requirement;

l.      failed to ensure that the Laboratory buildings and the equipment/components parts installed within were designed and installed in a condition so that the Specifications could be duly attained and consistently maintained to ensure proper operation;

m.      failed to properly install and commission the equipment required in order for the Laboratory to function properly;

n.      failed to procure specialized equipment such as, but not limited to, the specialized custom air compressor, and specialized gases required for the Laboratory;

o.      failed to choose and install an adequate and sufficient epoxy for the custom flooring, resulting in the ultimate removal of and inability to install the Cyclotron

16

adding additional months to the placement of the Cyclotron in the Laboratory and extended the completion of the Project;

p.      failed to coordinate, hire and supervise all necessary contractors and suppliers in order to ensure the Project was completed properly and within a specified period as time was of the essence;

q.      failed to provide and install a commercially operational PACS system.

83.      Due solely to GE HEALTHCARE's breaches and negligence, the Laboratory has failed to attain and/or maintain the Specifications, or otherwise comply with governing requisite standards, preventing X-RAY from operating the Laboratory in a commercially viable manner, thereby causing X-RAY significant financial loss as well as economic and reputational harm.

84.      GE HEALTHCARE knew, or in the exercise of reasonable care should have known, that its failure to properly complete and supervise the Project would result in the Laboratory not operating in a commercially viable manner, thereby causing X-RAY significant damage.

85.      As a direct and proximate result of the aforesaid negligence and breaches of GE HEALTHCARE, X-RAY has and continues to suffer substantial financial, economic and reputational harm and damages for the continued delayed inoperability of the Laboratory and expenses associated with the breaches as identified herein, such as those related to repair and/or replacement of damaged equipment and the hiring of other individuals or companies to correct and/or explore GE HEALTHCARE's deficiencies.

WHEREFORE, X-RAY requests judgment against GE HEALTHCARE for compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## COUNT III – BREACH OF WARRANTY OF GENERAL ELECTRIC

86.    X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

87.    GE expressly warranted to the public and more particularly to X-RAY that the equipment it required X-RAY purchase and that it had installed would work in a commercial operational manner.

88.    GE implicitly warranted to the general public and to X-RAY that the equipment it required X-RAY purchase for the Project as a whole and the Laboratory more specifically was operational and fit for the particular purpose to facilitate the operation of the Laboratory.

89.    X-RAY relied on the warranties made by GE.

90.    GE breached said warranties by failing to warn, disclose or instruct X-RAY of the problems with the Laboratory and equipment it installed and by failing to timely complete the Project and Laboratory. It also breached said warranties by causing the Laboratory to remain inoperable and noncompliant with governing standards and Specifications.

91.    X-RAY gave notice of breach of said warranties to GE on at least one occasion. *See* Letter attached at Exhibit C sent by X-RAY to GE dated January 5, 2018, listing the various breaches to the warranty.

92.    X-RAY has and continues to suffer substantial financial damages for the inoperability of the Laboratory because GE failed to adequately test, manufacture, inspect, warn and instruct X-RAY about the use of the Laboratory.

WHEREFORE, X-RAY requests judgment against GE for compensatory and economic damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## COUNT IV – BREACH OF WARRANTY – GE HEALTHCARE

93.     X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

94.     GE Healthcare expressly warranted to the public and more particularly to X-RAY that the services and equipment it required X-RAY purchase and that it had installed would perform and work in a commercial operational manner.

95.     GE Healthcare implicitly warranted an implied warranty to the general public and to X-RAY that the services and equipment it required X-RAY purchase for the Project as a whole and the Laboratory more specifically, was operational and fit for the particular purpose to facilitate the operation of the Laboratory.

96.     X-RAY relied on the warranties made by GE Healthcare.

97.     GE Healthcare breached said warranties by failing to warn, disclose or instruct X-RAY of the problems with the Laboratory and equipment it installed and by failing to timely complete the Project and Laboratory. It also breached said warranties by causing the Laboratory to remain inoperable and noncompliant with governing standards and Specifications.

98.     X-RAY gave notice of breach of said warranties to GE Healthcare.

99.     X-RAY has and continues to suffer substantial financial damages for the inoperability of the Laboratory because GE Healthcare failed to adequately test, manufacture, inspect, warn and instruct X-RAY about the use of the Laboratory.

WHEREFORE, X-RAY requests judgment against GE Healthcare for damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## <u>COUNT V – BREACH OF CONTRACT – GENERAL ELECTRIC COMPANY</u>

100.    X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

101.    The Agreement attached as Exhibit A entered into between GE and X-RAY on September 29, 2016 is a valid contract between the parties.

102.    Per the Agreement, GE agreed to construct, manage, supervise, build out, and furnish the Project and the Laboratory with the requisite plans, specifications, expertise, manpower, supplies and equipment necessary to ensure the Project and Laboratory was completed on time and was commercially operational, in exchange for financial consideration from X-RAY.

103.    As discussed in detail herein, GE breached the Agreement in several ways, including but not limited to, by failing to complete the Project and Laboratory in a timely manner and failing to complete the Project and Laboratory in compliance with the standards applicable to a Project and Laboratory of similar use and complexity, shop drawings, plans and specifications and other contract documents.

104.    The breaches include, but are not limited to, GE's:

105.    As a result of the breaches by GE, X-RAY has been damaged by incurring additional costs, including without limitation, labor, materials, rental equipment, idled and inefficient equipment, extended and unabsorbed job site overhead, repair costs, and replacement costs.

106.    As a result of the breaches by GE, X-RAY is additionally exposed to extended warranty requirements as a result of the incomplete completion of the Project and Laboratory.

WHEREFORE, X-RAY requests judgment against GE for economic and compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## COUNT VI – BREACH OF CONTRACT – GE HEALTHCARE

107.    X-RAY, reiterates, readopts and realleges paragraphs 1 - 73 above and further alleges:

108.    GE Healthcare agreed in the Agreement to construct, manage, supervise, build out, and furnish the Project and the Laboratory with the requisite plans, specifications, expertise, manpower, supplies and equipment necessary to ensure the Project and Laboratory was completed on time and was commercially operational.

109.    GE Healthcare breached the Agreement by failing to complete the Project and Laboratory in time and failed to complete the Project and Laboratory in compliance with the standards applicable to a Project and Laboratory of similar use and complexity, shop drawings, plans and specifications and other Contract Documents.

110.    As a result of the breach, X-RAY has been damaged by incurring additional costs, including without limitation, labor, materials, rental equipment, idled and inefficient equipment, extended and unabsorbed job site overhead, repair costs, and replacement costs.  X-Ray is additionally exposed to extended warranty requirements as a result of the incomplete completion of the Project and Laboratory.

WHEREFORE, X-RAY requests judgment against GE Healthcare for economic and compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## UNJUST ENRICHMENT – GENERAL ELECTRIC COMPANY

111.    X-RAY, reiterates, readopts and realleges paragraphs 1 – 73 above and further alleges:

112.    Per the agreements between the parties, X-RAY paid GE a substantial amount of money for the completion of the Project and Laboratory more than half a million dollars in the past four years and is continuing to pay GE.

113.    GE knowingly accepted the money paid to it by X-RAY without GE completing the Project and Laboratory, and it continues to use and/or hold the substantial amount of money for its own benefit.

114.    It is inequitable and unjust for GE to continue to enjoy the benefit of the money paid by X-RAY without GE having completed or otherwise fulfilling or satisfying its obligations pursuant to the agreements between the parties.

115.    X-RAY continues to accrue damages for GE's shortcomings, failures and breaches, yet paid GE to complete that work.

WHEREFORE, X-RAY requests judgment against for economic and compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADES PRACTICES ACT (FDUTPA)

116.    X-RAY, reiterates, readopts and realleges paragraphs 1 – 73 above and further alleges:

117.    GE knowingly deceived X-Ray when it required X-Ray to purchase what GE represented as a new state of the art PACS system at full market price for the electronic storage of images that GE represented would provide X-Ray with remote access to these stored images

for the use of its staff and referring doctors globally.  The PACS system has failed to operate in a commercially proper manner.

118.    After countless attempts by X-RAY to decipher why the PACS system it purchased from GE has failed to operate properly, X-RAY discovered by its own efforts and at additional expense that the software GE installed in the PACS system at the time of purchase had already expired at the time it was sold by GE to X-RAY and was no longer supported to receive the requisite software updates needed to function properly.

119.    The PACS system GE sold X-RAY with its outdated software was not new, nor state of the art and because the software GE installed in the PACS system was no longer supported to receive updates the machine could not function nor operate properly, resulting in X-RAY left with a PACS system that is rendered valueless.

120.    X-RAY suffered actual damages for the diminished value of the inoperable PACS system and is entitled to the reimbursement of the full purchase price it paid GE for the PACS system that GE knew was not commercially operational at the time it sold the PACS system to X-RAY.

WHEREFORE, X-RAY requests judgment against for economic and compensatory damages, interest, loss of profits, costs, attorneys' fees and such other relief as this Court deems proper.

## **DEMAND FOR JURY TRIAL**

121.    X-RAY demands a jury trial on all issues so triable.

DATED this 13th day of August, 2020.

/s/Hanton H. Walters, Esquire
HANTON H. WALTERS, ESQUIRE
Florida Bar No. 430005
Hwalters@drml-law.com
Marla@drml-law.com
WILLIAM E. LAWTON, ESQUIRE
Florida Bar No. 0163236
Wlawton@drml-law.com
Marla@drml-law.com
JENNA M. WINCHESTER
Florida Bar No. 114280
Jwinchester@drml-law.com
Katie@drml-law.com
Dean, Ringers, Morgan and Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802
Phone: (407) 422-4310  Fax: (407) 648-0233
Attorneys for Plaintiff



**GE Healthcare**
General Electric Company

## INTERNATIONAL FINANCED SALES AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as by and between General Electric Company, through its GE Healthcare division, a corporation incorporated in the State of New York, United States of America (hereinafter referred to as "Seller"), and X-Ray And Diagnostic, Ultrasound Consultants Limited, a company organized under the laws of Jamaica (hereinafter referred to as "Buyer").

### 1. PURCHASE AND SALE.

1.1. Subject to the terms and conditions of this Agreement and the schedules attached hereto, Seller hereby agrees to sell, and Buyer agrees to purchase, the Equipment described in Schedule A attached hereto (hereinafter referred to as the "Equipment").

1.2. This Agreement shall be subject to the Seller's Standard Terms and Conditions set forth in Schedule C and the Software License set forth in Schedule D.

1.3. Buyer acknowledges that the Equipment is not manufactured in the country of domicile of the Buyer and shall be imported to such country pursuant to the terms and conditions set forth in Schedule C.

1.4. Buyer agrees that Seller's obligations with respect to the installation of the Equipment and warranty service may be performed by the Seller directly or through its authorized service agents.

### 2. PRICE; PAYMENT TERMS, INSTALLATION.

2.1. The total price for the Equipment shall be the price in United States dollars (hereinafter referred to as "Dollars" and/or "U.S.$") set forth in Schedule B (the "Purchase Price"). The Purchase Price, less any down payment, (hereinafter the "Financed Amount") shall be paid in Twenty Eight (28) equal quarterly installments, commencing the first day of the third month following the Interest Commencement Date (as defined in Schedule B), each a "Payment Date".

2.2. Buyer shall pay interest in respect of the Financed Amount commencing on the interest commencement date set forth in Schedule B (the "Interest Commencement Date"), and until the Financed Amount is paid in full, at the rate specified in Schedule B (the "Contractual Rate"). Interest shall be paid in Twenty Eight (28) quarterly installments, commencing the first day of the third month following the Interest Commencement Date (as defined in Schedule B), and then each Payment Date.

The payment of interest shall be calculated on the basis of a year of 360 days and the actual number of days actually elapsed.

2.3. All amounts due and payable with respect to the Equipment shall be paid by wire transfer to Account No. 502 565 30,of General Electric at Deutsche Bank, ABA No. 021 001 033, 60 Wall Street, New York, NY 10005, United States of America, or such other account as Seller may specify in writing to Buyer. Lender is under no obligation to accept payments if the funds do not originate from accounts in the name of Buyer. Payment in U.S. Dollars to the exclusion of any other currency is of the essence of this Agreement.

2.4. The Financed Amount shall be further evidenced by a promissory note made by Buyer (the "Note"), in the form requested by the Seller, payable to the order of Seller and representing the obligation of Buyer to pay Seller the amount of the Financed Amount outstanding at any time, plus accrued interest.

2.5. All payments by Buyer under this Agreement, any Note, any other collateral documents or otherwise in connection with the transactions contemplated hereby shall be made without set-off or counterclaim and shall be made free and clear of and without deduction or withholding for or on account of any Taxes (as defined herein). In the event that any deduction or withholding from any payment to be made by Buyer is required in respect of any Taxes pursuant to any applicable law, rule or regulation (including, without limitation, deduction or withholding for or on account of any interest withholding tax or rent withholding tax), then Buyer shall (i) pay directly to the relevant taxing authority the full amount required to be so withheld or deducted, (ii) forward to Seller within fifteen (15) days from payment an official receipt or other documentation satisfactory to Seller evidencing such payment to such authority, and (iii) pay to Seller such additional amount or amounts as is necessary to ensure that the net amount actually received by Seller will equal the full amount Seller would have received had no such withholding or deduction been required. As used herein, "Taxes" shall mean any and all present or future taxes (including, without limitation, income, gross receipts, gains, excess profits, sales, use, property, withholding, ad valorem, doing business, municipal, transfer, franchise, capital, occupational, license, value added, fuel, excise and stamp taxes and any and all interest withholding taxes, rent withholding tax), levies, imposts, bank fees, duties, assessments, fees (including, without limitation, documentary, license, filing, recording, and registration fees and charges), of any nature or kind whatsoever, together with any penalties, fines, additions to tax or interest thereon, however imposed, withheld, levied, collected or assessed by any country or governmental authority or subdivision thereof or therein.



**EXHIBIT**

**A**



**GE Healthcare**
General Electric Company

2.6. All or any part of the outstanding Financed Amount may be prepaid at any time with prior notification in writing from Buyer to Seller. Any principal prepayment that is not received in conjunction with a scheduled payment will not be applied until the next scheduled due date. Any partial prepayment will be applied first to any interest and/or principal payments past due and the balance shall be applied to future principal installments in the inverse order of their maturity. No prepayment shall suspend any required payments of either principal or interest on the remaining outstanding Financed Amount or reduce the amount of any scheduled payment. Prepayment may be subject to a surcharge as follows:

Before the first Year: 7%

After the first Year but before the second Year: 6%

After the second Year but before the third Year: 5%

After the third Year but before the fourth Year: 4%

After the fourth Year but before the fifth Year: 3%

After the fifth Year but before the sixth Year: 2%

One Percent (1%) thereafter.

For purposes of this Section 2.6, "Year" means the period commencing on the first Payment Date extending up to, but not including, the date of the first anniversary of such first Payment Date, and thereafter, the period commencing on each anniversary of the first Payment Date and extending up to, but not including, the next anniversary of the first Payment Date.

2.7. Upon installation of the Equipment Seller shall issue and deliver to Buyer a certificate of acceptance (the "Certificate of Acceptance"), substantially in the form attached hereto as Schedule E, a copy of which signed by the Buyer shall be returned to Seller no later than five (5) days from the date the Certificate of Acceptance is given to Buyer. Buyer's signature in the Certificate of Acceptance shall constitute conclusive evidence of Buyer's acknowledgment that the Equipment (A) was inspected by Buyer; (B) conforms to the description in Schedule A hereto and (C) has been accepted by the Buyer in the conditions and for the intended use as contemplated in this Agreement.

2.8. If following the five-day period described in the preceding Section 2.7 the Buyer has not return to Seller a copy of the Certificate of Acceptance signed by the Buyer, the Parties agree that through such inaction Buyer shall be deemed to have accepted the installation and the Certificate of Acceptance as evidenced de by the service records of the Seller or its service representative, unless Seller had timely rejected the installation pursuant to Section 2.10

2.9. Delays caused by Buyer in obtaining customs clearance, or Buyer's failure to identify the installation site, or

the lack of readiness of the site, shall all have the same effect of a Certificate of Acceptance, in addition to constitute an Event of Default under Section 6(c). During occurrence of any of such events, when the Interest Commencement Date is determined by the date of installation of the Equipment (Schedule B Paragraph 3), then interest accrual on the Finance Amount shall commence upon notice from Seller to Buyer requesting completion of customs clearance, identification of installation site, or confirmation of site readiness, as the case may be.

2.10. Buyer can reject the Equipment only on grounds of apparent defects as the quantity of quality of the installation, and only substantial lack of quantity or quality conformance in the installation, and only if reported in detail to Seller in writing within its 5-day period described in Section 2.7. Nothing in this Section 2.10 is intended to limit Buyer's rights under Section 9.

2.11. For purposes of Paragraph 3 of Schedule B, when the Interest Commencement Date is determined by the date of installation of the Equipment, Customer shall be deemed to have accepted the Equipment installed by Seller the date the Customer first uses the Equipment for patient use.

2.12. Promptly upon Equipment installation Seller or its authorized service agent shall send to Buyer a written applications training schedule including a minimum of two alternative dates at least a week apart that Buyer may choose from to receive such training. Unless the parties expressly agree otherwise in advance, applications training shall be available for scheduling by Seller at the site Monday through Friday between 8:00 AM and 5:00 PM, commencing no later than Tuesday of the week selected by Buyer. Buyer shall be responsible to coordinate the participation of its designated employees at the scheduled training. Buyer reserves the right to charge a supplemental application training fee at its then current applicable rates (the "Surcharge Amount"), if one or more applications training are delayed beyond twelve (12) months from Equipment installation for reasons attributable to Buyer. To that effect, promptly upon the expiry of the 12-month period Seller shall deliver a written notice to Buyer, which notice shall state (i) the Surcharge Amount and (ii) the schedule for such remaining applications training within no later than thirty (30) calendar days of receipt of the notice. Failure by Buyer to provide written confirmation of the scheduled training and pay in advance the Surcharge Amount shall be deemed as a waiver of its rights to receive such remaining applications.

2.13. Notwithstanding anything to the contrary contained in this Agreement, the Seller reserves the right to terminate this Agreement by written notice to the Buyer in the event the Equipment is not exported by October 30, 2016, unless the failure to export is attributable solely to the Seller for failure to comply with its obligations under this Agreement



**GE Healthcare**
General Electric Company

prior to the date of such termination. In the event of such termination by the Seller, this Agreement shall cease to be valid, and no party shall have any obligation hereunder, except for such obligations which may have arisen from failure to comply with any provision hereof.

### 3. PERSONAL GUARANTY; SECURITY INTEREST.

3.1. Each of the undersigned guarantors (the "Guarantors"), as primary obligor, hereby unconditionally and irrevocably agrees to pay and satisfy to Seller on demand the full, prompt and complete payment when due (whether at scheduled maturity, by reason of acceleration or otherwise) of the principal of, and interest on, the Finance Amount (the "Guarantee").

3.2. Buyer undertakes to grant to Seller a security interest by way of a purchase money security interest in the Equipment and, to the maximum extent permitted by applicable law, all proceeds thereof, for the full amount of the Purchase Price and any costs and charges incurred by Seller in connection therewith, substantially in the form attached hereto as Schedule H (the "Collateral"). At Seller's request, Buyer shall take any other action required by law to perfect the security interest granted hereunder under the laws of the country and/or province or state where the Equipment shall be located. All costs and expenses incurred or to be incurred in connection with the preparation, presentation, filing, recordation, registration, cancelation, or otherwise with the perfection or maintenance of the security interest, including reasonable attorney's fees, shall be borne exclusively by Buyer.

### 4. BUYER'S REPRESENTATIONS AND WARRANTIES.

Buyer hereby represents and warrants to Seller that Buyer

(a) is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, undertakes to produce a certificate of good standing, and has no debenture over its assets;

(b) has the requisite power and authority and the legal right to own, pledge and operate its properties, to lease the property it operates under lease, and to conduct its business as now, heretofore and proposed to be conducted;

(c) has the corporate power and authority to execute, and carry out the terms and provisions of this Agreement and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement. Seller has duly executed and delivered This Agreement and this Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms;

(d) has all necessary material licenses, permits, consents or approvals for the conduct of its business;

(e) has, to the extent necessary, taken all steps and done all things in order to cause this Agreement and all other collateral writings executed in connection herewith to comply in all respects with the laws, regulations and practices of the jurisdiction of its incorporation, including the Central Bank thereof or its equivalent, and any other regulatory agency, as they may pertain to the transactions contemplated herein and therein; being conditions precedent to the coming to force of this Agreement on the date hereunder.

### 5. BUYER'S COVENANTS.

5.1. So long as any part of the Financed Amount shall remain outstanding, including, but not limited to, as a result of any amendment, extension, renewal, restructuring or rescheduling of the payment schedule set forth in Section 2.1, and unless Seller otherwise consents in writing, Buyer shall comply with the following requirements:

(a) Buyer shall keep accurate books and records in which true and complete entries will be made. Upon request of Seller, Buyer, during normal business hours, shall give any representative of Seller access to and permit such representative to examine and copy all books, records and other writings in its possession.

(b) Without limiting the foregoing, Buyer will permit Seller to conduct periodic collateral audits of Buyer's operations at such intervals as Seller deems to be reasonably necessary or desirable, which collateral audits may include, without limitation, examinations of the Equipment.

(c) Buyer, at its sole cost and expense, shall keep and maintain the Equipment in good condition and repair.

(d) Buyer shall obtain and maintain insurance with insurers that are acceptable to Seller, naming Seller as additional insured and loss payee and in such amounts and with such coverage (including without limitation public liability insurance, fire, hazard and extended risk insurance on all of its assets, necessary workers' compensation insurance and all other coverage as are consistent with industry practice) as are acceptable to Seller. Certificates of insurance verifying the existence of such policies shall be furnished to Seller, but Seller's failure to request such certificates or failure to approve such shall not be a waiver of Seller's future right to enforce the terms of this Section. All policies shall require at least 30 days prior written notice to Seller of cancellation or modification.

(e) Buyer shall comply with all laws governing the use of the Equipment and shall obtain and maintain, at its



**GE Healthcare**
General Electric Company

sole cost, all necessary government permits, licenses, certificates or approvals as may be required by law for the exportation, importation, installation and operation of the Equipment.

(f) Buyer shall not change the legal format under which Buyer was organized without the prior written consent of Seller nor shall Buyer cease to do business or engage in any line of business materially different from that presently engaged in by Buyer.

(g) Buyer shall not sell, lease, assign, transfer, relocate or otherwise dispose of the Equipment, or any part thereof, without the prior written consent of Seller. In addition, Buyer shall not sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any person other than in the ordinary course of business.

(h) Buyer shall not create, incur or permit to exist in favor of any person other than Seller any debenture, mortgage, deed of trust, security interest, charge, encumbrance or other lien on any of the Equipment.

(i) At Seller's request at any time following the date of this Agreement, Buyer shall provide Seller with financial information of the type requested by and satisfactory to Seller, with an English translation thereof if Seller so requests.

(j) Buyer shall not take any action that will have a material adverse effect on its ability to pay the Financed Amount.

(k) Prior to Seller (or any assignee of, or purchaser of the Equipment from, Buyer, or any third party acting on behalf of or at the direction of Buyer) taking possession of the Equipment from Buyer, whether following an event of default, termination of this Agreement or any Schedule, or otherwise, Buyer shall securely remove, or render indecipherable in accordance with prevailing industry standards and available analytical research and in accordance with at least the standard, method and specification for data removal and disposal established under the laws of all applicable jurisdictions, all data (including any and all patient data and information protected under any laws applicable to any party hereto) stored on or otherwise accessible from the Equipment (including from any and all disk drives or magnetic media). Buyer shall be solely responsible for selecting an appropriate removal standard that meets Buyer's business needs and complies with all applicable laws, and agrees that Seller shall not be held responsible for any losses directly or indirectly arising out of, or by reason of the presence and/or use of any and all data or information residing on or within the Equipment.

(l) Buyer will use the Equipment for business and not for personal, household or family use.

5.2. <u>Judgment Currency</u>. If for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "<u>Other Currency</u>"), the rate of exchange used shall be that at which in accordance with normal banking procedures Seller could purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given. For purposes herein, a "<u>Business Day</u>" shall be a day on which banks in New York, State of New York, U.S.A. are not required or authorized be closed. The obligation of Buyer in respect of any such sum due from it to Seller hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that on the Business Day following receipt by Seller of any sum adjudged to be due hereunder in such Other Currency, Seller may in accordance with normal banking procedures purchase Dollars with such Other Currency. If the Dollars so purchased are less than the sum originally due to Seller in Dollars, Buyer agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Seller against such loss, and if the Dollars so purchased exceed the sum originally due to Seller in Dollars, Seller agrees to remit to Buyer such excess.

**6. EVENTS OF DEFAULT.**

The occurrence, at any time after the date hereof, of any of the following events shall constitute an "<u>Event of Default</u>":

(a) Default in the payment of any amount due under this Agreement or any writing executed at any time in connection with this Agreement

(b) Default in the performance or breach of any other covenant or agreement of Buyer or any Guarantor in this Agreement, any writing executed at any time in connection with this Agreement or any other agreement with Seller.

(c) Failure by Buyer to accept the Equipment due to conditions beyond Seller's control, including but not limited to the site not being ready for installation, or refusal by Buyer to accept the Equipment upon completion of the installation thereof.

(d) Any statement, representation or warranty of Buyer (or any officer, employee, agent or attorney of Buyer) or any Guarantor, including without limitation any statement, representation or warranty made in this Agreement or in any writing executed at any time in connection with this Agreement, shall prove to have been incorrect or misleading in any respect when made.

(e) Buyer or any Guarantor shall become insolvent, make an assignment for the benefit of creditors, apply for or consent to the application or suffer the appointment of any receiver, trustee or similar officer, or initiate or have initiated



**GE Healthcare**
General Electric Company

against it any act, process or proceeding under any insolvency, bankruptcy, reorganization, dissolution, liquidation or similar law.

(f)  Any uninsured loss, theft, substantial damage or destruction to Buyer's or any Guarantor's property, or the issuance of any writ, warrant, attachment, levy, garnishment, execution or similar process against any property of Buyer or any Guarantor.

(g)  Any Guarantor shall die, sell a substantial portion of its assets, or take any action to revoke or terminate the Guarantee, and the Buyer fails to secure a substitute comparable Guarantor.

(h)  Seller shall in good faith believe that the prospect for due and punctual payment or performance of any obligation under this Agreement or any other writing executed at any time in connection with this Agreement is materially impaired.

(i)  Buyer shall have failed to obtain any requisite foreign exchange control approvals and other authorizations by any competent authorities to assure the availability and transferability of Dollars to enable Buyer to perform its obligations hereunder, or such approvals and other authorizations shall have expired or shall have been revoked, canceled, terminated or otherwise shall have ceased to be in full force and effect for any reason.

## 7. REMEDIES

7.1.  Upon the occurrence of an Event of Default Seller may exercise any and all of the following rights and remedies:

(a)  Acceleration.  Seller may, to the extent permitted by law, declare the Financed Amount to be immediately due and payable whereupon the same shall become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Buyer.

(b)  Provide Insurance on the Equipment.  In the event Buyer shall fail to maintain insurance in the manner required hereby, Seller may (but shall not be obligated to) purchase such insurance, and in such event, Buyer shall, upon demand, reimburse Seller for the cost thereof, with interest thereon at 12% per annum, it being understood that such action by Seller shall not be deemed a cure or waiver of Buyer's default.

(c)  Penalty Interest.  If Buyer shall fail to pay when due (whether at maturity, by reason of acceleration or otherwise) all or any portion of any principal amount of or interest on the Financed Amount, to the extent permitted by applicable law, any such unpaid amount shall bear interest for each day, from and including the date it became due, to but excluding the date it is paid in full prior to 12:00 p.m. New

York time, at a rate per annum equal to the post-default rate specified in Schedule B (the "Post-Default Rate").  Nothing contained in this Agreement or any Note shall require or permit the collection of interest in the excess of the maximum amount permitted by applicable law.

## 8. REMEDIES CUMULATIVE.

All rights and remedies of Seller are cumulative and not exclusive.  Seller may exercise and enforce any of its other rights and remedies under this Agreement, any Note and/or any other writings executed in connection with this Agreement, and any other right and/or remedy available to it at law, in equity, or under any other agreement or writing.  In addition, Seller shall have the right to withhold shipment or delivery of any or all of the Equipment.

## 9. LIMITED WARRANTY.

Any warranties for the Equipment shall be as set forth in the warranty form attached as Schedule F and shall be subject to any additional exclusions and limitations set forth therein.  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT OR IN WARRANTY FORMS SPECIFICALLY DELIVERED TO BUYER, SELLER MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, USAGE OF TRADE, OR SAMPLES PREVIOUSLY SUPPLIED.

## 10. LIMITATION OF LIABILITY.

In no event, whether as a result of breach of contract, warranty, tort, (including negligence and strict liability) or otherwise, shall Seller's or its affiliates, distributors, agents, subcontractors', or suppliers' total liability to Buyer for any and all loss or damage arising out of, or resulting from, this Agreement or from its performance or breach, or from the Equipment or any Operating Package, as defined in Schedule D, or service exceed the price for the specific component of the Equipment, Operating Package or service which gives rise to the claim.  Any such liability shall terminate upon the expiration of the warranty period.  In no event, whether as a result of breach of contract, warranty, tort (including negligence and strict liability) or otherwise, shall Seller or its affiliates, distributors, agents, subcontractors, or suppliers be liable for any special, consequential, incidental or penal damages including but not limited to, loss of profit or revenue, loss of use of the Equipment or any Operating Package or any associated equipment, service materials or Software, as defined in Schedule D, damage to associated equipment, service material or Software, cost of capital, cost of substitute equipment, service materials or Software, facilities, services or replacement power, downtime costs or claims of Buyer's customers for such damages.  If Buyer transfers title to or

Confidential
Copyright © GE 2012

rev. 04/12



leases the Equipment sold hereunder to any third party, Buyer shall obtain from such third party a provision affording Seller and its affiliates, distributors, agents, subcontracts and suppliers the protection of the preceding sentence. If Seller or its affiliates, distributors, agents, subcontractors, or suppliers, furnish Buyer with advice or other assistance which concerns any of the Equipment or any Operating Package covered by this Agreement, or any system or equipment in which same may be installed or to which it might relate, and which is not required pursuant to this Agreement, the furnishing of such advice or assistance will not subject Seller and its affiliates, distributors, agents, subcontractors or suppliers to any liability, whether in contract, warranty, tort (including negligence and strict liability) or otherwise.

## 11. ASSIGNMENT.

Seller may sell, assign or otherwise transfer to one or more persons or entities all or any part of, Seller's rights hereunder, under any related documents, including, but not limited to, Seller's right in and to the Purchase Price. Buyer hereby waives an agrees no to assert any such assignee any defense, set-off recoupment or counterclaim which Buyer has or may at any time have against Seller for any reason whatsoever. Buyer may not sell, assign or otherwise transfer its rights or obligations hereunder or any interest herein, including by consolidation or merger, without Seller's prior written consent and any such sale, assignment or transfer without Seller's consent shall be null and void.

## 12. NOTICE.

All notices required or permitted to be given hereunder shall be in writing, and in English and shall be (a) personally delivered, (b) transmitted by telecopy facsimile, or (c) by an internationally recognized express delivery service postage and charges prepaid to the address for notice in the signature page (or such other address, as any party may hereafter specify by notice to the other party). In all case, notice shall be effective upon receipt if confirmed in writing (by a representative of the party or the courier service or, in the event of facsimile transmission, sender's fax machine confirmation of complete transmission).

## 13. MODIFICATION; WAIVER.

No modification or change may be made in this Agreement except by a writing signed by a duly authorized representative of each party. None of the conditions or provisions of this Agreement shall be held to have been waived by any act or knowledge on the part of either party, except by an instrument in writing signed by a duly authorized officer or representative of the parties.

## 14. CONSTRUCTION OF AGREEMENT AND RESOLUTION OF DISPUTES.

14.1. This Agreement shall be construed and governed according to the laws of the State of Florida applicable to contracts made and to be fully performed therein, excluding the United Nations Convention on Contracts for the International Sale of Goods and excluding the 1974 Convention on the Limitation Period in the International Sale of Goods (the "1974 Convention") and the Protocol amending the 1974 Convention, done at Vienna April 11, 1980.

14.2. The Guarantee shall be construed in accordance with the laws of Jamaica and shall extend to and ensure to the benefit of the successors and assigns of Seller and shall be binding upon the Guarantors and the heirs, executors, administrators and successors of the Guarantors. The Collateral shall be construed in accordance with the laws of Jamaica.

14.3. The parties irrevocably submit to the jurisdiction of the federal and state courts sitting in Miami, Florida, United States of America; and at the election only of the Seller, to the exclusion of the courts of any country which may have jurisdiction for the purpose of protecting and enforcing the Seller's rights either hereunder or pursuant to any other agreements, documents, instruments or otherwise, for the purposes of any suit, action or other proceeding arising in connection hereto or thereto, or the subject matter hereof or thereof, or any of the transactions contemplated hereby or thereby, brought by the Seller, or their respective successors, subrogees or assigns. For purposes of the Guarantee and the Collateral, the parties submit to the competent courts of [INSERT JURISDICTION WHERE THE COLLATERAL WILL BE LOCATED].

14.4. Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding relating to this Agreement in Miami, Florida, United States of America and further irrevocably waives any claim that Miami, Florida, United States of America is not a convenient forum for any such suit, action or proceeding.

14.5. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR COUNTERCLAIM ARISING UNDER OR IN ANY WAY RELATED TO THIS AGREEMENT, AND UNDER ANY THEORY OF LAW OR EQUITY, WHETHER NOW EXISTING OR HEREAFTER ARISING.

14.6. Buyer agrees to pay to Seller all expenses incurred or paid by Seller, including reasonable attorneys' fees and court costs, in connection with any Event of Default

## 15. ENTIRE AGREEMENT.

This Agreement constitutes the entire understanding among Seller and Buyer and supersedes all earlier or



**GE Healthcare**
General Electric Company

SEAL

contemporaneous agreements, whether written or oral, concerning the subject matter of this Agreement.

### 16. BENEFICIARIES.

The provisions of this Agreement are for the benefit of the parties hereto and not for any other person except as specifically provided herein.

### 17. SEVERABILITY.

If any provision of this Agreement is declared invalid or unenforceable by a court or arbitral tribunal having competent jurisdiction, it is mutually agreed that this Agreement shall endure except for the part declared invalid or unenforceable by order of such court.

### 16. COMMISSION FEE

The Buyer shall pay to Seller a commission fee of equal to 1% of the Financed Amount.

### 17. EXHIBITS.

The Schedules and Exhibits attached to this Agreement hereby are incorporated into and made a part of this Agreement.

### 18. COUNTERPARTS; EFFECTIVE DATE.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall become effective upon the signature of each of signatory parties (the "<u>Effective Date</u>"), subject to Section 4(e) above.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the day and year first above written.

**SELLER:**

GENERAL ELECTRIC COMPANY, through its
GE Healthcare division

Name: _____
_____, _____, 2016
20225 Watertower Boulevard Crossroads
Corporate Center XII
Brookfield, WI, 53045-3597,
Telephone:

**BUYER:**
X-RAY AND DIAGNOSTIC ULTRASOUND CONSULTANTS LIMITED

Name: Winston Franklin Barrington Clarke
Title: Managing Director
_____, _____, 2016
Address: 1 Ripon Road,  Kingston 5, Jamaica
Telephone:  (876) 929-0844;  (876) 929-0845; (876) 929-8140

**GUARANTOR:**
WINSTON FRANKLIN BARRINGTON CLARKE

ARTHUR HAMILTON
Attorney-at-Law
NOTARY PUBLIC
JAMAICA WEST INDIES

Winston Franklin Barrington Clarke  TRN  101455488
_____, _____, 2016
Address : 4 Margaret Drive, Kingston 6, Jamaica

**GUARANTOR:**
EILEEN PATRICIA CLARKE

ARTHUR HAMILTON
Attorney-at-Law
NOTARY PUBLIC
JAMAICA WEST INDIES

Eileen Patricia Clarke TRN 101455526
_____, _____, 2016
Address : 4 Margaret Drive, Kingston 6, Jamaica

ARTHUR HAMILTON
Attorney-at-Law
NOTARY PUBLIC

**GUARANTOR:**
THE RADIATION ONCOLOGY CENTRE OF JAMAICA LIMITED
TRN 001676032

JAMAICA WEST INDIES

Collie Roy Emanuel Miller - Managing Director
_____, _____, 2016
Address : Suite 3, 1 Ripon Road, Kingston 5, Jamaica
Phone: [876] 920 1823; [876] 920 8404;  [876] 960 0975

ARTHUR HAMILTON
Attorney-at-Law
NOTARY PUBLIC
JAMAICA WEST INDIES

Confidential
Copyright © GE 2012

A - 1

SCHEDULE A

DESCRIPTION OF EQUIPMENT

# HOTCELL

## 1. Double vertical cell for synthesis modules, COMECER model BBS2 V



- Stacked double cell, shielded housing for **2** synthesis modules.
- Supporting frame made of carbon steel and outer covering case made of AISI 304 stainless steel, with Scotch-Brite finishing.
- The joints between the various pieces are manufactured with TIG continuous welding in argon atmosphere.
- 2 working chambers (boxes) entirely made of AISI 316 L stainless steel, single-block, with Mirror-Brite finishing.
- Lead shielding on all sides with thickness 75 mm.
- Hinged front doors with electric lock, internal CCD camera with external monitor (each box).
- Air-tight system with acrylic screen and inflatable gaskets.
- If applicable, frontal air tightness between clean room and rear technical area can be achieved.

<u>Standard equipment for each box:</u>

- HMI touch screen allowing the complete management of the machine utilities, data display with recording and reporting parameters, alarms control.
- Internal lighting by led ceiling lamps;
- sealed cables entry;
- 4 connections for technical gases and compressed air;
- airtight and shielded inlets for radiofluids;
- 2 electrical supply sockets 110V-10/16A with individual control via an external button;
- filtering units consisting of absolute and activated charcoal filters;
- Steel tray on sliding guides allowing the easy extraction of the module for service maintenance.
- This hot cell model is equipped with a lateral column housing **2** technical compartments and 1 shielded compartment, which can be used to transfer the radiopharmaceutical outside the synthesis chambers, directly into a bulk vial housed inside a lead container.
- There are two electrical sockets of 110V-10/16A for each technical compartment (upper and lower).
- Two PC holders located at the front, movable sideways.
- Air quality: Class B – ISO5
  *OPTIONAL: GM probe for the detection of radioactivity level inside the box and door interlock*

<u>SPECIFICATIONS:</u>

- Overall external dimensions: 1412 x 1115 x 2400 mm (w x d x h)
- Internal net dimensions of each box: 634 x 735 x 674 mm(w x d x h)
- Net tray dimensions: 600 x 500 mm (w x d)

- Power supply:
  - 230V 50/60Hz 16A (Europe, Australia, Korea)
  - 208V/120V (3Ph + N+PE –GRD-) 60Hz 15A (America, Japan)
- Weight: 9000 kg

## 2. Automatic dispenser for syringes in sterile environment with pre-chamber COMECER model ALTHEA-PC



- The Althea-PC cell for automatic dispensing has been designed for the preparation of syringes containing calibrated doses of radio-pharmaceuticals, while maintaining sterile conditions.
- Supporting frame made of carbon steel and outer covering case made of AISI 304 stainless steel, with Scotch-Brite finishing
- Air-tight system with inflatable gaskets
- Lead shielding on all sides with 50 mm of thickness
- The front door is shielded with 60 mm of lead.
- Hinged front door with electric lock and shielded glass window, lead equivalence of 60 mm and dimensions 300 x 200 mm (w x h) . 2 airtight hand ports with gloves.
- Working chamber (box) entirely made of AISI 316L stainless steel, single-block, with Mirror-Brite finishing, housing the syringe dispensing system.

ALTHEA-PC is equipped with a ventilated airtight pre-chamber located under the work top (class B), used for the introduction of multi-doses vials / disposables and with a syringe extraction system (DWS) enabling to send a filled and calibrated syringe directly to shielded transport container, via a ventilated duct .

Fractionator:

    a)   allows completely automatic syringe mono-dose filling;
    b)   possibility to order a certain activity at a given time;
    c)   possibility to select and adjust the volume inside the syringe;
    d)   records of the performed operations in the supplied PC.

The machine includes 2 dose calibrators, one for the bulk vial and one for the syringe during the filling process; Althea-PC is equipped with 2 PCs, housed on a special console mounted at the front of the machine. One PC is used to manage the automatic filling process and dose calibration, the other one is a touch screen panel, used to perform full set of quality control software routines including linearity test (sample and decay mode), range selection is automatic (Autorange), or user-adjustable.

The disposable fillings kits are supplied by Comecer.
Air quality: COMECER Laminar Flow Re-circulation System Class A

Starting set included at delivery of Althea-PC: 5 tungsten syringe shields (PST), 1 lead transport container (CF18), 20 disposable kits A Gemini (3821402005), 20 perforating sets(38A1A10008) and 60 disposable kits B Gemini (3821402004).

SPECIFICATIONS:
    Outer dimensions: (w x d x h) 1272 x 1025 x 2400 mm
    Inner box dimensions: (w x d x h) 900 x 500 x 738 mm
    Weight 6900 kg

A - 4

### 3.  Tungsten container for syringe transport COMECER model CTS



Completely made of tungsten, 5,5 mm of thickness,  designed for the safe transport of a filled 10 ml or 5 ml syringe with pierceable cap: the syringe is housed inside a further tungsten shield, Comecer model PST (5,5 mm of thickness).
Equipped with handle.

Pit dimensions: 33 x 179 mm (d x h)
Total external dimensions: 120 x 90 x 275 mm (w x d x h)
Total weight: ~ 4,8 kg
Total weight of CTS container + PST shield: ~ 5,4 kg

A - 5

# FUME HOODS

**4. Radiochemistry hood for class 2 laboratories, COMECER model FHR 3**



- Completely made of AISI 304 stainless steel with a structure that can be completely decontaminated and perfectly welded junctions, without continuity solution.
- Work top with raised edge for liquid containment.
- Double walled aspiration system, frontal air speed of 50 cm/sec .
- Filtration system with absolute and activated carbon filters.
- Controlled discharge of radioactive liquid waste into a polyethylene bin with a capacity of 20 liters.
- Automatic interruption of the water flow when the container is full.
- Remote control for adjusting the hot/cold water.
- Gas spout with remote control
- Electrical system in compliance. with CEI standards.
- 2 inter-locked electrical outlets 2P+T 16A.

**SPECIFICATIONS:**
- Dimensions: 1200 x 750 x 2600 mm (w x d x h)
- Power supply: 230V 50Hz 16A
- Weight: 350 kg

## 5. Radiochemistry hood with unidirectional flow, COMECER model FHR SSC



- This containment hood guarantees the maximum protection for the operator, the working area and for the manipulated product, whilst maintaining sterility.
- Biological cabinet class II A, with frontal opening allowing air inlet, characterised by unidirectional vertical flow on the work bench. The inlet air is filtered through a HEPA filter. The air quality of the hood can be classified as "Class A". It is normally used for the introduction of materials in production lines for the pharmaceutical industry and to handle the reagents of the radiochemistry synthesis modules.

**Standard equipment:**

- Frontal Plexiglas screen with latch opening;
- filtration system with HEPA filter
- electrical system in compliance with CE standards;
- lighting with neon lamps;
- manometer to monitor the filters obstruction, with alarm warning light;
- technical compartment with door and key lock;
- air extraction fan.

A - 7

# CONTAINERS & ACCESSORIES

## 6. Tungsten shield for syringes, COMECER model PST



Tungsten shield for 5 cc syringes.
Shielding varies from 4 to 7 mm: in order to make the syringe handling easier, PST shield is equipped with an ergonomic notch in the central part.

Inner dimensions 13,8 x 51 mm
Weight 0,350 kg

## 7. 511 "L" Block Table Top Shield



The newly designed 511 "L" Block Shield is placed in front of the Drawing and used to provide a protected work area for safe handling of 511 keV The front wall and the base of the unit are constructed of steel with buil shielding. A 4" thick lead glass window offers maximum protection and a unrestricted viewing area. In addition, the lead glass is protected from so chips by a sheet

• The fixed angle design of the lead glass allows easier viewing.
• Contains two sheets of 1¼4" window glass to protect lead glass from s and chips (industry exclusive).
• 20 1/4" H x 14" W x 14" D (51 x 35.5 x 35.5 cm)
• 8" H x 8" W x 4" D (51 x 51 x 25 cm) 5.2 g/cc density lead glass.
• Weight: 195 lb. (89 kg)

A - 8

## 8.  Painted Chevron Brick Kit 12 " H x 28"



Larger 3 sided cave provides flexible placement of L block, easy side access, and more room for source storage
Used for the 511 L Block Table Top Shield.

Specifications

• Lead Brick Enclosure 2 " lead
• 28 " wide x 12 " height x 16 " deep (outer)

• Weight 550 lbs

# VALIDATIONS AND TECHNICAL DOCUMENTATION

## FAT & SAT (Protocol and Documentation)

**Offer includes:**

Comecer supplies FAT (Factory Acceptance Test) protocol validation for every Hot Cell.
Comecer performs SAT (Site Acceptance Test) and supply (if requested, quoted and ordered) the IQ & OQ protocols (Installation Qualification & Operational Qualification).

The validation protocols comply with the following standards:

ISO 14644 (Cleanrooms and associated controlled Environments)
ISO 10648 (Containment enclosures)
EEC-GMP (Good Manufacturing Practice - Annex 1 Manufacture of sterile Medicinal Products)
PDA – TR Nr 34 (Design and Validation of Isolator Systems for the Manufacturing and Testing of Health Care Products)

Validation is a documented activity performed with the empty hot cell under real working conditions. The process is designed to prove that the hot cell will perform as specified within the required conditions.

**Offer does not include:**

- On site unloading of the material from the truck and transfer into the room (rigging)
- Building construction
- Local duties and taxes

**Hot Cells Supply Limit:**

- Connexions of the Electrical Feeding Cabinets to the line protected by an Automatic Circuit Breaker and a Safety Switch.
- Realization of the Air Extracting Piping from the flanges located in the upper part of the Cells.
- Realization of the Technical Gases & Compressed Air Lines, with pression reductor, located near the upper part of the Cells.
- Verification of the Floor Load Capacity and of the Doors and Corridors Net Opening (l. x h.) following the Weights and Dimensions given by Comecer.

**Comecer will supply:**

- FAT (Factory Acceptance Test) Protocols for the Lab. Validation [2]
- SAT (Site Acceptance Test) [1] [3]
- One day full - training on our equipment package [1]
- One documentation package including:

    - Performed FAT Protocol
    - Maintenance and User's manual in English
    - Recommended spare parts list (included in the maintenance manual)
    - Certificate of compliance

- As built technical drawings (electrical, mechanical, pneumatic & process schemes)
- Materials certificates/data sheets
- Main equipments data sheets
- Instruments calibration certificates
- Welding Processes qualification

*(1) Please Note:*

*the Training and the SAT are included in the price of this offer on condition that they will take place the last days of the installation. If, for any reason not depending from Comecer, the realization of the Training and the SAT will have to be postponed, an additional quotation will have to be submitted to you.*

*(2) FAT (Factory Acceptance Test)*

*The complete validation test for Hot Cells/Dispensing systems/Isolators will be performed at Comecer 's site. The FAT protocol will  include the following tests:*
*Test Instrument Data (Calibration Certificates of the reference instruments)*
*System Documentation Verification (documents list for the equipment qualification)*
*Construction Design Verification ("As Built drawings and schemes")*
*Main Equipment Specification Verification (correspondence with the design)*
*Functionality/Interlocks Verification (Mechanical & Software)*
*Glove Breach Test (only where gloves provided)*
*Unidirectional Air Flow Verification (Smoke pattern test - only with Laminar flow)*
*Air Change Rate*
*Air Velocity Verification (only with Laminar flow)*
*Filter Leakage (Integrity test)*
*Leak tightness Test (only if applicable)*
*Non Viable Particle Counts (Air classification)*

*(3) SAT (Site Acceptance Test)*

*The SAT will include the following tests:*
*Finishing Visual check*
*Main components visual check*
*Internal cell pressure and ventilation setting*
*Utilities functionality and setting check*
*Operating functionality verification*
*Safety devices and interlocks check*
*Operator's training*
*Delivery of the performed FAT protocol and documentation package*

## IQ & OQ (Installation Qualification and Operational Qualification)

If requested, as an additional service, Comecer can perform IQ-OQ validation on customer's site. The IQ-OQ validation will be performed by qualified technicians (Comecer Validation Dept.) and the protocol will include the complete tests list as performed during the FAT, repeated again on customer's site.

A - 12

## IQ Medical Services Warranty Statement Guidelines

### Limited Warranty

Subject to the terms and conditions of this warranty statement, and for the applicable limited period of time specified below (the "Warranty Period"), IQ Medical Services (IQMS) warrants that (a) the product will meet the manufacturer's specifications and will be free of material defects in materials and workmanship; (b) with respect to products that consist of software and instrumentation, such software and instrumentation will operate in substantial conformity with its published documentation when properly installed and used in accordance with its documentation; and (c) services performed by IQMS in connection with such equipment, such as site supervision and installation services relating to the equipment, shall be free from defects.

| Product | Warranty Period |
|---------|-----------------|
| Products listed under Appendix A (Products under extended warranty) of this Statement with purchased Installation and qualification (IQ/OQ) | One (1) year from the earlier of (a) the installation date*; or (b) the sixth month after the date of shipment. |
| Software applications | Ninety (90) days and limited solely to replacement of the defective Item from the date of shipment. |
| Services | One (1) year from the date of performance of such services |
| Consumables | No warranty provided. |
| Spare Parts | Ninety (90) days from the date of shipment. |
| All other Products | One (1) year from the date of shipment. |

*Installation date is defined as the date IQ/OQ documentation is signed-off by IQMS representative and the customer.

"Consumables" mean any material, part, component or chemical which is consumed or worn away in the normal course of use, including but not limited to gases, solvents, chemicals, calibration standards, glassware, syringes, needles, septa, peristaltic pump tubing, auto sampler vials & caps, sample cups, sample cells, diskettes, tape cartridges, printer ribbons, cartridges, printer paper, TCD filaments, NPD beads, DELCD heaters, FPD photomultiplier tubes, ECD detector cells, lamps, heaters, septa, traps, filters, HPLC columns, syringes, etc.

### Service Response Time

- Calls and emails will be responded within 8 hours of first contact 5 days a week (excluding US weekends and holidays).

- Replacement parts will be available for shipment within 24 hours of IQMS expert confirmation (excluding weekends and US holidays)

- On site response time within 72 hours once on-site support is approved by IQMS and confirmation spare parts are on site.

- IQMS will provide a 24/5 remote global support with an 4-8 hour response time.  Customer can also email us at support@iqmedicalservices.com with a 4-8 hour response time.

US:
+1 -253-274-6188
+1  800-890-1334
EU & Middle East & Africa
+46-18-495-1128
+36-21-252-3509__

Asia & Pacific
+85-28-124-5757

Australia
+61-28-006-1999

## Warranty Remedies

Any product that fails to conform to the foregoing warranty during its stated Warranty Period will be repaired or replaced at the sole discretion of IQMS at the manufacturer's facility provided that Buyer:

(1) Provides written notice of the defect to IQMS promptly after BUYER discovers or should have discovered the defect, AND

(2) Returns the defective article, properly packed with all freight charges prepaid, to the IQMS factory in Miami, Florida (or to an alternative location designated by IQMS), in accordance with IQMS's return process described below.

If the Product is listed under Appendix A (Products under extended warranty), IQMS will either send the customer a replacement unit (loaner program) or local representative from the manufacturer or IQMS personnel will be dispatched to the site.

Loaner Program:

- IQMS offers a replacement item that will be in stock at IQMS's warehouse in Miami, Florida. The replacement item will be shipped to the address specified by the Customer within 24 hours of the request (excluding US weekends and holidays).
- The damaged item will need to be returned to IQMS in Miami, Florida. The item needs to be packaged in the original crating or box or equivalent to prevent damage during transit.
- IQMS will charge the customer a penalty fee of $100 USD per day if the damaged equipment is not sent back to IQMS within 20 days of the end customer having the loaner or replacement equipment delivered to the site.

Local Manufacturer Support:

- The local manufacturer vendor or distributor for the product will provide the service support. In case the manufacturer does not have a local representation, IQMS will send their qualified service technician to fix the issue. In the event the issue cannot be fixed, IQMS will replace the equipment.

Buyer's sole and exclusive remedy, and IQMS's sole liability, for any nonconformity to this limited warranty is repair or replacement of defective articles or parts, or, if IQMS determines that it is commercially infeasible to repair or replace such defective items, to issue a refund equal to the net price paid for such defective articles or parts. For the avoidance of doubt, minor deviations from specification, which do not affect performance of the articles, shall not constitute material defects in breach of the foregoing warranty.

This warranty is limited to the original BUYER and is not transferable.

## Exclusions

The foregoing warranty shall not apply to defects resulting from:

i.   Equipment which has been altered or modified without supplier's written permission or damage which has been caused by abuse, misuse, accident, neglect or unusual physical or electrical stress, as determined by Supplier.
ii.  Adjustment or repair is required because of damage caused by other than ordinary use or if the Equipment is serviced or repaired, or if an attempt is made to service.
iii. Improper or inadequate maintenance, adjustment, calibration or operation by BUYER.
iv.  BUYER-supplied software, hardware, interfacing, or consumables.
v.   Operation outside of the environmental and electrical specifications for the product.
vi.  Improper site preparation and maintenance; or BUYER-induced contamination or leaks.
vii. The serial number or date code has not been removed, defaced, or otherwise changed.

viii. Detector damage due to neutrons or heavy charged particles. Failure of beryllium, carbon composite, or polymer windows or of windowless detectors caused by physical or chemical damage from the environment is not covered by warranty.

ix. Damage sustained in transit. Buyer should examine shipments upon receipt for evidence of damage caused in transit. If damage is found, notify IQMS and the carrier immediately. Keep all packages, materials and documents, including the freight bill, invoice and packing list.

Statements made by any person, including by representatives of IQMS, which are inconsistent or in conflict with the terms of this warranty shall not be binding upon IQMS unless reduced to writing and signed by an officer of IQMS.

**Return Policy and Process**

In the event that a part needs to be sent back to the supplier for repair, the customer must receive return goods authorization (RGA) first. The product must be returned in their original crating or boxing or equivalent to prevent damage during transit.

The customer will be responsible for all shipping, customs and duties charges for importing and exporting the item into and out of the local country.

Replacements will be on an exchange basis without further credit and all replaced parts or articles will become the property of IQ Medical Services.

A - 15

**Appendix A**
**Products Under Extended Warranty**

| Equipment Description | Brand | Model |
|---|---|---|
| Gas Chromatograph GC436 w FID* | Bruker | GC436 |
| GC Autoinjector* | Bruker | 8410 |
| High Performance Liquid Chromatography HPLC* | Dionex (Thermo Scientific) | ICS 5000 & ICS 1600 |
| Multichannel Analyzer System | Canberra Industries | OSPREY & Detector 2"X2" |
| TLC Scanner | Carroll & Ramsey | EZ Scan TLC |
| Radioactivity Detector | Carroll & Ramsey | C105S |
| Peak Simple Data System Interface | SRI Instruments | Model 302 |
| LAL Tester | Charles River Laboratories | PTS 550 Reader |
| Dose Calibrator | Capintec | CRC-25PET & CRC-55tPET |
| pH Meter | Mettler Toledo | S40 |
| Balance | Mettler Toledo | XS204 |
| Telemanipulator | Tru Motion | Telemanipulator 2748-10L |
| General Purpose Ratemeter | Ludlum Measurement Instruments | Model 14C |
| Pancake GM Detector | Ludlum Measurement Instruments | Model 44-9 |
| Area Monitor Controller | Ludlum Measurement Instruments | Model M375 |
| Alpha Beta Gamma Foot Monitor Detector | Ludlum Measurement Instruments | Model 44-26 |
| Personal Dosimeter | Arrow Tech | RAD-60R |
| Stack Monitoring Channel Detector | Rotem Industries | PM11 |
| Stack Monitoring Channel Detector | Rotem Industries | GM42 |
| Cyclotron vault area monitoring | Rotem Industries | GM-41 |
| Local Alarm Unit | Rotem Industries | BAK-2850 |

* These Products are not covered under the Loaner Program, instead local support is provided.

A - 16

## Appendix B
## IQ MEDICAL SERVICES
## TERMS AND CONDITIONS OF SALE

**1. ENTIRE AGREEMENT.** These Terms and Conditions of Sale ("Terms") shall apply to the sale by IQ Medical Services, and in the Support Agreement Acceptance form, Quotation, Sales Order, Acknowledgment, Purchase Order, web page or other contract documentation to which these Terms are attached, incorporated by reference and made an integral part (the "Contract Documents") with respect to the equipment described in the Contract Documents ("Equipment"),  such services being hereafter collectively referred to as the "Services".  Except as expressly agreed by authorized representatives of both parties in writing, no other terms and conditions, including any terms and conditions attached to Buyer's request for quotation, acknowledgment, purchase order or other contract documentation, shall apply to IQ Medical Services' sale of the Services.  IQ Medical Services' performance of any purchase order or contract is expressly conditioned on Buyer's acceptance of these Terms. As used herein, "Contract" refers to the applicable order pursuant to which IQ Medical Services is selling the Services to Buyer.

**2. EQUIPMENT ELIGIBILITY.** Each item of Equipment must be placed in good operating condition at Buyer's expense prior to coverage under this Contract.

**3.**  **EXCLUSIONS.** This Contract does not cover, and IQ Medical Services shall have no obligation to provide Services with respect to (i) equipment, components, software or accessories not supplied or licensed by IQ Medical Services; (ii) contamination, however caused; (iii) Consumables, as defined below; (iv) any components that directly contact any sample; (v) elements, including but not limited to photomultiplier tubes, mirrors, lenses, windows, gratings, optical filters, or electron multipliers; (vi) maintenance and parts needed due to applications or method development; (vii) Equipment out of production for more than three (3) years for which parts are no longer available; (viii) Equipment not yet eligible for coverage as set forth in Section 2; (ix) Equipment which has been moved from its original location; (x) Equipment which has been abused, altered, misused, operated or maintained improperly, used in an unsuitable physical environment, or used with inadequate facilities or utilities; (xi) software installation or modification of hardware to make it software compatible; (xii) computer processing units (CPUs); or (xiii) any condition which is defined as a Buyer responsibility under Section 8 below or which results from Buyer's failure to fulfill such a responsibility.
"Consumables" means any material, part, component or chemical which is consumed or worn away in the normal course of use, including but not limited to gases, solvents, chemicals, calibration standards, glassware, syringes, needles, septa, peristaltic pump tubing, auto sampler vials & caps, sample cups, sample cells, diskettes, tape cartridges, printer ribbons, cartridges, printer paper.

**4. PRICE.** All Services are included in the fixed or periodic price set forth in the Contract Documents (the "Price") unless specifically priced therein as a separate line item, excluded from coverage as set forth in Section 3, or performed outside normal working hours.  All other service, parts, travel, shipping, or other expenses incurred by IQ Medical Services will be invoiced to Buyer at IQ Medical Services' then current and applicable rates.  Prices are subject to change without notice and orders will be invoiced at prices in effect at the time of the order placement. All stenographical and clerical errors are subject to correction.

**5. PAYMENT.** If IQ Medical Services extends credit to the Buyer, terms of payment shall be net 30 days from invoice date unless otherwise specifically agreed to by IQ Medical Services. Finance charges shall be assessed on any amounts outstanding after 30 days in the amount of 1.5% per month of the unpaid balance.  All costs related to collections on unpaid balances will be billed to the Buyer. All monies paid by Buyer hereunder (including but not limited to the Price) are non-refundable for any reason. If purchase is being made from outside the United States of America, payment shall be in lawful, unblocked, free United States dollar exchange. IQ Medical Services reserves the right to withdraw any offer to sell or to cancel any agreement prior to shipment of goods if, in IQ Medical Services' sole judgment, Buyer's credit record is inadequate. IQ Medical Services also reserves the right to change the credit terms, or to withdraw credit.

**6. CANCELATION.** Buyer may not cancel this order, or any portion thereof, except upon written notice to Seller and upon payment to Seller of the cancellation charges specified below. Buyer acknowledges that such charges have been agreed upon, not as a penalty, but as a result of the difficulty of computing actual damages and the inconvenience and non-feasibility of Seller otherwise obtaining an adequate remedy. Such cancellation charges are as follows:
Cancellation Notice Received Prior to Scheduled Delivery 60 days or more Cancellation Charges (Percentage of Sales Price of Goods and/or Services) 25%
Cancellation Notice Received Prior to Scheduled Delivery less than 60 days Cancellation Charges (Percentage of Sales Price of Goods and/or Services) 35%
Buyer may not cancel any order, or portion thereof, after shipment. Buyer may not reschedule or change any order, or portion thereof, without Seller's prior written consent.

**7. TAXES AND OTHER CHARGES.** Buyer is responsible for all sales, use, property, license, value added, excise or similar taxes, federal, state, or local that are imposed on or with respect to the products or their delivery, sales, use, ownership or possession, and for all international packing charges, inspection fees, agent and trading company fees, customs and consular fees, duties, imposts and similar charges. Buyer shall pay such taxes and charges and indemnify IQ Medical Services against all liability for such. Unless separately stated, all prices will be quoted, all orders accepted, and all billings rendered exclusive of such taxes and charges. When separately stated, Buyer shall pay IQ Medical Services such taxes and charges for purposes of collection and IQ Medical Services shall remit the proceeds of such collection to the appropriate authority.

**8. BUYER RESPONSIBILITIES.** Buyer shall:  (i) perform routine operation and maintenance procedures as outlined in the instruction manual(s) and this Contract; (ii) maintain any gas line filters; (iii) ensure that the recommended grade of gas is used with the Equipment; (iv) comply with all laws and regulations applicable to the Equipment and any workspace accessed by IQ Medical Services representatives, including but not limited to those pertaining to worker safety and to the handling, packaging, transport and disposal of hazardous material; (iv) provide IQ Medical Services representatives a safe environment in which to work and inform them of any hazardous materials in use and/or hazardous conditions affecting the area which they are working; (v)  replace and dispose of any roughing pump oil used with the Equipment; (vi) ensure the use of high-grade acetone packed acetylene and clean air with any gas control unit;  (vii) ensure no acetylene tanks have been operated below 100 PSI; (viii) ensure all air used with air compressors has passed through a filter and oil and water trap.

**9. SHIPMENTS.** All products are shipped F.O.B., point of shipment. Risk of loss shall transfer to the Buyer upon tender of goods to Buyer, Buyer's representative, or common carrier. The cost of any special packing or special handling caused by Buyer's requirements or requests shall be added to the amount of the order. If Buyer causes or requests a shipment delay, or if Seller ships or delivers the products erroneously as a result of inaccurate, incomplete or misleading information supplied by Buyer or its agents or employees, storage and all other additional costs and risks shall be borne solely by Buyer. Claims for products damaged or lost in transit should be made by Buyer to the carrier, as Seller's responsibility ceases upon tender of goods to Buyer, Buyer's representative or common carrier.

**10. TERMINATION.** IQ Medical Services may, in its sole discretion, terminate this Contract without liability or refund, effective upon written notice, if: (i) any amount payable hereunder remains unpaid for fifteen (15) days; (ii) Buyer becomes bankrupt or insolvent, or a receiver is appointed for all or part of the Buyer's business; or (iii) the total value of the Services, including routine service and parts, at IQ Medical Services' then current rates, exceeds three times the Price, or three times amount of payments received by IQ Medical Services hereunder.  No cancellation or termination of this Contract is permitted by either party except as expressly stated in this Section 10.

**11. ASSIGNMENT.** Buyer may not assign this Contract or any rights hereunder without the prior written consent of IQ Medical Services, and any attempted Buyer assignment without such consent shall be void from the outset.
**12. DAMAGES.** In no event shall IQ Medical Services or Buyer be liable to the other or their respective affiliates for incidental, consequential, indirect, punitive, or special loss or damages of any kind, including but not limited to lost revenues, lost profits, loss of goodwill or lost production, however caused, whether based on contract, tort (including negligence) or any other legal theory. The aggregate liability of IQ Medical Services' total liability in damages or otherwise to Buyer and its affiliates shall not exceed payments received by IQ Medical Services under the Contract.

**12. LIMITED WARRANTY AND LIMITATION OF LIABILITY.** IQ Medical Services warrants its products to be free from defects in materials and workmanship, subject to the following terms and conditions: Without charge, IQ Medical Services will repair or replace products found to be defective in materials or workmanship within the warranty period; provided that:

a) the product has not been subjected to abuse, neglect, accident, incorrect wiring not our own, improper installation or servicing, or use in violation of instructions furnished by IQ Medical Services;

b) the product has not been repaired or altered by anyone except IQ Medical Services or its authorized service agencies,

c) the serial number or date code has not been removed, defaced, or otherwise changed; and

d) examination discloses, in the judgment of IQ Medical Services, the defect in materials or workmanship developed under normal installation, use and service;

e) IQ Medical Services is notified in advance of and the product is returned to IQ Medical Services transportation prepaid.

THE FOREGOING WARRANTY IS IN LIEU OF ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR MERCHANTABILITY FOR A PARTICULAR PURPOSE. IQ MEDICAL SERVICES' LIABILITY FOR BREACH OF WARRANTY IS LIMITED TO REPAIR OR REPLACEMENT, OR IF THE GOODS CANNOT BE REPAIRED OR REPLACED, TO A REFUND OF THE PURCHASE PRICE. IQ MEDICAL SERVICES' LIABILITY FOR ALL OTHER BREACHES IS LIMITED TO A REFUND OF THE PURCHASE PRICE. IN NO INSTANCE SHALL IQ MEDICAL SERVICES BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING FROM A BREACH OF WARRANTY, OR FROM THE USE OR INSTALLATION OF ITS PRODUCTS. No representative or person is authorized to give any warranty other than as set out above or to assume for IQ MEDICAL SERVICES any other liability in connection with the sale of its products.

13. **INDEMNITY.** Buyer shall indemnify, defend and hold harmless IQ Medical Services from any and all claims, damages, injuries or liabilities arising from, or in any way related to, use, operation or service of Equipment unless solely and proximately caused by the negligence of IQ Medical Services.

14. **FORCE MAJEURE.** Neither IQ Medical Services, nor Buyer shall be liable to the other for failure to perform any obligation under the Contract to the extent such failure is due to labor unrest, riot, war, fire, accident, weather or other natural disasters, lack of energy supplies, supplier delays, compliance with law, failure to obtain all necessary licenses, permits or approvals after reasonable efforts, or any unforeseen circumstances or other causes beyond such party's reasonable control.

15. **SOLE TERMS.** These Terms and the Contract Documents of which they are a part set forth the entire agreement between IQ Medical Services and Buyer with respect to their subject matter and supersede all previous written or oral agreements and understandings between IQ Medical Services and Buyer. These Terms and the Contract Documents may not be amended nor may compliance with any provision herein or therein be waived, except by a written document duly and validly executed by both IQ Medical Services and Buyer, or in the case of a waiver, the party waiving compliance. Any part of these Terms held to be void, invalid or unenforceable shall be treated as severable, leaving valid the remaining Terms.

16. **GOVERNING LAW.** This Agreement has been entered into and shall be construed and enforced in accordance with the laws of the State of Florida without reference to the choice of law principles thereof. Venue and jurisdiction for any proceedings arising out of this Agreement shall lay exclusively in the state and federal courts of Miami Dade County, Florida. The applicability of the UN Convention on Contracts for the International Sale of Goods is hereby expressly waived by the parties and it shall not apply to the terms and conditions of this Agreement.

A-18



***CONFIDENTIALITY NOTICE*** Information contained in this document, together with any other documents or attachments, is privileged and confidential, and is intended only for the use of the individual or entity to which it is addressed. This transmission may contain information or materials protected by the applicable laws of the State of Florida. The authorized recipient of this information is STRICTLY PROHIBITED from disclosing this information after its stated need has been fulfilled. Misuse or distribution of the information contained in this transmission is punishable by civil and/or criminal penalties under state or federal law. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, saving, printing, copying, or action taken in reliance on the contents of these documents of this message, or any attachment, is strictly prohibited. Please notify the original sender (only) immediately by telephone or by reply e-mail and delete this document, along with any attachments from your computer immediately.

***GENERAL NOTICE*** In the event that at the time of shipping of the order IQ Medical Services can't provide a product offered, IQ Medical Services reserves the right to provide an equivalent product with prior customer approval.

A - 19

Quotation Number: PR2-C51772 Version 2

Xray Diagnostic U Snd Ltd
2 Ripon Road
Kingston 03 00000

Attn: Freddie Clarke

Date: 06-04-2015

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| 1 | | **FASTlab** |

**P5370KF**

**FL COLLECTION CONS. (10)**
FASTlab tracer collection accessories (box of 10 accessory packs)
- FASTlab tracer collection accessories include everything that is required to collect the tracer produced by a FASTlab synthesizer. The accessories with its components are manufactured in a controlled environment and accompanied with a certificate of analysis. Each cassette pack includes: 1 x FASTlab 25mL sterile product collection vial
- 1 x 0.22 mm sterile liquid filter
- 1 x 0.22 mm sterile glass filter
- 2 x sterile needles

1   S9170DA

**FASTLAB 2 MULTI-TRACER**
FASTlab 2 Multi-Tracer Synthesizer
The GE FASTlab 2 Multi-Tracer Synthesizer is a versatile and automated PET radiochemistry synthesis platform for easy and efficient production of F18-fluorine based PET-tracers. The application for production of 2-deoxy-2 F18 fluoro-D-glucose (F18 FDG), the most widely used PET compound is supplied as a standard with the equipment. F18 fluoride is produced by a cyclotron (for example GE PETtrace or MINItrace) and converted into F18 FDG in less than 23 min with 68% uncorrected yield. The user simply plugs in the FASTlab cassette pre-loaded with chemicals and the system is ready for processing. An integrated RFID system automatically determines the synthesis program to be run according to the cassette used, eliminating the need for reprogramming or reconfiguring the module. The chemicals only come in contact with the cassette, ensuring a clean operation every time.
The system includes: oP5370DA FASTlab 2 Synthesizer process module(1) o P5370DB FASTlab 2 Synthesizer computer (1) o P5370DC FASTlab 2 Synthesizer software and documentation (1)

1   P5370KI

**PACK 5 FDG DUO CASSETTES**
1 installation pack of 5 FASTlab PET-FDG Duo citrate cassettes integrated with reagents. For installation only. This cassette can be used on the FASTlab 2 synthesizer to produce 2 FDG citrate batches using 1 cassette.

A - 20

Quotation Number: PR2-C51772 Version 2

1      P5450DC      CHEMISTRY APPLICATIONS 4 DAYS
App Training TRACERlab 4 days
This is the 4 day application training package for the GE TRACERlab FX series systems
The training includes theoretical and practical training for up to 2 operator based on available GE
documentation for the selected TRACERlab FX modules onsite.
This session is delivered by a qualified GE L3 engineer.
Total 4 days onsite

1                **NonProducts**

1                Synthesis module transportation

**Quote Summary:**

125,000.00

**SCHEDULE B**

All terms not otherwise defined herein shall have the meanings given to them in the Agreement to which this Schedule B is attached.

I.   **PURCHASE PRICE**

US$933,250.00 (Nine Hundred Thirty Three Thousand Two Hundred Fifty Dollars and 00/100 Dollars).

II.   **DOWN PAYMENT**

US$318,650.00 (Three Hundred Eighteen Thousand Six Hundred Fifty Dollars and 00/100 Dollars).

III.   **FINANCED AMOUNT**

US$614,600.00 (Six Hundred Fourteen Thousand Six Hundred Dollars and 00/100 Dollars).

III.   **INTEREST COMMENCEMENT DATE**

The Interest Commencement Date shall be the date of acceptance of the Equipment.

IV.   **CONTRACTUAL RATE**

The Contractual Rate shall be, in relation to any quarterly interest period, the rate of interest per annum equal to two and one-half percent (2.5%) per annum (the "Margin") above 3-Month LIBOR (as hereinafter defined).

The payment of interest shall be calculated on the basis of a year of 360 days and the actual number of days actually elapsed.

"LIBOR" means, in relation to any Interest Period, the rate of interest per annum (rounded upward, if necessary, to the nearest 1/16 of 1%) quoted by the principal London office of General Electric Capital Corporation or an affiliate of General Electric Capital Corporation designated by General Electric Capital Corporation at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for the offering to leading banks in the London interbank market of United States Dollar deposits for three months and in an amount comparable to the principal amount upon which interest is to be paid during such Interest Period.

"Interest Period" means (i) the period commencing on the date of disbursement of the Financed Amount and extending up to, but not including, the next Payment Date; provided, however, that if such date of disbursement is within sixty (60) days of such Payment Date, the Interest Period shall end on the next succeeding Payment Date; and (ii) thereafter the period commencing on each Payment Date and extending up to, but not including, the next Payment Date.

V.   **POST-DEFAULT RATE**

The Post-Default Rate shall be twelve and one-half percent (12.5%) per annum, on the basis of a year of 360 days and the actual number of days actually elapsed.

Confidential
Copyright © GE 2012

rev. 04/12

VI.    DISBURSEMENT

The Financed Amount shall be disbursed as follows:

Within _____ ( ) days of the Interest Commencement Date, the sum of US$324,800.00 shall be disbursed to the account of IQ Medical Services LLC, account number ██████████, at the Sabadell United Bank N.A., Swift Code SAUBUS3M and ABA ████████, for the purchase of the Hotcells & Accesories.

Within _____ ( ) days of the Interest Commencement Date, the sum of US$289,800.00 shall be disbursed to the account of GE Medical Systems in the Pittsburgh National Bank, account number ___1-████████, SWIFT CODE: _PNCCUS33, y ABA 043-000096; for the purchase of the Synthesis Box-Fastlab Equipment.

Confidential
Copyright © GE 2012

rev. 04/12

## SCHEDULE C

## STANDARD TERMS AND CONDITIONS

1. **DELIVERY.**

    (a)     Seller shall deliver the Equipment CIF Kingston 5Jamaica Incoterms 2010.   All risk of loss or damage passes to Buyer onboard of the vessel at the port of shipment.

    (b)     Equipment may be delivered in installments.

2. **EXPORT SHIPMENT; GOVERNMENTAL REGULATIONS.**

    (a)     Seller shall arrange for (i) export shipment to Buyer's country, and (ii) marine or air transport warehouse-to-warehouse insurance (including war risk, if available).

    (b)     In performing any of the foregoing services, Seller shall comply with any reasonable instructions of Buyer or, in the absence thereof, shall act according to its best judgment.  In so acting on Buyer's behalf, neither Seller nor its agent shall be liable for negligence or for any special consequential, incidental, indirect or exemplary damages to Buyer resulting therefrom.

    (c)     The party who arranges for export shipment shall be responsible for the timely application in its own name for any export license required by the United States of America (and/or other country or origin).   Notwithstanding the above, in case Seller is to arrange for export shipment of Equipment in accordance with this Agreement, Seller's delivery obligation hereunder shall be subject to the right and ability of Seller to make such delivery and/or obtain required licenses and permits under all decrees, statutes, rules and regulations of the United States government and agencies thereof presently in effect or which may be in effect hereafter, in particular, but without limitation, legislation pertaining to international traffic-in-arms and other export controls.  Seller shall not be required to comply with any foreign law, regulation or requirement which would subject Seller to criminal or civil penalties or loss of tax benefits under any federal, state or local law regulation of the United States or any other country of Equipment origin, and the execution of this Agreement does not entail an agreement to furnish any information which would subject Seller to any of the above-mentioned penalties or loss of tax benefits. In any event, Buyer shall be responsible for timely obtaining and maintaining any required import license, exchange permit, authorizations or approvals of any ministry of health or sanitation surveillance authorities, or any other governmental authorization required for the importation.  Seller shall not be liable if any authorization of any government is delayed, denied, revoked, restricted or not renewed, and Buyer shall not be relieved thereby of any of its payment obligations hereunder.

    (d)     Buyer hereby agrees: (i) to assist Seller, if Seller is to arrange for export shipment of Equipment in accordance with this Agreement, in obtaining any such required licenses or permits by supplying such documentation or information as may be requested by Seller; (ii) to comply with such decrees, statutes, rules and regulations of the government of the United States and agencies or instrumentalities thereof; (iii) to maintain the necessary records to comply with such decrees, statutes, rules and regulations; (iv) not to export or re-export the Equipment except in compliance with such decrees, statutes, rules and regulations; (v) to obtain all governmental approvals and licenses necessary to import the Equipment; (vi) not to sell, transfer or otherwise dispose of the Equipment in violation of the export laws of the United States; and (vii) to indemnify and hold harmless Seller from any and all fines, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by Seller as a result of any breach of this subsection by Buyer or any of Buyer's customers.

Confidential
Copyright © GE 2012

## 3. EXCUSABLE DELAYS.

(a)  Seller shall not be liable for delays in delivery or performance, or failure to manufacture, deliver or perform due to causes beyond its reasonable control, including but not limited to acts of God, acts (including failure to act) of any governmental authority (de jure or de facto), wars (declared or undeclared), governmental priorities, port congestion, riots, revolutions, strikes or other labor disputes, fires, floods, sabotage, nuclear incidents, earthquakes, storms, epidemics, delays in transportation, car shortage, inability due to causes beyond its reasonable control to obtain necessary labor, materials, components, services, manufacturing facilities, or any other commercial impracticability. The foregoing shall apply even though any of such causes exist at the time of the order or on the Effective Date, or occur after Seller's performance of its obligation is delayed for other causes.

(b)  Seller shall notify Buyer of any delay or failure excused by this Section and shall specify the revised delivery date as soon as practicable.  In the event of such delay, subject to paragraph (d) below, there shall be no termination and the time of delivery or performance shall be extended for a period equal to the time lost by Seller by reason of the delay.  In the event of a supply, equipment or facility shortage, Seller shall have the right to allocate its available resources among its customers in such a manner as Seller may consider equitable.

(c)  If delay excused by this Section extends for more than 60 days and the parties have not agreed upon a revised basis for continuing the work at the end of the delay, including adjustment of the Purchase Price, then either party (except where delay is caused by Buyer, in which event only Seller), upon 30 days written notice, may terminate this Agreement.

## 4. SITE READINESS.

Buyer shall provide free and clear access for delivery of the Equipment. Site selection is the sole responsibility of Buyer and Seller shall have no responsibility for delays caused by the Site not being ready to accept delivery of the Equipment. In addition, Buyer shall be responsible for making the Site ready for installation in compliance with Seller's written specifications, including but not limited to environmental (including air conditioning and shielding) requirements.

## 5. MANUFACTURE AND FINAL ASSEMBLY.

Seller reserves the right to utilize refurbished components in the manufacture or development, assembly or installation of the Equipment or any Operating Package covered by this Agreement and any options, upgrades or revisions required by this Agreement to be provided by Seller to Buyer. To the extent that such components are utilized, they shall be subjected to the same inspection and quality control procedures as, and shall be warranted by Seller to the same extent as, equivalent new components under applicable warranties expressly identified in this Agreement. Unless otherwise specified in writing, Seller or its affiliates, distributors, agents, subcontractors or suppliers will assemble the Equipment (with the exception of most supply and accessory items) and will connect same to the safety switches or electrical outlets to be provided and installed by Buyer. If for any reason final assembly, installation or electrical connections are made by other than Seller's own employees, its affiliates, distributors, agents, subcontractors or suppliers, the cost of such outside labor will be solely borne by Buyer.  It is understood that proper electrical service for operation of the Equipment will be brought to the safety switches and outlets by Buyer and that Buyer will supply all of the necessary conduits, connectors, wiring, Unistrut steel with associated hardware or similar support in the ceiling, plumbing, carpentry, construction work, and rigging required for making the installation. It is further understood that should anything additional be required for the installation, it will be supplied by Buyer at Buyer's sole expense.

## 6. TESTING AND CERTIFICATION.

Confidential
Copyright © GE 2012

If any certificates or other approvals of any governmental authority are required to be obtained for the assembly, installation or use of the Equipment or any Operating Package, the same shall be procured by Buyer at Buyer's sole expense before delivery. Trained technical personnel will assemble, install, interconnect, adjust, test, calibrate and check out the Equipment utilizing factory-specified calibration and test procedures and instruments. The criteria for testing shall be Seller's or manufacturer's applicable equipment performance specifications.

## 7. SERVICE MATERIAL USE AND DATA ACCESS.

In connection with the installation, configuration, maintenance, repair and/or deinstallation of the Equipment, GE might deliver to the Site, along with the Equipment or separately, and store at the Site, attach to or install on the Equipment, and use, materials that have not been purchased by or licensed to you. You hereby consent to (a) this delivery, storage, attachment, installation and use, (b) to the presence of GE's locked cabinet or box on the Site for storage of this property, and (c) to GE's removal of all or any part of this property at any reasonable time, all without charge to GE. The presence of this property within the Site will not give you any right or title to this property or any license or other right to access, use, or decompile this property. Any access to or use of this property (except in compliance with GE's written direction to you to determine Equipment performance on GE's behalf) and any decompilation of this property by anyone other than GE's personnel is prohibited. You agree that you will use reasonable efforts to protect this property against damage or loss and to prevent any access to or use or decompilation of this property contrary to this prohibition. You agree to permit GE to connect to the Equipment, or to otherwise access data related to the Equipment, to allow GE to gather, aggregate, compile, and use Equipment and resource usage data in various ways including quality initiatives, benchmarking, and reporting services. The data collected by GE will be used, during and after the term of this Agreement, in a manner that will maintain patient and customer level anonymity.

Confidential
Copyright © GE 2012

SCHEDULE D

SOFTWARE LICENSE

**1. LIMITED SOFTWARE LICENSE AND CONFIDENTIALITY PROVISIONS.**

In the event that Operating Software and/or Basic Service Software are being sold with the Equipment, Buyer shall be granted hereunder a limited license to same subject to the following terms and conditions. By acceptance of any part of such Software, Buyer agrees to be bound to and to comply with these terms and conditions. Buyer is not granted a license with respect to any Software other than the Software, if any, that is specifically identified herein as "Licensed Software."

**2. RIGHTS AND OBLIGATIONS**

2.1. Copyright. All Software is protected by the copyright laws of the United States (and/or other country of origin) and by applicable international treaties. No right under copyright is transferred to Buyer by virtue of this Agreement, except as specifically provided in this Section in the paragraph entitled "License."

2.2. Ownership. All Software (and the media in which it is embodied), documentation and tools related to or usable with the Equipment (except Operating Documentation and Operating Tools identified in this Agreement) are and shall remain the sole property of Seller, its affiliates or suppliers. Buyer expressly agrees that Seller, or its authorized representative, may at any time take possession of and/or remove from the Site some or all of such Software, documentation, tools and any copies and other reproductions thereof which might be located in the Site or in the possession or control of Buyer. However, unless Buyer ceases to be a health care provider or is otherwise in breach of this Agreement, Seller may not remove the Licensed Software such that the Equipment specifically described herein cannot operate in compliance with the manufacturer's applicable specifications.

2.3. License. Seller hereby grants Buyer a LIMITED, NONEXCLUSIVE, NON-TRANSFERABLE LICENSE.

(a) TO LOAD AND RUN THE OPERATING SOFTWARE ON THE PRODUCTS IN THE SITE, BUT ONLY SO LONG AS THE PRODUCTS ARE LOCATED IN THE SITE FOR USE BY BUYER FOR A HEALTH CARE PURPOSE.

(b) TO LOAD AND RUN THE BASIC SERVICE SOFTWARE ON THE PRODUCTS IN THE SITE AS AN AID TO INSTALLING, MAINTAINING AND/OR REPAIRING THE PRODUCTS, BUT ONLY SO LONG AS THE PRODUCTS ARE LOCATED IN THE SITE FOR USE BY BUYER FOR A HEALTH CARE PURPOSE; AND

(c) TO MAKE ONE ARCHIVAL COPY OF THE OPERATING SOFTWARE AND BASIC SERVICE SOFTWARE, AND FOR NO OTHER PURPOSE. Buyer may exercise this limited license only through one or more employees or agents of Buyer or a contractor of Buyer for the service of the Equipment. Except as aforesaid, BUYER SHALL NOT, EITHER DIRECTLY OR THROUGH ANY OTHER PERSON, FIRM, CORPORATION, OR OTHER ENTITY, COPY, ACCESS, RUN, PERFORM, DISPLAY, DISASSEMBLE, DECOMPILE, DISTRIBUTE, SUBLICENSE, SELL, ASSIGN, OR OTHERWISE TRANSFER ALL OR PART OF SUCH SOFTWARE. IN ADDITION, BUYER SHALL NOT USE OR PERMIT ANY PERSON TO USE AN UNAUTHORIZED COPY OF ALL OR ANY PART OF THE LICENSED SOFTWARE. BUYER SHALL NOT EXAMINE OR DISPLAY OR PERMIT ANY PERSON TO EXAMINE OR DISPLAY ALL OR ANY PART OF THE SOFTWARE CODE OR DATA AND BUYER SHALL NOT PERMIT ANY PERSON (OTHER THAN AN EMPLOYEE OF BUYER, AN AGENT, AN EMPLOYEE OF A CONTRACTOR OF BUYER FOR THE SERVICE OF THE PRODUCTS, OR AN AUTHORIZED REPRESENTATIVE OF SELLER) TO LOAD OR RUN

Confidential
Copyright © GE 2012

THE LICENSED SOFTWARE.

NO LICENSE OR RIGHT OF ANY KIND IS HEREBY GRANTED OR TRANSFERRED WITH RESPECT TO ANYTHING NOT SPECIFICALLY IDENTIFIED IN THIS QUOTATION UNDER THE DEFINITIONS OF "OPERATING SOFTWARE" AND "BASIC SERVICE SOFTWARE.".

2.4. <u>Storage</u>.  In connection with the installation, configuration, maintenance, repair and/or deinstallation of the Equipment, we might deliver to the Site, along with the Equipment or separately, and store at the Site, attach to or install on the Equipment, and use an InSite Package or parts of this package which have not been purchased by or licensed to you.  Buyer hereby consent to this delivery, storage, attachment, installation and use, to the presence of our locked cabinet or box in the Site for storage of this property, and to our removal of all or any part of this property at any reasonable time, all without charge to us.  The presence of this property within the Site will not give the Buyer any right or title to this property or any license or other right to access, use, or decompile this property.  Any access to or use of this property (except the Buyer use of  InSite or our Advance Service Package in compliance with our written direction to the Buyer to determine Equipment performance on our behalf) and any decompilation of this property by anyone other than our personnel is prohibited.  Buyer agrees to use reasonable efforts to protect this property against damage or loss and to prevent any access to or use or decompilation of this property contrary to this prohibition.

2.5. <u>Confidentiality</u>.  Buyer acknowledges that all documentation and tools (other than Operating Documentation and Operating Tools purchased by Buyer) and all Software are confidential, proprietary, and valuable to Seller.  Buyer agrees to use its best efforts to prevent any access to, disclosure of, or use of any such property in the Site or within Buyer's possession or control not specifically permitted in the paragraph hereof entitled "License."

2.6. <u>Modification</u>.  Because of the highly technical nature of Software and the high probability that any modification of it, however minor, could significantly affect the performance of the Equipment to which it applies, Buyer agrees that it shall not modify, or allow the modification of, all or any part of the Licensed Software in any manner whatsoever other than by, or with the express written authorization of, Seller.

2.7. <u>Reservation of Rights</u>.  The rights granted to Buyer hereunder shall not affect the exclusive ownership by Seller and/or its vendors of any trademarks, copyrights, patents, common law property rights pertaining to any Licensed Software, covered hereby or to any Operating Documentation or Operating Tools sold to Buyer.  Any transfer of any such property shall at all times be subject to all trademarks, copyrights, letters, patent, and common law property rights of Seller and/or its vendors relating thereto.

## 3.  TERM, RELICENSE

This license shall commence upon Buyer's acceptance of the Equipment and payment of the applicable license price (if any) and shall continue for as long as Buyer remains a health care provider with full legal right and authority to operate the Equipment in the Site and Buyer does not breach any term, covenant or condition contained in this Agreement.  Seller may terminate this license in the event of any breach by Buyer.  Such termination shall not relieve Buyer of any of its obligations incurred prior to such termination and shall not impair any of Seller's rights which have accrued prior to such date.  Buyer agrees to return the Licensed Software and all copies thereof to Seller at Buyer's sole expense immediately upon the termination of this license.  The covenants of Buyer contained in this license shall survive the termination of this license.  If the Equipment are later transferred to another health care provider for the sole use of providing health care, Buyer will grant to the transferee, upon the request and qualification of the transferee, a license generally similar to the license granted herein, but on and in consideration of Seller's then prevailing terms and conditions.

Confidential
Copyright © GE 2012

4.. DEFINITIONS.

As used in this Section, the following terms shall have the following meanings:

**"Site"** means only the exact room or other limited area at Buyer's premises, or the exact vehicle (in the case of a mobile site), in which the Equipment have been installed.

**"InSite Package"** means Manufacturing Material, Advanced Service Package, Vendor Service Package, and InSite.

**Manufacturing Material"** means our proprietary manufacturing, engineering and/or developmental Software, hardware, firmware, documentation, and tools developed or under development by and/or provided to us for our assembly, configuration and/or possible future service of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:

"MANUFACTURING MATERIAL PROPERTY OF GE

FOR GE SERVICE PERSONNEL ONLY

NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Operating Package"** means Operating Documentation, Operating Software, Operating Tools and Basic Service Software identified in this Agreement.

**"Operating Documentation"** means operating and basic service documentation embodying information developed and/or provided to Seller for the installation, operation, maintenance and/or repair of the Equipment and bearing a white cover and/or a label or a notice which reads as follows:

"OPERATING DOCUMENTATION"

**"Operating Tools"** means tangible, basic operating and service instruments or instrument combinations which have been developed by and/or provided to Seller for the installation, maintenance and/or repair of the Equipment and which either bear or are maintained in a container which bears a white label and/or a notice which reads as follows:

"OPERATING TOOLS"

**"Software"** means any computer program or compilation of data that is fixed in any tangible medium of expression, including but not limited to disks, tapes, cards, paper, random access memory, read only memory devices (whether or not such devices are erasable or programmable) or any storage medium from which the program may be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device.

**"Operating Software"** means proprietary operating Software developed by and/or provided to Seller for the ordinary operation of the Equipment, any optional Software to enhance the operation of the Equipment, as well as any upgrades or revisions thereof that Seller provides in fulfillment of a specific written commitment, bearing a white label and/or a notice which reads as follows:

"OPERATING SOFTWARE PROPERTY OF GE"

Confidential
Copyright © GE 2012

**"Basic Service Software"** means proprietary basic service Software developed by and/or provided to Seller for the installation, maintenance and/or repair of the Equipment, as well as any upgrades or revisions thereof that Seller provides in fulfillment of a specific written commitment, which either bears a white label or incorporates or displays a notice that reads as follows:

"BASIC SERVICES SOFTWARE PROPERTY OF GE"

**"Licensed Software"** means Operating Software and Basic Service Software identified in this Agreement.

**"Advance Service Package"** means Advance Service Documentation, Advance Service Software and Advance Service Tools.

**"Advanced Service Documentation"** means proprietary service documentation embodying advanced information developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and bearing a yellow cover and/or a label or a notice which reads as follows:

"ADVANCED SERVICE DOCUMENTATION PROPERTY OF GE

FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Advanced Service Tools"** means proprietary, tangible, advance service instruments or instrument combinations which have been developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and which either bear or are maintained in a container which bears a yellow cover and/or a label or a notice which reads as follows:

"ADVANCED SERVICE TOOL PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Advanced Service Software"** means proprietary advance service Software developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and bearing a yellow label or incorporating or displaying a notice that reads as follows:

"ADVANCED SERVICE SOFTWARE PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Vendor Service Package"** means vendor proprietary service Software, firmware, documentation, and tangible instruments or instrument combinations provided by a vendor to us for our installation maintenance, repair, and/or deinstallation of vendor-supplied components of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:

"GE VENDOR SERVICE SOFTWARE or DOCUMENTATION or TOOLS PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"InSite"** means our proprietary remote service Software, hardware, firmware, documentation, and tangible instruments or instrument combinations developed by and/or provided to us for our

Confidential
Copyright © GE 2012

assembly, installation, configuration, maintenance, repair, and/or deinstallation of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:

"INSITE PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED – DO NOT USE OR COPY – DISCLOSURE TO THIRD PARTIES PROHIBITED"

Confidential
Copyright © GE 2012

rev. 04/12

**SCHEDULE E**

**FORM OF CERTIFICATE OF ACCEPTANCE**

**CERTIFICATE OF ACCEPTANCE**

FDO No. _____

[INSERT PLACE]
[INSERT DATE]

This certificate is issued and delivered as of the date first written above to [INSERT NAME OF BUYER] (hereinafter the "Buyer") on behalf of GE Healthcare, a division of General Electric Company (hereinafter the "Seller "), pursuant to the terms of the International Sales Agreement (hereinafter the "Agreement), between Buyer and Seller.  Capitalized terms employed herein but not otherwise defined have the meanings ascribed to them in the Agreement. A complete list of the Equipment is included in Annex A to the Agreement.

By signing this certificate in the space provide below, Buyer acknowledges that (i) it has inspected the Equipment and it conforms to Customer's order and the Equipment description in Annex A to the Agreement and (ii) Customers accepts the Equipment for all purposes under the Agreement.

[INSERT NAME OF AGENT THAT COMPLETED DELIVERY], on behalf of GEHC
**as Seller**

**\*\*DO NOT SIGN HERE \*\***

Name: _____
Title:

Agreed and Accepted:

[INSERT NAME OF CUSTOMER],
**as Buyer**

**\*\*DO NOT SIGN HERE \*\***

Name: _____
Title:

Confidential
Copyright © GE 2012

rev. 04/12

# PRODUCT WARRANTY

G GE MEDICAL SYSTEMS –AMERICAS: MILWAUKEE, USA
WWW.GEMEDICALSYSTEMS.COM
GE MEDICAL SYSTEMS – LATIN AMERICA: MIAMI, USA FAX 305-269-4000
ARGENTINA: FAX (54 11) 4639-9350
BRAZIL: FAX (55 11) 3067 8367
CHILE: FAX (56 2) 421 4103
MÉXICO: FAX (52 55) 5228-9661
PUERTO RICO: FAX (1 787) 282 7436

F3705 ENG-SPA-POR / R8/02 PAGE 1 OF 6
© COPYRIGHT 2002 GENERAL ELECTRIC COMPANY
GEMS PRODUCT WARRANTY
(LATIN AMERICA AND THE CARIBBEAN)

Confidential
Copyright © GE 2012

rev. 04/12

COVERED PRODUCTS AND
EXCLUDED PRODUCTS
COVERED PRODUCTS
THESE WARRANTIES COVER THE FOLLOWING EQUIPMENT
AND PRODUCTS BY GEMS:
• MAGNETIC RESONANCE ("MR") PRODUCTS (NEW
EQUIPMENT, PARTIAL SYSTEM HARDWARE
UPGRADES).
• COMPUTED TOMOGRAPHY ("CT") PRODUCTS
(NEW EQUIPMENT, FULL SYSTEM HARDWARE
UPGRADES, PARTIAL SYSTEM HARDWARE UPGRADES).
• X-RAY AND MAMMOGRAPHY PRODUCTS (NEW
EQUIPMENT, PARTIAL SYSTEM HARDWARE
UPGRADES).
• NUCLEAR PRODUCTS (NEW EQUIPMENT, PARTIAL
SYSTEM HARDWARE UPGRADES).
• POSITRON EMISSION TOMOGRAPHY ("PET")
PRODUCTS (NEW EQUIPMENT, INCLUDING
SCANNERS, CYCLOTRONS AND CHEMISTRY LABS, AND
PARTIAL SYSTEM HARDWARE UPGRADES).
• ULTRASOUND PRODUCTS (NEW EQUIPMENT).
• INTEGRATED IMAGING SOLUTION ("IIS") PRODUCTS
(NEW WORKSTATIONS AND NEW CONNECTIVITY
PRODUCTS).
• GOLD SEAL PREFERRED PRODUCTS (PRE-OWNED GE
EQUIPMENT PROVIDED WITH A WARRANTY).
• INVASIVE CARDIOLOGY PRODUCTS (NEW
EQUIPMENT).
EXCLUDED PRODUCTS
THESE WARRANTIES DO NOT COVER THE FOLLOWING
EQUIPMENT AND PRODUCTS:
• ACCESSORIES AND SUPPLIES IDENTIFIED BY
CATALOG NUMBERS STARTING WITH THE LETTER
"E" (COVERED BY A SEPARATE WARRANTY).
• PRODUCTS NOT LISTED IN GEMS' PRICE PAGES AT
THE TIME OF SALE, NORMALLY IDENTIFIED BY NL
OR NW SERIES NUMBERS IN GEMS' QUOTATION
(PROVIDED WITH THE MANUFACTURER'S
WARRANTIES, IF ANY, GEMS IS PERMITTED TO
PASS ON TO CUSTOMER; OTHERWISE, PROVIDED
AS IS).
• GE X-RAY TUBES AND GE IMAGE INTENSIFIER
TUBES (COVERED BY A SEPARATE WARRANTY).
• MAXIRAY X-RAY TUBES (COVERED BY A SEPARATE
WARRANTY).
• GE POWERTECH POWER CONDITIONING
PRODUCTS (COVERED BY A SEPARATE WARRANTY).
• NEW OR EXCHANGE PARTS SOLD BY GEMS
DIRECT CUSTOMER ORDER SERVICE (COVERED BY
A SEPARATE WARRANTY).
• PARTIAL SYSTEM HARDWARE UPGRADES IDENTIFIED

IN GEMS' E-PRICEBOOK AS BEING ELIGIBLE ONLY FOR WARRANTY CREDITS FOR GEMS' SERVICE CONTRACT CUSTOMERS.
• PRODUCTS MANUFACTURED AND SOLD BY GEMS' AFFILIATES (SUCH AS GE OEC, GE LUNAR AND GEMS IT), UNLESS OTHERWISE SPECIFIED IN THE SALES CONTRACTS USED BY GEMS' AFFILIATES.
• GOLD SEAL EXCHANGE PRODUCTS (PRE-OWNED EQUIPMENT PROVIDED AS IS).
• MULTI-VENDOR PREFERRED PRODUCTS (PRE-OWNED NON-GE EQUIPMENT PROVIDED WITH A LIMITED WARRANTY).

SCOPE AND DURATION OF WARRANTIES

PRODUCT WARRANTIES: GEMS WARRANT TO CUSTOMER THAT THE COVERED PRODUCTS LISTED IN GEMS' QUOTATION WILL (1) BE FREE FROM DEFECTS IN MATERIAL, WORKMANSHIP, AND TITLE, AND (2) CONFORM TO GEMS' PUBLISHED COVERED PRODUCT SPECIFICATIONS IN EFFECT ON THE DATE OF SHIPMENT OF THE COVERED PRODUCTS. GEMS' PUBLISHED COVERED PRODUCT SPECIFICATIONS ARE AVAILABLE ON REQUEST.

PATENT AND COPYRIGHT WARRANTY: GEMS WARRANTS TO CUSTOMER THAT WHEN THEY ARE DELIVERED, THE COVERED PRODUCTS WILL NOT BE SUBJECT TO ANY VALID PATENT OR COPYRIGHT INFRINGEMENT CLAIM.

WARRANTY PERIOD: THE WARRANTY PERIOD FOR ALL WARRANTIES LISTED ABOVE, EXCEPT THE WARRANTY OF TITLE AND THE PATENT AND COPYRIGHT WARRANTY, IS LIMITED IN TIME AS SHOWN IN THE WARRANTY SCHEDULE BELOW.

IF GEMS DOES NOT ASSEMBLE OR INSTALL THE COVERED PRODUCTS, THE WARRANTY PERIOD BEGINS ON THE DATE THE COVERED PRODUCTS ARE DELIVERED TO CUSTOMER. IF GEMS ASSEMBLES OR INSTAL THE COVERED PRODUCTS, THE WARRANTY PERIOD BEGINS ON THE EARLIER OF (1) FIVE DAYS AFTER THE DATE GEMS NOTIFIES CUSTOMER THAT GEMS HAS COMPLETED ASSEMBLY OR INSTALLATION AND THE COVERED PRODUCTS ARE OPERATING IN ACCORDANCE WITH GEMS' PUBLISHED COVERED PRODUCT SPECIFICATIONS, OR (2) THE DATE CUSTOMER FIRST USE THE COVERED PRODUCTS FOR PATIENT USE. IF ASSEMBLY IS DELAYED FOR NINETY (90) DAYS OR MORE AFTER THE DATE OF DELIVERY FOR A REASON BEYOND GEMS' REASONABLE CONTROL, THE WARRANTY PERIOD WILL BEGIN ON THE NINETIETH (90TH) DAY AFTER THE DATE OF DELIVERY.

THE WARRANTY PERIOD FOR ANY COVERED PRODUCT OR

AND MAMMOGRAPHY SYSTEMS (PRORATED AS SHOWN BELOW)
3 MONTHS
• HEALTHNET vLAN, ADVANTAGE REVIEW - REMOTE PRODUCTS (IIS PRODUCTS)
• T3 EXCHANGE ULTRASOUND PROBES AND TRANSDUCERS, ULTRASOUND WATER PATH ATTACHMENT KIT (ULTRASOUND PRODUCTS)
BATTERIES
FOR X-RAY AND MAMMOGRAPHY SYSTEMS, IF NICKEL CADMIUM OR LEAD ACID BATTERIES NEED REPLACEMENT DURING THEIR APPLICABLE WARRANTY PERIOD, CUSTOMER WILL PAY THE PRICE OF THE REPLACEMENT BATTERY IN EFFECT ON ITS DELIVERY DATE LESS A PRO RATA CREDIT ALLOWANCE. THE PRO RATA CREDIT ALLOWANCE FOR BATTERIES THAT FAIL LESS THAN 12 MONTHS AFTER THE WARRANTY BEGINS IS 100%. THE PRO RATA CREDIT ALLOWANCE FOR BATTERIES THAT FAIL MORE THAN 12 MONTHS AFTER THE WARRANTY BEGIN IS:
$1 - \frac{\text{\# OF MOS. AFTER WARRANTY COMENCEMENT}}{60} \times 100\%$

FOR THE PURPOSE OF PRO RATA CREDIT ALLOWANCE, A FRACTION OF A MONTH LESS THAN 15 DAYS WILL BE DISREGARDED, AND A FRACTION OF A MONTH EQUAL TO OR GREATER THAN 15 DAYS WILL BE REGARDED AS A FULL

G *GE MEDICAL SYSTEMS –AMERICAS: MILWAUKEE, USA*
*WWW.GEMEDICALSYSTEMS.COM*
*GE MEDICAL SYSTEMS – LATIN AMERICA: MIAMI, USA FAX 305-269-4000*
*ARGENTINA: FAX (54 11) 4639-9350*
*BRAZIL: FAX (55 11) 3067 8367*
*CHILE: FAX (56 2) 421 4103*
*MÉXICO: FAX (52 55) 5228-9661*
*PUERTO RICO: FAX (1 787) 282 7436*

F3705 ENG-SPA-POR / R8/02 PÁGINA 3 DE 6
© COPYRIGHT 2002 GENERAL ELECTRIC COMPANY
GARANTÍA DE PRODUCTOS GEMS
(AMÉRICA LATINA Y EL CARIBE)

 **GE Capital**

*Sept 29,* 2016

X-Ray and Diagnostic Ultrasound Consultants Limited
The Radiation Oncology Centre of Jamaica Limited
Winston Franklin Barrington Clarke
Eileen Patricia Clarke
1 Ripon Road
Kingston 5, Jamaica

Re:    Modification of Credit Agreement.

Dear Customer:

We make reference to the Credit Agreement, between and among GE HFS, LLC, as Lender, X-Ray and Diagnostic Ultrasound Consultants Limited, as Borrower, and The Radiation Oncology Centre of Jamaica Limited, Winston Franklin Barrington Clarke and Eileen Patricia Clarke, as Guarantors for the amount of US$1,371,283.00 executed before Mr. Arthur Hamilton, Notary Public of Jamaica West Indies (the "Credit Agreement").

Unless otherwise defined herein, capitalized terms used and not defined herein have the meanings given in the Credit Agreement.

Subject to the terms and conditions in the Credit Agreement, Lender agrees to make a Loan to Borrower on the Closing Date. Therefore, and pursuant to Section 10.7 of the Credit Agreement, Lender amends the Credit Agreement in order to incorporate the new terms and conditions agreed and acknowledged by the parties regarding the Closing Date.

The Credit Agreement is hereby amended as follows:

*"Section 1. "The Credit Facility"*

*"1.2.  Manner and Disbursement of Loan.  No later than five (5) days after the Closing Date the Loan shall be disbursed to GE Medical Systems. Account No. 1-████, Pittsburgh National Bank in 960 Fort Duquesne Blvd. PA 15222, ABA # ████████ SWIFT Code PNCCUS33.*

*Section 3. Conditions Precedent.*

*The obligation of Lender to make the Loan hereunder is subject to the following conditions precedent being satisfied prior to December 22, 2016:*

*3.1. Conditions. Before or concurrently with the making of the Loan Lender shall have received:*

**EXHIBIT**

**B**



    (a)  a proof of delivery of the Equipment signed by Borrower;

    (b)  the duly executed Note;

    (c)  payment of all fees, taxes (including the Note's stamp tax) and expenses (including the fees and expenses of legal counsel to Lender) then due and owing;

    (d)  proof of perfection of the security interest in the Collateral pursuant to Section 4.2;

    (e)  the duly executed Subordination Agreement in substantially the form of Annex C (the "Subordination Agreement");

Furthermore, the parties agree and acknowledge that Annex B "Payment Schedule" shall be amended in terms of the new Annex B attached hereto.

Except as provided for in this letter agreement, the remaining terms of the Credit Agreement, shall remain in full force and effect.

This letter agreement, and the rights and duties of the parties thereto, shall be construed in accordance with and governed by the internal laws of the State of New York.

We kindly request that you acknowledge this amendment by your signature below.

Best regards,

GE HFS, LLC

By: _Lori Sanderik_

Name: _Lori Sanderik_

Title: _Duly Authorized Signor_

ACKNOWLEDGED AND AGREED:

X-Ray and Diagnostic Ultrasound Consultants Limited

By: _Winston FBClarke_

Name: _WINSTON F. B. CLARKE_

Title: _MANAGING DIRECTOR_

The Radiation Oncology Centre of Jamaica Limited

By: _Collie Miller_

Name: _Collie MILLER_

Title: _Managing Director_

Winston Franklin Barrington Clarke

By: _Winston FBClarke_

Name: _WINSTON F. B. CLARKE_

Title: _MANAGING DIRECTOR_

3 of 4

Eileen Patricia Clarke

By: _____

Name: EILEEN P. CLARKE

Title: DIRECTOR/ SECRETARY

CHRISTINA M. BROWN
Attorney-at-Law
No. 5283

ANNEX B

PAYMENT SCHEDULE

| # | Payment Date | Principal Amount |
|---|--------------|------------------|
| | --------- | ---------- |
| 1 | March 31, 2017 | $ 105,483.31 |
| 2 | September 30, 2017 | $ 105,483.31 |
| 3 | March 31, 2018 | $ 105,483.31 |
| 4 | September 30, 2018 | $ 105,483.31 |
| 5 | March 31, 2019 | $ 105,483.31 |
| 6 | September 30, 2019 | $ 105,483.31 |
| 7 | March 31, 2020 | $ 105,483.31 |
| 8 | September 30, 2020 | $ 105,483.31 |
| 9 | March 31, 2021 | $ 105,483.31 |
| 10 | September 30, 2021 | $ 105,483.31 |
| 11 | March 31, 2022 | $ 105,483.31 |
| 12 | September 30, 2022 | $ 105,483.31 |
| 13 | March 31, 2023 | $ 105,483.28 |

 **GE Capital**

*Dec. 22*, 2016

X-Ray and Diagnostic Ultrasound Consultants Limited
The Radiation Oncology Centre of Jamaica Limited
Winston Franklin Barrington Clarke & Eileen Patricia Clarke
1 Ripon Road, Kingston 5, Jamaica

Re:      Modification of International Financed Sales Agreement.

Dear Customer:

We make reference to the International Financed Sales Agreement between and among General Electric Company, as Seller, X-Ray and Diagnostic Ultrasound Consultants Limited, as Buyer, and The Radiation Oncology Centre of Jamaica Limited, Winston Franklin Barrington Clarke and Eileen Patricia Clarke, as Guarantors executed before Mr. Arthur Hamilton, Notary Public of Jamaica West Indies and also to the Modification of International Financed Sales Agreement dated September 29, 2016, executed before Christina M. Brown, Attorney-at-Law (the sales agreement along with its amendments and modifications, the "Sales Agreement").

Unless otherwise defined herein, capitalized terms used and not defined herein have the meanings given in the Sales Agreement.

The parties agree and acknowledge that Annex B "Payment Schedule", Clause IV, shall be amended as follow:

IV.      **CONTRACTUAL RATE**

The Contractual Rate shall be, in relation to any quarterly interest period, the rate of interest per annum equal to three and one-half percent (3.5%) per annum (the "Margin") above 3-Month LIBOR (as hereinafter defined).

The payment of interest shall be calculated on the basis of a year of 360 days and the actual number of days actually elapsed.

"LIBOR" means, in relation to any Interest Period, the rate of interest per annum (rounded upward, if necessary, to the nearest 1/16 of 1%) quoted by the principal London office of General Electric Capital Corporation or an affiliate of General Electric Capital Corporation designated by General Electric Capital Corporation at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for the offering to leading banks in the London interbank market of United States Dollar deposits for three months and in an amount comparable to the principal amount upon which interest is to be paid during such Interest Period.

"Interest Period" means (i) the period commencing on December 22, 2016 and extending up to, but not including, the next Payment Date; provided, however, that if such date of disbursement is within sixty (60) days of such Payment Date, the Interest Period shall end on the next succeeding Payment Date; and (ii) thereafter the period commencing on each Payment Date and extending up to, but not including, the next Payment Date.

This letter agreement, and the rights and duties of the parties thereto, shall be construed in accordance with and governed by the internal laws of the State of Florida.

We kindly request that you acknowledge this amendment by your signature below.

Best regards,

General Electric Company

By: _Lori Sandvik_

Name: _Lori Sandvik_

Date: _1/27/17_

ACKNOWLEDGED AND AGREED:

X-Ray and Diagnostic Ultrasound Consultants Limited

By: _Winston F B Clarke_

Name: _WINSTON F. B. CLARKE_

Title: _MANAGING DIRECTOR_

Date: _December 22, 2016_

The Radiation Oncology Centre of Jamaica Limited

By: _Collie Miller_

Name: _Collie Miller_

Title: _Managing Director_

Date: _December 22, 2016_

Winston Franklin Barrington Clarke

By: _Winston FB Clarke_

Name: _WINSTON F. B. CLARKE_

Date: _December 22, 2016_

Eileen Patricia Clarke

By: _Eileen P. Clarke_

Name: _EILEEN P. CLARKE_

Date: _December 22, 2016_

2 of 2

 **GE Capital**

*Sept 29*, 2016

X-Ray and Diagnostic Ultrasound Consultants Limited
The Radiation Oncology Centre of Jamaica Limited
Winston Franklin Barrington Clarke
Eileen Patricia Clarke
1 Ripon Road
Kingston 5, Jamaica

Re:    Modification of International Financed Sales Agreement.

Dear Customer:

We make reference to the International Financed Sales Agreement, between and among General Electric Company, as Seller, X-Ray and Diagnostic Ultrasound Consultants Limited, as Buyer, and The Radiation Oncology Centre of Jamaica Limited, Winston Franklin Barrington Clarke and Eileen Patricia Clarke, as Guarantors executed before Mr. Arthur Hamilton, Notary Public of Jamaica West Indies (the "Sales Agreement").

Unless otherwise defined herein, capitalized terms used and not defined herein have the meanings given in the Sales Agreement.

Subject to the terms and conditions in the Sales Agreement, the Financed Amount shall be paid in twenty eight (28) equal quarterly installments, commencing on the first day of the third month following the Interest Commencement Date. Pursuant to Section 13 of the Sales Agreement, Seller amends the Sales Agreement in order to incorporate the new terms and conditions agreed and acknowledged by the parties regarding the Interest Commencement Date and the Payment Date.

The Sales Agreement is hereby amended as follows:

*"2. PRICE; PAYMENT TERMS, INSTALLATION.*

*[..]*

*[..]*

*2.11 Customer shall be deemed to have accepted the Equipment installed by Seller the date the Customer first uses the Equipment for patient use."*

Furthermore, the parties agree and acknowledge that Schedule B and Schedule C shall be amended in terms of the new Schedule B and Schedule C

1 of 8

Winston Franklin Barrington Clarke

By: _Winston FB Clarke_

Name: _WINSTON F. B. CLARKE_

Title: _MANAGING DIRECTOR_

Eileen Patricia Clarke

By: _Eileen P. Blake_

Name: _EILEEN P. CLARKE._

Title: _DIRECTOR / SECRETARY._

CHRISTINA M. BROWN
Attorney-at-Law
No. 5283

**V.    POST-DEFAULT RATE**

The Post-Default Rate shall be twelve and one-half percent (12.5%) per annum, on the basis of a year of 360 days and the actual number of days actually elapsed.

**VI.    DISBURSEMENT**

The Financed Amount shall be disbursed as follows:

Within five (5) days of the Interest Commencement Date, the sum of US$324,800.00 shall be disbursed to the account of IQ Medical Services LLC, account number 0███████, at the Sabadell United Bank N.A., Swift Code SAUBUS3M and ABA ████████, for the purchase of the Hotcells & Accesories.

Within five (5) days of the Interest Commencement Date, the sum of US$289,800.00 shall be disbursed to the account of GE Medical Systems in the Pittsburgh National Bank, account number ___1-██████, SWIFT CODE: _PNCCUS33, y ABA ███████; for the purchase of the Synthesis Box-Fastlab Equipment.

**VII.    PAYMENT SCHEDULE**

[Attached]

5 of 8

3. EXCUSABLE DELAYS.

(a)     Seller shall not be liable for delays in delivery or performance, or failure to manufacture, deliver or perform due to causes beyond its reasonable control, including but not limited to acts of God, acts (including failure to act) of any governmental authority (*de jure* or *de facto*), wars (declared or undeclared), governmental priorities, port congestion, riots, revolutions, strikes or other labor disputes, fires, floods, sabotage, nuclear incidents, earthquakes, storms, epidemics, delays in transportation, car shortage, inability due to causes beyond its reasonable control to obtain necessary labor, materials, components, services, manufacturing facilities, or any other commercial impracticability. The foregoing shall apply even though any of such causes exist at the time of the order or on the Effective Date, or occur after Seller's performance of its obligation is delayed for other causes.

(b)     Seller shall notify Buyer of any delay or failure excused by this Section and shall specify the revised delivery date as soon as practicable. In the event of such delay, subject to paragraph (d) below, there shall be no termination and the time of delivery or performance shall be extended for a period equal to the time lost by Seller by reason of the delay. In the event of a supply, equipment or facility shortage, Seller shall have the right to allocate its available resources among its customers in such a manner as Seller may consider equitable.

(c) If delay excused by this Section extends for more than 60 days and the parties have not agreed upon a revised basis for continuing the work at the end of the delay, including adjustment of the Purchase Price, then either party (except where delay is caused by Buyer, in which event only Seller), upon 30 days written notice, may terminate this Agreement.

4. SITE READINESS.

Buyer shall provide free and clear access for delivery of the Equipment. Site selection is the sole responsibility of Buyer and Seller shall have no responsibility for delays caused by the Site not being ready to accept delivery of the Equipment. In addition, Buyer shall be responsible for making the Site ready for installation in compliance with Seller's written specifications, including but not limited to environmental (including air conditioning and shielding) requirements.

5. MANUFACTURE AND FINAL ASSEMBLY.

Seller reserves the right to utilize refurbished components in the manufacture or development, assembly or installation of the Equipment or any Operating Package covered by this Agreement and any options, upgrades or revisions required by this Agreement to be provided by Seller to Buyer. To the extent that such components are utilized, they shall be subjected to the same inspection and quality control procedures as, and shall be warranted by Seller to the same extent as, equivalent new components under applicable warranties expressly identified in this Agreement. Unless otherwise specified in writing, Seller or its affiliates, distributors, agents, subcontractors or suppliers will assemble the Equipment (with the exception of most supply and accessory items) and will connect same to the safety switches or electrical outlets to be provided and installed by Buyer. If for any reason final assembly, installation or electrical connections are made by other than Seller's own employees, its affiliates, distributors, agents, subcontractors or suppliers, the cost of such outside labor will be solely borne by Buyer. It is understood that proper electrical service for operation of the Equipment will be brought to the safety switches and outlets by Buyer and that Buyer will supply all of the necessary conduits, connectors, wiring, Unistrut steel with associated hardware or similar support in the

PAYMENT SCHEDULE

| # | Payment Date | Principal Amount |
|---|---|---|
| 1 | April 1, 2017 | $ 21,950.00 |
| 2 | July 1, 2017 | $ 21,950.00 |
| 3 | October 1, 2017 | $ 21,950.00 |
| 4 | January 1, 2018 | $ 21,950.00 |
| 5 | April 1, 2018 | $ 21,950.00 |
| 6 | July 1, 2018 | $ 21,950.00 |
| 7 | October 1, 2018 | $ 21,950.00 |
| 8 | January 1, 2019 | $ 21,950.00 |
| 9 | April 1, 2019 | $ 21,950.00 |
| 10 | July 1, 2019 | $ 21,950.00 |
| 11 | October 1, 2019 | $ 21,950.00 |
| 12 | January 1, 2020 | $ 21,950.00 |
| 13 | April 1, 2020 | $ 21,950.00 |
| 14 | July 1, 2020 | $ 21,950.00 |
| 15 | October 1, 2020 | $ 21,950.00 |
| 16 | January 1, 2021 | $ 21,950.00 |
| 17 | April 1, 2021 | $ 21,950.00 |
| 18 | July 1, 2021 | $ 21,950.00 |
| 19 | October 1, 2021 | $ 21,950.00 |
| 20 | January 1, 2022 | $ 21,950.00 |
| 21 | April 1, 2022 | $ 21,950.00 |
| 22 | July 1, 2022 | $ 21,950.00 |
| 23 | October 1, 2022 | $ 21,950.00 |
| 24 | January 1, 2023 | $ 21,950.00 |
| 25 | April 1, 2023 | $ 21,950.00 |
| 26 | July 1, 2023 | $ 21,950.00 |
| 27 | October 1, 2023 | $ 21,950.00 |
| 28 | January 1, 2024 | $ 21,950.00 |



**GE Capital Corporation**
Healthcare Financial Services

## CREDIT AGREEMENT

**CREDIT AGREEMENT**, dated as of _____, \_\_\_, 2016, between X-ray And Diagnostic Ultrasound Consultants Limited ("Borrower"), a company organized under the laws of Jamaica, and GE HFS LLC, a corporation formed under the laws of the State of Delaware, United States of America ("Lender").

### WITNESSETH THAT:

**WHEREAS**, Borrower desires to obtain a term loan from Lender, the proceeds of which will be used by Borrower to acquire from General Electric Healthcare, a division of General Electric, certain medical equipment described in Annex A hereto (the "Equipment"); and to pay the Total Exposure Fee (as defined in the letter from the Export-Import Bank of the United States ("Ex-Im Bank") to the Lender with Tracking No. 616249, dated April 28, 2015).

**WHEREAS**, Lender is willing to make such a term loan subject to all of the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth.

**NOW, THEREFORE**, in consideration of the recitals set forth above and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

### SECTION 1. THE CREDIT FACILITY.

**1.1.** Borrowing of Term Loan. Subject to the terms and conditions hereof, Lender agrees to make a single loan (the "Loan") to Borrower on the Closing Date up to and not exceeding the amount of one million, three hundred seventy-one thousand, two hundred eighty-three United States Dollars ($1,371,283.00 United States Dollars) (the "Term Loan Commitment"). Any portion of the Term Loan Commitment not borrowed on the Closing Date shall terminate and not be available for borrowing.

**1.2.** Manner and Disbursement of Loan. No later than ten (10) days after the Closing Date the Loan shall be disbursed to GE Medical Systems. Account No. 1-▉▉▉▉, Pittsburgh National Bank in 960 Fort Duquesne Blvd. PA ▉▉▉, ABA # ▉▉▉▉▉▉ SWIFT Code PNCCUS33.

**1.3.** Payment of Loan. The principal hereof shall be due and payable semi-annually on March 31 and September 30 of each year (each, a "Payment Date"), beginning on the first such Payment Date set forth in Annex B hereto. Each payment of principal shall be in the percentage amounts set forth in such Annex B hereto; provided, that on the last Payment Date, the Borrower shall repay in full the principal amount hereof then outstanding. Interest on the unpaid principal amount from time to time is due and payable on each Payment Date, beginning on March 31, 2017 and thereafter so long as any principal hereof remains outstanding. All payments received under the Credit Documents shall be applied in the manner and order of priority determined by the Lender in its sole discretion.

**1.4.** Applicable Interest Rate. The Loan shall bear interest (computed on the basis of the actual number of days elapsed (including the first day, but excluding the last day) over a year of 360 days) on the unpaid principal amount thereof with respect to each Interest Period from the date the Loan is made until maturity

(whether by acceleration or otherwise) at the rate (the "Contractual Rate") of two and one-half percent (2.5%) per annum (the "Margin") above LIBOR (as hereinafter defined); provided that, beginning on the Ex-Im Bank Claim Payment Date (hereinafter defined), the definition of Special LIBOR shall apply for all purposes, in place of the definition of LIBOR and the Borrower shall pay interest on the principal balance hereof from time to time outstanding at a rate equal to the greater of (i) Special LIBOR or (ii) Special LIBOR plus the Margin.

**1.5.** Optional Prepayments. Borrower shall have the privilege of prepaying the Loan without premium or penalty and in whole or in part (but, if in part, then in an amount which is an integral multiple of $1,000 equal to or greater than $10,000) at any time; provided, however, that Borrower shall have given irrevocable notice of such prepayment to Lender at least ten (10) days prior to the date of prepayment.

**1.6.** The Note. The Loan shall be evidenced by a single promissory note (the "Note").

### SECTION 2. PAYMENTS.

**2.1.** Place and Application of Payments. (a) All payments of principal of and interest on the Loan, and of all other amounts payable by Borrower under the Credit Documents shall be made by Borrower to Lender by no later than 1:00 p.m. (New York time) on the due date thereof by wire transfer to GE, at Deutsche Bank Trust Company, ABA No. ▉▉▉▉▉▉, 60 Wall Street, New York, NY 10005, United States of America, Account No. 502 565 30, or such other account as Lender may specify. Any payments received by Lender from Borrower after 11:00 a.m. (New York time) shall be deemed to have been received on the next Business Day. Such payments shall be made in Dollars in immediately available funds at the place of payment without restrictions, conditions, defense, setoff or counterclaim. Lender shall have the right to decline any payments originated from accounts not in the name of Borrower.

(b) If any payment received by Lender under any Credit Document (including from the proceeds of Collateral) is insufficient to pay in full all amounts then due and payable to Lender under the Credit Documents, such payment shall be distributed by Lender and applied by Lender in the following order: First, to the payment of interest then due and payable on Loan; and Second, to the payment of the principal amount of the Loan and all other obligations then due and payable.

**2.2.** Payments Free of Withholding. Each payment by Borrower under this Agreement or any other Credit Document shall be made without set-off, counterclaim, deduction or withholding for or on account of any present or future taxes (other than overall net income taxes on the recipient) imposed by or within the jurisdiction in which Borrower is domiciled, any jurisdiction from which Borrower makes any payment, or (in each case) any political subdivision or taxing authority thereof or therein. If any such withholding is so required, Borrower shall make the withholding, pay the amount withheld to the appropriate governmental authority before penalties attach thereto or interest accrues thereon and forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by Lender free and clear of such taxes (including such taxes on such additional amount) is equal to the amount that Lender would have received had such withholding not been made. If Lender pays

Confidential
Copyright © GE 2004

1

rev. 06/04



**GE Capital Corporation**
Healthcare Financial Services

any amount in respect of any such taxes, penalties or interest Borrower shall reimburse Lender for that payment on demand. If Borrower pays any such taxes, penalties or interest, it shall deliver official tax receipts evidencing that payment or certified copies thereof to Lender on or before the thirtieth day after payment.

2.3. All or any part of the outstanding Financed Amount may be prepaid at any time with prior notification in writing from Seller. Any principal prepayment that is not received in conjunction with a scheduled payment will not be applied until the next scheduled due date. Any partial prepayment will be applied first to any interest and/or principal payments past due and the balance shall be applied to future principal installments in the inverse order of their maturity. No prepayment shall suspend any required payments of either principal or interest on the remaining outstanding Financed Amount or reduce the amount of any scheduled payment. Prepayment may be subject to a surcharge as follows:

Before the first Year: 7%

After the first Year but before the second Year: 6%

After the second Year but before the third Year: 5%

After the third Year but before the fourth Year: 4%

After the fourth Year but before the fifth Year: 3%

After the fifth Year but before the sixth Year: 2%

One Percent (1%) thereafter.

For purposes of this Section 2.3, "Year" means the period commencing on the first Payment Date extending up to, but not including, the date of the first anniversary of such first Payment Date, and thereafter, the period commencing on each anniversary of the first Payment Date and extending up to, but not including, the next anniversary of the first Payment Date.

## SECTION 3. CONDITIONS PRECEDENT.

The obligation of Lender to make the Loan hereunder is subject to the following conditions precedent being satisfied prior to July 31, 2016:

3.1. Conditions. Before or concurrently with the making of the Loan Lender shall have received:

(a) a clean certificate of acceptance of the Equipment signed by Borrower;

(b) the duly executed Note;

(c) payment of all fees, taxes (including the Note's stamp tax) and expenses (including the fees and expenses of legal counsel to Lender) then due and owing;

(d) proof of perfection of the security interest in the Collateral pursuant to Section 2.4;

(e) the duly executed Subordination Agreement in substantially the form of Annex C (the "Subordination Agreement");

(f) a Disbursement Approval (as defined in the MGA (as defined below)) with respect to the Loan; and

(g) all legal matters incident to the execution and delivery of the Credit Documents shall be satisfactory to Lender.

## SECTION 4. SECURITY INTEREST.

4.1. Creation of Security Interest. To secure Borrower's payment and performance of any and all Obligations, Borrower grants to Lender a security interest in all the Equipment and in all additions and accessions and substitutions therefore, now or hereafter owned, all unearned insurance premiums and insurance proceeds relating to such property, and the proceeds of all of the foregoing (the "Collateral").

4.2. Perfection of Security Interest in Collateral. At Lender's request at any time, Borrower shall sign any security agreement (the "Security Agreement") and take any other action required by law to perfect the security interest in the Collateral granted hereunder under the laws of the country and/or province or state where the Equipment shall be located. All costs and expenses incurred or to be incurred in connection with the preparation, presentation, filing, recordation, registration, publication, or otherwise with the perfection or maintenance of the Collateral shall be borne exclusively by Borrower.

## SECTION 5. REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Lender as follows:

5.1. Corporate Organization. Borrower: (i) is a duly organized and existing entity in good standing under the laws of the jurisdiction of its organization; (ii) has all necessary corporate power to own the property and assets it uses in its business and otherwise to carry on its present business and the business it currently proposes to transact; and (iii) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business transacted by it or the nature of the property owned or leased by it makes such licensing or qualification necessary and in which the failure to be so licensed or qualified would have a Material Adverse Effect.

5.2. Corporate Power and Authority. Borrower has the corporate power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate action to authorize the execution, delivery and performance of such Credit Documents. Borrower has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of Borrower enforceable in accordance with its terms.

5.3. No Violation. Neither the execution, delivery or performance by Borrower of the Credit Documents to which it is a party nor compliance by it with the terms and provisions thereof, nor the consummation of the transactions contemplated herein or therein, will (i) contravene any applicable provision of any law, statute, rule or regulation, or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any term, covenant, condition or other provision of, or constitute a default under, or (other than pursuant to the Security Documents) result in the creation or imposition of (or the obligation to create or



**GE Capital Corporation**
Healthcare Financial Services

impose) any Lien upon any of the property or assets of Borrower under the terms of any Contractual Obligation to which Borrower is a party or by which it or any of its property or assets are bound or to which it may be subject or (iii) violate any provision of the Organizational Documents of Borrower.

5.4. Litigation. There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened, involving Borrower (i) that are likely to have a Material Adverse Effect or (ii) that could reasonably be expected to have an adverse effect on the rights or remedies of Lender or on the ability of Borrower to perform its obligations to Lender under the Credit Documents.

5.5. Use of Proceeds. The proceeds of the Loan shall be used by Borrower to acquire the Equipment and to pay the Total Exposure Fee.

5.6. Financial Statements. All financial statements heretofore delivered to Lender showing historical performance of Borrower have been prepared in accordance with applicable law applied on a basis consistent, except as otherwise noted therein, with that of the previous fiscal year. Each of such financial statements fairly presents on a consolidated basis the financial position of Borrower, as of the dates thereof, and the results of operations for the periods covered thereby.

5.7. No Material Adverse Change. There has been no material adverse change in the condition, financial or otherwise, or business prospects of Borrower.

5.8. Compliance with Statutes, Etc. Borrower is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic and foreign, in respect of the conduct of its business and the ownership of their respective property, except such non-compliance as is not likely to, individually or in the aggregate, have a Material Adverse Effect.

5.9. Due Diligence. Borrower has taken all necessary actions and performed all the due diligence required in order to make the representations and warranties contained in this Section 5.

**SECTION 6. COVENANTS.**

The Borrower covenants and agrees that, so long as the Note is outstanding, except to the extent compliance in any case is waived in writing by the Lender:

6.1. Corporate Existence. The Borrower will preserve and maintain its corporate existence.

6.2. Insurance. The Borrower will insure, and keep insured, in good and responsible insurance companies acceptable to the Lender, all insurable property and assets owned by it of a character usually insured by companies similarly situated and, operating like property or assets, to the extent (as to amounts and coverage of risks) usually insured by such similar companies. The Borrower will also insure employers' and public and product liability risks in good and responsible insurance companies. The Borrower will, upon request of the Lender, furnish to the Lender a summary setting forth the nature and extent of the insurance maintained pursuant to this Section 6.2.

6.3. Financial Reports and Other Information. (a) The Borrower will maintain a system of accounting in accordance with applicable law and will furnish to the Lender and its authorized representatives such information about the business and financial condition of the Borrower as the Lender may reasonably request. The Borrower will deliver to the Lender and to the Ex-Im Bank:

(i) audited financial statements within 90 days after each fiscal year end and

(ii) interim financial statements, certified by its management, within 45 days after the date which is six (6) months prior to its fiscal year end.

(b) Promptly after obtaining knowledge of any of the following, the Borrower will provide the Lender with written notice in reasonable detail of:

(i) any pending or threatened Environmental Claim against the Borrower or any real property owned or operated by the Borrower;

(ii) any condition or occurrence on any real property owned or operated by the Borrower that (x) results in noncompliance by the Borrower with any Environmental Law or (y) could reasonably be anticipated to form the basis of an Environmental Claim against the Borrower or any such real property;

(iii) any condition or occurrence on any real property owned or operated by the Borrower that could reasonably by anticipated to cause such real property to be subject to any restrictions on the ownership, occupancy, use or transferability by the Borrower, of its interest in such real property under any Environmental Law; and

(iv) the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any real property owned or operated by the Borrower.

(c) The Borrower will promptly (and in any event within one Business Day after an officer of the Borrower has knowledge thereof) give notice to the Lender of:

(A) the occurrence of any Default or Event of Default;

(B) any litigation or governmental proceeding of the type described in clause (i) or (ii) of Section 5.4; and

(C) any circumstance that has had or reasonably threatens a Material Adverse Effect.

6.4. Mergers, Consolidations and Sales of Assets. The Borrower will not, (i) consolidate with or be a party to a merger with any other Person or (ii) sell, lease or otherwise dispose of all or a "substantial part" of the consolidated assets of the Borrower; provided, however, that. As used in this Section 5.6, a sale, lease, transfer or disposition of assets shall be deemed to be of a "substantial part" of the consolidated assets of the Borrower if the book value of such assets, when added to the book value of all other assets sold, leased, transferred or disposed of by the Borrower since December 31, 2015 (other than inventory in the ordinary course of business and obsolete, worn out and unusable machinery and equipment) exceeds 5% of

Confidential
Copyright © GE 2004

3



**GE Capital Corporation**
Healthcare Financial Services

their consolidated tangible assets as of December 31, 2015.

**6.5.** Liens. The Borrower will not create, incur, assume or suffer to exist any Lien of any kind on the Equipment except the Liens created by the Security Documents.

**6.6.** Fundamental Changes. The Borrower shall not, without the prior written consent of the Lender, enter into any transaction or merger or consolidation, change, amend, or otherwise modify its Organizational Documents or its business, liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), discontinue its business, enter into any partnership or joint venture or create any subsidiary.

**6.7** Data. Prior to Lender (or any assignee of, or purchaser of the Equipment from, Borrower, or any third party acting on behalf of or at the direction of Borrower) taking possession of the Equipment from Borrower, whether following an event of default, termination of this Agreement or any Schedule, or otherwise, Borrower shall securely remove, or render indecipherable in accordance with prevailing industry standards and available analytical research and in accordance with at least the standard, method and specification for data removal and disposal established under the laws of all applicable jurisdictions, all data (including any and all patient data and information protected under any laws applicable to any party hereto) stored on or otherwise accessible from the Equipment (including from any and all disk drives or magnetic media). Borrower shall be solely responsible for selecting an appropriate removal standard that meets Borrower's business needs and complies with all applicable laws, and agrees that Lender shall not be held responsible for any losses directly or indirectly arising out of, or by reason of the presence and/or use of any and all data or information residing on or within the Equipment.

**6.8** DISCLAIMER; INDEMNIFICATION. Borrower has selected the Collateral without any assistance from Lender and acknowledges that Lender makes no warranty or representation with respect to any Collateral and has no liability to Borrower for any punitive, special, incidental or consequential damages, including lost profit or revenue. BORROWER SHALL INDEMNIFY AND HOLD LENDER, ITS AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES, INCLUDING LEGAL EXPENSES, OF WHATSOEVER KIND ARISING OUT OF OR RELATING TO THE COLLATERAL OR THIS AGREEMENT ("CLAIMS"), INCLUDING, WITHOUT LIMITATION, CLAIMS ARISING OUT OF THE SELECTION, MANUFACTURE OR PURCHASE OF THE COLLATERAL, OWNERSHIP OF THE COLLATERAL, THE DELIVERY, POSSESSION, MAINTENANCE, AND OPERATION OF THE COLLATERAL. BORROWER SHALL, UPON LENDER'S REQUEST, DEFEND ANY ACTIONS BASED ON, OR ARISING OUT OF, ANY OF THE FOREGOING.

**SECTION 7. EVENTS OF DEFAULT.**

**Section 7.1** Events of Default. The occurrence, at any time after the date hereof, of any of the following events shall constitute an "Event of Default":

**7.1.1** Monetary. Default in the payment when due of any principal, interest, or other amount under any Credit Document as and when such amount becomes payable (whether as stated maturity or otherwise).

**7.1.2** Misstatement. Any statement, representation or warranty of Borrower (or any officer, employee, agent or attorney of Borrower), including without limitation any statement, representation or warranty made in this Agreement or in any writing executed at any time in connection with this Agreement, shall prove to have been incorrect or misleading in any respect when made.

**7.1.3** Breach of Covenant. Default in the performance or breach of any other covenant or agreement of Borrower in the Credit Documents, any writing executed at any time in connection with the Credit Documents or any other agreement with Lender.

**7.1.4** Insolvency or Bankruptcy. Borrower shall become insolvent, make an assignment for the benefit of creditors, apply for or consent to the application or suffer the appointment of any receiver, trustee or similar officer, or initiate or have initiated against it any act, process or proceeding under any insolvency, bankruptcy, reorganization, dissolution, liquidation or similar law.

**7.1.5** Cross-Defaults. The occurrence of an event of default under any collateral agreement or any other document executed by Borrower and delivered to Lender at any time in connection with this Agreement.

**7.1.6** Casualty Loss or Other Events. Any uninsured loss, theft, substantial damage or destruction to Borrower's property, or the issuance of any writ, warrant, attachment, levy, garnishment, execution or similar process against any property of Borrower.

**7.1.7** Lender's Insecurity. Lender shall in good faith believe that the prospect for due and punctual payment or performance of any obligation under the Credit Documents is materially impaired.

**7.1.8** Foreign Currency Unavailability. Borrower shall have failed to obtain any requisite foreign exchange control approvals and other authorizations by any competent authorities to assure the availability and transferability of Dollars to enable Borrower to perform its obligations hereunder, or such approvals and other authorizations shall have expired or shall have been revoked, canceled, terminated or otherwise shall have ceased to be in full force and effect for any reason.

**7.1.9** Material Adverse Effect. A Material Adverse Effect shall have occurred.

**7.2** Expenses. Borrower agrees to pay to Lender all expenses incurred or paid by Lender, including reasonable attorneys' fees and court costs, in connection with any Event of Default hereunder or in connection with the enforcement of any of the Credit Documents.

**SECTION 8. REMEDIES.**

**8.1.** Upon default in the prompt and full payment of any installment of principal or interest on the Loan, the entire outstanding principal amount and interest on the Loan to the date of payment shall immediately become due and payable at the option and upon the demand of Ex-Im Bank. Further, upon the occurrence of a Default



**GE Capital Corporation**
Healthcare Financial Services

or an Event of Default or at any time thereafter until such Event of Default is cured to the written satisfaction of Lender, Lender may exercise any and all of the following rights and remedies:

8.1.1. <u>Termination of Commitment</u>. Lender may terminate the Commitment.

8.1.2. <u>Provide insurance on the Equipment</u>. In the event Borrower shall fail to maintain insurance in the manner required hereby, Lender may (but shall not be obligated to) purchase such insurance, and in such event, Borrower shall, upon demand, reimburse Lender for the cost thereof, with interest thereon at 12% per annum, it being understood that such action by Lender shall not be deemed a cure or waiver of Borrower's default.

8.1.3. <u>Default Rate</u>. (a) In the event that any amount of the principal hereof or accrued interest on the Loans is not paid in full when due (whether at stated maturity, by acceleration or otherwise), Borrower shall pay to Lender, on demand, interest on such unpaid amount for the period from the date such amount was due until such amount shall have been paid in full at an interest rate per annum equal to Twelve point five (12.5%) per annum. Nothing contained in any Credit Document shall require or permit the collection of interest in the excess of the maximum amount permitted by applicable law.

(b) Beginning on the date (the "Ex-Im Bank Claim Payment Date") on which the Ex-Im Bank makes a claim payment to the Lender under the Master Guarantee Agreement (Medium Term Credits – Electronic Compliance Program), dated as of June 26, 2001 between the Lender and Ex-Im Bank (the "MGA"), in the event any amount of principal of, or accrued interest on, the Loan owing to Ex-Im Bank is not paid in full when due (whether at stated maturity, by acceleration or otherwise), the Borrower shall pay to Ex-Im Bank on demand interest on such unpaid amount (to the extent permitted by applicable law) for the period from the date such amount was due until such amount shall have been paid in full, at an interest rate per annum equal to one percent (1%) per annum above the Contractual Rate otherwise then applicable under Section 1.4.

8.1.4. <u>Additional Rights and Remedies</u>. Lender may exercise and enforce any of its other rights and remedies under the Credit Documents, and any other right and/or remedy available to it at law, in equity, or under any other agreement or writing. In addition, Lender shall have the right to withhold shipment or delivery of any or all of the Equipment or to repossess (through judicial action if repossession cannot be done without breach of peace) Equipment previously delivered to Borrower. In the event of repossession of the Equipment, Lender shall have the right to recover from Lender the amount of any deficiency between the value of the Equipment at the time of repossession and the then outstanding Loan, plus accrued interest.

8.1.5. <u>Judgment Currency</u>. If for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "<u>Other Currency</u>"), the rate of exchange used shall be that at which in accordance with normal banking procedures Lender could

purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given. The obligation of Borrower in respect of any such sum due from it to Lender hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that on the Business Day following receipt by Lender of any sum adjudged to be due hereunder in such Other Currency, Lender may in accordance with normal banking procedures purchase Dollars with such Other Currency. If the Dollars so purchased are less than the sum originally due to Lender in Dollars, Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Lender against such loss, and if the Dollars so purchased exceed the sum originally due to Lender in Dollars, Lender agrees to remit to Borrower such excess.

8.2. <u>Remedies Cumulative</u>. The rights and remedies under the Credit Documents of Lender are cumulative to, and not exclusive of, any rights or remedies Lender would otherwise have.

8.3. <u>Expenses</u>. Borrower agrees to pay to Lender all expenses incurred or paid by Lender, including reasonable attorneys' fees and court costs, in connection with any Default or Event of Default by Borrower hereunder or in connection with the enforcement of any of the Credit Documents.

**SECTION 9. DEFINITIONS; INTERPRETATION.**

9.1. <u>Definitions</u>. The following terms when used herein have the following meanings:

"<u>Business Day</u>" means any day on which dealings in Dollar deposits are carried on in the London interbank market and on which the Federal Reserve Bank of New York and commercial banks in London and New York City are open for domestic and foreign exchange business.

"<u>Closing Date</u>" means the date on which all the conditions specified in or pursuant to Section 3.1 shall have been satisfied.

"<u>Credit Documents</u>" means this Agreement, the Note, the Subordination Agreement and the Security Documents and all documents executed in connection therewith.

"<u>Default</u>" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"<u>Dollars</u>" or "<u>$</u>" means the lawful money of the United States of America.

"<u>Environmental Claims</u>" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law ("<u>Claims</u>") or any permit issued under any Environmental Law, including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.



**GE Capital Corporation**
Healthcare Financial Services

"Environmental Law" means any Jamaican statute, law, rule, regulation, ordinance, code, policy or rule of common law now or hereafter in effect and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent, decree or judgment relating to the environment, health, safety or Hazardous Materials.

"Hazardous Material" means (a) any asbestos, PCBs or dioxins or insulation or other material composed of or containing asbestos, PCBs or dioxins and (b) any petroleum product and any chemical, material or other substance defined as "hazardous" or "toxic" or words with similar meaning and effect under any Environmental Law.

"Interest Period" means (i) the period commencing on the date of disbursement of the Loan and extending up to, but not including, the next Payment Date (as hereinafter defined); provided, however, that if such date of disbursement is within sixty (60) days of such Payment Date, the Interest Period shall end on the next succeeding Payment Date; and (ii) thereafter the period commencing on each Payment Date and extending up to, but not including, the next Payment Date.

"LIBOR" means, in relation to any Interest Period, the rate of interest per annum (rounded upward, if necessary, to the nearest 1/16 of 1%) quoted by the principal London office of the Lender or an affiliate of the Lender designated by the Lender at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for the offering to leading banks in the London interbank market of United States Dollar deposits for a period and in an amount comparable to such Interest Period and the principal amount upon which interest is to be paid during such Interest Period.

"Lien" means any interest in any property or asset securing an obligation owed to, or a claim by, a Person other than the owner of the property or asset, whether such interest is based on the common law, statute or contract, including, but not limited to, the security interest lien arising from a mortgage, encumbrance, pledge, conditional sale, security agreement or trust receipt, or a lease, consignment or bailment for security purposes.

"Material Adverse Effect" means a material adverse effect on the business, properties, assets, liabilities, condition (financial or otherwise) or prospects of Borrower.

"Obligations" means all fees payable hereunder, all obligations of Borrower to pay principal or interest on the Loan, all other payment obligations of Borrower to Lender arising under or in relation to any Credit Document.

"Organizational Documents" means, relative to any Person, its certificate of incorporation, certificate of formation, articles of incorporation, by-laws, and similar documents and all operating agreements, shareholder agreements, joint-venture agreements, voting trusts and similar arrangements to which such Person is a party applicable to any of its capital stock, membership interests and all other equity interest of such Person of any other type.

"Person" means an individual, partnership, corporation, association, trust, unincorporated organization, limited liability company or any other entity or organization, including a government or any agency or political subdivision thereof.

"Security Documents" means the Security Agreement and all

other security agreements, mortgages and like agreements or instruments delivered by Borrower granting a Lien to Lender to secure the Obligations as any of the same may be amended, supplemented or otherwise modified from time to time.

"Special LIBOR" means, with respect to any Interest Period, the rate of interest per annum specified as the Dollar LIBOR Interbank fixing rate in the *Financial Times* under the table entitled "Money Rates" (or any successor title) in effect on the day two Business Days prior to the first day of the relevant Interest Period for a term similar to the term of such Interest Period; *provided* that if no rate is specified for such day, the applicable rate shall be the rate specified for the immediately preceding day for which a rate is specified, and if more than one rate is specified, the applicable rate shall be the highest of all such rates; *provided further*, that in the event the *Financial Times* either completely ceases publication or discontinues publication of the Dollar LIBOR interbank fixing rate, then Ex-Im Bank shall determine Special LIBOR by reference to a financial publication with similar international or U.S. circulation, which publication shall be selected by Ex-Im Bank in its sole discretion.

9.2. Interpretation. The foregoing definitions shall be equally applicable to the singular and plural forms of the terms defined. All references to times of day in this Agreement shall be references to New York time unless otherwise specifically provided..

SECTION 10. MISCELLANEOUS.

10.1. No Waiver of Rights. No delay or failure on the part of Lender in the exercise of any power or right under any Credit Document shall operate as a waiver thereof or as acquiescence in any default, nor shall any single or partial exercise thereof preclude any other or further exercise of any other power or right.

10.2. Non-Business Day. If any payment of principal or interest on the Loan or of any other Obligation shall fall due on a day which is not a Business Day, interest or fees (as applicable) at the rate, if any, the Loan or other Obligation bears for the period prior to maturity shall continue to accrue on such Obligation from the stated due date thereof to and including the next succeeding Business Day, on which the same shall be payable.

10.3. Survival of Representations. All representations and warranties made herein or in certificates given pursuant hereto shall survive the execution and delivery of this Agreement and the other Credit Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

10.4. Notices. Except as otherwise specified herein, all notices under the Credit Documents shall be in writing (including cable, telecopy or telex) and shall be given to a party hereunder at its address, telecopier number or telex numbers set forth below or such other address, telecopier number or telex as such party may hereafter specify by notice to the other party, given by courier, by United States certified or registered mail, by telegram or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices under the Credit Documents to Borrower and Lender shall be addressed to their respective addresses, telecopier, telex, or telephone numbers set forth below:



**GE Capital Corporation**
Healthcare Financial Services

Borrower:

X-RAY AND DIAGNOSTIC, ULTRASOUND CONSULTANTS  LIMITED

Address:   1 Ripon Road, Kingston 5,  Jamaica
Telephone: 876 929 0844;
              876 929 0845

Lender:

GE HFS LLC
20225 Watertower Blvd Crossroads Corporate Center XII
Brookfield, WI. 53045
Telephone: (305) 593 4453;  (305) 593 4476;  (305) 593 4471

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section 9.7 and a confirmation of receipt of such telecopy has been received by the sender, (ii) if given by courier, when delivered, (iii) if given by mail, five (5) days after such communication is deposited in the mail, registered with return receipt requested, addressed as aforesaid or (iv  if given by any other means, when delivered at the addresses specified in this Section 10.4.

10.5.  Counterparts. This Agreement may be executed in any number of counterpart signature pages, and by the different parties on different counterpart signature pages, each of which when executed shall be deemed an original but all such counterparts taken together shall constitute one and the same instrument.  Delivery of an executed counterpart signature page of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

10.6.  Successors and Assigns. This Agreement shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns, including any subsequent holder of any Note.  Borrower may not assign any of its rights or obligations under any Credit Document without the written consent of Lender.

10.7.  Amendments. Any provision of the Credit Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Lender.

10.8.  Headings; Construction.  Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement. The parties acknowledge and agree that neither this Agreement nor the other Credit Documents shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of this Agreement and the other Credit Documents.

10.9.  Entire Agreement. The Credit Documents constitute the entire understanding among Borrower and Lender and supersede all earlier or contemporaneous agreements, whether written or oral, concerning the subject matter of the Credit Documents.

10.10.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. (a) This Agreement, and the rights and duties of the parties thereto, shall be construed in accordance with and governed by the internal laws of the State of New York.

(b)   The parties irrevocably submit to the jurisdiction of the federal and state courts sitting in the Borough of Manhattan, City of New York, State of New York, United States of America; and at the election only of Lender, to the exclusion of the courts of any country which may have jurisdiction for the purpose of protecting and enforcing Lender's rights either hereunder or pursuant to any other agreements, documents, instruments or otherwise, for the purposes of any suit, action or other proceeding arising in connection hereto or thereto, or the subject matter hereof or thereof, or any of the transactions contemplated hereby or thereby, brought by the Lender, or their respective successors, subrogees or assigns.

(c)   Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party in the manner provided in Section 10.4 and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

(d)   Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding relating to this Agreement in the Borough of Manhattan, City of New York, State of New York, United States of America and further irrevocably waives any claim that the Borough of Manhattan, City of New York, State of New York, United States of America is not a convenient forum for any such suit, action or proceeding.

(e)   TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR COUNTERCLAIM ARISING UNDER OR IN ANY WAY RELATED TO THIS AGREEMENT, AND UNDER ANY THEORY OF LAW OR EQUITY, WHETHER NOW EXISTING OR HEREAFTER ARISING.

(f)   Nothing contained in this Section 10 shall preclude the bringing by the Lender of any action or proceeding in respect to this Agreement in the courts of any jurisdiction in which Borrower or any of its property or assets may be found or located.

(g)   The Note and the Security Agreement shall be governed by the laws of the jurisdiction set forth therein.

10.11.  Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.12.  Currency. Each reference in the Credit Documents to

Confidential
Copyright © GE 2004

7

rev. 06/04



**GE Capital Corporation**
Healthcare Financial Services

Dollars is of the essence. To the fullest extent permitted by law, the obligation of Borrower in respect of the Obligations shall, notwithstanding payment in any other currency (whether pursuant to judgment or otherwise), be discharged only to the extent of the amount of Dollars that Lender may, in accordance with its normal banking procedures, purchase with the sum paid in such other currency (after any premium and costs of exchange) on the business Day immediately following the day on which Lender receives such payment. If the amount of Dollars so purchased for any reason is less than the sum originally due to Lender in Dollars, Borrower agrees, as a separate obligation and notwithstanding any such judgment or other circumstance, to indemnify Lender against such loss.

10.13. <u>Fee</u>. Borrower shall pay to Lender a fee equal to 1% of the Term Loan Commitment on or before the Closing Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

Borrower:

X-RAY AND DIAGNOSTIC ULTRASOUND CONSULTANTS LIMITED

Name: Winston Franklin Barrington Clarke
Title: Managing Director
_____, 2016
Address: 1 Ripon Road, Kingston 5, Jamaica
Telephone: (876) 929-0844; (876) 929-0845
(876) 929-8140

GUARANTOR:
WINSTON FRANKLIN BARRINGTON CLARKE

Winston Franklin Barrington Clarke
TRN 101455488
_____, 2016
Address: 4 Margaret Drive, Kingston 6, Jamaica

GUARANTOR:
EILEEN PATRICIA CLARKE

Eileen Patricia Clarke
TRN 101455526
_____, 2016
Address: 4 Margaret Drive, Kingston 6, Jamaica

GUARANTOR:
THE RADIATION ONCOLOGY CENTRE OF JAMAICA LIMITED
TRN 001676032

Name: Collie Roy Emanuel Miller- Title: Managing Director
_____, 2016
Address: Suite 3, 1 Ripon Road, Kingston 5, Jamaica
Phone: (876) 920 1823 /  (876) 920 8404
(876) 960 0975

Lender:
GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
[NAME]
[TITLE]

**[AFFIX STAMP DUTIES]**

Confidential
Copyright © GE 2004

8

rev. 06/04

ANNEX A
EQUIPMENT & CONFIGURATION

Quotation Number: PR7-C66465 Version 2

| CATALOG | QTY | CATALOG | DESCRIPTION |
|---|---|---|---|
| | 1 | | **Discovery IQ** |
| 1 | 1 | S9215CM | Discovery IQ - 3 Ring |
| 2 | 1 | P5800ES | Spanish Label Kit |
| 3 | 1 | P5051TF | PET/CT Long Length Cables |
| 4 | 1 | P5051MO | ASiR Option for NIO 16 sl system |
| 5 | 1 | S9220DE | Advanced Workflow Scanning Package |
| 6 | 1 | S9225DE | Cardiac PET Scanning Package |
| 7 | 1 | P5051KK | GPU 16fps Recon Upgrade |
| 8 | 1 | P5051TR | 2M Scan Range option |
| 9 | 1 | P5051SK | SharpIR option |
| 10 | 1 | P5051NN | Q.CORE +2, with GPU |
| 11 | 1 | P5051QC | Q.Clear option |
| 12 | 1 | P5051NE | Q.CORE+ Upgrade Kit |
| 13 | 1 | B7870JC | Advanced Vessel Analysis Xpress on Operator Console |
| 14 | 1 | B7870JD | AutoBone Xpress on Operator Console |
| 15 | 1 | B77292CA | CT Service Cabinet |
| 16 | 1 | E4502FB | GE Digital Energy Signature 5000 Series 100 KVA UPS – CT & MR |
| 17 | 1 | E4502AC | 110 Amp Main Disconnect Panel for CT (INTL) |
| 18 | 1 | E8007RT | Ivy 7800 Cardiac Monitoring Kit |
| 19 | 1 | E8007TB | Cardiac Cable Kit for IPC, Ivy 3150-B, Ivy 7800 |
| 20 | 1 | E8505NE | MEDTEC Silverman Clear Plastic Head Support |
| 21 | 1 | E8500NB | Patient Arm Support System for Nuclear, PET/CT, MRI |
| 22 | 1 | E8500NC | Patient Leg Rest for Nuclear, PET/CT, MRI |
| 23 | 1 | E8500PC | Three Piece Patient Leg Rest Set |

A-1

Quotation Number: PR7-C66465 Version 2

| CATALOG QTY | | CATALOG | DESCRIPTION |
|---|---|---|---|
| 24 | 1 | E8004FC | Wide Security Straps for HiSpeed Advantage 9800 |
| 25 | 1 | E8004FD | Narrow Security Straps for HiSpeed Advantage 9800 |
| 26 | 1 | E8016BL | Slicker Cushion for PET GT Table |
| 27 | 1 | E8008P | VQC Phantom for Volumetric Registration |
| 28 | 1 | E8008PS | PET ANNULUS PHANTOM SHIEL |
| 29 | 1 | E8008PN | PET ANNULUS PHANTOM - DQA |
| 30 | 1 | E8000HF | 2 TB USB EXT HARD DRIVE |
| | 1 | | **AW VOLUMESHARE 7** |
| 31 | 1 | S7580AW | AW Package with Full Fusion and Dynamic VUE |
| 32 | 1 | M81521BN | ONCOQUANT MULTIMODALITY P |
| 33 | 1 | B79821WB | COLON VCAR EC |
| 34 | 1 | B77021PV | CT PERF 4D MULTI-ORGAN |
| 35 | 1 | B79971JH | SmartScore 4.0 Software - for AW 4.2P and Higher |
| 36 | 1 | B79821SJ | THORACIC VCAR AND LUNG VC |
| 37 | 1 | B77121BH | VESSELIQ XPRESS AND AUTOB |
| 38 | 1 | P51821BD | CARDIQ FUSION PET AND SPE |
| 39 | 1 | P50801BF | CardIQ Physio for AW |
| 40 | 1 | P50821PF | PET VCAR |
| | 1 | | **TiP Apps Latin America Training** |
| 41 | 2 | W8107NM | 8 Days NM or PET System Onsite Training forNew NM or PET System 4+4 - 8 Days Total |
| | 1 | | **NonProducts** |
| 42 | 1 | | Ocean Freight and Insurance to Jamaica |

**Quote Summary:**

A-2

Quotation Number: PR7-C66465 Version 2

| CATALOG QTY | CATALOG | DESCRIPTION |
|---|---|---|

1,150,000.00

(Quoted prices do not reflect state and local taxes if applicable)



GE Medical Systems–Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4639-9350
Brazil: Fax (55 11) 3057 6367
Chile: Fax (56 2) 421 4103
México:  Fax (52 55) 5228-9661
Puerto Rico: Fax (1 787) 282 7436

# GEMS Product Warranty
## (Latin America and the Caribbean)

## Covered Products and Excluded Products

### Covered Products

These warranties cover the following equipment and products by GEMS:

- Magnetic Resonance ("MR") Products (new equipment, partial system hardware upgrades).
- Computed Tomography ("CT") Products (new equipment, full system hardware upgrades, partial system hardware upgrades).
- X-ray and Mammography Products (new equipment, partial system hardware upgrades).
- Nuclear Products (new equipment, partial system hardware upgrades).
- Positron Emission Tomography ("PET") Products (new equipment, including scanners, cyclotrons and chemistry labs, and partial system hardware upgrades).
- Ultrasound Products (new equipment).
- Integrated Imaging Solution ("IIS") Products (new workstations and new connectivity products).
- Gold Seal Preferred Products (pre-owned GE equipment provided with a warranty).
- Invasive Cardiology Products (new equipment).

### Excluded Products

These warranties do not cover the following equipment and products:

- Accessories and Supplies identified by catalog numbers starting with the letter "E"(covered by a separate warranty).
- Products not listed in GEMS' price pages at the time of sale, normally identified by NL or NW series numbers in GEMS' Quotation (provided with the manufacturer's warranties, if any, GEMS is permitted to pass on to Customer; otherwise, provided AS IS).
- GE X-ray Tubes and GE Image Intensifier Tubes (covered by a separate warranty).
- Maxiray X-ray Tubes (covered by a separate warranty).
- GE PowerTech Power Conditioning Products (covered by a separate warranty).
- New or Exchange Parts sold by GEMS Direct Customer Order Service (covered by a separate warranty).
- Partial System Hardware Upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers.
- Products manufactured and sold by GEMS' affiliates (such as GE OEC, GE Lunar and GEMS IT), unless otherwise specified in the sales contracts used by GEMS' affiliates.
- Gold Seal Exchange Products (pre-owned equipment provided AS IS).

- Multi-Vendor Preferred Products (pre-owned non-GE equipment provided with a limited warranty).

## Scope and Duration of Warranties

**Product Warranties:** GEMS warrant to Customer that the Covered Products listed in GEMS' Quotation will (1) be free from defects in material, workmanship, and title, and (2) conform to OEMS' published Covered Product specifications in effect on the date of shipment of the Covered Products. GEMS' published Covered Product specifications are available on request.

**Patent and Copyright Warranty:** GEMS warrants to Customer that when they are delivered, the Covered Products will not be subject to any valid patent or copyright infringement claim.

**Warranty Period:** The warranty period for all warranties listed above, except the warranty of title and the Patent and Copyright Warranty, is limited in time as shown in the Warranty Schedule below.

If GEMS does not assemble or install the Covered Products, the warranty period begins on the date the Covered Products are delivered to Customer.  If GEMS assembles or install the Covered Products, the warranty period begins on the earlier of (1) five days after the date GEMS notifies Customer that GEMS has completed assembly or installation and the Covered Products are operating in accordance with GEMS' published Covered Product specifications, or (2) the date Customer first use the Covered Products for patient use.  If assembly is delayed for ninety (90) days or more after the date of delivery for a reason beyond GEMS' reasonable control, the warranty period will begin on the ninetieth (90th) day after the date of delivery.

The warranty period for any Covered Product or part furnished to Customer without a pro rata charge as a warranty remedy will be the remaining portion of the warranty period applicable to the repaired or replaced Covered Product.  The warranty period for any replacement Covered Product or part furnished to Customer with a pro rata charge as a warranty remedy will be the full period of the warranty applicable to the replacement Covered Product.

## Warranty Exclusions

These warranties are exclusive and in lieu of all other warranties, whether written, oral, expressed, implied or statutory.  EXCEPT AS PROVIDED HEREIN, NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET

ENJOYMENT, SYSTEM INTEGRATION AND DATA ACCURACY, WILL APPLY.  THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE DESCRIBED IN THIS DOCUMENT AND NO PRIOR STATEMENTS BY ANY OF GEMS' REPRESENTATIVES SHALL MODIFY OR EXPAND THESE WARRANTIES.

The warranties do not cover:

A. Any defect or deficiency (including failure to conform to GEMS' published Covered Product specifications) which results, in whole or in part, from: (1) any improper storage, handling, use or maintenance of the Covered Products, or any alteration, extraordinary use, repair or service of the Covered Products, by anyone other than GEMS, or any subsidiary, affiliated company or authorized service representative of ours or the manufacturer; (2) failure to follow any of GEMS' written instructions or recommendations provided by GEMS or any subsidiary, affiliated company or authorized service representative of GEMS or the manufacturer; (3) using or combining the Covered Products with any item or data except as specified in the Covered Product specifications or using or combining the Covered Products with any item or data that does not properly and unambiguously exchange data with the Covered Products in accordance with the Covered Products' specifications; (4) any of Customer's designs, specifications or instructions; (5) any failure to use the Covered Products in accordance with their specifications, including upper and lower date limits; and (6) any cause external to the Covered Products as furnished by GEMS or beyond GEMS' reasonable control, including, but not limited to, power failure, failure to keep Customer's site clean and free of dust, sand other particles or debris, failure to keep your site in a proper environmental condition, and, for MR systems, failure of any water chiller system supplied by Customer;

B. The payment or reimbursement of any facility costs arising from repair or replacement of the Covered Products or parts;

C. Products sold to OEMS' international distributors (covered by a separate warranty);

D. Covered Products installed outside Latin America and the Caribbean;

E. Expandable supply items;

F. For MR systems, service to any water chiller systems supplied by Customer;

G. For MR systems with LHe/LN or shield cooler configured superconducting magnets



GE Medical Systems—Americas:  Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems— Latin America:  Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4839-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9661
Puerto Rico:  Fax (1 787) 282 7436

(except for MR Systems with LCC magnets), any cryogen supply, cryogenic service or service to the magnet, cryostat, coldhead, shield cooler compressor or superconductive or resistive shim coils unless the need for such supply or service is caused by a defect in material or workmanship covered by these warranties (GEMS' MR Magnet Maintenance and Cryogen Service Agreement is available to provide supplemental coverage during the warranty period); and

H. For Proteus XR/a, Revolution XR/d and Precision 500D x-ray systems, collimator bulbs.

## Exclusive Warranty Remedies

**Product Warranties:** If Customer promptly notify GEMS of Customer's warranty claim and make the Covered Product available for service, GEMS will at GEMS' option, either repair, adjust or replace (with new or exchange replacement parts) the non-conforming Covered Product or parts of the Covered Product.  Except as noted below for batteries, warranty service will be performed without charge ,from 8:00 a.m. to 5:00 p.m., Monday-Friday, excluding GEMS' holidays, and outside those hours at GEMS' then prevailing service rates and subject to the availability of personnel.  Installation, warranty service or other service required to be performed may be performed by GEMS or any subsidiary, affiliated company or authorized service representative of ours or the manufacturer. Warranty service for batteries used with X-ray and Mammography systems will be performed without charge during the hours shown above only during the first twelve months of the warranty period.

**Patent and Copyright Warranty:**  GEMS will defend or settle any suit against Customer to the extent it is based on an infringement claim that would be a breach of the Patent and Copyright warranty, provided GEMS receives prompt written notice of the claim, Customer's cooperation in its defense or settlement, and complete and exclusive control over its defense or settlement.  If a court of competent jurisdiction renders a final judgment that the infringement claim is valid, GEMS will pay all damages and costs awarded against Customer due to the breach.  In addition, GEMS will either obtain a license for Customer to continue using the infringing Covered Product, provide a non-infringing replacement, alter the Covered Product so that it is non-infringing, or remove the infringing Covered Product and refund the price (less reasonable depreciation) and any return transportation costs paid by Customer.

**Exclusive Remedies and Sole Liability:** The above remedies in this EXCLUSIVE WARRANTY REMEDIES section are Customer's exclusive remedies and constitute GEMS' sole liability for any warranty claims. CUSTOMER AGREES THAT GEMS AND GEMS' SUBSIDIARIES, AFFILIATES AND AUTHORIZED SERVICE REPRESENTATIVES HAVE NO LIABILITY TO CUSTOMER FOR (1) ANY PENAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS EXCESS COSTS

INCURRED AND LOST PROFITS OR REVENUE, (2) ANY ASSISTANCE NOT REQUIRED UNDER GEMS' SALES AGREEMENT, AND (3) ANYTHING OCCURRING AFTER THE WARRANTY PERIOD ENDS.

## Warranty Schedule

### 12 months
* MR systems and components
* CT systems, components, detectors and full system hardware upgrades
* X-ray and mammography systems, components and full system hardware upgrades
* Nuclear systems and components
* PET systems (scanners, cyclotrons and chemistry labs) and components
* Ultrasound systems, components, modules, upgrades, probes and transducers (except for Ultrasound products listed below)
* IIS workstation and connectivity products (except for IIS products listed below)
* Gold Seal Preferred products (unless otherwise specified in Quotation)

### 6 months
* MR partial system hardware upgrades (except for partial system hardware upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers)
* CT partial system hardware upgrades (except for partial system hardware upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers)
* X-ray partial system hardware upgrades; high voltage rectifiers and TV camera pick-up tubes
* PET partial system hardware upgrades (scanners, cyclotrons and chemistry labs)
* Nuclear partial systems hardware upgrades

### 60 months, prorated
* Nickel cadmium or lead acid batteries for X-ray and mammography systems (prorated as shown below)

### 3 months
* HealthNet vLan, Advantage Review - Remote Products (IIS products)
* T3 exchange ultrasound probes and transducers, ultrasound water path attachment kit (Ultrasound products)

## Batteries

For X-ray and mammography systems, if nickel cadmium or lead acid batteries need replacement during their applicable warranty period, Customer will pay the price of the replacement battery in effect on its delivery date less a Pro Rata Credit Allowance.  The Pro Rata Credit Allowance for batteries that fail less than 12 months after the warranty begins is 100%.  The Pro Rata Credit Allowance for batteries that fail more than 12 months after the warranty begin is:

$$\frac{1 - \text{# of Mos. After Warranty Commencement} \times 100\%}{60}$$

For the purpose of Pro Rata Credit Allowance, a fraction of a month less than 15 days will be disregarded, and a fraction of a month equal to or greater than 15 days will be regarded as a full month.



GE Medical Systems–Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems– Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4639-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5229-5661
Puerto Rico: Fax (1 787) 282 7436

# Garantía de Productos GEMS
## (América Latina y el Caribe)

## Productos Cubiertos y Productos Excluidos

### Productos Cubiertos

La garantía cubre los siguientes equipos de GEMS:

- Equipos de Resonancia Magnética ("MR") (equipos nuevos o mejoras del disco duro a una parte del sistema).
- Equipos de Tomografía Computada ("CT") (equipos nuevos, mejoras al disco duro de todo el sistema o mejoras del disco duro a una parte del sistema).
- Equipos de Rayos X y Mamografía (equipos nuevos o mejoras del disco duro a una parte del sistema).
- Equipos de Medicina Nuclear (equipos nuevos o mejoras del disco duro a una parte del sistema).
- Equipos de Tomografía por Emisión de Positrones ("PET") (equipos nuevos, incluso scanners, ciclotrones, laboratorios de química y mejoras del disco duro a una parte del sistema).
- Equipos de Ultrasonido (equipos nuevos).
- Equipos Integrated Imaging Solution ("IIS") (estaciones de trabajo nuevas y productos nuevos de conectividad).
- Productos Preferidos GoldSeal (equipos usados fabricados y garantizados por GEMS).
- Productos Cardiológicos Invasivos (equipo nuevo)

### Productos Excluidos

La garantía no cubre los siguientes equipos y productos:

- Los accesorios y piezas cuyos números de catálogo comienzan con la letra "E" (cubiertos por su propia garantía).
- Aquellos productos que al momento de su venta no se encuentran empadronados en las listas de precios de GEMS, normalmente identificados en las Cotizaciones de GEMS con los números de serie NL o NW (la garantía para productos no empadronados, si la hubiere, es aquella que ofrezca la casa fabricante y que ésta a su vez haya autorizado a GEMS a ofrecer al Cliente; en caso contrario, los productos no empadronados se entregan EN EL ESTADO EN QUE SE ENCUENTREN);
- Tubos GE de Rayos X y Tubos GE Intensificadores de Imágenes (cubiertos por su propia garantía).
- Tubos de Rayos X Maxiray (cubiertos por su propia garantía).
- Productos de Acondicionamiento de Potencia GE PowerTech (cubiertos por su propia garantía).
- Piezas nuevas o de recambio vendidas por GEMS Direct Customer Order Service (cubiertas por su propia garantía).
- Aquellas mejoras del disco duro a una parte del Sistema cuando conforme a la lista de precios electrónica de GEMS (e-Pricebook), la garantía

se reserva sólo a Clientes que cuenten con contrato de servicio.

- Productos que fabriquen y vendan afiliadas de GEMS (tales como GE OEC, GE Lunar y GEMS IT), salvo estipulación distinta contemplada en los formatos de contratos de compraventa que ellas utilizan.
- Productos de recambio GoldSeal (equipos usados que se entregan EN EL ESTADO EN QUE SE ENCUENTREN).
- Productos con Tratamiento Preferente manufacturados por Múltiples Fabricantes (equipos usados fabricados por terceros y que GEMS ofrece con garantía limitada).

## Alcance y Vigencia de la Garantía

**Garantías para los Producto:** GEMS garantiza al Cliente que los Productos Cubiertos que se incluyen en las Cotizaciones de GEMS (1) estarán libres de defectos resultantes de materiales, mano do obra o titulación y (2) responderán a las descripciones y especificaciones que se tengan publicadas para el respectivo producto en la fecha de su despacho al Cliente. Tales especificaciones pueden obtenerse en cualquier momento a sola solicitud.

**Garantía de Patentes y Derechos de Autor:** GEMS garantiza al Cliente que al momento de su entrega los Productos Cubiertos no son objeto de ningún reclamo legítimo por infracción de patentes o de derechos de autor.

**Vigencia de las Garantías:** La duración de las garantías, con excepción de la garantía de propiedad y de la Garantía de Patentes y Derechos de Autor, se limita a los períodos indicados en el cronograma que se establece en la página siguiente.

Tratándose de Productos Cubiertos no ensamblados ni instalados por GEMS, el período de vigencia de la garantía comienza en la fecha en que se entregan al Cliente. Si la instalación corre a cargo de GEMS, el período de vigencia de la garantía comenzará (1) cinco días después de la fecha en que GEMS notifique al Cliente que la instalación ha finalizado y que los Productos Cubiertos funcionan de acuerdo con sus descripciones o especificaciones ó (2) en la fecha en que el Cliente haga uso de los Productos Cubiertos por primera vez, lo que ocurra primero. En caso de que por causas razonablemente ajenas al control de GEMS la instalación se demore por noventa (90) o más días desde la fecha de entrega de los Productos, la vigencia de la garantía comenzará cumplidos noventa (90) días desde la fecha de entrega.

Cuando los Productos Cubiertos o las piezas sean entregadas al Cliente sin costo y como parte del servicio de garantía, la duración de su garantía será la que le restaba al Producto Cubierto reparado o sustituido. La duración de la garantía para Productos Cubiertos de reemplazo por los que el Cliente haya pagado un cargo proporcional, será la máxima que le corresponda al Producto Cubierto de reemplazo.

## Exclusiones de la Garantía

Esta garantía cancela y sustituye toda otra garantía, declaración o condición, sea escrita, verbal, expresa, implícita o dispuesta por ley.  SALVO LO DISPUESTO EN ESTE DOCUMENTO, NO SE OTORGAN GARANTÍAS EXPRESAS O IMPLÍCITAS DE COMERCIABILIDAD, DE ADAPTACIÓN PARA ALGÚN USO ESPECIAL, POSESIÓN LIBRE DE INTERFERENCIAS, INTEGRACIÓN DEL SISTEMA O EXACTITUD DE LA INFORMACIÓN (DATA).  NO SE OTORGA NINGUNA GARANTÍA DISTINTA A LA CONTENIDA EN ESTE DOCUMENTO; LA GARANTÍA PERMANECERÁ INALTERABLE, SIN VERSE MODIFICADA O AMPLIADA POR NINGUNA DECLARACIÓN O MANIFESTACIÓN QUE PUDIEREN HACER LOS REPRESENTANTES DE GEMS.

La garantía no cubre:

A. Cualquier defecto o deficiencia (incluso la falta de adecuación a las descripciones o especificaciones de los Productos) resultante, total o parcialmente, de cualquiera de las siguientes circunstancias: (1) almacenamiento, manipulación, uso o mantenimiento inadecuados, cualquier alteración o uso anormal de los Productos, reparación o servicio por parte de cualquier persona distinta a GEMS; (2) la falta de observación de cualquiera de las recomendaciones o instrucciones escritas de GEMS; (3) el uso o combinación de los Productos Cubiertos con cualquier elemento o dato, salvo según lo indicado en las especificaciones del Producto, o el uso o combinación de los Productos Cubiertos con cualquier elemento o dato que no intercambie datos en forma adecuada y precisa con los Productos Cubiertos, de acuerdo con sus especificaciones; (4) los diseños, especificaciones o instrucciones que provengan del Cliente; (5) cualquier uso de los Productos en discordancia con sus especificaciones, incluida la limitación de procesar fechas por debajo o por encima del rango operativo; o (6) cualquier factor externo a los Productos Cubiertos tal como GEMS los haya entregado, o razonablemente ajeno al control de GEMS, incluyendo, de forma meramente enunciativa, cortes de energía eléctrica, el no mantener el recinto limpio y libre de polvo, arena, u otras partículas o materiales de deshecho, el no mantener las instalaciones en adecuadas condiciones ecológicas o, para el caso de sistemas de RM, fallas en los sistemas de refrigeración agua que el propio Cliente tenga instalados;

B. El pago o reembolso de los costos asociados con el recinto, resultantes de la reparación o reemplazo de Productos Cubiertos o piezas;

C. Productos vendidos a los distribuidores internacionales de GEMS (cubiertos por su propia garantía);



GE Medical Systems—Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems— Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4639-3950
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9661
Puerto Rico: Fax (1 787) 282 7436

D. Productos Cubiertos instalados fuera de América Latina y el Caribe;

E. Artículos de suministro expandibles.

F. Con respecto a sistemas de RM, el servicio a los sistemas de refrigeración por agua que el propio Cliente tenga instalados;

G. Con respecto a los sistemas de RM con LHe/LN o magnetos superconductivos configurados del enfriador protector (con excepción de los Sistemas de RM con magnetos LCC), todo suministro de criógeno, servicio criogénico o servicio al magneto, criostato, cabezal frío, compresor del enfriador protector o bobinas del tipo "shim coil" superconductivas o resistivas, a menos que la necesidad de suministro o servicio sea resultado de un defecto en los materiales o en la mano de obra cubiertos por esta garantía (GEMS pone a disposición del Cliente su *MR Magnet Maintenance and Cryogen Service Agreement*, como una cobertura complementaria durante el período de vigencia de la garantía); y

H. Los focos collimator en los sistemas de rayos X Proteus XR/a, ni Revolution XR/d y el Precision 500D.

## Únicos Recursos Bajo la Garantía

**Garantía para los Productos:** Siempre que el Cliente formule con celeridad el reclamo bajo garantía a GEMS y ponga el Producto Cubierto a disposición de GEMS para que se le preste el servicio, GEMS, a su criterio, procederá a reparar, ajustar o sustituir todo el Producto Cubierto (usando repuestos nuevos o de recambio) o aquellas piezas que no se ajustan a las especificaciones. Salvo lo indicado posteriormente respecto de las baterías, el servicio de garantía se brinda en forma gratuita de lunes a viernes, de 8.00 am a 5.00 pm, salvo los feriados que observe GEMS. Fuera de este horario, y sujeto a disponibilidad de personal, el servicio de garantía estará disponible a las tarifas vigentes. La instalación, servicio de garantía u otros servicios necesarios podrán ser llevados a cabo por GEMS o por el fabricante, o por cualquiera de sus respectivas subsidiarias, afiliadas o representantes autorizados de servicio. El servicio de garantía de las baterías utilizadas en los sistemas de Rayos X y Mamografía se realizará en forma gratuita durante el horario anteriormente indicado sólo durante los primeros doce meses del período de vigencia de la garantía.

**Garantía de Patentes y Derechos de Autor:** GEMS defenderá o transará todo juicio iniciado contra el Cliente en la medida en que se base en un reclamo por violación de las garantías de Propiedad, Patentes y Derechos de Autor, a condición de que GEMS sea notificada al respecto por escrito, que el Cliente coopere en la defensa o transacción del reclamo y que se le permita a GEMS asumir en forma exclusiva el manejo del caso. GEMS pagará todos los daños y perjuicios y los gastos que el tribunal

imponga al Cliente con motivo de la infracción. Además, GEMS obtendrá una licencia para que el Cliente pueda continuar usando el Producto Cubierto que haya incurrido en violación de los derechos antes mencionados, o entregará al Cliente un producto de reemplazo que no viole dichos derechos, o modificará el Producto Cubierto de forma tal que no viole ningún derecho, o retirará el Producto Cubierto en infracción y reembolsará al Cliente tanto el precio (menos una amortización razonable) como los gastos de transporte en que el Cliente haya incurrido para retornar el Producto Cubierto.

**Únicos Recursos del Cliente y Limitación de la Responsabilidad de GEMS:** Los párrafos precedentes en la presente sección sobre ÚNICOS RECURSOS BAJO LA GARANTÍA son los únicos recursos con que cuenta el Cliente cuenta y constituyen la única responsabilidad de GEMS por cualquier reclamo que se efectúe bajo la garantía. EL CLIENTE ACEPTA QUE GEMS Y SUS SUBSIDIARIAS, AFILIADAS Y REPRESENTANTES AUTORIZADOS NO SERÁN RESPONSABLES FRENTE AL CLIENTE POR (1) DAÑOS Y PERJUICIOS PUNITIVOS, INCIDENTALES O INDIRECTOS, TALES COMO EL LUCRO CESANTE O LA PÉRDIDA DE INGRESOS, (2) ASISTENCIAS NO PREVISTAS EN EL RESPECTIVO CONTRATO DE VENTA O (3) CUALQUIER CIRCUNSTANCIA QUE SE PRESENTE DESPUÉS DE EXPIRADO EL PERÍODO DE VIGENCIA DE LA GARANTÍA.

## Cronograma de la Garantía

**12 meses**
- Sistemas y componentes de RM
- Sistemas, componentes, detectores y mejoras al hardware de todo el sistema de TC
- Sistemas, componentes y mejoras al hardware de todo el sistemas de equipos de Rayos X y Mamografía
- Sistemas y componentes de Medicina Nuclear
- Sistemas (scanners, ciclotrones y laboratorios de química) y componentes de PET
- Sistemas, componentes, módulos, mejoras, sondas y transductores de Ultrasonido (con excepción de los productos de Ultrasonido mencionados más adelante)
- Productos de estaciones de trabajo y conectividad de IIS (con excepción de los productos de IIS mencionados más adelante)
- Productos Preferidos GoldSeal (salvo indicación distinta en la Cotización)

**6 meses**
- Mejoras al hardware de parte de sistemas de RM (con excepción de las mejoras del disco duro a una parte de los sistemas y que, conforme a la lista de precios de GEMS (e-Pricebook), en garantía se reserve únicamente a Clientes que cuenten con contratos de servicio)
- Mejoras del disco duro a una parte de los sistemas de TC (con excepción de las mejoras del disco duro a partes de sistemas que, conforme a la lista de precios de GEMS (e-Pricebook), su garantía se reserve únicamente a Clientes que cuenten con contratos de servicio)
- Mejoras del disco duro a una parte de los sistemas de Rayos X, rectificadores de alto voltaje o tubos analizadores de cámaras de televisión
- Mejoras del disco duro a una parte de sistemas PET (scanners, ciclotrones y laboratorios de química)
- Mejoras del disco duro a una parte de los sistemas de Medicina Nuclear

**60 meses, prorrateados**
- Baterías de níquel cadmio o ácido de plomo para sistemas de Rayos X y mamografía (prorrateados según se indica más adelante)

**3 meses**
- Revisión HealthNet vLan, Advantage—Productos remotos (productos de IIS)
- Sondas y transductores T3 de recambio de ultrasonido, equipo de conexión de ultrasonido de conducción por agua (productos de Ultrasonido)

## Baterías

Con respecto a los sistemas de Rayos X y mamografía, cuando las baterías de níquel cadmio o de ácido de plomo tengan que ser reemplazadas durante su plazo de garantía, el Cliente pagará la batería de reemplazo al precio vigente en la fecha de entrega, menos la Cobertura de Crédito Proporcional. Esta cobertura es del 100% para las baterías que fallen dentro de los primeros 12 meses de la garantía. La Cobertura de Crédito Proporcional para las baterías que fallen pasados los 12 meses de garantía será la siguiente:

$$1 - \frac{\# \ de \ meses \ después \ del \ inicio \ de \ la \ garantía \times 100\%}{60}$$

Para el cálculo de la Cobertura de la Garantía Proporcional se obviarán fracciones de mes inferiores a quince días, pero se considerará mes completo la fracción de mes igual o superior a quince días.

☞  EL TEXTO DE LA PRESENTE GARANTÍA HA SIDO REDACTADO ORIGINALMENTE EN IDIOMA INGLÉS. LA PRESENTE VERSIÓN EN ESPAÑOL HA SIDO PREPARADA SOLO PARA FACILITAR SU ENTENDIMIENTO Y COMPRENSIÓN POR EL CLIENTE; QUEDANDO ESTABLECIDO QUE ESTA GARANTÍA SE RIGE Y DEBERÁ SER INTERPRETADA CONFORME A SU VERSIÓN EN IDIOMA INGLÉS, QUE ES LA ÚNICA QUE SURTE EFECTOS LEGALES.



GE Medical Systems–Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems– Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4639-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-5651
Puerto Rico: Fax (1 787) 282 7436

# Garantia dos Productos GEMS
(América Latina e Caribe)

## Produtos Garantidos e Produtos não cobertos pela garantia

### Produtos Garantidos

A garantia aqui apresentada aplica-se aos seguintes equipamentos e produtos daGEMS:

- Produtos de Ressonância Magnética ("RM") (equipamentos novos, upgrades parciais de hardware do sistema).
- Produtos de Tomografia Computadorizada ("TC") (equipamentos novos, upgrades totais o parciais de hardware do sistema).
- Produtos de Raio-X e Mamografia (equipamentos novos, upgrades parciais do hardware do sistema).
- Produtos de Medicina Nuclear (equipamentos novos, upgrades parciais do hardware do sistema).
- Produtos de Tomografia de Emissão de Positron ("PET") (equipamentos novos, incluindo scanners, cyclotrons e laboratórios de química e upgrades parciais do hardware do sistema).
- Produtos de Ultrassom (equipamentos novos).
- Produtos de Solução de Imagem Integrada ("IIS") (estações de trabalho novas e produtos de conectividade novos).
- Produtos Preferenciais Gold Seal (equipamentos usados GEMS fornecidos com garantia).
- Produtos de Cardiologia Invasiva (equipamento novo).

### Produtos Não Cobertos pela Garantia

A garantia aqui disciplinada não se aplica aos seguintes equipamentos e produtos:

- Acessórios e Materiais identificados por números de catálogo iniciados pela letra "B"(cobertos por garantia em apartado).
- Produtos não listados nas páginas de preços da GEMS à época de sua venda, normalmente identificados por números de série inlelados por NL ou NW na Proposta GEMS (fornecidos com as garantias próprias de seus fabricantes, se houver, desde que a GEMS esteja autorizada a repassar ao Cliente; caso contrário, tais produtos são fornecidos no estado em que se encontram, sem garantias).
- Tubos de Raio-X GE e Tubos Intensificadores de Imagen GE (cobertos por garantia específica em separado).
- Tubos de Raio-X Maxiray (cobertos por garantia específica em separado).
- Produtos GE PowerTech Power Conditioning (cobertos por garantia específica em separado).
- Peças Novas ou Trocadas vendidas pelo Serviço de Venda Direta ao Consumidor GEMS (cobertos por garantia específica em separado).
- Upgrades Parciais de Hardware de Sistemas identificados nos e-Pricebook da GEMS como sujeitos apenas aos créditos de garantia para os Clientes que tenham contratos de serviço com a GEMS.

- Produtos fabricados e vendidos pelas afiliadas GEMS (tais como GE OEC, GE Lunar e GEMS IT), salvo de outra forma especificado nos contratos de venda utilizados pelas afiliadas da GEMS.
- Produtos Gold Seal de troca (produtos usados fornecidos nas condições em que se encontram).
- Multi-Vendor Preferred Products (produtos usados não GE fornecidos com garantia limitada).

## Escopo e Duração das Garantias

**Garantia dos Produtos:** A GEMS garante que os Produtos Garantidos listados em nossa Proposta (1) estarão livres de defeitos de material, defeitos de fabricação e de titularidade; e (2) serão conformes às especificações do Produto Garantido em vigor na data de embarque do Produto Garantido. As especificações do Produto Garantido estão disponíveis ao Cliente, mediante solicitação.

**Garantia de Direitos Autorais e Patentes:** A GEMS garante ao Cliente que, à época da entrega, os Produtos Garantidos não serão objeto de qualquer demanda relativa à infração de patentes ou de direitos autorais.

**Prazo da Garantia.** O prazo de garantia, para todas as garantias listadas acima, com exceção da garantia de evicção, de patentes e direitos autorais é limitado no tempo conforme os períodos determinados na Tabela de Garantia abaixo.

Se os Produtos Garantidos não forem montados ou instalados pela GEMS, seu período de garantia se iniciará na data de entrega dos Produtos Garantidos ao Cliente. Se a GEMS montar ou instalar os Produtos Garantidos, o período de garantia se iniciará (1) cinco dias após a notificação, pela GEMS ao Cliente, de que a montagem ou instalação está completa e de que os Produtos Garantidos estão funcionando de acordo com as especificações GEMS para os Produtos Garantidos; ou (2) na data da primeira utilização do Produto Garantido para prestação de serviços a paecientes, o que ocorrer primeiro. Se a montagem dos Produtos Garantidos sofrer atraso igual ou superior a 90 (noventa) dias contados da data de entrega, por motivos não imputáveis exclusivamente à GEMS, o período de garantia se iniciará 90 (noventa) dias após a entrega do Produto Garantido ao Cliente.

O período de garantia de cada Produto Garantido ou peça fornecido ao Cliente sem cobrança de taxas proporcionais de garantia será a porção restante do período de garantia aplicável ao Produto Garantido na peça consertado ou substituído. O período de garantia para qualquer Produto Garantido substituído ou peça fornecido ao Cliente com cobrança de taxas proporcionais de garantia será o período completo de garantia aplávvel ao Produto Garantido fornecido en substituição.

## Exclusões de Garantia

As garantias aqui apresentadas cancelam e revogam toda e qualquer outra garantia ou condição semelhante, quer escrita, verbal, expressa, implícita ou decorrente de lei.  SALVO O DISPOSTO NESTE DOCUMENTO, NÃO SE APLICA AO PRESENTE TERMO QUALQUER GARANTIA EXPRESSA OU IMPLÍCITA DE COMERCIABILIDADE, DE ADEQUAÇÃO A UMA FINALIDADE ESPECÍFICA DE POSSE LIVRE DE INTERVENÇÃO, COMPATIBILIDADE DE SISTEMAS OU ACURACIDADE DE INFORMAÇÕES (DATA). NENHUMA GARANTIA GEMS DEVERÁ SER ESTENDIDA ALÉM DAQUELAS APRESENTADAS NESTE DOCUMENTO E NENHUMA DECLARAÇÃO ANTERIOR DA GEMS OU DE SEUS REPRESENTANTES DEVERÁ MODIFICAR OU ESTENDER AS GARANTIAS AQUI APRESENTADAS.

As garantias aqui apresentadas não cobrem:

A. Qualquer falha, defeito ou deficiência (inclusive falha de conformidade com as especificações publicadas pela GEMS relativas ao Produto Garantido) que seja resultante, no todo ou em parte, de (1) armazenamento impróprio, manuseio, uso, manutenção dos Produtos Garantidos, alteração ou utilização anormal dos Produtos Garantidos, serviços ou reparos realizados por qualquer pessoa que não a GEMS, uma subsidiária GEMS, uma empresa afiliada à GEMS ou um representante de serviços autorizado pela GEMS ou pelo fabricante; (2) falha no cumprimento de quaisquer recomendações, advertências ou instruções escritas fornecidas pela GEMS, sua afiliada, subsidiária, representante autorizada de serviços ou pelo fabricante; (3) utilizado ou combinação do Produto Garantido com qualquer itens ou dados que não àqueles determinados nas Especificações dos Produtos Garantidos, ou utilização do Produto Garantido sozinho ou em combinação com quaisquer itens ou dados que não sejam propriamente ou absolutamente compatíveis com os Produtos Garantidos, conforme as Especificações do Produto Garantido; (4) quaisquer desenhos, projetos, especificações ou instruções de Cliente; (5) qualquer falha na utilização dos Produtos Garantidos conforme suas especificações, incluindo tolerância de datas; ou (6) quaisquer causas externas aos Produtos Garantidos, conforme fornecidos pela GEMS, ou além do controle razoável da GEMS, incluindo mas não se limitando a falha de energia elétrica, falha na limpeza e manutenção do local de instalação dos Produtos Garantidos livre de poeira, areia, outras partículas ou restos, falha em manter o local de instalação do Produto Garantido em adequadas condições ambientais e, em caso de sistemas de RM, falha do sistema resfriador à água fornecido pelo Cliente;



*GE Medical Systems —Americas: Milwaukee, USA*
*www.gemedicalsystems.com*
*GE Medical Systems — Latin America: Miami, USA  Fax 305-269-4000*
*Argentina: Fax (54 11) 4639-9350*
*Brazil: Fax (55 11) 3067 8367*
*Chile: Fax (56 2) 421 4103*
*México: Fax (52 55) 5228-9661*
*Puerto Rico: Fax (1 787) 282 7436*

B  O pagamento ou reembolso de quaisquer custos de instalação decorrentes de reparo ou substituição dos Produtos Garantidos ou peças;

C.  Produtos vendidos a nossos distribuidores internacionais (cobertos por garantia específica em separado);

D.  Produtos Garantidos instalados em território fora da América Latina e do Caribe;

E.  Suprimento de item expandível;

F.  Em caso de sistemas de ressonância magnética, serviços a quaisquer sistemas de resfriamento a água fornecidos pelo Cliente;

G.  Para sistemas de ressonância magnética com LHe/LN ou magnetos supercondutores (exceto em caso de sistemas de ressonância magnética com ímãs LCC), fornecimento de criogênio, serviços de criogênio ou serviços ao criostato do magneto, "cold head", compressor ou shimming supercondutor ou resistivo, exceto se a necessidade de tais fornecimentos ou serviços tenha sido causada por um defeito material ou da fabricação coberto pelas garantias aqui disciplinadas.  (O MR Magnet Maintenance and Cryogen Service Agreement pode ser adquirido, para fornecimento de coberturas suplementares durante o período de garantia); e

H.  Para os bolbos de colimador do sistemas de Raio-X Proteus XIVa, Revolution XR/d e Precision 500D.

## Recursos Exclusivos do Cliente

**Garantia dos Produtos:** A GEMS, a seu exclusivo critério, reparará, ajustará ou substituirá (por peças novas ou peças trocadas em outras substituições) o Produto Garantido defeituoso ou desconforme, ou peças do Produto Garantido, desde que o Cliente tenha notificado à GEMS seu pedido de serviços de garantia e disponibilizado o Produto para conserto pela GEMS.  Exceto pelo discriminado abaixo em relação a baterias, os serviços de garantia serão executados sem quaisquer custos das 8h00 às 17h00, de segunda a sexta-feira, com exceção de feriados adotados por GEMS.  Fora dos horários e dias aqui estabelecidos, os serviços de garantia serão cobrados conforme as taxas de serviço da GEMS em vigor à época e estarão sujeitos à disponibilidade de pessoal da GEMS, a critério da GEMS.  Instalação, serviços de garantia ou outros serviços necessários podem ser executados pela GEMS ou por qualquer subsidiária, afiliada ou representante autorizada de serviços da GEMS ou do fabricante.  Serviços de garantia para as baterias usadas em sistemas de Raio-X e mamografia serão realizados sem encargos, nas horas determinadas acima, somente durante os primeiros doze meses do prazo de garantia.

**Garantia de Patente e Direitos Autorais:** A GEMS defenderá ou firmará acordos em quaisquer demandas interpostas contra o Cliente, na medida em que tais demandas sejam baseadas em alegação de infração da garantia de Patente ou Direitos Autorais, e desde que a GEMS tenha sido prontamente notificada, por escrito, da demanda; desde que o Cliente coopere na defesa da demanda ou acordo; e desde que a GEMS detenha o completo e exclusivo controle da defesa ou acordo.  Se qualquer juízo competente julgar, em última instância, sem possibilidade de recurso, que a demanda é válida, a GEMS pagará todos os custos e danos que o Cliente tenha sido condenado a pagar devido à violação da garantia de Patente e Direitos Autorais.  Ainda, a GEMS obterá uma licença para que o Cliente continue utilizando o Produto infrator, ou providenciará sua substituição por um produto não infrator ou modificará o Produto de forma a eliminar a infração, ou removerá o Produto infrator e reembolsará o Cliente pelos custos (descontada a depreciação razoável) e quaisquer custos de transporte pagos pelo Cliente.

**Recursos e Responsabilidade Exclusivos:** Os recursos previstos nos parágrafos acima desta Seção de RECURSOS E RESPONSABILIDADE EXCLUSIVOS são os ÚNICOS RECURSOS do Cliente e constituem a única responsabilidade da GEMS por quaisquer unidades de serviços de garantia.  O CLIENTE CONCORDA QUE A GEMS E SUAS AFILIADAS E REPRESENTANTES AUTORIZADAS DE SERVIÇOS NÃO SERÃO RESPONSÁVEIS PERANTE O CLIENTE POR (1) DANOS PENAIS, LUCROS CESSANTES OU DANOS INDIRETOS, TAIS COMO PERDA DE RECEITAS; (2) QUALQUER ASSISTÊNCIA NÃO REQUERIDA CONFORME A CONTRATO DE VENDA; OU (3) QUALQUER EVENTO OCORRIDO APÓS O TÉRMINO DO PERÍODO DE GARANTIA.

## Tabela de Garantia

**12 meses**
* Sistemas e componentes de RM
* Sistemas, componentes, detectores e upgrades de hardware de sistemas completos de TC
* Sistemas, componentes e upgrades de hardware de sistemas completos de Raio-X e mamografia
* Sistemas e componentes para medicina nuclear
* Sistemas e componentes para PET (scanners, cyclotrons e laboratórios químicos)
* sistemas, componentes, módulos, upgrades, sondas e transdutores de ultrassom (exceto produtos de ultrassom IIS listados abaixo)
* Estações de trabalho e produtos de conectividade IIS (exceto os produtos IIS listados abaixo)

* Produtos Preferenciais Gold Seal (salvo se de outra forma especificado na Proposta)

**6 meses**
* Upgrades parciais de hardware dos sistemas de RM (salvo upgrades parciais de hardware dos sistemas de RM identificados no livro de preços eletrônico – o-Pricebook – da GEMS como somente elegíveis para créditos de garantia para os Clientes que detêm contratos de serviços com a GEMS)
* Upgrades parciais de hardware dos sistemas de TC (salvo upgrades parciais de hardware de sistemas de TC identificados no o-Pricebook da GEMS como somente elegíveis para créditos de garantia para os Clientes que detêm contratos de serviços com a GEMS)
* Upgrades parciais de hardware de sistemas de Raio-X, retificadores de alta voltagem e tubos pick up de câmara de TV
* Upgrades parciais de hardware de sistemas PET (scanners, cyclotrons e laboratórios de química)
* Upgrades parciais de hardware de sistemas nucleares

**60 meses, proporcional**
* Baterias de níquel cadium ou chumbo ácido (comum) para sistemas de Raio-X e mamografia (proporcionais conforme demonstrado abaixo)

**3 meses**
* HealthNet vLan, Estação de trabalho, produtos de distribuição de imagem (Produtos IIS )
* T3 exchange sondas e transdutores de ultrassom, kit anexo de ultrasound water path (Equipamentos de Ultrassom)

## Baterias

Para sistemas de Raio-X e mamografia se as baterias de níquel-cadium ou chumbo ácido (comum) precisarem de substituição durante o período de garantia aplicável, o Cliente pagará o preço da bateria de reposição em vigor na época de sua entrega, menos o Desconto Proporcional de Garantia.  O Desconto Proporcional de Garantia para baterias que falharem em menos do 12 (doze) meses após o início da garantia é de 100% (cem por cento).  O Desconto Proporcional de Garantia para baterias que falharem em mais de 12 meses após o início da garantia é calculado da seguinte forma:

$$\frac{1 - \# \text{ de meses após o início da garantia} \times 100\%}{60}$$

Para fins dos Descontos Proporcionais, uma fração de mês menor que 15 dias será desconsiderada; e uma fração de mês igual ou maior que 15 dias será considerada um mês inteiro.

---

☞ ESTE TERMO DE GARANTIA É REDIGIDO, ORIGINALMENTE, EM LÍNGUA INGLESA.  ESTA VERSÃO EM LÍNGUA PORTUGUESA FOI PREPARADA PARA FACILITAR O ENTENDIMENTO E COMPREENSÃO DO CLIENTE DAS CONDIÇÕES AQUI DISPOSTAS, FICANDO CLARO, NO ENTANTO, QUE O TERMO DE GARANTIA FOI REDIGIDO ORIGINALMENTE E DEVE SER INTERPRETADO CONFORME A VERSÃO EM LÍNGUA INGLESA, QUE SERÁ O ÚNICO DOCUMENTO VINCULANTE E PREVALECENTE.

---

© Copyright 2002 General Electric Company

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| 1 | | TRACERcenter |
| 1 | P5450NG | PET DISPENSING STATION |

Complete Pet Dispensing Station w/Standard 2" L-Block and Deluxe Tungsten Vial Shield and Stand.

The Dose Drawing System is used to draw FDG F-18 doses from a vial. It consists of a specially designed Dose Drawing Syringe Shield, vial shield and stand. When drawing FDG F-18, the vial shield and syringe shield remain on the stand. The stand allows the vial shield to rotate and has a fixed stop at the 45-degree downward angle. The vial shield is constructed of 1" lead encased in steel. The shield?s top is threaded to allow quick insertion and removal of vials. The top cover incorporates a pivoting shield for septum access that allows the use of a vent needle, if desired, along with the needle from a 5 cc syringe. oThe tungsten syringe shield mounts on a stainless steel rotating platform that slides the syringe into the vial and locks in position. The dose can then be drawn with forceps to minimize hand exposure.The syringe shield is constructed of .55" tungsten. A high-density lead glass window allows viewing up to the 5 cc mark on a 5 cc syringe. oThe PET Dose Drawing System provides a safe and shielded environment while making it easy to draw a FDG F-18 dose. oThe complete station includes: -Dose Drawing Syringe Shield -Dose Drawing Vial Shield -Dose Preparation Stand -Vial adapter to accommodate 10 ml vials. -2" L-Block Shield

| 1 | P5450PF | GAMMA SPECTROSCOPE (MCA) |

Multichannel Analyzer System

Canberra's The Osprey? is a high-performance, fully-integrated multi-channel analyzer (MCA) tube base that contains everything needed to support a scintillation spectrometry system. Osprey can be controlled through both USB and Ethernet with no need to purchase two separate units ? an industry first. USB or Ethernet, there is only one cable connecting the Osprey to the control and data acquisition system.

- This package contains: -All-in-one HVPS, preamplifier, and digital MCA -Compatible with all standard 14-pin scintillation detectors, including NaI(TI) and LaBr3(Ce)++++++ -Optional 8-pin LED temperature-stabilized locking NaI probe (late availability) -USB 2.0 connection for PC plug-and-play -Ethernet 10/100T (PoE) connection for network applications -PHA, MCS, SCA, MSS, List, and Time-stamped List modes -Fully supported by Genie? 2000 Software -Programming libraries with examples -Web GUI (late availability) -Compatible with Model 727 shield -Includes S504C Genie 2000 Basic Spectroscop software -NAI Well Detector 2"X2" -Lead Shield

| 1 | P5450PG | EZ SCAN TLC |

EZ SCAN TLC SCANNER US

The Thin Layer Chromatography system from Carroll & Ramsey is a PIN-diode-based detector

2/10

A-10

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| | | module for scanning TLC plates which have been ?spotted? with compounds labeled with commonly used medical and research isotopes, including low-energy gamma emitters such as 125I or 99mTc, positron-emitters such as 18F, or beta (-) emitters such as 131I. |
| 2 | P5450MM | DELL LAPTOP COMPUTER |
| | | DELL 610 Laptop System |
| | | • DELL 610 Laptop System. The systme features: |
| | | - Windows XP operating system |
| | | - Pentium M 1.73 GHz, |
| | | - 14.1 XGA Screen, |
| | | - 256 MB RAM, |
| | | - 60 GB HD, |
| | | - 24x CD-Rewritable Drive |
| 1 | P5450JB | PEAK SIMPLE DATA SYSTEM |
| | | The SRI Six Channel USB Peak Simple Data System Model 302 may be used with ony brand or model of GC or HPLC offering an analog detector output signal ranging from -5V to +5V. It includes three independent, programmable controls (0V to +5V analog output) for temperature & pressure or HPLC gradient formation. The Model 302 has six channels, which can be randomly assigned to one of four time bases, which allows independent start and stop times for four separate instruments. Four remote start inputs compatible with 2-wire switch closures (typically output by GCs and HPLCs as a remote start signal) are also included for your use. Two pulse stretchers are provided to accommodate instruments with remote start signals shorter than one second. |
| 1 | P5450JA | RP 2MM NUMBER |
| | | Radio HPLC -lead shield for radioactivity detector |
| | | Lead shield for HPLC |
| 1 | P5450PH | LAL TESTER - ENDOSAFE |
| | | LAL Tester |
| | | The Endosafe PTS endotoxin detection system is a rapid point of use test system that provides quantitative LAL results quickly using LAL reagents in a disposable test cartridge with a handheld reader for a completely contained, real-time endotoxin testing system. This package includes a set of 10 disposable cartridges and an Epson printer. |
| 1 | P5450PN | MILLEX INTEGRITY TESTER |

3/10

A-11

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|-----|---------|-------------|
| | | Millex Integrity Tester |
| | | Millipore Integrity Tester is used for bubble point testing of small filter units. The units tests a wide range of pore sizes and membrane types. |
| 1 | P5430KM | GC AUTOINJECTOR |
| | | The Varian 8400 AutoSampler Autoinjector is a sample handling device that offers outstanding performance features, including liquid, headspace, and solid phase microextraction (SPME) injections, all from the one versatile autosampler. The 8400 AutoSampler provides maximum sample throughput with a standard 100 sample carousel for 2 mL vials. The 8410 AutoInjector supports ten 2 mL, six 5 mL, and five 10 mL sample vials on a fixed sample tray for high precision sample injection where sample throughput is low. |
| 1 | P5450WH | MILLIPORE WATER PURIFIER |
| | | Water Purifier |
| | | The Millipore easy-to-use Direct-Q system is designed to simplify life for small volume users, delivers ultrapure water on demand ? directly from top water. The system guarantees the production of high-quality ultropure water, providing a superior olternative to battled water or DI cartridges. In addition, the system produces pure (Type III) water that is stored in an integrated reservoir, and can be used for basic applications. Water Purifier system includes: - Millipore Direct-Q 3 UV System - Millipak-20 Express, 0.22 Hm, non-sterile filter - SmartPak DQ3 Purification (2 Packs) - Wall Mounting Bracket with Tap for Direct-Q 3 Systems - UV LAMP 185 NM FOR DQ 3 - BIOPAK ULTRAFILTRATION CARTRIDGE |
| 1 | P5450AM | VENTED FILTER |
| | | Vented Filter |
| | | 0.2 Micron SUPOR Low Volume Air Eliminating IV Filter with luer lock & SPIN-LOCK connections, 0.8mL Priming Volume, DEHP & Latex Free (LF) Case of 50 |
| 1 | P5450BR | ICS-1600 FOR NH3 |
| | | ICS-1600 for NH3 |
| | | ICS-1600 Ion Chromatography System with Degas. |
| | | Dionex's high-performance integrated Reagent-Free ion chromatography (RFIC) systems, ICS-1600 provide the ultimate in productivity for low cost per analysis while maintaining high-sensitivity results. The systems combine the power of on-line sample preparation with all the capabilities of modern IC Systems, including eluent generation (EG), eluent regeneration (ER), and electrolytic sample preparation (ESP). All three RFIC systems feature a dual-piston pump and optional eluent degasser, a conductivity detector with heated cell, and a |

4/10

A-12

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|-----|---------|-------------|
| | | chromatography compartment for columns, suppressors, and automated sample preparation. The ICS-1100 and ICS-1600 are the first integrated RFIC systems with built-in ER control (RFIC-ER systems), allowing continuous operation for up to four weeks. The ICS series is compatible with all Dionex suppressor technologies and all Dionex 2 mm to 5 mm columns. |
| 1 | P5450FD | DOSE CAL 55T FOR QC |

Dose cal 55t for QC

CRC-55t Dose Calibrator and Chamber Shield Touch Screen INCLUDES: o CRC-55tPET PET DOSE CALIBRATOR o Positron Chamber Shield o Epson Printer and tickets

The new Capintec CRCy-55tPET Dose Calibrator gives you the ultimate features in the industry's finest package. The CRCy-55tPET Dose Calibrator is designed to meet the demands of your department with accuracy and ease of operation. Reduced chamber pressure and increased bias voltage increases the maximum activity range for highenergy PET isotopes. The CRCy-55tPET provides a menu driven, touch screen interface that is easy to learn and use. The improved user interface contains an improved graphic color display, making operation and usage easier than ever. The unit provides 28 programmable keys. The user can select from over 80 nuclides by simply selecting the nuclide symbol on the touch screen interface. Other capabilities include storage of reference sources in memory that automatically decay correct for today's time and date. Automated quality control tests and self-diagnostics are built-in with automatic zero and background subtraction making the CRCy-55tPET exceptionally easy to use.

| 1 | P5450SZ | INSTALL AND IQOQ FDG-USP |

Install and IQOQ FDG-USP

General Description QC Equipment installation and IQOQ for FDG USP includes a QC expert to be on-site to perform installation of all the QC equipment and ensure proper Operation and Qualification. This is valid for the TRACERcenter QC Package for FDG-USP. the installation and set-up of an HPLC system is not covered. For Performance Qualification and Process Validation a separate catalogue# needs to be ordered, as those services are not part of installation and IQ/OQ for QC equipment.

Installation Qualification o A documented demonstration that the laboratory equipment is installed as designed and specified and is correctly interfaced with its corresponding systems. o Develop and execute Installation Qualification protocols for all the Quality Control Equipment for FDG (no HPLC included).

Operation Qualification o A documented demonstration that the equipment functions according to manufacturers specifications. o Develop and execute Operation Qualification protocols for all the Quality Control Equipment for FDG (no HPLC included).

5/10

A-13

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| 1 | P5450PU | QC INST KIT WITHOUT HPLC |
| | | Installation Kit QC without HPLC |
| | | The reagent kit for initial QC tests consists of all the chemicals and reagents needed to complete up to 5 quality control tests of FDG. This kit is for laboratories that do not have HPLC systems and follow the US Pharmacopeia. The kit contains: |
| | | Item Description Qty ACS Reagent Grade Acetonitrile 500 mL ACS Reagent Grade Ethanol 500 mL ACS Reagent Grade Acetone 500 mL ACS Reagent Grade Sulfuric Acid 500 mL ACS Reagent Grade Methanol 500 mL ACS Reagent Grade Ammonium Hydroxide 30% 500 mL Cryptand 2.2.2 reference standard 20 mg HPLC grade water (4 L) Reference Standard Buffer pH 4 red/ 7 yellow/ 10 blue: (Pack 500 mL each bottle) KCl 3M+AgCl Reference electrolyte 250 mL 0.9% sodium chloride injection USP 10ml vial (qty 25) Sterile Water for Injection 10ml vial (qty 25) Sterile 70% Isopropanol Solution 16 oz (qty 2) LAL cartridges-0.05 EU/ml cartridges (Pack of 10) LAL blank cartridges (Pack of 2) Calibration weight, 10 mg (Qty 1) Calibration weight, 20 g (Qty 1) |
| 1 | P5450PV | MILLIPORE PH STRIPS |
| | | MILLIPORE PH STRIPS |
| 1 | P5450NV | BRUKER GC 436 WITH FID |
| | | BRUKER GC 436 WITH FID |
| 1 | P5450RA | RAD MON EQUIPMENT PKG |
| | | Radiation Monitoring Equipment Pkg - Hand Held |
| | | The Hand Held package includes two (2) Ludlum Model 14C Survey Meters and two (2) Ludlum Model 44-9 Pancake GM Detectors. The Model 14C is a ruggedized, portable survey instrument that operates on two standard D cell alkaline batteries. This general purpose, handheld analog ratemeter supports operating two separate radiation detectors. A switch allows the user to select between the internally mounted GM detector with an exposure range of 0-20 mSv/h (0-2000 mR/hr) or an external GM or scintillator detector of choice (not included in this package).The Model 44-9 is a pancake G-M that can be used with several different instruments including survey meters. This detector is sensitive to alpha, beta, and gamma radiation, is enclosed within a rugged metal enclosure, and is conveniently shaped and sized for checking contamination on people and objects. This detector operates between 85 to 1000 volts, and is compatible with any Ludlum instrument capable of supplying 900 Vdc and an input sensitivity of 30 mV or higher. |
| 1 | P5450RB | RAD MON EQUIP-HAND-FOOT |
| | | Radiation Monitoring Equipment Hand - Foot Monitor |

6/10

A-14

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|-----|---------|-------------|
| | | The Ludlum Hand - Foot Monitor package features a Model 375 Area monitor to display the reading activity levels of the Model 44-26 Model pancake G-M foot probe and the Model 44-9 pancake G-M. The Model 375 Area Monitor The Model 375 is a versatile, compact, and very offordable digital electronic controller designed for monitoring radiation in areas. Its simple design accommodates many different detectors suiting a wide variety of applications, and is equipped with a local readout and alarms. These versatile units may also be connected to an optional auxiliary indicator/annunciators for alerting personnel at remote locations. The user-friendly digital design enhances setup and operation. These units may also be networked to a central PC-based station where data are logged and alarm posted. Features of the Model 375 Area Monitor: Indicated use: area monitoring Display: four-digit LED display with 2 cm (0.8 in.) digits Display range: 000.0-9999 Display units: can be made to display in HR/hr, mR/hr, R/hr, HSv/h, mSv/h, Sv/h, Hrem/hr, mrem/hr, rem/hr, cpm, cps, and others Linearity: reading within 10% of true value Response: typically three seconds from 10%-90% of final reading One Model 44-26 is a pancake G-M foot probe is also included in the kit for contamination survey with an alarm rate meter. One Model 44-9 is a pancake G-M is also included in the kit. The Model 44-9 is a pancake G-M that can be used with several different instruments including survey meters. This detector is sensitive to alpha, beta, and gamma radiation, is enclosed within a rugged metal enclosure, and is conveniently shaped and sized for checking contamination on people and objects. This detector operates between 85 to 1000 volts, and is compatible with any Ludlum instrument capable of supplying 900 Vdc and an input sensitivity of 30 mV or higher. The package also includes Series "C" T Connector for Hand/Foot Monitor Connection and 5 feet long cable Sold as kit. |
| 4 | P5450RC | PERSONAL DOSIMETER

Rados RAD-60 Personal Alarm Dosimeter is a precise radiation measuring instrument for reliable detection and registration of radiation in order to ensure the personal safety of the user. It is suitable for a broad range of everyday radiation monitoring purposes in standalone conditions. Features: - Radiation detected: gamma and x-rays - Detector type: energy compensated Si-Diode - Measurement range: dose: 1 HSv - 9.99 Sv or 0.1 mrem - 999 rem - Measurement range: dose rate: 5 HSv/h - 3 Sv/h or 0.5 mrem/h - 300 rem/h - Calibration: better than E 5 % (Cs-137, 662 keV at 2 mSv/h), Hp(10) - Energy response: Hp(10), 60 keV - 3 MeV, better than E 25 %, up to 6 MeV, better than E35% - Dose rate linearity: better than E 15 %, up to 3 Sv/h (300 rem/h) - Temperature range: -20 - +50 degrees Celsius operational, humidity up to 90% RH, non-condensed; -20 - +70 degrees Celsius storing - Dimensions: 78 x 67 x 22 mm - Weight: 80 g including battery |
| 1 | P5450RP | MEDI-SMARTS BASIC SW

The MediSmarts is a SW program that collects data from MediComm Application and displays the radiation levels on the screen in predetermined points. The data is shown in points, whose color reflects the status of the radiation level against the preset threshold levels and Alarm |

7/10

A-15

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| | | status of each point. The data is refreshed every fixed interval according to user requirements. |
| 1 | P5450RG | RAD MON COMP STATION |
| | | Standard PC including in-house integration and testing before shipment. |
| 1 | P5450RE | PM-11 STACK MONITORING |
| | | Extremeley sensitive Na(Tl) detector used to detect radiation in exhaust stacks and waste tanks |
| 1 | P5450RL | STACK FLOW METER |
| | | Flow Meter used to input air velocity in order to enable software to display online activity and concentration in units of HCi/m3 or Bq/m3 |
| 1 | P5450RR | GM-42 STACK MONITORING |
| | | Backup detector used to detect radiation in exhaust stocks if sensitive detector becomes saturated during release. |
| 1 | P5450RS | CYCLOTRON VAULT AREA GM-4 |
| | | Area Monitor detector used to detect radiation levels in high radiation work areas. (cyc vault, hot cells) |
| 2 | P5450RF | GM-42 |
| | | Area Monitor detector used to detect radiation levels in normal radiation level work areas. |
| 1 | P5450RH | PC100 CONNECTION KIT |
| | | First Connection Unit used to feed 24VDC to monitoring channels and RS-485 to Computer. |
| 2 | P5450RJ | LOCAL ALARM UNIT |
| | | Optional Alarm Unit used mainly in cyclotron vault and other locations |
| 1 | P5450RK | SPARE PARTS KIT 2 |
| | | "Spare Part Kit G-0700 comprises of: 1 x Pm-11 detector (Stack Monitor) 1 x GM-42 detector (Area Monitor or Cyclotron Vault ) 1 x DPU (Data Processing Unit) This kit is suitable for smaller sites which have installed a stack monitor (PM-11) and GM-42 detector in the cyclotron vault." |
| 2 | P5450RN | CABLE DPU - COMBOX (50M) |
| | | 6-5006 Cable - Communication DPU to connection box. NSL per foot. |
| | | Communication Cable between Monitoring Channels |
| 1 | P5450RQ | AREA MONITORING CHANNEL |

8/10

A-16

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|-----|---------|-------------|
| | | AREA MONITORING CHANNEL |
| 1 | P5450TN | TGT REBUILD&CYC SVC BENCH |
| | | Target Rebuild and Cyclotron Servicing Bench |
| | | Sturdy as they come, this steel table can be used for just about any application requiring a strong, level platform. Ideal for holding heavy L-Block shields and caves, the surface is powder coated and the front legs feature adjustable levelers. The middle shelf features a storage safe that is ideal for storing large quantities of high-energy radioisotopes and/or target decay. Shielded with a thickness of 2" of lead, the safe is encased in a powder-coated steel jacket and features an adjustable shelf. The lead-lined door is hung with heavy duty non-sagging hinges and is key-locked to prevent unauthorized access. Dimensions: 36.75" w x 24" depth x 36" h (93.5 x 61 x 91.5 cm)Finish: Powder coat Weight Capacity: 1,600 lb (725.76 kg) includes 1,050 lb for safe |
| 1 | S9150NM | LAB EQUIPMENT |
| | | Lab Equipment Package and accessories The package includes: 1 - P5450RT - Lab Weighing Equipment 1 - P5450PQ - Temperature, time and Flow measurement equipment 1 - P5450PT - Laboratory Equipment 1 - P5450PW - Laboratory Supplies 1 - P5450PJ - Clean Room Accessories 1 - P5450MT - Glassware and Labware accessories |
| 1 | P5450HD | PQPV FDG AND NH3 |
| | | PQPV FDG and NH3 |
| | | The initial purpose of this protocol is the Performance Qualification (PQ) and Process Validation (PV) of the QC Equipment for FDG and NH3 acquired through GE TRACERcenter-. This includes a TRACERcenter expert to be on-site to perform the Performance Qualification; provide training for the production and quality control of FDG and NH3, Batch Records and operator training on all QC equipment. |
| | | Performance Qualification (PQ) Goal: To ensure the equipment required to perform the quality control tests are demonstrated to be suitable for the specific tests they are intended to perform. Unlike IQ/OQ, PQ is application specific.Typical PQ analysis for analytical test equipment: o Linearity - The ability of the instrument to detect and report a result which is directly proportional to the concentration. o Sensitivity (Lower detection limit) o Resolution - the ability to accurately detect and report separate adjacent peaks. o Accuracy - The ability of the instrument to accurately detect and report the amount as prepared. o Precision (Repeatability) -The ability of the instrument to produce the same result from analysis to analysis. Seven replicate analysis is proven to be statistically suitable. |
| | | Quality Control Equipment Training Perform QC equipment training on the operation as well as QC tests protocols following the SOPs. The objective of this training is for the lab operator to |

9/10

A-17

Quotation Number: PR12-C47280 Version 1

| QTY | CATALOG | DESCRIPTION |
|-----|---------|-------------|
|  |  | understand how to use the equipment to run the QC tests. |
|  |  | Process Validation (PV) Batch production, analysis, and documentation, including microbiological evaluation and product stability. Goal: To validate the equipment, materials, staff, and procedures are all working together suitably for producing the drug. To demonstrate and document the procedures operate effectively, produce the finished product or the required quality. Prerequisites: o Staff is trained and qualified to operate the equipment and follow the procedures. o All Raw Materials are logged in and assigned ITN's. o SOP's (particularly batch records) are authorized and ready for use. o IQ/OQ completed: Equipment is installed, operating per manufacturer specifications, and shown to be suitable. o The GE TRACERcenter Site Readiness Checklist has been completed and signed-off by the project managers (Customer and GE TRACERcenter) o The required consumables necessary to perform the process validation that need to be sourced locally by the customer are on site and ready to use. |
|  |  | Outcome: The customer will be able to perform three runs of FDG and NH3 (not for human use) from start to finish (manufacturing & QC), strictly following procedures, with no deviations, ensuring all batch records are completed correctly under the supervision of the TRACERcenter expert. |
| 1 |  | **NonProducts** |
| 1 |  | IQMS services for IQOQNH3, NH3 Setup, NH3 Reagents |
| 1 |  | **NonProducts** |
| 1 |  | Transportation |
| 1 |  | **NonProducts** |
| 1 |  | Interest subsidy |

**Quote Summary:**

560,000.02

(Quoted prices do not reflect state and local taxes if applicable)

10/10

A18



GE Medical Systems—Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4839-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9661
Puerto Rico: Fax (1 787) 282 7436

# GEMS Product Warranty
## (Latin America and the Caribbean)

## Covered Products and Excluded Products

### Covered Products

These warranties cover the following equipment and products by GEMS

- Magnetic Resonance ("MR") Products (new equipment, partial system hardware upgrades)
- Computed Tomography ("CT") Products (new equipment, full system hardware upgrades, partial system hardware upgrades)
- X-ray and Mammography Products (new equipment, partial system hardware upgrades)
- Nuclear Products (new equipment, partial system hardware upgrades)
- Position Emission Tomography ("PET") Products (new equipment, including scanners, cyclotrons and chemistry labs, and partial system hardware upgrades)
- Ultrasound Products (new equipment).
- Integrated Imaging Solutions ("IIS") Products (new workstations and new connectivity products).
- Gold Seal Preferred Products (pre-owned GE equipment provided with a warranty)
- Invasive Cardiology Products (new equipment).

### Excluded Products

These warranties do not cover the following equipment and products.

- Accessories and Supplies identified by catalog numbers starting with the letter "E"(covered by a separate warranty)
- Products not listed in GEMS' price pages at the time of sale, normally identified by NL or NW series numbers in GEMS' Quotation (provided with the manufacturer's warranties, if any, GEMS is permitted to pass on to Customer, otherwise, provided AS IS)
- GE X-ray Tubes and GE Image Intensifier Tubes (covered by a separate warranty).
- Maxiray X-ray Tubes (covered by a separate warranty)
- GE PowerTech Power Conditioning Products (covered by a separate warranty)
- New or Exchange Parts sold by GEMS Direct Customer Order Service (covered by a separate warranty).
- Partial System Hardware Upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers
- Products manufactured and sold by GEMS' affiliates (such as GE OEC, GE Lunar and GEMS IT), unless otherwise specified in the sales contracts used by GEMS' affiliates
- Gold Seal Exchange Products (pre-owned equipment provided AS IS)

- Multi-Vendor Preferred Products (pre-owned non-GE equipment provided with a limited warranty)

## Scope and Duration of Warranties

**Product Warranties:** GEMS warrant to Customer that the Covered Products listed in GEMS' Quotation will (1) be free from defects in material, workmanship, and title, and (2) conform to GEMS' published Covered Product specifications in effect as the date of shipment of the Covered Products  GEMS' published Covered Product specifications are available on request.

**Patent and Copyright Warranty:** GEMS warrants to Customer that when they are delivered, the Covered Products will not be subject to any valid patent or copyright infringement claim.

**Warranty Period:**  The warranty period for all warranties listed above, except the warranty of title and the Patent and Copyright Warranty, is limited in time as shown in the Warranty Schedule below

If GEMS does not assemble or install the Covered Products, the warranty period begins on the date the Covered Products are delivered to Customer  If GEMS assembles or install the Covered Products, the warranty period begins on the earlier of (1) five days after the date GEMS notifies Customer that GEMS has completed assembly or installation and the Covered Products are operating in accordance with GEMS' published Covered Product specifications, or (2) the date Customer first use the Covered Products for patient use  If assembly is delayed for ninety (90) days or more after the date of delivery for a reason beyond GEMS' reasonable control, the warranty period will begin on the ninetieth (90th) day after the date of delivery

The warranty period for any Covered Product or part furnished to Customer without a pro rata charge as a warranty remedy will be the remaining portion of the warranty period applicable to the repaired or replaced Covered Product.  The warranty period for any replacement Covered Product or part furnished to Customer with a pro rata charge as a warranty remedy will be the full period of the warranty applicable to the replacement Covered Product

## Warranty Exclusions

These warranties are exclusive and in lieu of all other warranties, whether written, oral, expressed, implied or statutory  EXCEPT AS PROVIDED HEREIN, NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET

ENJOYMENT, SYSTEM INTEGRATION AND DATA ACCURACY, WILL APPLY.  THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE DESCRIBED IN THIS DOCUMENT AND NO PRIOR STATEMENTS BY ANY OF GEMS' REPRESENTATIVES SHALL MODIFY OR EXPAND THESE WARRANTIES

The warranties do not cover.

A.  Any defect or deficiency (including failure to conform to GEMS' published Covered Product specifications) which results, in whole or in part, from  (1) any improper storage, handling, use or maintenance of the Covered Products, or any alteration, extraordinary use, repair or service of the Covered Products, by anyone other than GEMS, or any subsidiary, affiliated company or authorized service representative of ours or the manufacturer; (3) failure to follow any of GEMS' written instructions or recommendations provided by GEMS or any subsidiary, affiliated company or authorized service representative of GEMS or the manufacturer, (3) using or combining the Covered Products with any item or data except as specified in the Covered Product specifications or using or combining the Covered Products with any item or data that does not properly and unambiguously exchange data with the Covered Products in accordance with the Covered Products' specifications, (4) any of Customer's designs, specifications or instructions, (5) any failure to use the Covered Products in accordance with their specifications, including upper and lower date limits; and (6) any cause external to the Covered Products as furnished by GEMS or beyond GEMS' reasonable control, including, but not limited to, power failure, failure to keep Customer's site clean and free of dust, sand other particles or debris, failure to keep your site in a proper environmental condition, and, for MR systems, failure of any water chiller system supplied by Customer,

B  The payment or reimbursement of any facility costs arising from repair or replacement of the Covered Products or parts,

C  Products sold to GEMS' international distributors (covered by a separate warranty),

D  Covered Products installed outside Latin America and the Caribbean,

E  Expandable supply items,

F  For MR systems, service to any water chiller systems supplied by Customer,

G  For MR systems with LHe/LN or shield cooler configured superconducting magnets



*GE Medical Systems –Americas: Milwaukee, USA*
*www.gemedicalsystems.com*
*GE Medical Systems – Latin America: Miami, USA  Fax 305-269-4000*
*Argentina: Fax (54 11) 4639-9350*
*Brazil: Fax (55 11) 3067 8367*
*Chile: Fax (56 2) 421 4103*
*México: Fax (52 55) 5228-9651*
*Puerto Rico: Fax (1 787) 282 7436*

(except for MR Systems with LCC magnets), any cryogen supply, cryogenic service or service to the magnet, cryostat, coldhead, shield cooler compressor or superconductive or resistive shim coils unless the need for such supply or service is caused by a defect in material or workmanship covered by these warranties (GEMS' MR Magnet Maintenance and Cryogen Service Agreement is available to provide supplemental coverage during the warranty period), and

H  For Proteus XR/a, Revolution XR/d and Precision 500D x-ray systems, collimator bulbs

## Exclusive Warranty Remedies

**Product Warranties:** If Customer promptly notify GEMS of Customer's warranty claim and make the Covered Product available for service, GEMS will at GEMS' option, either repair, adjust or replace (with new or exchange replacement parts) the non-conforming Covered Product or parts of the Covered Product. Except as noted below for batteries, warranty service will be performed without charge, from 8:00 a.m to 5:00 p.m, Monday-Friday, excluding GEMS' holidays, and outside those hours at GEMS' then prevailing service rates and subject to the availability of personnel. Installation, warranty service or other service required to be performed may be performed by GEMS or any subsidiary, affiliated company or authorized service representative of ours or the manufacturer. Warranty service for batteries used with X-ray and Mammography systems will be performed without charge during the hours shown above only during the first twelve months of the warranty period.

**Patent and Copyright Warranty:** GEMS will defend or settle any suit against Customer to the extent it is based on an infringement claim that would be a breach of this Patent and Copyright warranty, provided GEMS receives prompt written notice of the claim, Customer's cooperation in its defense or settlement, and complete and exclusive control over its defense or settlement. If a court of competent jurisdiction renders a final judgment that the infringement claim is valid, GEMS will pay all damages and costs awarded against Customer due to the breach. In addition, GEMS will either obtain a license for Customer to continue using the infringing Covered Product, provide a non-infringing replacement, alter the Covered Product so that it is non-infringing, or remove the infringing Covered Product and refund the price (less reasonable depreciation) and any return transportation costs paid by Customer.

**Exclusive Remedies and Sole Liability:** The above remedies in this EXCLUSIVE WARRANTY REMEDIES section are Customer's exclusive remedies and constitute GEMS' sole liability for any warranty claims. CUSTOMER AGREES THAT GEMS AND GEMS' SUBSIDIARIES, AFFILIATES AND AUTHORIZED SERVICE REPRESENTATIVES HAVE NO LIABILITY TO CUSTOMER FOR (I) ANY PENAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS EXCESS COSTS

INCURRED AND LOST PROFITS OR REVENUE, (2) ANY ASSISTANCE NOT REQUIRED UNDER GEMS' SALES AGREEMENT, AND (3) ANYTHING OCCURRING AFTER THE WARRANTY PERIOD ENDS

## Warranty Schedule

**12 months**
* MR systems and components
* CT systems, components, detectors and full system hardware upgrades
* X-ray and mammography systems, components and full system hardware upgrades
* Nuclear systems and components
* PET systems (scanners, cyclotrons and chemistry labs) and components
* Ultrasound systems, components, modules, upgrades, probes and transducers (except for Ultrasound products listed below)
* IIS workstation and connectivity products (except for IIS products listed below)
* Gold Seal Preferred products (unless otherwise specified in Quotation)

**6 months**
* MR partial system hardware upgrades (except for partial system hardware upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers)
* CT partial system hardware upgrades (except for partial system hardware upgrades identified in GEMS' e-Pricebook as being eligible only for warranty credits for GEMS' service contract customers)
* X-ray partial system hardware upgrades, high voltage rectifiers and TV camera pick-up tubes
* PET partial system hardware upgrades (scanners, cyclotrons and chemistry labs)
* Nuclear partial systems hardware upgrades

**60 months, prorated**
* Nickel cadmium or lead acid batteries for X-ray and mammography systems (prorated as shown below)

**3 months**
* HealthNet vLan, Advantage Review - Remote Products (IIS products)
* TJ exchange ultrasound probes and transducers, ultrasound water path attachment kit (Ultrasound products)

## Batteries

For X-ray and mammography systems, if nickel cadmium or lead acid batteries need replacement during their applicable warranty period, Customer will pay the price of the replacement battery in effect on its delivery date less a Pro Rata Credit Allowance  The Pro Rata Credit Allowance for batteries that fail less than 12 months after the warranty begins is 100%  The Pro Rata Credit Allowance for batteries that fail more than 12 months after the warranty begins is

$$\frac{1 - \text{\# of Mos. After Warranty Commencement} \times 100\%}{60}$$

For the purpose of Pro Rata Credit Allowance, a fraction of a month less than 15 days will be disregarded, and a fraction of a month equal to or greater than 15 days will be regarded as a full month



GE Medical Systems~Americas:  Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America:  Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4939-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9651
Puerto Rico:  Fax (1 787) 282 7436

# Garantía de Productos GEMS
## (América Latina y el Caribe)

## Productos Cubiertos y Productos Excluidos

### Productos Cubiertos

La garantía cubre los siguientes equipos de GEMS:

* Equipos de Resonancia Magnética ("MR") (equipos nuevos o mejoras del disco duro a una parte del sistema)
* Equipos de Tomografía Computada ("CT") (equipos nuevos, mejoras al disco duro de toda el sistema o mejoras del disco duro a una parte del sistema)
* Equipos de Rayos X y Mamografía (equipos nuevos o mejoras del disco duro a una parte del sistema)
* Equipos de Medicina Nuclear (equipos nuevos o mejoras del disco duro a una parte del sistema)
* Equipos de Tomografía por Emisión de Positrones ("PET") (equipos nuevos, incluso scanners, ciclotrones, laboratorios de química y mejoras del disco duro a una parte del sistema)
* Equipos de Ultrasonido (equipos nuevos)
* Equipos Integrated Imaging Solution ("IIS") (estaciones de trabajo nuevas y productos nuevos de conectividad)
* Productos Preferidos GoldSeal (equipos usados fabricados y garantizados por GEMS)
* Productos Cardiológicos Invasivos (equipo nuevo)

### Productos Excluidos

La garantía no cubre los siguientes equipos y productos.

* Los accesorios y piezas cuyos números de catálogo comiencen con la letra "B" (cubiertos por su propia garantía).
* Aquellos productos que al momento de su venta no se encuentren empadronados en las listas de precios de GEMS con las iniciales de serie NL o NW (la garantía para productos no empadronados, si la hubiere, es aquella que ofrezca la casa fabricante y que ésta a su vez haya autorizado a GEMS a ofrecer al Cliente; en caso contrario, los productos no empadronados se entregan EN EL ESTADO EN QUE SE ENCUENTREN).
* Tubos GE de Rayos X y Tubos GE Intensificadores de Imágenes (cubiertos por su propia garantía).
* Tubos de Rayos X Maxray (cubiertos por su propia garantía).
* Productos de Acondicionamiento de Potencia GE PowerTech (cubiertos por su propia garantía).
* Piezas nuevas o de recambio vendidas por GEMS Direct Customer Order Service (cubiertas por su propia garantía).
* Aquellas mejoras del disco duro a una parte del Sistema cuando conforma a la lista de precios electrónica de GEMS (e-Pricebook), la garantía se reserve sólo a Clientes que cuenten con contrato de servicio.
* Productos que fabriquen y vendan afiliadas de GEMS (tales como OE OEC, OB Lunar y GEMS IT), salvo estipulación distinta contemplada en los formatos de contratos de compraventa que ellas utilizan.
* Productos de recambio GoldSeal (equipos usados que se entregan EN EL ESTADO EN QUE SE ENCUENTREN).
* Productos con Tratamiento Preferente manufacturados por Múltiples Fabricantes (equipos usados fabricados por terceros y que GEMS ofrece con garantía limitada).

## Alcance y Vigencia de la Garantía

**Garantías para los Productos:** GEMS garantiza al Cliente que los Productos Cubiertos que se incluyen en las Cotizaciones de OEMS (1) estarán libres de defectos resultantes de materiales, mano de obra o titulación y (2) responderán a las descripciones y especificaciones que se tengan publicadas para el respectivo producto en la fecha de su despacho al Cliente  Tales especificaciones pueden obtenerse en cualquier momento a solo solicitud.

**Garantía de Patentes y Derechos de Autor:** GEMS garantiza al Cliente que al momento de su entrega los Productos Cubiertos no son objeto de ningún reclamo legítimo por infracción de patentes o de derechos de autor.

**Vigencia de las Garantías:** La duración de las garantías, con excepción de la garantía de propiedad y de la Garantía de Patentes y Derechos de Autor, se limita a los períodos indicados en el cronograma que se establece en la página siguiente.

Tratándose de Productos Cubiertos no ensamblados ni instalados por GEMS, el período de vigencia de la garantía comienza en la fecha en que se entregan al Cliente  Si la instalación corre a cargo de GEMS, el período de vigencia de la garantía comenzará (1) ciento diez después de la fecha en que GEMS notifique al Cliente que la instalación ha finalizado y que los Productos Cubiertos funcionan de acuerdo con sus descripciones o especificaciones ó (2) en la fecha en que el Cliente haga uso de los Productos Cubiertos por primera vez, lo que ocurra primero  En caso de que por causas razonablemente ajenas al control de GEMS la instalación se demore por noventa (90) o más días desde la fecha de entrega de los Productos, la vigencia de la garantía comenzará cumplidos noventa (90) días desde la fecha de entrega

Cuando los Productos Cubiertos o las piezas sean entregadas al Cliente sin costo y como parte del servicio de garantía, la duración de su garantía será la que le restaba al Producto Cubierto reparado o sustituido.  La duración de la garantía para Productos Cubiertos de reemplazo por los cuales el Cliente haya pagado un cargo proporcional, será la máxima que le corresponda al Producto Cubierto de reemplazo

## Exclusiones de la Garantía

Esta garantía cancela y sustituye toda otra garantía, declaración o condición, sea expresa, verbal, expresa, implícita o dispuesta por ley.  SALVO LO DISPUESTO EN ESTE DOCUMENTO, NO SE OTORGAN GARANTÍAS EXPRESAS O IMPLÍCITAS DE COMERCIABILIDAD, DE ADAPTACIÓN PARA ALGÚN USO ESPECIAL, POSESIÓN LIBRE DE INTERFERENCIAS, INTEGRACIÓN DEL SISTEMA O EXACTITUD DE LA INFORMACIÓN (DATA)  NO SE OTORGA NINGUNA GARANTÍA DISTINTA A LA CONTENIDA EN ESTE DOCUMENTO, LA GARANTÍA PERMANECERÁ INALTERABLE, SIN VERSE MODIFICADA O AMPLIADA POR NINGUNA DECLARACIÓN O MANIFESTACIÓN QUE PUDIEREN HACER LOS REPRESENTANTES DE GEMS.

La garantía no cubre

A. Cualquier defecto o deficiencia (incluso la falta de adecuación a las descripciones o especificaciones del Producto) resultante, total o parcialmente, de cualquiera de las siguientes circunstancias: (1) almacenamiento, manipulación, uso o mantenimiento inadecuados, cualquier alteración o uso anormal de los Productos, reparación o servicio por parte de cualquier persona distinta a GEMS; (2) la falta de observación de cualquiera de las recomendaciones o instrucciones escritas de GEMS, (3) el uso o combinación de los Productos Cubiertos con cualquier elemento o dato, salvo según lo indicado en las especificaciones del Producto; o el uso o combinación de los Productos Cubiertos con cualquier elemento o dato que no intercambie datos en forma adecuada y precisa con los Productos Cubiertos, de acuerdo con sus especificaciones; (4) los diseños, especificaciones o instrucciones que provengan del Cliente; (5) cualquier uso de los Productos en discordancia con sus especificaciones, incluida la limitación de procesar fechas por debajo o por encima del rango operativo; o (6) cualquier factor externo a los Productos Cubiertos tal como GEMS lo haya entregado, razonablemente ajeno al control de GEMS, incluyendo, de forma meramente enunciativa, cortes de energía eléctrica, el no mantener el recinto limpio y libre de polvo, tierra, u otras partículas o materiales de desecho, el no mantener las instalaciones en adecuadas condiciones ecológicas o, en el caso de sistemas de RM, faltas en los sistemas de refrigeración por agua que el propio Cliente tenga instalados;

B. El pago o reembolso de los costos asociados con el retorno, resultantes de la reparación o reemplazo de Productos Cubiertos o piezas,

C. Productos vendidos a los distribuidores internacionales de GEMS (cubiertos por su propia garantía);



GE Medical Systems—Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America:  Miami, USA  Fax 305-269-4090
Argentina: Fax (54 11) 4359-5350
Brasil: Fax (55 11) 3067 6367
Chile: Fax (58 2) 421 4103
México:  Fax (52 55) 5228-9681
Puerto Rico:  Fax (1 787) 282 7436

# Garantía de Productos GEMS
## (América Latina y el Caribe)

### Productos Cubiertos y Productos Excluidos

**Productos Cubiertos**

La garantía cubre los siguientes equipos de GEMS

* Equipos de Resonancia Magnética ("MR") (equipos nuevos o mejoras del disco duro a una parte del sistema).
* Equipos de Tomografía Computada ("CT") (equipos nuevos, mejoras al disco duro de todo el sistema o mejoras del disco duro a una parte del sistema).
* Equipos de Rayos X y Mamografía (equipos nuevos o mejoras del disco duro a una parte del sistema)
* Equipos de Medicina Nuclear (equipos nuevos o mejoras del disco duro a una parte del sistema).
* Equipos de Tomografía por Emisión de Positrones ("PET") (equipos nuevos; incluso scanners, ciclotrones, laboratorios de química y mejoras del disco duro a una parte del sistema).
* Equipos de Ultrasonido (equipos nuevos)
* Equipos Integrated Imaging Solution ("IIS") (estaciones de trabajo nuevas y productos nuevos de conectividad).
* Productos Preferidos GoldSeal (equipos usados fabricados y garantizados por GEMS)
* Productos Cardiológicos Invasivos (equipo nuevo)

**Productos Excluidos**

La garantía **no** cubre los siguientes equipos y productos:

* Los accesorios y piezas cuyos números de catálogo comiencen con la letra "E" (cubiertos por su propia garantía).
* Aquellas productos que al momento de su venta no se encuentren empadronados en las listas de precios de GEMS, normalmente identificados en las Cotizaciones de GEMS con los números de serie NL o NW (la garantía para productos no empadronados, si la hubiere, es aquella que ofrezca la casa fabricante y que ésta a su vez haya autorizado a GEMS a ofrecer al Cliente; en caso contrario, los productos no empadronados se entregan EN EL ESTADO EN QUE SE ENCUENTREN).
* Tubos OE de Rayos X y Tubos GE Intensificadores de Imágenes (cubiertos por su propia garantía).
* Tubos de Rayos X Maxiray (cubiertos por su propia garantía).
* Productos de Acondicionamiento de Potencia OE PowerTech (cubiertos por su propia garantía).
* Piezas nuevas o de recambio vendidas por GEMS Direct Customer Order Service (cubiertas por su propia garantía)
* Aquellas mejoras del disco duro a una parte del Sistema cuando conforma a la lista de precios electrónica de GEMS (e-Pricebook), la garantía

se reserve sólo a Clientes que cuenten con contrato de servicio.
* Productos que fabriquen y vendan afiliadas de GEMS (tales como GE OEC, GE Lunar y GEMS IT), salvo estipulación distinta contemplada en los formatos de contratos de compraventa que ellas utilizan
* Productos de recambio GoldSeal (equipos usados que se entregan EN EL ESTADO EN QUE SE ENCUENTREN).
* Productos con Tratamiento Preferente manufacturados por Múltiples Fabricantes (equipos usados fabricados por terceros y que GEMS ofrece con garantía limitada).

### Alcance y Vigencia de la Garantía

**Garantía para los Productos:**  GEMS garantiza al Cliente que los Productos Cubiertos que se incluyen en las Cotizaciones de GEMS (1) estarán libres de defectos resultantes de materiales, mano de obra o titulación y (2) responderán a las descripciones y especificaciones que se tengan publicadas para el respectivo producto en la fecha de su despacho al Cliente.  Tales especificaciones pueden obtenerse en cualquier momento a sola solicitud

**Garantía de Patentes y Derechos de Autor:**  GEMS garantiza al Cliente que al momento de su entrega los Productos Cubiertos no son objeto de ningún reclamo legítimo por infracción de patentes o de derechos de autor.

**Vigencia de las Garantías:**  La duración de las garantía, con excepción de la garantía de propiedad y de la Garantía de Patentes y Derechos de Autor, se limita a los períodos indicados en el cronograma que se establece en la página siguiente

Tratándose de Productos Cubiertos no ensamblados ni instalados por GEMS, el período de vigencia de la garantía comienza en la fecha en que se entregan al Cliente  Si la instalación corre a cargo de GEMS, el período de vigencia de la garantía comenzará (1) cinco días después de la fecha en que GEMS notifique al Cliente que la instalación ha finalizado y que los Productos Cubiertos funcionan de acuerdo con sus descripciones o especificaciones o (2) en la fecha en que el Cliente haga uso de los Productos Cubiertos por primera vez, lo que ocurra primero.  En caso de que por causas razonablemente ajenas al control de GEMS la instalación se demore por noventa (90) o más días desde la fecha de entrega de los Productos, la vigencia de la garantía comenzará cumplidos noventa (90) días desde la fecha de entrega

Cuando los Productos Cubiertos o las piezas sean entregadas al Cliente sin costo y como parte del servicio de garantía, la duración de su garantía será la que le restaba al Producto Cubierto reparado o sustituido.  La duración de la garantía para Productos Cubiertos de reemplazo por los que el Cliente haya pagado un cargo proporcional, será la máxima que le corresponda al Producto Cubierto de reemplazo

### Exclusiones de la Garantía

Esta garantía cancela y sustituye toda otra garantía, declaración o condición, sea escrita, verbal, expresa, implícita o dispuesta por ley.  SALVO LO DISPUESTO EN ESTE DOCUMENTO, NO SE OTORGAN GARANTÍAS EXPRESAS O IMPLÍCITAS DE COMERCIABILIDAD, DE ADAPTACIÓN PARA ALGÚN USO ESPECIAL, POSESIÓN LIBRE DE INTERFERENCIAS, INTEGRACIÓN DEL SISTEMA O EXACTITUD DE LA INFORMACIÓN (DATA)  NO SE OTORGA NINGUNA GARANTÍA DISTINTA A LA CONTENIDA EN ESTE DOCUMENTO.  LA GARANTÍA PERMANECERÁ INALTERABLE, SIN VERSE MODIFICADA O AMPLIADA POR NINGUNA DECLARACIÓN O MANIFESTACIÓN QUE PUDIEREN HACER LOS REPRESENTANTES DE GEMS.

La garantía no cubre

A. Cualquier defecto o deficiencia (incluso la falta de adecuación a las descripciones o especificaciones del os Productos) resultante, total o parcialmente, de cualquiera de las siguientes circunstancias:  (1) almacenamiento, manipulación, uso o mantenimiento inadecuados, cualquier alteración o uso anormal de los Productos, cualquier reparación o servicio por parte de cualquier persona distinta a GEMS, (2) la falta de observancia de cualquiera de las recomendaciones e instrucciones escritas de GEMS, (3) el uso o combinación de los Productos Cubiertos con cualquier elemento o dato, salvo según lo indicado en las especificaciones del Producto, o el uso o combinación de los Productos Cubiertos con cualquier elemento o dato que no fuere aquel intercambie datos en forma adecuada y precisa con los Productos Cubiertos, de acuerdo con sus especificaciones; (4) los diseños, especificaciones o instrucciones que provengan del Cliente; (5) cualquier uso de los Productos en discordancia con sus especificaciones, incluida la limitación de procesar fechas por debajo o por encima del rango operativo; o (6) cualquier factor externo a los Productos Cubiertos tal como GEMS los haya entregado, o razonablemente ajeno al control de GEMS, incluyendo, de forma meramente enunciativa, cortes de energía, defectos de deshecho; el no manejar las instalaciones en adecuadas condiciones ecológicas o, para el caso de sistemas de RM, fallas en los sistemas de refrigeración por agua que el propio Cliente tenga instalados;

B  El pago o reembolso de los costos asociados con el reciente, resultantes de la reparación o reemplazo de Productos Cubiertos o piezas,

C  Productos vendidos a los distribuidores internacionales de GEMS (cubiertos por su propia garantía);



GE Medical Systems—Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4839-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9651
Puerto Rico: Fax (1 787) 282 7436

D  Productos Cubiertos instalados fuera de América Latina y el Caribe,

E  Artículos de suministro expandibles

F  Con respecto a sistemas de RM, el servicio a los sistemas de refrigeración por agua que el propio Cliente tenga instalados,

G  Con respecto a los sistemas de RM con LHe/LN o magnetos superconductivos configurados del enfriador protector (con excepción de los Sistemas de RM con magnetos LCC), todo suministro de criógeno, servicio criogénico o servicio al magneto, criostato, cabezal frío, compresor del enfriador protector o bobinas del tipo "shim coil" superconductivas o resistivas, a menos que la necesidad de suministro o servicio sea resultado de un defecto en los materiales o en la mano de obra cubiertos por esta garantía (GEMS pone a disposición del Cliente su *HR Magnet Maintenance and Cryogen Service Agreement*, como una cobertura complementaria durante el período de vigencia de la garantía), y

H  Los focos collimator en los sistemas de rayos X Proteus XR/a, al Revolution XR/d y el Precision 500D.

## Únicos Recursos Bajo la Garantía

**Garantía para los Productos:** Siempre que el Cliente formule con celeridad el reclamo bajo garantía a GEMS y ponga el Producto Cubierto a disposición de GEMS para que se le preste el servicio, GEMS, a su criterio, procederá a reparar, ajustar o sustituir todo el Producto Cubierto (usando repuestos nuevos o de recambio) o aquellas piezas que no se ajusten a las especificaciones  Salvo lo indicado posteriormente respecto de las baterías, el servicio de garantía se brinda en forma gratuita de lunes a viernes, de 8:00 am a 5:00 pm, salvo los feriados que observe GEMS  Fuera de este horario, y sujeto a disponibilidad de personal, el servicio de garantía estará disponible a las tarifas vigentes  La instalación, servicio de garantía u otros servicios necesarios podrían ser llevados a cabo por GEMS o por el fabricante, o por cualquiera de sus respectivas subsidiarias, afiliadas o representantes autorizados de servicio  El servicio de garantía de las baterías utilizadas en los sistemas de Rayos X y Mamografía se realizará en forma gratuita durante el horario anteriormente indicado sólo durante los primeros doce meses del período de vigencia de la garantía

**Garantía de Patentes y Derechos de Autor:** GEMS defenderá o transará todo juicio iniciado contra el Cliente en la medida en que se base en un reclamo por violación de las garantías de Propiedad, Patentes y Derechos de Autor, a condición de que GEMS sea notificada al respecto por escrito, que el Cliente coopere en la defensa o transacción del reclamo y que se permita a GEMS asumir en forma exclusiva el manejo del caso  GEMS pagará todos los daños y perjuicios y los gastos que el tribunal

imponga al Cliente con motivo de la infracción  Además, GEMS obtendrá una licencia para que el Cliente pueda continuar usando el Producto Cubierto que haya incurrido en violación de los derechos antes mencionados, o entregará al Cliente un producto de reemplazo que no viole dichos derechos, o modificará el Producto Cubierto de forma tal que no viole ningún derecho, o retirará el Producto Cubierto en infracción y reembolsará al Cliente tanto el precio (menos una amortización razonable) como los gastos de transporte en que el Cliente haya incurrido para retornar el Producto Cubierto

## Únicos Recursos del Cliente y Limitación de la Responsabilidad de GEMS:

Los párrafos precedentes en la presente sección sobre ÚNICOS RECURSOS BAJO LA GARANTÍA son los únicos recursos con que cuenta el Cliente cuenta y constituyen la única responsabilidad de GEMS por cualquier reclamo que se efectúe bajo la garantía  EL CLIENTE ACEPTA QUE GEMS Y SUS SUBSIDIARIAS, AFILIADAS Y REPRESENTANTES AUTORIZADOS NO SERÁN RESPONSABLES FRENTE AL CLIENTE POR (1) DAÑOS Y PERJUICIOS PUNITIVOS, INCIDENTALES O INDIRECTOS, TALES COMO EL LUCRO CESANTE O LA PÉRDIDA DE INGRESOS, (2) ASISTENCIAS NO PREVISTAS EN EL RESPECTIVO CONTRATO DE VENTA O (3) CUALQUIER CIRCUNSTANCIA QUE SE PRESENTE DESPUÉS DE EXPIRADO EL PERÍODO DE VIGENCIA DE LA GARANTÍA

## Cronograma de la Garantía

### 12 meses

• Sistemas y componentes de RM
• Sistemas, componentes, detectores y mejoras al hardware de todo el sistema de TC
• Sistemas, componentes y mejoras al hardware de todo el sistemas de equipos de Rayos X y Mamografía
• Sistemas y componentes de Medicina Nuclear
• Sistemas (scanners, ciclotrones y laboratorios de química) y componentes de PET
• Sistemas, componentes, módulos, mejoras, sondas y transductores de Ultrasonido (con excepción de los productos de Ultrasonido mencionados más adelante)
• Productos de estaciones de trabajo y conectividad de IIS (con excepción de los productos de IIS mencionados más adelante)
• Productos Preferidos GoldSeal (salvo indicación distinta en la Cotización)

### 6 meses

• Mejoras al hardware de parte de sistemas de RM (con excepción de las mejoras del disco duro a una parte de los sistemas y que, conforme a la lista de precios de GEMS (e-Pricebook), su garantía se reserve únicamente a Clientes que cuenten con contratos de servicio)
• Mejoras del disco duro a una parte de los sistemas de TC (con excepción de las mejoras del disco duro a partes de sistemas que, conforme a la lista de precios de GEMS (e-Pricebook), su garantía se reserve únicamente a Clientes que cuenten con contratos de servicio)
• Mejoras del disco duro a una parte de los sistemas de Rayos X, rectificadores de alto voltaje o tubos analizadores de cámaras de televisión
• Mejoras del disco duro a una parte de sistemas PET (scanners, ciclotrones y laboratorios de química)
• Mejoras del disco duro a una parte de los sistemas de Medicina Nuclear

### 60 meses, prorrateados

• Baterías de níquel cadmio o ácido de plomo para sistemas de Rayos X y mamografía (prorrateados según se indica más adelante)

### 3 meses

• Revisión HealthNet vLan, Advantage~ Productos remotos (productos de IIS)
• Sondas y transductores T3 de recambio de ultrasonido, equipo de conexión de ultrasonido de conducción por agua (productos de Ultrasonido)

## Baterías

Con respecto a los sistemas de Rayos X y mamografía, cuando las baterías de níquel cadmio o de ácido de plomo tengan que ser reemplazadas durante su plazo de garantía, el Cliente pagará la batería de reemplazo al precio vigente en la fecha de entrega, menos la Cobertura de Crédito Proporcional. Esta cobertura es del 100% para las baterías que fallen dentro de los primeros 12 meses de la garantía  La Cobertura de Crédito Proporcional para las baterías que fallen pasados los 12 meses de garantía será la siguiente

$$1 - \frac{\text{# de meses después del inicio de la garantía}}{60} \times 100\%$$

Para el cálculo de la Cobertura de la Garantía Proporcional se obviarán fracciones de mes inferiores a quince días, pero se considerará mes completo la fracción de mes igual o superior a quince días

▲  EL TEXTO DE LA PRESENTE GARANTÍA HA SIDO REDACTADO ORIGINALMENTE EN IDIOMA INGLÉS.  LA PRESENTE VERSIÓN EN ESPAÑOL HA SIDO PREPARADA SOLO PARA FACILITAR SU ENTENDIMIENTO Y COMPRENSIÓN POR EL CLIENTE; QUEDANDO ESTABLECIDO QUE ESTA GARANTÍA SE RIGE Y DEBERÁ SER INTERPRETADA CONFORME A SU VERSIÓN EN IDIOMA INGLÉS, QUE ES LA ÚNICA QUE SURTE EFECTOS LEGALES.



GE Medical Systems~Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-268-4000
Argentina: Fax (54 11) 4639-9350
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9661
Puerto Rico: Fax (1 787) 282 7436

# Garantia dos Produtos GEMS

## (América Latina e Caribe)

### Produtos Garantidos e Produtos não cobertos pela garantia

#### Produtos Garantidos

A garantia aqui apresentada aplica-se aos seguintes equipamentos e produtos da GEMS

- Produtos de Ressonância Magnética ("RM") (equipamentos novos, upgrades parciais de hardware do sistema).
- Produtos de Tomografia Computadorizada ("TC") (equipamentos novos, upgrades totais o parciais de hardware do sistema).
- Produtos de Raio-X e Mamografia (equipamentos novos, upgrades parciais de hardware do sistema).
- Produtos de Medicina Nuclear (equipamentos novos, upgrades parciais do hardware do sistema).
- Produtos de Tomografia de Emissão de Positron ("PET") (equipamentos novos, incluindo scanners, cyclotrons e laboratórios de química e upgrades parciais do hardware do sistema).
- Produtos de Ultrasson (equipamentos novos)
- Produtos de Solução de Imagem Integrada ("IIS") (estações de trabalho novas e produtos de conectividade novos).
- Produtos Preferenciais Gold Seal (equipamentos usados GEMS fornecidos com garantia)
- Produtos de Cardiologia Invasiva (equipamento novo).

#### Produtos Não Cobertos pela Garantia

A garantia aqui disciplinada não se aplica aos seguintes equipamentos e produtos

- Acessórios e Materiais identificados por números de catálogo iniciados pela letra "E"(cobertos por garantia em apartado)
- Produtos não listados nas páginas de preços da GEMS à época de sua venda, normalmente identificados por números de série iniciados por NL ou NW na Proposta GEMS (fornecidos com as garantias próprias de seus fabricantes, se houver, desde que a GEMS esteja autorizada a repassar ao Cliente; caso contrário, tais produtos são fornecidos no estado em que se encontram, sem garantias).
- Tubos de Raio-X GE e Tubos Intensificadores de Imagem GE (cobertos por garantia específica em separado).
- Tubos de Raio-X Maxiray (cobertos por garantia específica em separado)
- Produtos GE PowerTech Power Conditioning (cobertos por garantia específica em separado)
- Peças Novas ou Trocadas vendidas pelo Serviço de Venda Direta ao Consumidor GEMS (cobertos por garantia específica em separado)
- Upgrades Parciais de Hardware de Sistemas identificados nas e-Pricebook da GEMS como sujeitos apenas aos créditos de garantia para os Clientes que tenham contratos de serviço com a GEMS

- Produtos fabricados e vendidos pelas afiliadas GEMS (tais como GE OEC, GE Lunar e GEMS IT), salvo de outra forma especificado nos contratos de venda utilizados pelas afiliadas da GEMS.
- Produtos Gold Seal de troca (produtos usados fornecidos nas condições em que se encontram)
- Multi-Vendor Preferred Products (produtos usados não GE fornecidos com garantia limitada).

### Escopo e Duração das Garantias

#### Garantia dos Produtos.
A GEMS garante que os Produtos Garantidos listados em nossa Proposta (1) estarão livres de defeitos de material, defeitos de fabricação e de titularidade, e (2) serão conformes às especificações do Produto Garantido em vigor na data de embarque do Produto Garantido. As especificações do Produto Garantido estão disponíveis ao Cliente, mediante solicitação

#### Garantia de Direitos Autorais e Patentes.
A GEMS garante que o Cliente que, à época da entrega, os Produtos Garantidos não serão objeto de qualquer demanda relativa a infração de patentes ou de direitos autorais

#### Prazo de Garantia.
O prazo de garantia, para todas as garantias listadas acima, com exceção da garantia de evicção, de patentes e direitos autorais é limitado ao tempo conforme os períodos determinados na Tabela de Garantia abaixo.

Se os Produtos Garantidos não forem montados ou instalados pela GEMS, seu período de garantia se iniciará na data de entrega dos Produtos Garantidos ao Cliente.  Se a GEMS montar ou instalar os Produtos Garantidos, o período de garantia se iniciará (1) cinco dias após a notificação, pela GEMS ao Cliente, de que a montagem ou instalação está completa e de que os Produtos Garantidos então funcionando de acordo com as especificações GEMS para os Produtos Garantidos, ou (2) na data da primeira utilização do Produto Garantido para prestação de serviços a pacientes, o que ocorrer primeiro  Se a montagem dos Produtos Garantidos sofrer atraso igual ou superior a 90 (noventa) dias contados da data de entrega, por motivos não imputáveis exclusivamente à GEMS, o período de garantia se iniciará 90 (noventa) dias após a entrega do Produto Garantido ao Cliente

O período de garantia de cada Produto Garantido ou peça fornecido ao Cliente sem cobrança de taxas proporcionais de garantia será a porção restante do período de garantia aplicável ao Produto Garantido ou peça consertado ou substituído  O período de garantia para qualquer Produto Garantido substituído ou peça fornecido ao Cliente com cobrança de taxas proporcionais de garantia será o período completo de garantia aplicável ao Produto Garantido fornecido em substituição

### Exclusões de Garantia

As garantias aqui apresentadas cancelam e revogam toda e qualquer outra garantia ou condição semelhante, quer escrita, verbal, expressa, implícita ou decorrente de lei  SALVO O DISPOSTO NESTE DOCUMENTO, NÃO SE APLICA AO PRESENTE TERMO QUALQUER GARANTIA EXPRESSA OU IMPLÍCITA DE COMERCIABILIDADE, DE ADEQUAÇÃO A UMA FINALIDADE ESPECÍFICA DE POSSE LIVRE DE INTERVENÇÃO, COMPATIBILIDADE OU ACURACIDADE DE INFORMAÇÕES (DATA) NENHUMA GARANTIA GEMS DEVERÁ SER ESTENDIDA ALÉM DAQUELAS APRESENTADAS NESTE DOCUMENTO E NENHUMA DECLARAÇÃO ANTERIOR DA GEMS OU DE SEUS REPRESENTANTES DEVERÁ MODIFICAR OU ESTENDER AS GARANTIAS AQUI APRESENTADAS

As garantias aqui apresentadas não cobrem

A  Qualquer falha, defeito ou deficiência (inclusive falha de conformidade com as especificações publicadas pela GEMS relativas ao Produto Garantido) que seja resultante, no todo ou em parte, de (1) armazenamento impróprio, manuseio, uso, manutenção dos Produtos Garantidos, alteração ou utilização anormal dos Produtos Garantidos, serviços ou reparos realizados por qualquer pessoa que não a GEMS, uma subsidiária GEMS, uma empresa afiliada à GEMS ou um representante de serviços autorizado pela GEMS ou pelo fabricante, (2) falha no cumprimento de quaisquer recomendações, advertências ou instruções escritas fornecidas pela GEMS, sua afiliada, subsidiária, representante autorizado de serviços ou pelo fabricante, (3) utilização ou combinação do Produto Garantido com quaisquer itens ou dados que não aqueles determinados nas Especificações dos Produtos Garantidos, ou utilização do Produto Garantido sozinho ou em combinação com quaisquer itens ou dados que não sejam propriamente ou absolutamente compatíveis com os Produtos Garantidos, conforme as Especificações do Produto Garantido, (4) quaisquer desenhos, projetos, especificações ou instruções do Cliente, (5) qualquer falha na utilização dos Produtos Garantidos conforme suas especificações, incluindo tolerância de dutos, ou (6) qualquer causa externa aos Produtos Garantidos, conforme fornecidos pela GEMS, ou além do controle razável da GEMS, incluindo mas não se limitando a falha de energia elétrica, falha na limpeza e manutenção do local de instalação dos Produtos Garantidos livre de poeira, sona, outras partículas ou ruído, falha em manter o local de instalação do Produto Garantido em adequadas condições ambientais, e, em caso de sistemas de RM, falha do sistema resfriador à água fornecido pelo Cliente;



GE Medical Systems—Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-269-4000
Argentina: Fax (54 11) 4899-9350
Brazil: Fax (55 11) 3067 8387
Chile: Fax (56 2) 421 4103
México: Fax (52 55) 5228-9661
Puerto Rico: Fax (1 787) 282 7436

B  O pagamento ou reembolso de quaisquer custos de instalação decorrentes de reparo ou substituição dos Produtos Garantidos ou peças;

C  Produtos vendidos a nossos distribuidores internacionais (cobertos por garantia específica em separado);

D  Produtos Garantidos instalados em território fora da América Latina e do Caribe;

E  Suprimento de item expandível;

F  Em caso de sistemas de ressonância magnética, serviços a quaisquer sistemas de resfriamento a água fornecidos pelo Cliente;

G  Para sistemas de ressonância magnética com LHe/LN ou magnetos supercondutores (exceto em caso de sistemas de ressonância magnética com ímãs LCC), fornecimento de criogênio, serviços de criogênio ou serviços no criostato do magneto, "cold head", compressor ou shimming supercondutor ou resistivo, exceto se a necessidade de tais fornecimentos ou serviços tenha sido causada por um defeito material ou de fabricação coberto pelas garantias aqui disciplinadas.  (O MR Magnet Maintenance and Cryogen Service Agreement pode ser adquirido, para fornecimento de coberturas suplementares durante o período de garantia), e

H  Para as bolsas de colimador de sistemas de Raio-X Proteus XR/a, Revolution XR/d e Precision 500D

## Recursos Exclusivos do Cliente

Garantias dos Produtos: A GEMS, a seu exclusivo critério, reparará, ajustará ou substituirá (por peças novas ou peças trocadas em outras substituições) o Produto Garantido defeituoso ou desconforme, ou peças do Produto Garantido, desde que o Cliente tenha notificado à GEMS seu pedido de serviços de garantia e disponibilizado o Produto para conserto pela GEMS.  Exceto pelo discriminado abaixo em relação a baterias, os serviços de garantia serão executados sem quaisquer custos das 8h00 às 17h00, de segunda a sexta-feira, com exceção de feriados adotados por GEMS.  Fora dos horários e dias aqui estabelecidos, os serviços de garantia serão cobrados conforme as taxas de serviço da GEMS em vigor à época e estarão sujeitos à disponibilidade de pessoal da GEMS, a critério da GEMS.  Instalação, serviços de garantia ou outros serviços necessários podem ser executados pela GEMS ou por qualquer subsidiária, afiliada ou representante autorizada de serviços da GEMS ou do fabricante  Serviços de garantia para as baterias usadas em sistemas de Raio-X e mamografia serão realizados sem encargos, nas horas determinadas acima, somente durante os primeiros doze meses do prazo de garantia

Garantia de Patente e Direitos Autorais:  A GEMS defenderá ou firmará acordos em quaisquer demandas interpostas contra o Cliente, na medida em que tais demandas sejam baseadas em alegação de infração da garantia de Patente ou Direitos Autorais, e desde que a GEMS tenha sido prontamente notificada, por escrito, da demanda, desde que o Cliente coopere na defesa da demanda ou acordo; e desde que a GEMS detenha o completo e exclusivo controle da defesa ou acordo  Se qualquer juízo competente julgar, em última instância, sem possibilidade de recurso, que a demanda é válida, a GEMS pagará todos os custos e danos que o Cliente tenha sido condenado a pagar devido à violação da garantia de Patente e Direitos Autorais  Ainda, a GEMS obterá uma licença para que o Cliente continue utilizando o Produto infrator, ou providenciará sua substituição por um produto não infrator ou modificará o Produto de forma a eliminar a infração, ou removerá o Produto infrator e reembolsará o Cliente pelos custos (descontada a depreciação razoável) e quaisquer custos de transporte pagos pelo Cliente

Recursos e Responsabilidade Exclusivos:  Os recursos previstos nos parágrafos acima desta Seção de RECURSOS E RESPONSABILIDADE EXCLUSIVOS são os ÚNICOS RECURSOS do Cliente e constituem a única responsabilidade da GEMS por quaisquer solicitações de serviços de garantia.  O CLIENTE CONCORDA QUE A GEMS E SUAS AFILIADAS E REPRESENTANTES AUTORIZADAS DE SERVIÇOS NÃO SERÃO RESPONSÁVEIS PERANTE O CLIENTE POR (1) DANOS PENAIS, LUCROS CESSANTES OU DANOS INDIRETOS, TAIS COMO PERDA DE RECEITAS, (2) QUALQUER ASSISTÊNCIA NÃO REQUERIDA CONFORME A CONTRATO DE VENDA; OU (3) QUALQUER EVENTO OCORRIDO APÓS O TÉRMINO DO PERÍODO DE GARANTIA.

## Tabela de Garantia

**12 meses**
- Sistemas e componentes de RM
- Sistemas, componentes, detectores  e upgrades de hardware de sistemas completos de TC
- Sistemas, componentes e upgrades de hardware de sistemas completos de Raio-X e mamografia
- Sistemas e componentes para medicina nuclear
- Sistemas e componentes para PET (scanners, cyclotrons e laboratórios químicos)
- sistemas, componentes, módulos, upgrades, sondas e transdutores de ultrassom (exceto produtos de ultrassom listados abaixo)
- Estações de trabalho e produtos de conectividade IIS (exceto os produtos IIS listados abaixo)

- Produtos Preferenciais Gold Seal (salvo se de outra forma especificado na Proposta)

**6 meses**
- Upgrades parciais de hardware dos sistemas de RM (salvo upgrades parciais de hardware dos sistemas de RM identificados no livro de preços eletrônico – e-Pricebook – da GEMS como somente elegíveis para créditos de garantia para os Clientes que detêm contratos de serviços com a GEMS)
- Upgrades parciais de hardware dos sistemas de TC (salvo upgrades parciais de hardware de sistemas de TC identificados no e-Pricebook da GEMS como somente elegíveis para créditos de garantia para os Clientes que detêm contratos de serviços com a GEMS)
- Upgrades parciais de hardware de sistemas de Raio-X, retificadores de alta voltagem a tubos pick up de câmara de TV
- Upgrades parciais de hardware de sistemas PET (scanners, cyclotrons e laboratórios de química)
- Upgrades parciais de hardware de sistemas nucleares

**60 meses, proporcional**
- Baterias de níquel cadmium ou chumbo ácido (comum) para sistemas de Raio-X e mamografia (proporcionais conforme demonstrado abaixo)

**3 meses**
- HealthNet vLan, Estação de trabalho, produtos de distribuição de imagem (Produtos IIS )
- T3 exchange sondas e transdutores de ultrassom, kit anexo de ultrassound water path (Equipamentos de Ultrasom)

## Baterias

Para sistemas de Raio-X e mamografia se as baterias de níquel-cadium ou chumbo ácido (comum) precisarem de substituição durante o período de garantia aplicável, o Cliente pagará o preço da bateria de reposição em vigor na época de sua entrega, menos o Desconto Proporcional de Garantia  O Desconto Proporcional de Garantia para baterias que falharem em menos de 12 (doze) meses após o início da garantia é de 100% (cem por cento).  O Desconto Proporcional de Garantia para baterias que falharem em mais de 12 meses após o início da garantia é calculado da seguinte forma:

1 – # de meses após o início da garantia x 100% :
                        60

Para fins dos Descontos Proporcionais, uma fração de mês menor que 15 dias será desconsiderada, e uma fração do mês igual ou maior que 15 dias será considerada um mês inteiro

---

☞  ESTE TERMO DE GARANTIA É REDIGIDO, ORIGINALMENTE, EM LÍNGUA INGLESA.  ESTA VERSÃO EM LÍNGUA PORTUGUESA FOI PREPARADA PARA FACILITAR O ENTENDIMENTO E COMPREENSÃO DO CLIENTE DAS CONDIÇÕES AQUI DISPOSTAS, FICANDO CLARO, NO ENTANTO, QUE O TERMO DE GARANTIA FOI REDIGIDO ORIGINALMENTE E DEVE SER INTERPRETADO CONFORME A VERSÃO EM LÍNGUA INGLESA, QUE SERÁ O ÚNICO DOCUMENTO VINCULANTE E PREVALECENTE.

---



**GE Commercial Finance**
Healthcare Financial Services

ANNEX B

PAYMENT SCHEDULE

| | Days After Installation | Principal (US$) | Interest (US$) | Total Payment (US$) |
|---|---|---|---|---|
| 1 | 180 | $105,483.31 | $23,515.10 | $128,998.41 |
| 2 | 360 | $105,483.31 | $21,706.25 | $127,189.56 |
| 3 | 540 | $105,483.31 | $19,897.39 | $125,380.70 |
| 4 | 720 | $105,483.31 | $18,088.54 | $123,571.85 |
| 5 | 900 | $105,483.31 | $16,279.68 | $121,762.99 |
| 6 | 1080 | $105,483.31 | $14,470.83 | $119,954.14 |
| 7 | 1260 | $105,483.31 | $12,661.98 | $118,145.29 |
| 8 | 1440 | $105,483.31 | $10,853.12 | $116,336.43 |
| 9 | 1620 | $105,483.31 | $9,044.27 | $114,527.58 |
| 10 | 1800 | $105,483.31 | $7,235.41 | $112,718.72 |
| 11 | 1980 | $105,483.31 | $5,426.56 | $110,909.87 |
| 12 | 2160 | $105,483.31 | $3,617.71 | $109,101.02 |
| 13 | 2340 | $105,483.28 | $1,808.89 | $107,292.17 |
| ------ | -------------- | -------------- | -------------- | -------------- |
| ----- | -------------- | -------------- | -------------- | -------------- |



**GE Commercial Finance**
Healthcare Financial Services

ANNEX  C

SUBORDINATION AGREEMENT

 **GE Capital**

*Sept 29,* 2016

X-Ray and Diagnostic Ultrasound Consultants Limited
The Radiation Oncology Centre of Jamaica Limited
Winston Franklin Barrington Clarke
Eileen Patricia Clarke
1 Ripon Road
Kingston 5, Jamaica

Re:     Modification of Credit Agreement.

Dear Customer:

We make reference to the Credit Agreement, between and among GE HFS, LLC, as Lender, X-Ray and Diagnostic Ultrasound Consultants Limited, as Borrower, and The Radiation Oncology Centre of Jamaica Limited, Winston Franklin Barrington Clarke and Eileen Patricia Clarke, as Guarantors for the amount of US$1,371,283.00 executed before Mr. Arthur Hamilton, Notary Public of Jamaica West Indies (the "<u>Credit Agreement</u>").

Unless otherwise defined herein, capitalized terms used and not defined herein have the meanings given in the Credit Agreement.

Subject to the terms and conditions in the Credit Agreement, Lender agrees to make a Loan to Borrower on the Closing Date. Therefore, and pursuant to Section 10.7 of the Credit Agreement, Lender amends the Credit Agreement in order to incorporate the new terms and conditions agreed and acknowledged by the parties regarding the Closing Date.

The Credit Agreement is hereby amended as follows:

    *"Section 1. "The Credit Facility"*

    *"1.2.  Manner and Disbursement of Loan.  No later than five (5) days after the Closing Date the Loan shall be disbursed to GE Medical Systems. Account No. 1-██████, Pittsburgh National Bank in 960 Fort Duquesne Blvd. PA 15222, ABA # ██████████ SWIFT Code PNCCUS33.*

    *Section 3. Conditions Precedent.*

    *The obligation of Lender to make the Loan hereunder is subject to the following conditions precedent being satisfied prior to December 22, 2016:*

    *3.1. Conditions. Before or concurrently with the making of the Loan Lender shall have received:*

(a)  a proof of delivery of the Equipment signed by Borrower;

(b)  the duly executed Note;

(c)  payment of all fees, taxes (including the Note's stamp tax) and expenses (including the fees and expenses of legal counsel to Lender) then due and owing;

(d)  proof of perfection of the security interest in the Collateral pursuant to Section 4.2;

(e)  the duly executed Subordination Agreement in substantially the form of Annex C (the "Subordination Agreement");

Furthermore, the parties agree and acknowledge that Annex B "Payment Schedule" shall be amended in terms of the new Annex B attached hereto.

Except as provided for in this letter agreement, the remaining terms of the Credit Agreement, shall remain in full force and effect.

This letter agreement, and the rights and duties of the parties thereto, shall be construed in accordance with and governed by the internal laws of the State of New York.

We kindly request that you acknowledge this amendment by your signature below.

Best regards,

GE HFS, LLC

By: _Lori Sundvik_

Name: _Lon Sundvik_

Title: _Duly Authorized Signor_


ACKNOWLEDGED AND AGREED:


X-Ray and Diagnostic Ultrasound Consultants Limited


By: _Winston FBClarke_

Name: _WINSTON F.B. CLARKE_

Title: _MANAGING DIRECTOR_


The Radiation Oncology Centre of Jamaica Limited


By: _Collie Miller_

Name: _Collie MILLER_

Title: _Managing Director_


Winston Franklin Barrington Clarke


By: _Winston FBClarke_

Name: _WINSTON F.B. CLARKE_

Title: _MANAGING DIRECTOR_


3 of 4

Eileen Patricia Clarke

By: _____

Name: EILEEN P. CLARKE

Title: DIRECTOR/ SECRETARY

CHRISTINA M. BROWN
Attorney-at-Law
No. 5283

ANNEX B

PAYMENT SCHEDULE

| # | Payment Date | Principal Amount |
|---|---|---|
| | --------- | ----------- |
| 1 | March 31, 2017 | $ 105,483.31 |
| 2 | September 30, 2017 | $ 105,483.31 |
| 3 | March 31, 2018 | $ 105,483.31 |
| 4 | September 30, 2018 | $ 105,483.31 |
| 5 | March 31, 2019 | $ 105,483.31 |
| 6 | September 30, 2019 | $ 105,483.31 |
| 7 | March 31, 2020 | $ 105,483.31 |
| 8 | September 30, 2020 | $ 105,483.31 |
| 9 | March 31, 2021 | $ 105,483.31 |
| 10 | September 30, 2021 | $ 105,483.31 |
| 11 | March 31, 2022 | $ 105,483.31 |
| 12 | September 30, 2022 | $ 105,483.31 |
| 13 | March 31, 2023 | $ 105,483.28 |



# PROMISSORY NOTE

US$ 614,600.00

REF.
PLACE OF ISSUE: KINGSTON 5, JAMAICA
DATE OF ISSUE: ____, _____, 2016
EXPIRATION DATE: SIGHT DRAFT

FOR VALUE RECEIVED, X-Ray And Diagnostic Ultrasound Consultants Limited, a corporation duly organized and existing under the laws of Jamaica, TRN (the "Payor") and Winston Franklin Barrington Clarke, TRN: 101455488, Eileen Patricia Clarke, TRN 101455526 and The Radiation Oncology Centre of Jamaica Limited, TRN 001676032, (together, the "Guarantors"), hereby jointly and severally unconditionally promise to pay to the order of GENERAL ELECTRIC COMPANY through its GE Healthcare division division ("GECO"), in lawful money of the United States of America ("Dollars" or "US$"), and in immediately available funds, the principal sum of US$614,600.00 (Six Hundred Fourteen Thousand Six Hundred Dollars with 00/100 Dollars), at the offices of GECO at 20225 Watertower Boulevard Crossroads Corporate Center XII, Brookfield, WI, 53045-3597, United States of America or at any other location designated in writing by GECO or, at GECO's option, by transfer to a banking account in Jamaica, United States of America or elsewhere to be timely designated in writing by GECO by notice to Payor at its address set forth below. All costs and expenses incidental to any payments made by Payor under this Note shall be borne exclusively by Payor.

While any default exists in the making of any payment of this Note, Payor further agrees to pay interest on such overdue amount at the rate of 12% per annum.

All payments made by Payor under this Note shall be made unconditionally in full without set-off, defense or counterclaim by Payor, including (without limitation) any defense or counterclaim based on any law, rule or policy which is now or hereafter promulgated by any Jamaican governmental authority or regulatory body and which may adversely affect the obligation of Payor to make, or the right of GECO to receive, such payments. Payor shall make all payments of all amounts payable under this Note free and clear of and without liability for and without deduction or withholding for any and all past, present and future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, imposed by Jamaica or any political subdivision or taxing authority thereof or therein.

Payor may, at its option, at any time and from time to time, pay all or any portion of this Note without any penalty. Such payment shall be applied first to costs and expenses and then to the principal amount.

If any payment hereunder is not made when due, Payor shall pay all costs of collection whether or not suit is filed hereon, including, but not limited to, reasonable attorneys' fees.

Each payment made on account of this Note, shall be recorded by GECO in this document.

Payor hereby expressly waives any diligence, presentment, protest and demand, notice of protest, demand, dishonor and nonpayment of this Note and all other notices of any kind, except as otherwise provided herein, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time without in any way affecting the liability of Payor. To the fullest extent permitted by law, the defense of the statute of limitations in any action on this Note is waived.

This Note shall be governed and construed in accordance with the laws of Jamaica. Payor hereby irrevocably agrees that any legal suit, action or proceeding arising out of or relating to this Note may be instituted in any court sitting in Kingston, and by the execution and delivery of this Note, Payor expressly waives any objection which it may have now or hereafter to the laying of the venue or to the jurisdiction of any such suit, action or proceeding, and irrevocably submits generally and unconditionally to the jurisdiction of such court in such suit, action or proceeding. Nothing contained herein shall preclude the bringing by GECO of any action or proceeding in respect to this Note in the courts of any jurisdiction in Jamaica or elsewhere in which Payor or any of its property or assets may be found or located.

All notices, requirements, demands and other communications hereunder to Payor shall be in writing in English and shall be deemed to have been duly given if presented personally or delivered at the following address:

Payors:   X-Ray And Diagnostic, Ultrasound
          Consultants Limited
          1 Ripon Road, Kingston 5,
          Jamaica

          Winston Franklin Barrington Clarke
          & Eileen Patricia Clarke
          4 Margaret Drive, Kingston 6,
          Jamaica

          The Radiation Oncology Centre of
          Jamaica Limited
          Suite 3, 1 Ripon Road
          Kingston 5, Jamaica

No single or partial exercise of any power by GECO hereunder shall preclude other or further exercise thereof or the exercise of any other power. No delay or omission on the part of GECO in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note.

Executed and delivered by Payor in Kingston, Jamaica.

1

**PAYORS:**
X-RAY AND DIAGNOSTIC, ULTRASOUND CONSULTANTS
LIMITED

Name : Winston Franklin Barrington Clarke
Title: Managing Director
_____, _____, 2016
Address : 1 Ripon Road, Kingston 5, Jamaica
Telephone: (876)929-0844; (876)929-0845;
(876) 929-8140

**GUARANTORS:**
THE RADIATION ONCOLOGY CENTRE OF JAMAICA
LIMITED
TRN 001676032

Collie Roy Emanuel Miller - Managing Director
_____, _____, 2016
Address : Suite 3, 1 Ripon Road, Kingston 5, Jamaica
Phone:[876] 920 1823; [876] 920 8404; [876] 960 0975

[AFFIX STAMP DUTIES]

FOR VALUE RECEIVED, each of the undersigned
Guarantors, as primary obligor, hereby unconditionally
and irrevocably guarantees the full, prompt and complete
payment when due (whether at scheduled maturity, by
reason of acceleration or otherwise) of the principal of
and interest on the foregoing promissory note, and
hereby waives acceptance, diligence, presentment,
demand, protest or notice of any kind whatsoever
(including notice of default or non-payment), as well as
any requirement that the holder exhaust any right or take
any action against the maker of the foregoing promissory
note, and hereby consents to any extension of time or
renewal or other modification thereof.   This is a
continuing, absolute and unconditional guarantee of
payment and not merely of collection.  To the maximum
extent permitted by applicable law, the undersigned
hereby waives all defenses of a surety or guarantor to
which it might be entitled by statute or otherwise.

**GUARANTORS:**

WINSTON FRANKLIN BARRINGTON CLARKE

Winston Franklin Barrington Clarke   TRN 101455488
_____, _____, 2016
Address : 4 Margaret Drive, Kingston 6, Jamaica

**GUARANTORS:**

EILEEN PATRICIA CLARKE

Eileen Patricia Clarke   TRN 101455526
_____, _____, 2016
Address : 4 Margaret Drive, Kingston 6, Jamaica

2



**GE Healthcare**
General Electric Company

### INTERNATIONAL SALES AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as by and between General Electric Company, a corporation incorporated in the State of New York, United States of America (hereinafter referred to as "Seller" or "GEHC"), and X-Ray & Diagnostic Ultrasound Consultants Ltd. A company incorporated under the laws of Jamaica, (hereinafter referred to as "Buyer" or "Customer").

### 1. PURCHASE AND SALE.

1.1. Subject to the terms and conditions of this Agreement and the schedules attached hereto, Seller hereby agrees to sell, and Buyer agrees to purchase, the medical equipment described in Schedule A attached hereto (hereinafter referred to as the "Equipment").

1.2. As agreed to by both parties hereto, this Agreement shall be subject to the Seller's Standard Terms and Conditions set forth in Schedule C, to the Additional Specific Terms for Cyclotron and Radio-pharmacy Equipment set forth in Schedule D and the Software License set forth in Schedule E.

1.3. Buyer acknowledges that the Equipment is not manufactured in the domicile country of the Buyer, and shall be imported to such country pursuant to the terms and conditions stated in Schedule C.

1.4. Buyer agrees that Seller's obligations with respect to the installation of the Equipment and warranty service may be performed by the Seller directly or through its authorized local agents.

### 2. PRICES, AND PAYMENT TERMS.

2.1. The total price for the Equipment shall be the price in United States dollars (hereinafter referred to as "Dollars" and/or "U.S.$") set forth in section 1 of Schedule B (the "Purchase Price"), payable as stated in Schedule B. Payment in U.S. Dollars to the exclusion of any other currency is of the essence of this Agreement, meaning that payments shall only have its full effect provided they are done in US Dollars.

2.2. All amounts due and payable with respect to the Equipment shall be paid with immediately available funds, freely transferrable through wire transfer to the bank account indicated in Schedule B or any other banking institution appointed by the Seller and duly informed in written to the Buyer in the address defined below. Seller is under no obligation to accept payments if the funds do not originate from accounts in the name of Buyer.

2.3. All payments by Buyer under this Agreement, any other collateral documents or otherwise in connection with the transactions contemplated hereby shall be made without set-off or counterclaim and shall be made free and clear of and without deduction or withholding for or on account of any Taxes (as defined herein). In the event that any deduction or withholding from any payment to be made by Buyer is required in respect of any Taxes pursuant to any applicable law, rule or regulation (including, without limitation, deduction or withholding for or on account of any interest withholding tax or rent withholding tax), then Buyer shall (i) pay directly to the relevant taxing authority the

full amount required to be so withheld or deducted, (ii) forward to Seller within fifteen (15) days from payment an official receipt or other documentation satisfactory to Seller evidencing such payment to such authority, and (iii) pay to Seller such additional amount or amounts as is necessary to ensure that the net amount actually received by Seller will equal the full amount Seller would have received had no such withholding or deduction been required. As used herein, "Taxes" shall mean any and all present or future taxes (including, without limitation, income, gross receipts, gains, excess profits, sales, use, property, withholding, ad valorem, doing business, municipal, transfer, franchise, capital, occupational, license, value added, fuel, excise and stamp taxes and any and all interest withholding taxes, rent withholding tax), levies, imposts, taxes, bank fees, duties, assessments, fees (including, without limitation, documentary, license, filing, recording, and registration fees and charges), of any nature or kind whatsoever, together with any penalties, fines, additions to tax or interest thereon, however imposed, withheld, levied, collected or assessed by any country or governmental authority or subdivision thereof or therein.

2.4 The Parties agree that is their intention that the invoices with which the transactions are registered constitute securities or financial instruments that are considered an enforceable obligation and shall be subject to collection by execution of judgment. The Seller, at any time, may assign or transfer the invoices issued under this agreement partially   or completely to any authorized financial institution of its choice. Therefore the Buyer may not transfer nor sell any of the invoices issued in respect of this contract.

### 3. INSTALLATION.

3.1. The Equipment shall be installed at 3 Ripon Road, Kingston 5, JAMAICA (the "Site" or "Installation Site").

3.2. Customer agrees that the Equipment is accepted seven (7) days after the date on which GEHC notifies Customer that the testing of the Equipment has been successfully completed. In the event GEHC is prevented from testing the Equipment for reasons outside of GEHC's control (including, but not limited to, Customer (i) not complying with its obligations to obtain the appropriate permits or license(s) and/or (ii) failing to successfully complete any preparation/installation item as required in GEHC's specifications) within such timelines as specified in the related planning, then GEHC may inform Customer in writing that Customer should remedy such situation within seven (7) days. If Customer fails to remedy the situation within such seven (7) day-period, then, provided always that the mechanical installation of the Equipment was satisfactorily completed (using GEHC's standard procedures), GEHC may issue a Certificate of Installation (substantially in the form attached hereto as Schedule F) and the related (final) payment is due by Customer. Such Certificate of Installation shall be conclusive evidence of the installation and the Equipment being complete and in compliance with GEHC's obligations under the Agreement. Customer, at its reasonable request, shall be entitled to be present at and to witness the mechanical installation of the Equipment and shall not be entitled to raise any objection to the installation carried out, or to the verification thereof, if Customer failed to attend when advised that installation was to take place.

Confidential
Copyright © GE 2012

rev. 04/12



**GE Healthcare**
**General Electric Company**

3.3. Buyer can reject the Equipment only on grounds of apparent defects as the quantity or quality of the installation, and only substantial lack of quantity or quality conformance in the installation, and only if reported in detail to Seller in writing within the 5-days period described in Section 3.1.

3.4. Upon Equipment installation the parties will define a date in order to carry the corresponding trainings. Unless the parties expressly agree otherwise in advance, applications training shall be available for scheduling by Seller at the Site Monday through Friday between 8:00 AM and 5:00 PM, commencing no later than Tuesday of the week selected by Buyer. Buyer shall be responsible to coordinate the participation of its designated employees at the scheduled training. Seller reserves the right to charge a supplemental application training fee at its then current applicable rates (the "Surcharge Amount"), if one or more applications training are delayed beyond twelve (12) months from Equipment installation for reasons attributable to Buyer. To that effect, promptly upon the expiry of the 12-month period Seller shall deliver a written notice to Buyer, which notice shall state (i) the Surcharge Amount and (ii) the schedule for such remaining applications training within no later than thirty (30) calendar days of receipt of the notice. Failure by Buyer to provide written confirmation of the scheduled training and pay in advance the Surcharge Amount shall be deemed as a waiver of its rights to receive such remaining applications.

3.5. The Buyer will obtain any approvals, permits and licenses which are required for Installation or use of the Equipment, at the Buyer's sole expense.

3.6. if for reasons not attributed to the Seller the installation is delayed for more than 18 (eighteen months from the date of shipment, the Seller will be released from its installation obligation and such release will generate the same effect as the signature by the Buyer of a Certificate of Installation.

**4. BUYER'S REPRESENTATIONS AND WARRANTIES.**

Buyer hereby represents and warrants to Seller that Buyer:

(a) is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation;

(b) has all necessary material licenses, permits, consents or approvals for the conduct of its business;

(c) has the corporate power and authority to execute and carry out the terms and provisions of this Agreement, and has taken all necessary corporate action to authorize the execution of this Agreement by its signatories;

(d) has, to the extent necessary, taken all steps and done all things in order to cause this Agreement and all other collateral writings executed

(e) is compliant in all respects with the laws, regulations and practices of the jurisdiction of its incorporation, including the Central Bank thereof or its equivalent, and any other regulatory agency, as they may pertain to the transactions contemplated herein and therein.

(f) is hereby represented by signees that have enough capabilities to sign on its behalf, and that those capabilities are in full force and effect. However the Seller is entitled to review

the evidence of said capabilities;

(g) Acknowledges as valid all and every obligation and transaction established on this Agreement, which will be legally enforceable by the Seller in accordance to the terms and conditions provided herein.

(h) has no legal nor regulatory nor contractual limitation and/or obstacle to subscribe this Agreement.

**5. BUYER'S COVENANTS.**

5.1. So long as any part of the Purchase Price shall remain outstanding, Buyer shall comply with the following requirements:

(a) Buyer, at its sole cost and expense, shall keep and maintain the Equipment in good condition and repair.

(b) Buyer shall comply with all laws governing the use of the Equipment and shall obtain and maintain, at its sole cost, all necessary government permits, licenses, certificates or approvals as may be required by law for the exportation, importation, installation and operation of the Equipment.

(g) Buyer shall not sell, lease, assign, transfer, relocate or otherwise dispose of the Equipment, or any part thereof, without the prior written consent of Seller, if the title hasn't been transferred to the Buyer.

5.2. Judgment Currency. If for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "Other Currency"), the rate of exchange used shall be that at which in accordance with normal banking procedures Seller could purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given. For purposes herein, a "Business Day" shall be a day on which banks in New York, State of New York, U.S.A. are not required or authorized to be closed. The obligation of Buyer in respect of any such sum due from it to Seller hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that on the Business Day following receipt by Seller of any sum adjudged to be due hereunder in such Other Currency, Seller may in accordance with normal banking procedures purchase Dollars with such Other Currency. If the Dollars so purchased are less than the sum originally due to Seller in Dollars, Buyer agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Seller against such loss, and if the Dollars so purchased exceed the sum originally due to Seller in Dollars, Seller agrees to remit to Buyer such excess.

5.3. Buyer herby commits to keep the confidentiality of this Agreement and the information contained in it, and to not disclose nor use that information without the Seller's prior consent in writing. In case of breach, all legal consequences shall apply.

**6. EVENTS OF DEFAULT.**

6.1. The occurrence, at any time after the date hereof, of any of the following events shall constitute an "Event of Default":

(a) Default in the payment of any amount due under this Agreement or any writing executed at any time in connection with this Agreement;



**GE Healthcare**
**General Electric Company**

(b)   Default in the performance or breach of any other covenant or agreement of Buyer in this Agreement, any writing executed at any time in connection with this Agreement or any other agreement with Seller;

(c)   Failure by Buyer to accept the Equipment due to conditions beyond Seller's control, including but not limited to the Site not being ready for installation, or refusal by Buyer to accept the Equipment upon completion of the installation thereof.

(d)   Any statement, representation or warranty of Buyer shall prove to have been incorrect or misleading in any respect when made.

(e)   Buyer shall become insolvent, make an assignment for the benefit of creditors, apply for or consent to the application or suffer the appointment of any receiver, trustee or similar officer, or initiate or have initiated against it any act, process or proceeding under any insolvency, bankruptcy, reorganization, dissolution, liquidation or similar law.

(f)   Buyer fails to obtain any requisite foreign exchange control approvals and other authorizations by any competent authorities to assure the availability and transferability of Dollars to enable Buyer to perform its obligations hereunder, or such approvals and other authorizations shall have expired or shall have been revoked, canceled, terminated or otherwise shall have ceased to be in full force and effect for any reason.

6.2. The occurrence of any Event of Default, as well as its effects, shall take place at the exact time of its occurrence, with no need of notice, communication nor action of the Seller.

## 7.  REMEDIES.

Upon the occurrence of an Event of Default Seller may exercise any and all of the following rights and remedies:

(a)   Acceleration.  Seller may, to the extent permitted by law, declare the Purchase Price to be immediately due and payable whereupon the same shall become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Buyer.

(b)   Penalty Interest. If Buyer shall fail to pay when due (whether at maturity, by reason of acceleration or otherwise) all or any portion of any principal amount of or interest on the Purchase Price, to the extent permitted by applicable law, any such unpaid amount shall bear interest for each day, from and including the date it became due, to but excluding the date it is paid in full prior to 12:00 p.m. Miami time, at a rate per annum equal to the interest rate specified in Schedule B.  Nothing contained in this Agreement shall require or permit the collection of interest in the excess of the maximum amount permitted by applicable law.

(c)   Inform Government Authorities: The occurrence of an Event of Default that might be considered by the Seller as a risk for the adequate functioning or operation of the Equipment, entitles the Seller to inform such event to the corresponding medical Government Authorities and the users of the service rendered about the risk of malfunctioning of such Equipment.

(d) Inform financial and Credit Institutions: The Seller is entitled to inform Events of Default to financial and Credit Institutions,

provided it is compliant with applicable legislation.

(e) Remote deactivation of the Equipment: The occurrence of an event of default, entitles the Seller to remotely deactivate any Software installed in the Equipment..

## 8.  CUMULATIVE REMEDIES.

All rights and remedies of Seller are cumulative and not exclusive. Seller may exercise and enforce any of its other rights and remedies under this Agreement, any Note and/or any other writings executed in connection with this Agreement, and any other right and/or remedy available to it at law, in equity, or under any other agreement or writing.  In addition, Seller shall have the right to withhold shipment or delivery of any or all of the Equipment.

## 9.  LIMITED WARRANTY.

Any warranties for the Equipment shall be as set forth in the warranty forms delivered to Buyer for the particular type of Equipment and shall be subject to any additional exclusions and limitations set forth therein herein in accordance to Schedule G attached hereto. Equipment is warranted to be free of defects in workmanship or materials under normal usage for a period of one (1) year from the warranty period begins and any claim shall be submitted in writing within such period. Seller's sole liability and Buyer's exclusive remedy for a breach of this warranty is limited to repair, replacement or refund at the sole option of Seller. Such repairs or replacement will not extend the warranty period. . In addition, any service rendered during the warranty period and in connection to such warranty must be requested by the Buyer exclusively throughout the GE SERVICE CENTER. Requests made throughout any other means, shall not be considered as such, and the Seller will not be liable in any way. The limited warranty established herein, is the one and only warranty committed, and substitute of any and all other warranties. If no such warranty has been provided, the Equipment is sold AS IS, WITH ALL FAULTS, without warranty of any kind, whether written, oral, expressed, implied or statutory. Any Operating Documentation and Operating Tools, as defined in Schedule E, covered by this Agreement are provided AS IS, without warranty of any kind whether written, oral, expressed, implied or statutory.  EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT OR IN WARRANTY FORMS SPECIFICALLY DELIVERED TO BUYER, SELLER MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, USAGE OF TRADE, OR SAMPLES PREVIOUSLY SUPPLIED.

## 10. LIMITATION OF LIABILITY.

In no event, whether as a result of breach of contract, warranty, tort, (including negligence and strict liability) or otherwise, shall Seller's or its affiliates, distributors, agents, subcontractors', or suppliers' total liability to Buyer for any and all loss or damage arising out of, or resulting from, this Agreement or from its performance or breach, or from the Equipment or any Operating Package, as defined in Schedule E, or service exceed the price for the specific component of the Equipment, Operating Package or service which gives rise to the claim.  Any such liability shall

Confidential
Copyright © GE 2012

rev. 04/12



**GE Healthcare**
**General Electric Company**

terminate upon the expiration of the warranty period. In no event, whether as a result of breach of contract, warranty, tort (including negligence and strict liability) or otherwise, shall Seller or its affiliates, distributors, agents, subcontractors, or suppliers be liable for any special, consequential, incidental or penal damages including but not limited to, loss of profit or revenue, loss of use of the Equipment or any Operating Package or any associated equipment, service materials or Software, as defined in Schedule E, damage to associated equipment, service material or Software, cost of capital, cost of substitute equipment, service materials or Software, facilities, services or replacement power, downtime costs or claims of Buyer's customers for such damages. If Buyer transfers title to or leases the Equipment sold hereunder to any third party, Buyer shall obtain from such third party a provision affording Seller and its affiliates, distributors, agents, subcontracts and suppliers the protection of the preceding sentence. If Seller or its affiliates, distributors, agents, subcontractors, or suppliers, furnish Buyer with advice or other assistance which concerns any of the Equipment or any Operating Package covered by this Agreement, or any system or equipment in which same may be installed or to which it might relate, and which is not required pursuant to this Agreement, the furnishing of such advice or assistance will not subject Seller and its affiliates, distributors, agents, subcontractors or suppliers to any liability, whether in contract, warranty, tort (including negligence and strict liability) or otherwise.

**11. ASSIGNMENT.**

Seller may sell, assign or otherwise transfer to one or more persons or entities all or any part of, Seller's rights hereunder, under any related documents, including, but not limited to, Seller's right in and to the Purchase Price. Buyer may not sell, assign or otherwise transfer its rights or obligations hereunder or any interest herein, including by consolidation or merger, without Seller's prior written consent and any such sale, assignment or transfer without Seller's consent shall be null and void. This shall be applicable only if the title of the goods has not been transferred to the Buyer.

**12. ANTI MONEY LAUNDRY SECTION**

Parties acknowledge and agree that the means of payment listed below, shall not be accepted by the Seller, and the breach of the abovementioned shall not be considered an effective payment.

(a) Unidentified bank deposits; (b) Deposits generated by one or more credit instrument (checks, etc.)

(c) In kind deposits;;

(d) Post or predated checks; (e) Partial payments made throughout several credit instruments in different terms; ;

(f) Unidentified payments;

(g) Transactions originated in countries that are considered "tax haven" by the Central Bank, the State Department and Justice Department of the United States of America; and/or triangled through such countries

(h) Payment with more than one credit instrument, even when those instruments have been authorized by the Seller;

(i) The usage of non-financial institutions such as security brokers, currency Exchange offices, couriers (Eg. Western Union, etc.), money orders, among others;

(j) Transfers from countries or jurisdictions considered as "high risk" ones by the State Department of the United states of America.

**13. NOTICE.**

All notices required or permitted to be given hereunder shall be in writing, and in English and shall be personally delivered, or by an internationally recognized express delivery service postage and charges prepaid to the address for notice in the signature page (or such other address, as any party may hereafter specify by notice to the other party). In all case, notice shall be effective upon receipt if confirmed in writing (by a representative of the party or the courier service.

**14. MODIFICATION; WAIVER.**

No modification or change may be made in this Agreement except by a writing signed by a duly authorized representative of each party. None of the conditions or provisions of this Agreement shall be held to have been waived by any act or knowledge on the part of either party, except by an instrument in writing signed by a duly authorized officer or representative of the parties.

**15. CONSTRUCTION OF AGREEMENT AND RESOLUTION OF DISPUTES.**

15.1. This Agreement shall be construed and governed according to the laws of the State of Florida applicable to contracts made and to be fully performed therein, excluding the United Nations Convention on Contracts for the International Sale of Goods and excluding the 1974 Convention on the Limitation Period in the International Sale of Goods (the "1974 Convention") and the Protocol amending the 1974 Convention, done at Vienna April 11, 1980.

15.2. The parties irrevocably submit to the jurisdiction of the federal and state courts sitting in Miami, Florida, United States of America; and at the election only of the Seller, to the exclusion of the courts of any country which may have jurisdiction for the purpose of protecting and enforcing the Seller's rights either hereunder or pursuant to any other agreements, documents, instruments or otherwise, for the purposes of any suit, action or other proceeding arising in connection hereto or thereto, or the subject matter hereof or thereof, or any of the transactions contemplated hereby or thereby, brought by the Seller, or their respective successors, subrogees or assignees.

15.3. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR COUNTERCLAIM ARISING UNDER OR IN ANY WAY RELATED TO THIS AGREEMENT, AND UNDER ANY THEORY OF LAW OR EQUITY, WHETHER NOW EXISTING OR HEREAFTER ARISING.

15.4. Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding relating to this Agreement in Miami, Florida, United States of America and further irrevocably waives any claim





**GE Healthcare**
*General Electric Company*

that Miami, Florida, United States of America is not a convenient forum for any such suit, action or proceeding.

15.5. Buyer agrees to pay to Seller all expenses incurred or paid by Seller, including reasonable attorneys' fees and court costs, in connection with any Event of Default.

### 16. ENTIRE AGREEMENT.

This Agreement constitutes the entire understanding among Seller and Buyer and supersedes all earlier or contemporaneous agreements, whether written or oral, concerning the subject matter of this Agreement.

### 17. BENEFICIARIES.

The provisions of this Agreement are for the benefit of the parties hereto and not for any other person except as specifically provided herein.

### 18. SEVERABILITY.

If any provision of this Agreement is declared invalid or unenforceable by a court or arbitral tribunal having competent jurisdiction, it is mutually agreed that this Agreement shall endure except for the part declared invalid or unenforceable by order of such court.

### 19. EXHIBITS.

The Schedules attached to this Agreement hereby are incorporated into and made a part of this Agreement.

### 20. COUNTERPARTS; EFFECTIVE DATE.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement shall become effective upon the signature of each of signatory parties (the "_Effective Date_"), subject to Section 4(e) above.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed on the day and year first above written.

SELLER:

Name: _Carlos Castro_
Title: _Legal Representative_
Miami, _06-18-2015_
7600 Corporate Center Drive
Suite 501, Miami, FL, United States of America 33126
Telephone: (954)-744-5625

BUYER: X-Ray and Diagnostic Ultrasound Consultants Limited

Tax ID: █████████

Address: 1 Ripon Road, Kingston 5, JAMAICA.

Name: _Winston F.B. Clarke_
Title: _Managing Director_
Identity document: 101-455-488  01/16/2019

Patricia Petit
Legal Representative
Miami, FL
July 13, 2015

Confidential
Copyright © GE 2012

5

rev. 04/12

g

**GE Medical Systems**
**General Electric Company**

SCHEDULE A

DESCRIPTION OF EQUIPMENT

Quotation Number: PR2-C51770 Version 2

Xray Diagnostic U Snd Ltd                    Attn: Freddie Clarke                    Date: 06-04-2015
1   Ripon Road
    Kingston 03 00000

Duly authorized by General Electric Company   Healthcare Division from Milwaukee, Wisconsin, U.S.A (WHO  we are pleased to transmit the following supply, proposal, sales and payment conditions. Proposal object Healthcare equipment provided according to the attached document   will be supplied from GEHC, Inames in U.S.A. The services of Installation and technical assistance (when existing), will be provided by an authorized company in your country as indicated by the vendor accordant to the conditions explained in proposal and related documents.

- Terms and Conditions:
- Warranty:                                  See attached.
- Terms of Delivery:                         CIF - Cost, Insurance and Freight
- Quotation Expiration Date:                 08-26-2015
- Billing Terms:
- Payment Terms:                             As per Schedule B

BY GE HEALTHCARE
GE HEALTHCARE

Submitted By:
                Earle Spence
                06-04-2015

BUYER:
                _Winston F.B Clarke_
                Authorized Customer              Date
                WINSTON F.B. CLARKE
                Print or Type Name
                MANAGING  DIRECTOR
                Title
                PO#

| | Date |
|---|---|
| GE HEALTHCARE | |



**GE Medical Systems**
*General Electric Company*

Quotation Number: PR2-C51770 Version 2

| QTY | CATALOG | DESCRIPTION |
|---|---|---|
| 1 | | NonProducts |
| 1 | | Refurbished MiniTrace |
| 1 | | MINITrace |
| 1 | P5230JP | MINITrace Nitrogen-13 Target System |
| | | PETtrace 700 13N-Ammonia Target System for production of ammonia. The ammonia is produced by an over-pressure of methane gas inside the target. |
| | | The system includes: |
| | | • 13N-Ammonia target body with a silver chamber |
| | | • Liquid Target Filling System (LTF) o Beam collimators o Beam Exit Valve and connection flange o Valves, connectors and tubes for water and Helium cooling o Acceptance test kit |
| | | Target filling volume 0.8 ml Target performance is verified at 25 HA beam current. |
| 1 | | MINITrace |
| 1 | W0200RP | 7 Days TiP Cyclotron Onsite Training |
| | | 7 Days TiP Cyclotron Onsite Training |
| | | • One 4 day onsite visit to coincide with system start-up. |
| | | • One 3 day onsite follow-up visit 4-8 weeks post system start-up. |
| | | Includes Travel and Living expenses. |
| | | This training program must be scheduled and completed within 12 months after the date of product delivery. |
| 1 | R0703PT | MINITrace Training for in house Engineer |
| | | PET Mini Service (Class/Lab) |
| | | Two Week Long Service Engineering Training Class Taught in Sweden. The Course Covers the Basics of Servicing GE Cyclotrons. This course must be taken within 2 years from the purchase date. |
| 1 | | NonProducts |
| 1 | | Transportation |
| 1 | | NonProducts |

FDG production

2/3

Quotation Number: PR2-C51770 Version 2

| QTY | CATALOG | DESCRIPTION | |
|---|---|---|---|
| | | | 827,000.00 |

(Quoted prices do not reflect state and local taxes if applicable)







**GE Medical Systems**
*General Electric Company*



*GE Medical Systems—Americas. Milwaukee, USA*
*GE Medical Systems—Latin America: Miami, USA Fax 305-375-4306*
*Argentina: Fax (54 11) 4329-5380*
*Brasil: Fax (55 11) 2067 8387*
*Chile: Fax (56 2) 421 4103*
*México: Fax (52 55) 5228-9651*
*Puerto Rico: Fax (1 787) 282 7436*

# GEMS Product Warranty
## (Latin America and the Caribbean)

### Covered Products and Excluded Products

*(Body text illegible due to low resolution.)*

### Scope and Duration of Warranties

### Warranty Exclusions



8





GE Medical Systems

General Electric Company



**GE Medical Systems**
**General Electric Company**



GE Medical Systems – Latin America: Miami USA Fax 305-285-6300
Argentina: Fax (54 11) 4109-4350
Brasil: Fax (55 11) 3067-8367
Chile: Fax (56 2) 421-4123
México: Fax (52 55) 5206-9551
Puerto Rico: Fax (1 787) 281-7438

## Garantía de Productos GEMS
### (América Latina y el Caribe)

### Productos Cubiertos y Productos Excluidos

**Productos Cubiertos**

La garantía cubre los siguientes sistemas de GEMS:

- Equipos de Resonancia Magnética ("MR") (equipos nuevos o mejoras del disco duro a una parte del sistema)
- Equipos de Tomografía Computada ("CT") (equipos nuevos, mejoras al disco duro de uno o el sistema o mejoras del disco duro a una parte del sistema)
- Equipos de Rayos X y Mamografía (equipos nuevos o mejoras del disco duro a una parte del sistema)
- Equipos de Medicina Nuclear (equipos nuevos o mejoras del disco duro a una parte del sistema)
- Equipos de Tomografía por Emisión de Positrones ("PET") (equipos nuevos, inclusive monitores, refrigerantes, aceleradores de química y mejoras del disco duro a una parte del sistema)
- Equipos de Ultrasonido (equipos nuevos)
- Equipos Integrated Imaging Solution ("IIS") (soluciones de trabajo nuevas y productos nuevos de consorcio del)
- Productos Profesades GoldSeal (equipos usados)
- Productos GoldSeal (equipos usados)

**Productos Excluidos**

La garantía no cubre los siguientes equipos o productos:

[illegible list items]

### Exclusiones de la Garantía

[illegible body text]

La garantía no cubre:

A. Cualquier defecto o deficiencia [illegible]

B. [illegible]

C. [illegible]

© Copyright 2002 General Electric Company



10



## GE Medical Systems
### General Electric Company



GE Medical Systems Americas: Milwaukee, USA
www.gemedicalsystems.com
Argentina: Fax (54 11) 4356.8300
Brazil: Fax (55 11) 2067 1367
Chile: Fax (56 2) 421 4153
Mexico: Fax (52 55) 5228.9631
Puerto Rico: Fax (1 787) 282 2456

D) Productos Cubiertos instalados fuera de América Latina y el Caribe.

E) Artículos de mercadería específicos

F) Con respecto a sistemas de RM, el servicio a los sistemas de refrigeración por agua que el propio Cliente tenga instalados.

G) Con respecto a los sistemas de RM con IMaLN o magnetos superconductores con configuración del actuador protector para recuperación de los sistemas de RM con magnetos LCO, todo su sistema de criógeno, será un compuesto o servicio al magneto, criostato, criostilo XRA, compresor del actuador protector o bobina del tipo "short coil" superconductoras o recurrirá a gastos que la necesidad de una reservación se vea resultado de un defecto en los materiales o en la mano de obra cubiertos por esta garantía (GEMS pone a disposición del Cliente su MR Magnet Maintenance and Cryogen Service Agreement como una cobertura complementaria durante el periodo de vigencia de la garantía).

H) Los focos utilizados en los sistemas de rayos X (excepto XR-4, el Performix XR-4 y el Performix 5000)

## Único Recurso Bajo la Garantía

Garantía para los Productos: Siempre que el Cliente formule con celeridad el reclamo bajo garantía a GEMS y ponga el Producto Cubierto a disposición de GEMS para que se lo preste el servicio, GEMS, a su criterio, procederá a reparar, ajustar o sustituir todo el Producto Cubierto (cuando reparemos servicios de mostrador) o aquellas partes que se ...

[remaining body text illegible]

### Cronograma de la Garantía

12 meses

[body text illegible]

## 6 meses

[body text illegible]

☞ EL TEXTO DE LA PRESENTE GARANTÍA HA SIDO REDACTADO ORIGINALMENTE EN IDIOMA INGLÉS. LA PRESENTE VERSIÓN EN ESPAÑOL HA SIDO PREPARADA SÓLO PARA FACILITAR SU ENTENDIMIENTO Y COMPRENSIÓN POR EL CLIENTE, QUEDANDO ESTABLECIDO QUE ESTA GARANTÍA SE RIGE Y DEBERÁ SER INTERPRETADA CONFORME A SU VERSIÓN EN IDIOMA INGLÉS, QUE ES LA ÚNICA QUE SURTE EFECTOS LEGALES.





**GE Medical Systems**
**General Electric Company**



GE Medical Systems–Americas: Milwaukee, USA
GE Medical Systems–Latin America: Miami, USA   Fax 305-364-4002
Argentina: Fax (54 11) 4515-3920
Brasil: Fax (55 11) 3067-8287
Chile: Fax (56 2) 424 4123
México: Fax (52 55) 5228-9651
Puerto Rico: Fax (1 787) 281 5456

## Garantia dos Productos GEMS
(América Latina e Caribe)

### Produtos Garantidos e Produtos não cobertos pela garantia

*Produtos Garantidos*

A garantia aqui apresentada aplica-se aos seguintes equipamentos e produtos da GEMS:

- Produtos de Ressonância Magnética ("RM") (equipamentos novos, agregados parciais de hardware ou sistema)
- Produtos de Tomografia Computadorizada ("TC") (equipamentos novos, agregados parciais de hardware ou sistema)
- Produtos de Raio-X e Mamografia (equipamentos novos, agregados parciais de hardware ou sistema)
- Produtos de Medicina Nuclear (equipamentos novos, agregados parciais de hardware ou sistema)
- Produtos de Tomografia de Emissão de Prótrons ("PET") (equipamentos novos, agregados parciais de hardware ou sistema)
- Produtos de Ultrasom (equipamentos novos)
- Produtos de Estação de Imagem Integrada ("EII") (estações de trabalho novas e produtos de conectividade novos)
- Produtos Profissionais (eII final independentes e todos GEMS fornecidos com garantia)
- Produtos de Cardiologia Invasiva (equipamentos novos)

*Produtos Não Cobertos pela Garantia*

A garantia aqui descrita não se aplica aos seguintes equipamentos e produtos:

- Acessórios e Materiais identificados por números de catálogo iniciados pela letra "H" (cobertos por garantia em separado).
- Produtos não baseados nas práticas de processo da GEMS à época de sua venda, normalmente identificados por números de série iniciados por NL ou NM na Proposta GEMS (vencidos com as garantias próprias de seus fabricantes, se houver, desde que a GEMS esteja autorizada a repassar ao Cliente tais garantias, tais produtos não fornecidos ou cobertos por um contrato, sem garantia).
- Tubos de Raio-X CT e Tubos Intensificadores de Imagem GE (cobertos por garantia especificada em separado).
- Tubos de Raio-X Mamray (cobertos por garantia especificada em separado).
- Produtos GE PowerPaq Power Conditioning (cobertos por garantia especificada em separado).
- Peças Novas ou Trocadas usadas pelo Serviço de Venda Direta ou Contrato do GEMS (cobertos por garantia especificada em separado).
- Upgrades Parciais de Hardware de Sistemas identificados em separado da GEMS como itens de upgrade para a realização de serviço por um Cliente que tenha contrato de serviço com a GEMS)

- Produtos fabricados e vendidos pelas afiliadas GEMS (tais como GE OEC, GE Hiram e GEMS IT), salvo de outra forma especificado nos contratos de venda utilizados pelas afiliadas da GEMS.
- Produtos OEM (isto é, troca (produtos usados fornecidos em estoque) que se que se encontra) fornecido)
- Multi-Vendor Preferred Products (produtos usados têm GEMS não seja sua garantia limitada)

### Escopo e Duração das Garantia:

*Garantia dos Produtos*: A GEMS garante que os Produtos Garantidos listados em nossa Proposta (1) estarão livres de defeitos de material, defeitos de fabricação e de titularidade; e (2) serão conformes às especificações do Produto Garantido no que vigor na data de entrega do Produto Garantido. As especificações do Produto Garantido estão disponíveis ao Cliente, mediante solicitação.

*Garantia de Direitos Autorais e Patentes*: A GEMS garante ao Cliente que, à época da entrega do Produto Garantido não será objeto de qualquer demanda relativa a infração de patente ou de direitos autorais.

*Prazo de Garantia*: O prazo de garantia, para todas as garantias listadas acima, com exceção da garantia de exidão, de patentes e direitos autorais é iniciado no serviço conforme os períodos abaixo na Tabela de Garantia abaixo.

Se os Produtos Garantidos não forem instalados ou instalados pela GEMS, seu período de garantia se inicia na data da entrega dos Produtos Garantidos ao Cliente. Se a GEMS instalar os produtos Garantidos, o período da garantia se inicia (1) como data que após a instalação pela GEMS ao Cliente, do que o a menagem ou Instalação está completa e do que os Produtos Garantidos para prestação de serviço a pacientes, o do normal primeiro. Se a menagem dos Produtos Garantidos se der após a instalação, no entanto a 90 (noventa) dias corridos da data de entrega, por seu enceada requisitos exclusivamente à GEMS, o período da garantia se iniciará 90 (noventa) dias após a entrega do Produto Garantido ao Cliente.

O período de garantia de cada Produto Garantido no baseado no Cliente com o dada de base proporciona na garantia é o período inteiro do período de garantia aplicável ao Produto Garantido se seja convertido no subtratado. O período da garantia para qualquer Produto Garantido nas subtratações para fornecido ao Cliente com cobrança de base proporcional ao período de garantia do se período completo do período de garantia aplicável ao Produto Garantido fornecido em subtratação.

### Exclusões de Garantia

As garantias aqui apresentadas constituem as únicas e qualquer outra garantia ou conjunto dos estabelecidos, quer escrita, verbal, expressa, implícita ou decorrente de lei. SALVO O DISPOSTO NESTE DOCUMENTO, NÃO SE APLICA AO PRESENTE TERMO QUALQUER GARANTIA EXPRESSA OU IMPLÍCITA DE COMERCIABILIDADE, DE ADEQUAÇÃO A UMA FINALIDADE ESPECÍFICA DE NOME LIVRE DE INFRAÇÃO, COMPATIBILIDADE IRRESTRITA OU ADEQUABILIDADE. DE ENDOSSAMOS QUE DATAS NENHUMA GARANTIA GEMS DIVULGA SER NENHUMA GARANTIA AQUI ENUNCIADAS APRESENTADAS NESTE DOCUMENTO. NENHUMA DECLARAÇÃO ANTERIOR DA GEMS DE SEUS REPRESENTANTES DEVERÁ MODIFICAR OU ESTENDER AS GARANTIAS AQUI APRESENTADAS

As garantias aqui apresentadas não cobrem:

A. Qualquer falha, defeito ou inadequação (inclusive falha de conformidade com as especificações publicadas pela GEMS relativa ao Produto Garantido) que seja resultante, no todo ou em parte (1) da manutenção imprópria, imerensão, uso, manutenção dos Produtos Garantidos, alteração ou utilização anormal dos Produtos Garantidos, serviços ou reparos realizados por qualquer pessoa que não a GEMS, uma subsidiária GEMS, uma terceira aliança GEMS ou um representante de serviço autorizado pela GEMS ou pelo fabricante; (2) falha no cumprimento de qualquer recomendações, advertências ou instruções escritas fornecidas pela GEMS, sua afiliada, terceira aliança, representante autorizada de serviços ou pelo fabricante; (3) utilização em combinação do Produto Garantido com qualquer item ou dado que não tenha sido fornecido à essas Especificações dos Produtos Garantidos, ou utilização do Produto Garantido em combinação com qualquer item ou dado que não esteja proporcionado ou absolutamente compatível com os Produtos Garantidos, conforme as Especificações do Produto Garantido; (4) qualquer desenho, projeto especificações ou instruções do Cliente; (5) qualquer falha na utilização dos Produtos Garantidos conforme suas especificações, incluindo utilização de dados; ou (6) qualquer outra situação dos Produtos Garantidos, conforme fornecidos pela GEMS, os atos de eventos manuais da GEMS; inclusive mas não se limitando a falha de energia elétrica, falta às lençóis e inundação de lençol de umidade, dados não particulares ou outra falha em razões e dados de instalação dos Produtos Garantidos estão produtos dos itens subsistema, ou, em caso de sistemas de RM, falha dos motores resfriadores e água fornecidos pelo Cliente





**GE Medical Systems**
**General Electric Company**



GE Medical Systems–Americas: Milwaukee, USA
www.gemedicalsystems.com
GE Medical Systems – Latin America: Miami, USA  Fax 305-395-4300
Argentina: Fax (54 11) 4629-8390
Brazil: Fax (55 11) 3067 8367
Chile: Fax (56 2) 421 6159
México: Fax (52 55) 5326 9651
Puerto Rico: Fax (1 787) 282 2435

B) D) pagamento ou restituição de quaisquer custos de instalação decorrentes do reparo ou substituição dos Produtos Cobertos ou peças.

C) Produtos remédios e traços distribuídos, reativados e cobertos por garantia específica em separado;

D) Produtos Garantidos instalados em território fora da América Latina e do Caribe;

E) Suprimentos ou itens expansíveis;

F. Em caso de sistemas de ressonância magnética, serviços a quaisquer sistemas de resfriamento à água fornecidos pelo Cliente.

G) Para sistemas de ressonância magnética com 1.5 a 1.N ou imagens supercondutores (exceto em caso de sistemas de ressonância magnética com falha LCC), fornecimento de criogênio, serviços de criogênio ou serviços ao sistema de criogênio, "cold head", compressor ou sistema de supercondutor ou reinício, exceto se necessitado de uma falha causada no serviço tanto não causada por um defeito material ou de fabricação coberto pelas garantias aqui dispostas. (O Mr. Magnet Maintenance and Cryogen Service Agreement pode ser adquirida para fornecimento de cobertura suplementar durante o período de garantia); e

H. Para os bulbos de contrastivo de sistemas de Raio-X Proteus XR/a, Revolutivo XR/d e Proteus SX.C)

## Recursos Exclusivos do Cliente

Garantias dos Produtos. A GEMS, a seu exclusivo critério, reparará, ajustará ou substituirá (por peças novas ou peças trocadas aos custos estabelecidos no Produto Garantido defeituoso ou danos, ou peças do Produto Cobertos, desde que o Cliente tenha notificado a GEMS nos prazos de serviço da garantia a disponibilizado o Produto para remanejo pela GEMS. Exceto pelo disseminado que na relação a reparos, os serviços de garantia serão executados nos quaisquer caso das 8h00 às 17h30, de segunda a sexta-feira, com exceção de feriados adotados por GEMS. Para fins hostis a dias aqui estabelecidos, os serviços de garantia serão efetuados nos termos da taxa de serviço da GEMS em vigor à época a estarão sujeitos à disponibilidade do pessoal da GEMS, a critério da GEMS. Instalação, serviços de garantia ou outros serviços necessários podem ser concedidos pela GEMS por qualquer substitutivo, a fim de reparar/substituir nos estados de serviços da GEMS em fim de semana. Serviços de garantia para as horas realizadas em semanas de Raio-X Rastografia serão realizadas sem acréscimo, mas hora determinadas acima, somente durante as primeiras doze semanas do prazo de garantia.

Garantia de Patente e Direitos Autorais. A GEMS defenderá ou tomará acordos em quaisquer demandas instaurada contra o Cliente, na medida em que tais dem andas sejam baseadas em alegação de infração da garantia da Patente ou Direitos Autorais, a desde que a GEMS tenha sido gratuitamente notificada, por escrito, da demanda; desde que o Cliente coopere na defesa da demanda ou acordo; e desde que a GEMS detenha o controle exclusivo sobre a defesa ou acordo. Se qualquer juízo permanente julgar, em última instância, ser parte das possibilidades do recurso, que a demanda à válida, a GEMS pagará todos os custos e danos que o Cliente tenha sido condenado a pagar devido à violação da garantia da Patente e Direitos Autorais. Ainda, a GEMS obterá uma licença para que o Cliente continue utilizando o Produto anterior, ou providenciará sua substituição por um produto não-infrator ou modificará o Produto de forma a eliminar a infração, ou removerá o Produto e fará o reembolso ao Cliente pelos custos (descontada a depreciação razoável) a quaisquer custos de transporte pagos pelo Cliente.

Recursos e Responsabilidade Exclusivas: Os recursos previstos nos parágrafos acima desta Seção de RECURSOS E RESPONSABILIDADE EXCLUSIVOS são os ÚNICOS RECURSOS do Cliente a constituem a única responsabilidade da GEMS por quaisquer atribuições de serviços de garantia. O CLIENTE CONCORDA QUE A GEMS E SUAS AFILIADAS E REPRESENTANTES AUTORIZADAS DE SERVIÇOS NÃO SERÃO RESPONSÁVEIS PERANTE O CLIENTE POR (I) DANOS PENAIS, LUCROS CESSANTES OU DANOS INDIRETOS, TAIS COMO PERDA DE RECEITAS, OU QUALQUER ASSISTÊNCIA NÃO REALIZADA CONFORME A CONTRATO DE VENDA; OU (II) QUALQUER CUSTO OCORRIDO APÓS O TÉRMINO DO PERÍODO DE GARANTIA.

## Tabela de Garantia

**12 meses**
- Sistemas e componentes de RM
- Sistemas, componentes, detectores a upgrades de hardware de sistemas completos de TC
- Sistemas, componentes e upgrades de hardware de sistemas completos de Raio-X e mamografia
- Sistemas e componentes para máquinas nucleares
- Sistemas e componentes para PET (exceto, ciclotrons e laboratórios quentes)
- Sistemas, componentes, módulos, upgrades, sondas e transdutores de ultrassom (exceto produtos de ultrassom listados abaixo)
- Estações de trabalho produtos de conectividade HS (exceto os produtos HS listados abaixo)

- Produtos Proteus (um Gold Seal (salvo se de outra forma especificado na Proposta)

**6 meses**
- Upgrades parciais de hardware dos sistemas de RM (salvo upgrades parciais de hardware dos sistemas de RM identificados em 3 meses nos prazos de serviço – acima) – da GEMS como somente elegíveis para crédito da garantia para os Clientes que forem contratos de serviços com a GEMS)
- Upgrades parciais de hardware dos sistemas de TC (salvo upgrades parciais de hardware de sistemas de TC identificados em 3 meses) da GEMS como somente elegíveis para crédito da garantia para os Clientes que forem contratos de serviços com a GEMS)
- Upgrades parciais de hardware de sistemas de Raio-X, retificadores de alta voltagem e tubos pick up de câmara de TV
- Upgrades parciais de hardware de sistemas PET (câmaras, ciclotrons e laboratórios de química)
- Upgrades parciais de hardware de sistemas nucleares

**48 meses, proporcional**
- Câmaras de sinal oxônico ou chumbo ácido (exceto) para sistemas de Raio-X e mamografia (proporcionais conforme fórmula exibida abaixo)

**3 meses**
- Head Net tan, Estação de trabalho, painéis de distribuição de imagem (Proteus EV.)
- TB reforços exodas e transdutores de ultrassom, HS arera de ultrassom e water path (Suprimentos de Ultrassom)

## Baterias

Para sistemas de Raio-X e mamografia ou as baterias de alojamento ou com chumbo ácido (com um percurso de alternação durante o período de garantia aplicável, o Cliente pagará o prazo de baterias de reposição em vigor na época da sua entrega, sendo o Desconto Proporcional de Garantia. O Desconto Proporcional de Garantia para baterias que falharem em meses de 12 (doze) a cem após o início da garantia é de 100% (cem por cento). O Desconto Proporcional de Garantia para baterias que falharem em mais de 12 meses após o início da garantia é calculado da seguinte forma:

$$\frac{48 - (número total de meses na garantia x 100\%)}{48}$$

Para fins dos Descontos Proporcionais, uma fração de mês maior que 15 dias será descontado de uma fração de mês igual ou menor que 15 dias será considerada em um mês inteiro.

☞ ESTE TERMO DE GARANTIA E REDIGIDO, ORIGINALMENTE, EM LÍNGUA INGLESA. ESTA VERSÃO EM LÍNGUA PORTUGUESA FOI PREPARADA PARA FACILITAR O ENTENDIMENTO E COMPREENSÃO DO CLIENTE DAS CONDIÇÕES AQUI DISPOSTAS, FICANDO CLARO, NO ENTANTO, QUE O TERMO DE GARANTIA FOI REDIGIDO ORIGINALMENTE E DEVE SER INTERPRETADO CONFORME A VERSÃO EM LÍNGUA INGLESA, QUE SERÁ O ÚNICO DOCUMENTO VINCULANTE E PREVALECENTE.





**GE Medical Systems**
*General Electric Company*

**SCHEDULE B**

**PAYMENT SCHEDULE**

All terms not otherwise defined herein shall have the meanings given to them in the Agreement to which this Schedule B is attached.

1.  **PURCHASE PRICE:** CIF Port of Shipment  (INCOTERMS 2010)

    **US$ 827,000.00.- (Eight hundred and twenty seven  thousand United States Dollars), Net price excluding taxes** payable as detailed in Section 2 below.

    The Purchase Price includes:

    1.  Installation,
    2.  Start up.
    3.  Limited warranty as stated in Section 9 and Schedule G

2.  **PAYMENT SCHEDULE:**

    The purchase Price shall be paid through wire transfer in favor of GE Medical Systems, Pittsburgh National Bank  960 Fort Duquesne Blvd. PA 15222,  GE Medical Systems,  Acct: 1-424892,  ABA ▮▮▮▮▮▮▮, SWIFT CODE: PNCCUS33, as follows:

    The total value is of: **US$ USD 827,000.00.- (Eight  hundred and twenty seven  thousand United States Dollars)** Net price excluding taxes payable as follows:

    a)   The sum of **US$   241,750.00 - (Two hundred and forty one thousand, seven hundred and fifty. United States Dollars)** of the Purchase Price, which was paid by the Buyer with the acceptance of the offer
    <span style="font-size:small">Quotation Number: PR2-C51770 Version 2</span>  presented by the Seller.

    b)   The sum of **US$ 585,250.00.- (Five hundred and eighty-five thousand, two hundred and fifty United States Dollars)** of the Purchase Price shall be paid through an irrevocable letter of credit to be delivered by the Buyer to the Seller prior to shipment and payable within nine (9) months)  from the shipment date.

3.  **LATE PAYMENT INTEREST RATE (IF APPLICABLE)**
    The Interest Rate is 12% per year.

*[signature]*

14



**GE Medical Systems**
*General Electric Company*

SCHEDULE C

**STANDARD TERMS AND CONDITIONS**

**1. DELIVERY.**

(a)     Seller shall deliver the Equipment CIF **Port of Shipment (INCOTERMS 2010) with destination to** Kingston Jamaica. Upon delivery of the Equipment on board the vessel at the port of shipment, all risk of loss, damage and title to the Equipment shall pass to the Buyer.  Delivery times will be informed opportunely and are conditioned to availability of the Equipment in the Factory. Delivery times are approximate.

(b)     The Seller reserves the right to make delivery in installments. Delivery dates are tentative.

**2. EXPORT SHIPMENT; GOVERNMENTAL REGULATIONS.**

(a)     Seller shall arrange for (i) export shipment to Buyer's country, and (ii) marine or air transport warehouse-to-warehouse insurance (including war risk, if available).  Buyer shall pay Seller for all fees and expenses, including, but not limited to, those covering preparation of consular documents, consular fees, forwarding fees, ocean or air freight, storage, insurance and Seller's then current fees for such services.  Notwithstanding any extension of credit to Buyer, all such charges shall be promptly reimbursed by Buyer in Dollars upon submission of Seller's invoices therefor.

(b)     In performing any of the foregoing services, Seller shall comply with any reasonable instructions of Buyer or, in the absence thereof, shall act according to its best judgment.  In so acting on Buyer's behalf, neither Seller nor its agent shall be liable for negligence or for any special consequential, incidental, indirect or exemplary damages to Buyer resulting therefrom.

(c)     Seller's delivery obligation hereunder shall be subject to the right and ability of Seller to make such delivery and/or obtain required licenses and permits under all decrees, statutes, rules and regulations of the United States government and agencies thereof presently in effect or which may be in effect hereafter, in particular, but without limitation, legislation pertaining to international traffic-in-arms and other export controls.  Seller shall not be required to comply with any foreign law, regulation or requirement which would subject Seller to criminal or civil penalties or loss of tax benefits under any federal, state or local law regulation of the United States or any other country of Equipment origin, and the execution of this Agreement does not entail an agreement to furnish any information which would subject Seller to any of the above-mentioned penalties or loss of tax benefits.  In any event, Buyer shall be responsible for timely obtaining and maintaining any required import license, exchange permit, authorizations or approvals of any ministry of health or sanitation surveillance authorities, or any other governmental authorization required for the importation.  Seller shall not be liable if any authorization of any government is delayed, denied, revoked, restricted or not renewed, and Buyer shall not be relieved thereby of any of its payment obligations hereunder.

(d)     Buyer hereby agrees: (i) to assist Seller in obtaining any such required export licenses or permits by supplying such documentation or information as may be requested by Seller; (ii) to comply with such decrees, statutes, rules and regulations of the government of the United States and agencies or instrumentalities thereof; (iii) to maintain the necessary records to comply with such decrees, statutes, rules and regulations; (iv) not to export or re-export the Equipment except in compliance with such decrees, statutes, rules and regulations; (v) to obtain all governmental approvals, permits and licenses necessary to import the Equipment; (vi) not to sell, transfer or otherwise dispose of the Equipment in violation of the export laws of the United States; and (vii) to indemnify and hold harmless Seller from any and all fines, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by Seller as a result of any breach of this subsection by Buyer or any of Buyer's customers.

**3. EXCUSABLE DELAYS.**

(a)     Seller shall not be liable for delays in delivery or performance, or failure to manufacture, deliver or perform due to causes beyond its reasonable control, including but not limited to acts of God, acts (including failure to act) of any governmental authority (*de jure* or *de facto*), wars (declared or undeclared), governmental



**GE Medical Systems**
**General Electric Company**

priorities, port congestion, riots, revolutions, strikes or other labor disputes, fires, floods, sabotage, nuclear incidents, earthquakes, storms, epidemics, delays in transportation, car shortage, inability due to causes beyond its reasonable control to obtain necessary labor, materials, components, services, manufacturing facilities, or any other commercial impracticability. The foregoing shall apply even though any of such causes exist at the time of the order or on the Effective Date, or occur after Seller's performance of its obligation is delayed for other causes.

(b)    Seller shall notify Buyer of any delay or failure excused by this Section and shall specify the revised delivery date as soon as practicable. In the event of such delay, subject to paragraph (d) below, there shall be no termination and the time of delivery or performance shall be extended for a period equal to the time lost by Seller by reason of the delay. In the event of a supply, equipment or facility shortage, Seller shall have the right to allocate its available resources among its customers in such a manner as Seller may consider equitable.

(c)    If delay excused by this Section extends for more than 60 days and the parties have not agreed upon a revised basis for continuing the work at the end of the delay, including adjustment of the Purchase Price, then either party (except where delay is caused by Buyer, in which event only Seller), upon 30 days written notice, may terminate this Agreement. If the delay is caused by Buyer and Seller terminates the Agreement, Seller Buyer shall promptly pay Seller its reasonable and proper termination charges (which charges shall be at least 15% (fifteen percent) of the Purchase Price) upon submission of Seller's invoices. Seller will retain as a credit any payments received up to the amount of the invoiced termination charges.

## 4. SITE READINESS.

Buyer shall provide free and clear access for delivery of the Equipment. Site selection is the sole responsibility of Buyer and Seller shall have no responsibility for delays caused by the Site not being ready to accept delivery of the Equipment. In addition, Buyer shall be responsible for making the Site ready for installation in compliance with Seller's written specifications, including but not limited to environmental (including air conditioning and shielding) requirements.

## 5. MANUFACTURE AND FINAL ASSEMBLY.

Buyer acknowledges that the purchased equipment is refurbished. Seller reserved right to utilize refurbished components in the manufacture or development, assembly or installation of the Equipment or any Operating Package covered by this Agreement and any options, upgrades or revisions required by this Agreement to be provided by Seller to Buyer. Refurbished components, in the manufacture or development shall be understood as those that have not been used in Equipment already sold in the market, but have been subject to a repair, modification or alteration. To the extent that such components are utilized, they shall be subjected to the same inspection and quality control procedures as, and shall be warranted by Seller to the same extent as, equivalent new components under applicable warranties expressly identified in this Agreement. Unless otherwise specified in writing, Seller or its affiliates, distributors, agents, subcontractors or suppliers will assemble the Equipment (with the exception of most supply and accessory items) and will connect same to the safety switches or electrical outlets to be provided and installed by Buyer. If for any reason final assembly, installation or electrical connections are made by other than Seller's own employees, its affiliates, distributors, agents, subcontractors or suppliers, the cost of such outside labor will be solely borne by Buyer. It is understood that proper electrical service for operation of the Equipment will be brought to the safety switches and outlets by Buyer and that Buyer will supply all of the necessary conduits, connectors, wiring, Unistrut steel with associated hardware or similar support in the ceiling, plumbing, carpentry, construction work, and rigging required for making the installation. It is further understood that should anything additional be required for the installation, it will be supplied by Buyer at Buyer's sole expense.

## 6. TESTING AND CERTIFICATION.

If any certificates or other approvals of any governmental authority are required to be obtained for the assembly, installation or use of the Equipment or any Operating Package, the same shall be procured by Buyer at Buyer's sole expense before delivery. Trained technical personnel will assemble, install, interconnect, adjust, test, calibrate and check out the Equipment utilizing factory-specified calibration and test procedures and instruments. The criteria for testing shall be Seller's or manufacturer's applicable equipment performance specifications.





**GE Medical Systems**
*General Electric Company*

### 7. SERVICE MATERIAL USE AND DATA ACCESS.

In connection with the installation, configuration, maintenance, repair and/or deinstallation of the Equipment, GE might deliver to the Site, along with the Equipment or separately, and store at the Site, attach to or install on the Equipment, and use, materials that have not been purchased by or licensed to the Buyer. The Buyer hereby consents to (a) this delivery, storage, attachment, installation and use, (b) to the presence of Seller's locked cabinet or box on the Site for storage of this property, and (c) to Seller's removal of all or any part of this property at any reasonable time, all without charge to Seller. The presence of this property within the Site will not give Buyer any right or title to this property or any license or other right to access, use, or decompile this property. Any access to or use of this property (except in compliance with Seller's written direction to Buyer to determine Equipment performance on Seller's behalf) and any decompilation of this property by anyone other than Seller's personnel is prohibited. Buyer agrees that it will use reasonable efforts to protect this property against damage or loss and to prevent any access to or use or decompilation of this property contrary to this prohibition.

Buyer agrees to permit Seller to connect to the Equipment, or to otherwise access data related to the Equipment, to allow Seller to gather, aggregate, compile, and use Equipment and resource usage data in various ways including quality initiatives, benchmarking, and reporting services. The data collected by Seller will be used, during and after the term of this Agreement, in a manner that will maintain patient and customer level anonymity.





**GE Medical Systems**
*General Electric Company*

SCHEDULE D

ADDITIONAL SPECIFIC TERMS FOR CYCLOTRON AND RADIOPHARMACY EQUIPMENT

In addition to the terms and conditions described in this Agreement, the following additional specific terms apply to cyclotron and radiopharmacy equipment including chemistry modules, TRACERcenter equipment (hot cells, quality control and radiation monitoring, and related documentation) ("Equipment"), except as otherwise indicated. For FASTlab Developer, further additional Terms and Conditions apply for use, warranty and liability.

## I. GENERAL CONSIDERATIONS ABOUT CYCLOTRON/RADIOPHARMACY PROJECTS

A cyclotron or radiopharmacy project undertaken by Customer often involves much more than the purchase and installation of Equipment. It may involve a tender for construction of a cyclotron facility or radiopharmacy facility (a construction, civil works, or "turnkey" project) to which GE Healthcare ("GEHC") may or may not be a party. The timing of installation of Equipment is highly dependent on necessary site preparation and pre-installation activities being completed.

### Site Preparation

Unless otherwise agreed, prior to installation of the Equipment, Customer is responsible at Customer's expense for all site preparation in compliance with applicable laws, regulations, codes and GEHC's Site Planning Guide and any site-specific specifications. Customer's site preparation includes (but is not limited to) the following:

- Site planning and design;
- Cost analysis, construction, renovation or alterations;
- Obtaining construction permits, inspections, licensing;
- Installation of the following including (but not limited to):
  - structural reinforcements, lighting, water cooling equipment, air conditioning and all requisite ventilation systems;
  - electrical power necessary for powering the Equipment;
  - electrical conduit, junction boxes, ducts, shielded covers, surface raceways, outlets and line safety switches, and raised flooring as applicable;
  - non-electrical supplies, such as plumbing, compressed air system and gas supplies (e.g., gases, stainless steel lines, regulators, valves) and gas bottle storage space;
  - fire control devices;
  - radiation shielding and protection material.

### Project Management

While GEHC provides a Site Planning Guide to Customer and assigns a GEHC Project Manager to coordinate GEHC's defined responsibilities as set forth in the Agreement, it is not intended to be a substitute for Customer having a qualified project manager/site planner/architect. The fact that GEHC provides a Site Planning Guide and/or other resources relating to site planning should not be construed as an offer to undertake or an undertaking of Customer's obligations relating to project management, construction and/or site planning and preparation. It is important to finalize the design of the desired site configuration before construction is started. Once construction begins, it will be difficult and costly to make revisions.

In addition to a planner/architect, Customer's team should also include a project manager ("Project Manager"), a Construction manager/supervisor, a "Qualified Person" (QP) as defined by applicable Good Manufacturing Practices ("GMP") and/or applicable pharmaceutical regulations or requirements, and a Radiation Safety Officer. Professionals with experience in cyclotron/radiopharmacy projects should be used. The Customer's Project Manager should be involved in every phase of development of the project, from concept of the facility to installation and start-up of the Equipment. The Customer's Project Manager should be thoroughly familiar with the construction process, and keep in close contact with Customer's planner/architects, contractors, and other team members. Customer's Project Manager should also keep GEHC Project Manager involved during each project phase. Maintaining a schedule and



**GE Medical Systems**
*General Electric Company*

adjusting that schedule as needed is the responsibility of the Project Manager. In addition, regulatory compliance, including as relating to radioactive materials as set forth below, should be arranged for early in the site planning process.

### Radioactive Materials and Regulatory Compliance

As with any equipment generating or utilizing radioactive materials, hazards exist which create possible physical danger to persons in the vicinity of the site. Customer is fully responsible for control of access to the Equipment and the site, all operations and protocols of the Equipment and the operations and protocols at the site, including ensuring compliance with environmental and health and safety regulations. As an example, during construction, Customer's Project Manager should ensure that the construction company is aware of the potential hazards of machining lead materials which are used for radiation shielding. Customer is responsible at its own expense for obtaining all required permits and licenses to handle or produce radioactive materials, including any decommissioning and disposal requirements of existing facilities or upon license termination and as applicable for compliance with GMP and/or pharmaceutical regulations or requirements. When handling any radioactive materials for which a license is required, Customer will provide such handling itself under an appropriate license, or if permitted under applicable licensing requirements, GEHC representatives will work under Customer's license and supervision.

### Installation & Testing

Customer is responsible at its own expense for making the site where the Equipment will be located ready for installation in accordance with GEHC's instructions. Customer is responsible at its own expense for obtaining all licenses required to complete Equipment installation and testing. GEHC will furnish mechanical installation services for the Equipment that GEHC provides. Any storage fees prior to installation and any rigging required to install the Equipment will be at Customer's expense. Upon completion of mechanical installation and prior to turnover to Customer, for cyclotron installations GEHC will perform prescribed tests utilizing GEHC-supplied reagent kit per installed target system to determine that the Equipment meets GEHC's applicable performance specifications. Customer is responsible for providing all radioactive materials for calibration and testing of the Equipment. Customer will be responsible for the expense of any additional testing requirements for the Equipment. The only installation services provided by GEHC, unless otherwise specifically agreed, are as follows: Cyclotron installation responsibilities provided by GEHC involve positioning of the system, installation of cables, hoses and pipes, mechanical installation, power check, startup and calibration; TRACERcenter installation responsibilities provided by GEHC involve positioning, wiring and startup of hot cells, hoods, chemistry systems and dispensing system, Quality Control (QC) lab equipment, radiation monitoring equipment. For avoidance of doubt, other installation such as main watercooling, main power supply and other necessary supplies for cyclotron operation, and installation of clean rooms, air conditioning, gases, electrical supply and other required supplies for TRACERcenter operation are the responsibility of Customer.

### Installation Qualification/Operational Qualification (IQ/OQ)

Unless otherwise stated in the Agreement, Customer is obligated to perform installation qualification and operational qualification for applicable Equipment in accordance with Customer's quality management system as required by GMP, pharmaceutical or other regulations/requirements.

Training on the Equipment will be provided by GEHC as specified in the Agreement.

### Servicing of Cyclotron

For purposes of radiation safety for servicing during the warranty period, Customer is responsible for the following: At GEHC's reasonable request, Customer will remove the targets prior to service and replace them when finished. These targets will be placed in an appropriately shielded area/container during service operations. Customer will provide at least 24 hours of downtime for the inside cyclotron vacuum chamber prior to any GEHC planned maintenance, thereby ensuring that the amount of radiation inside the working area will be less than 2 mSv/hour at the position where work will be performed. GEHC representatives reserve the right not to work in areas with dose rates in excess of 2 mSv/hour. At GEHC's request, Customer will confirm that GEHC personnel, their tools, and accessories are free from contamination prior to leaving Customer's facility. Customer will ensure that a Customer representative is available within the building/working area when GEHC personnel are performing service.





**GE Medical Systems**
*General Electric Company*

Customer will ensure that GEHC personnel are provided with Customer's emergency and site-specific safety procedures. In addition to the not-to-exceed dose rate of 2 mSv/hr, other radiation exposure limits may apply to the service activity, including daily or personal cumulative dose limits as well as local requirements, which could prevent servicing of the cyclotron until radiation levels are further reduced. In particular, GEHC service personnel will work in accordance with GEHC Health and Safety rules and applicable radiation and radioactive materials safety laws and regulations, whichever is more stringent, including assessment and management of radiation dose in accordance with the ALARA (As Low As Reasonably Achievable) standard. Customer agrees to support all reasonable ALARA efforts to maintain and control the radiation exposures as far below the dose limits specified by GEHC ALARA guidelines as possible, consistent with the need for servicing the equipment. Customer agrees to store and dispose of any waste, including radioactive waste, generated by the service activity in compliance with applicable laws and regulations.

**Decommissioning** is the responsibility of Customer in accordance with applicable laws and regulations.

## II. OTHER TERMS AND CONDITIONS

### Changes to Equipment or Installation Schedule

Customer-requested changes to the Equipment originally ordered and accepted by GEHC or to the agreed upon installation schedule, including any related storage fees, will be at additional charge to Customer.





**GE Medical Systems**
**General Electric** Company

SCHEDULE E

SOFTWARE LICENSE

**1. LIMITED SOFTWARE LICENSE AND CONFIDENTIALITY PROVISIONS.**

In the event that Operating Software and/or Basic Service Software are being sold with the Equipment, Buyer shall be granted hereunder a limited license to same subject to the following terms and conditions. By acceptance of any part of such Software, Buyer agrees to be bound to and to comply with these terms and conditions. Buyer is not granted a license with respect to any Software other than the Software, if any, that is specifically identified herein as "Licensed Software."

**2. RIGHTS AND OBLIGATIONS**

2.1. Copyright. All Software is protected by the copyright laws of the United States (and/or other country of origin) and by applicable international treaties. No right under copyright is transferred to Buyer by virtue of this Agreement, except as specifically provided in this Section in the paragraph 2.3 entitled "License."

2.2. Ownership. All Software (and the media in which it is embodied), documentation and tools related to or usable with the Equipment (except Operating Documentation and Operating Tools identified in this Agreement) are and shall remain the sole property of Seller, its affiliates or suppliers. Buyer expressly agrees that Seller, or its authorized representative, may at any time take possession of and/or remove from the Site some or all of such Software, documentation, tools and any copies and other reproductions thereof which might be located in the Site or in the possession or control of Buyer. However, unless Buyer ceases to be a health care provider or is otherwise in breach of this Agreement, Seller may not remove the Licensed Software such that the Equipment specifically described herein cannot operate in compliance with the manufacturer's applicable specifications.

2.3. License. Seller hereby grants Buyer a LIMITED, NONEXCLUSIVE, NON-TRANSFERABLE LICENSE.

(a) TO LOAD AND RUN THE OPERATING SOFTWARE ON THE PRODUCTS IN THE SITE, BUT ONLY SO LONG AS THE PRODUCTS ARE LOCATED IN THE SITE FOR USE BY BUYER FOR A HEALTH CARE PURPOSE.

(b) TO LOAD AND RUN THE BASIC SERVICE SOFTWARE ON THE PRODUCTS IN THE SITE AS AN AID TO INSTALLING, MAINTAINING AND/OR REPAIRING THE PRODUCTS, BUT ONLY SO LONG AS THE PRODUCTS ARE LOCATED IN THE SITE FOR USE BY BUYER FOR A HEALTH CARE PURPOSE; AND

(c) TO MAKE ONE ARCHIVAL COPY OF THE OPERATING SOFTWARE AND BASIC SERVICE SOFTWARE, AND FOR NO OTHER PURPOSE. Buyer may exercise this limited license only through one or more employees or agents of Buyer or a contractor of Buyer for the service of the Equipment. Except as aforesaid, BUYER SHALL NOT, EITHER DIRECTLY OR THROUGH ANY OTHER PERSON, FIRM, CORPORATION, OR OTHER ENTITY, COPY, ACCESS, RUN, PERFORM, DISPLAY, DISASSEMBLE, DECOMPILE, DISTRIBUTE, SUBLICENSE, SELL, ASSIGN, OR OTHERWISE TRANSFER ALL OR PART OF SUCH SOFTWARE. IN ADDITION, BUYER SHALL NOT USE OR PERMIT ANY PERSON TO USE AN UNAUTHORIZED COPY OF ALL OR ANY PART OF THE LICENSED SOFTWARE. BUYER SHALL NOT EXAMINE OR DISPLAY OR PERMIT ANY PERSON TO EXAMINE OR DISPLAY ALL OR ANY PART OF THE SOFTWARE CODE OR DATA AND BUYER SHALL NOT PERMIT ANY PERSON (OTHER THAN AN EMPLOYEE OF BUYER, AN AGENT, AN EMPLOYEE OF A CONTRACTOR OF BUYER FOR THE SERVICE OF THE PRODUCTS, OR AN AUTHORIZED REPRESENTATIVE OF SELLER) TO LOAD OR RUN THE LICENSED SOFTWARE.

NO LICENSE OR RIGHT OF ANY KIND IS HEREBY GRANTED OR TRANSFERRED WITH RESPECT TO ANYTHING NOT SPECIFICALLY IDENTIFIED IN THIS QUOTATION UNDER THE DEFINITIONS OF "OPERATING SOFTWARE" AND "BASIC SERVICE SOFTWARE.".

2.4. Storage. In connection with the installation, configuration, maintenance, repair and/or deinstallation of the Equipment, we might deliver to the Site, along with the Equipment or separately, and store at the Site, attach to or install on the Equipment, and use an InSite Package or parts of this package which have not been purchased





**GE Medical Systems**
*General Electric Company*

by or licensed to Buyer.  Buyer hereby consent to this delivery, storage, attachment, installation and use, to the presence of our locked cabinet or box in the Site for storage of this property, and to our removal of all or any part of this property at any reasonable time, all without charge to Seller.  The presence of this property within the Site will not give the Buyer any right or title to this property or any license or other right to access, use, or decompile this property.  Any access to or use of this property (except the Buyer use of  InSite or our Advance Service Package in compliance with our written direction to the Buyer to determine Equipment performance on our behalf) and any decompilation of this property by anyone other than our personnel is prohibited.  Buyer agrees to use reasonable efforts to protect this property against damage or loss and to prevent any access to or use or decompilation of this property contrary to this prohibition.

2.5. <u>Confidentiality</u>.  Buyer acknowledges that all documentation and tools (other than Operating Documentation and Operating Tools purchased by Buyer) and all Software are confidential, proprietary, and valuable to Seller.  Buyer agrees to use its best efforts to prevent any access to, disclosure of, or use of any such property in the Site or within Buyer's possession or control not specifically permitted in the paragraph 2.3 hereof entitled "License."

2.6. <u>Modification</u>.  Because of the highly technical nature of Software and the high probability that any modification of it, however minor, could significantly affect the performance of the Equipment to which it applies, Buyer agrees that it shall not modify, or allow the modification of, all or any part of the Licensed Software in any manner whatsoever other than by, or with the express written authorization of, Seller.

2.7. <u>Reservation of Rights</u>.  The rights granted to Buyer hereunder shall not affect the exclusive ownership by Seller and/or its vendors of any trademarks, copyrights, patents, and common law property rights pertaining to any Licensed Software, covered hereby or to any Operating Documentation or Operating Tools sold to Buyer.  Any transfer of any such property shall at all times be subject to all trademarks, copyrights, letters, patent, and common law property rights of Seller and/or its vendors relating thereto.

## 3. TERM, RELICENSE

This license shall commence upon Buyer's acceptance of the Equipment and payment of the applicable license price (if any) and shall continue for as long as Buyer remains a health care provider with full legal right and authority to operate the Equipment in the Site and Buyer does not breach any term, covenant or condition contained in this Agreement.  Seller may terminate this license in the event of any breach by Buyer.  Such termination shall not relieve Buyer of any of its obligations incurred prior to such termination and shall not impair any of Seller's rights which have accrued prior to such date.  Buyer agrees to return the Licensed Software and all copies thereof to Seller at Buyer's sole expense immediately upon the termination of this license.  The covenants of Buyer contained in this license shall survive the termination of this license.  If the Equipment are later transferred to another health care provider for the sole use of providing health care, Buyer will grant to the transferee, upon the request and qualification of the transferee, a license generally similar to the license granted herein, but on and in consideration of Seller's then prevailing terms and conditions.

## 4.. DEFINITIONS.

As used in this Section, the following terms shall have the following meanings:

**"Refurbished"**:  Reconditioning of used equipment for which GEHC has acquired ownership and/or intends to resell after additional processing. These activities include: decontamination, patient data, removal, repairs, installation of applicable FMI kits, and other activities that are described in the existing operation/service manuals applicable to device.

**"Remanufactured"**: Remanufacturing (fully refurbished defined by NB Med/2.1/Rec5 EU MDD guidelines) is a defined method of reconditioning and upgrading equipment for which GEHC has acquired ownership and intends to resell after additional processing. These activities include: changes to original product, approvals or design specifications of the device; included but not limited to installation of software or hardware, software or hardware upgrades, optional FMI kits providing features or updates.



Confidential
Copyright © GE 2012

C-5



**GE Medical Systems**
**General Electric Company**

"**Certified**" PreOwned: Used systems that the GEHC GoldSeal business has acquired ownership and intends to resell after additional evaluation & servicing that will be executed at a customer site and/or qualified servicing location. These activities include: decontamination, patient data removal, repairs, installation of applicable FMI kits, and other activities that are described in the existing operation/service manuals applicable to the device.

"**Site**" means only the exact room or other limited area at Buyer's premises, or the exact vehicle (in the case of a mobile site), in which the Equipment have been installed.

"**InSite Package**" means Manufacturing Material, Advanced Service Package, Vendor Service Package, and InSite.

**Manufacturing Material**" means our proprietary manufacturing, engineering and/or developmental Software, hardware, firmware, documentation, and tools developed or under development by and/or provided to Seller for our assembly, configuration and/or possible future service of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:

"MANUFACTURING MATERIAL PROPERTY OF GE

FOR GE SERVICE PERSONNEL ONLY

NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

"**Operating Package**" means Operating Documentation, Operating Software, Operating Tools and Basic Service Software identified in this Agreement.

"**Operating Documentation**" means operating and basic service documentation embodying information developed and/or provided to Seller for the installation, operation, maintenance and/or repair of the Equipment and bearing a white cover and/or a label or a notice which reads as follows:

"OPERATING DOCUMENTATION"

"**Operating Tools**" means tangible, basic operating and service instruments or instrument combinations which have been developed by and/or provided to Seller for the installation, maintenance and/or repair of the Equipment and which either bear or are maintained in a container which bears a white label and/or a notice which reads as follows:

"OPERATING TOOLS"

"**Software**" means any computer program or compilation of data that is fixed in any tangible medium of expression, including but not limited to disks, tapes, cards, paper, random access memory, read only memory devices (whether or not such devices are erasable or programmable) or any storage medium from which the program may be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device.

"**Operating Software**" means proprietary operating Software developed by and/or provided to Seller for the ordinary operation of the Equipment, any optional Software to enhance the operation of the Equipment, as well as any upgrades or revisions thereof that Seller provides in fulfillment of a specific written commitment, bearing a white label and/or a notice which reads as follows:

"OPERATING SOFTWARE PROPERTY OF GE"

"**Basic Service Software**" means proprietary basic service Software developed by and/or provided to





**GE Medical Systems**
**General Electric Company**

Seller for the installation, maintenance and/or repair of the Equipment, as well as any upgrades or revisions thereof that Seller provides in fulfillment of a specific written commitment, which either bears a white label or incorporates or displays a notice that reads as follows:

"BASIC SERVICES SOFTWARE PROPERTY OF GE"

**"Licensed Software"** means Operating Software and Basic Service Software identified in this Agreement.

**"Advance Service Package"** means Advance Service Documentation, Advance Service Software and Advance Service Tools.

**"Advanced Service Documentation"** means proprietary service documentation embodying advanced information developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and bearing a yellow cover and/or a label or a notice which reads as follows:

"ADVANCED SERVICE DOCUMENTATION PROPERTY OF GE"

FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Advanced Service Tools"** means proprietary, tangible, advance service instruments or instrument combinations which have been developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and which either bear or are maintained in a container which bears a yellow cover and/or a label or a notice which reads as follows:

"ADVANCED SERVICE TOOL PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Advanced Service Software"** means proprietary advance service Software developed by and/or provided to Seller for Seller's installation, maintenance and/or repair of the Equipment and bearing a yellow label or incorporating or displaying a notice that reads as follows:

"ADVANCED SERVICE SOFTWARE PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"Vendor Service Package"** means vendor proprietary service Software, firmware, documentation, and tangible instruments or instrument combinations provided by a vendor to Seller for our installation maintenance, repair, and/or deinstallation of vendor-supplied components of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:

"GE VENDOR SERVICE SOFTWARE or DOCUMENTATION or TOOLS PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY
NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"

**"InSite"** means our proprietary remote service Software, hardware, firmware, documentation, and tangible instruments or instrument combinations developed by and/or provided to Seller for our assembly, installation, configuration, maintenance, repair, and/or deinstallation of the Equipment, as well as any upgrades or revisions of this material, which bear a red cover or label and/or incorporate or display a notice that states substantially the following:



"INSITE PROPERTY OF GE
FOR GE SERVICE PERSONNEL ONLY

Confidential
Copyright © GE 2012                                    C-7

rev. 04/12



**GE Medical Systems**
*General Electric Company*

NO RIGHTS LICENSED - DO NOT USE OR COPY - DISCLOSURE TO THIRD PARTIES PROHIBITED"



**GE Medical Systems**
*General Electric Company*

**SCHEDULE F**

FORM OF CERTIFICATE OF INSTALATION

<u>CERTIFICATE OF INSTALLATION</u>

FDO No. _____

[INSERT PLACE]
[INSERT DATE]

This certificate is issued and delivered as of the date first written above to _____ (hereinafter the "Buyer") on behalf of _____ (hereinafter the "Seller "), pursuant to the terms of the International Sales Agreement (hereinafter the "Agreement), between Buyer and Seller. Capitalized terms employed herein but not otherwise defined have the meanings ascribed to them in the Agreement. A complete list of the Equipment is included in Schedule A to the Agreement.

    1.  <u>Installation</u>. Seller hereby certifies that it has completed the installation, field assembly, equipment calibration and check-out of the Equipment and that the Equipment is operating substantially in accordance with Seller's published performance specifications.

    2.  <u>Equipment</u>. By signing this certificate in the space provide below, Buyer acknowledges that (i) it has inspected the Equipment and it conforms to Buyer's order and the Equipment description in Schedule A to the Agreement (ii) Equipment is operational, subject to the product warranty under Section 9 of the Agreement and (iii) Buyer accepts the Equipment for all purposes under the Agreement.

on behalf of X-Ray & Diagnostic Ultrasound Consultants Ltd
os **Seller**

**\*\*DO NOT SIGN HERE \*\***

Name:
Title:

Agreed and Accepted:

_____

**\*\*DO NOT SIGN HERE \*\***

Name:
Title:



**GE MEDICAL SYSTEMS**
*General Electric Company*

SCHEDULE G
WARRANTY STATEMENT

Covered Products and
Excluded Products

**Covered Products**

These warranties cover the following equipment and products supplied by Seller:

- Magnetic Resonance ("MR") Products (new equipment, partial system hardware upgrades).
- Computed Tomography ("CT") Products (new equipment, full system hardware upgrades, partial system hardware upgrades).
- X-ray and Mammography Products (new equipment, partial system hardware upgrades).
- Nuclear Products (new equipment, partial system hardware upgrades).
- Positron Emission Tomography ("PET") Products (new equipment, including scanners, cyclotrons and chemistry labs, and partial system hardware upgrades).
- Ultrasound Products (new equipment).
- Integrated Imaging Solution ("IIS") Products (PACS, RIS, Enterprise Archive, Centricity Web, RA600).
- Gold Seal Preferred Products (pre-owned GE equipment provided with a warranty).
- Cardiology Products (new equipment).
- Surgical Navigation Systems
- Bone Mineral Densitometry
- Physiological Monitoring
- Anesthesia Delivery
- Respiratory Care
- Phototherapy and other infant care accessories
- Microenvironments including Giraffe, Careplus, Ohio Infant Warmer Systems and Panda Baby Warmers

**Excluded Products**

The warranty does <u>not</u> cover the following equipment and products:

- Accessories and Supplies sometimes identified by catalog numbers starting with the letter "E" (covered by a separate warranty). Supplies and accessories for Datex Ohmeda Inc, anesthesia, respiratory care and monitors carry a warranty of (a) 12 months for reusable products and (b) the earlier of first use or expiration date for disposable products.
- Products not listed in Seller's price pages at the time of sale, often identified by NL or NW series numbers in Seller's Quotation (provided with the manufacturer's warranties, if any, Seller is permitted to pass on to customers; otherwise, provided AS IS).
- Quality Control equipment products for PET Products / cyclotrons.
- X-ray Tubes and Image Intensifier Tubes coils, helium coldheads, digital detectors, digital cassettes, crystals, photomultiplier (covered by a separate warranty(covered by a separate warranty).
- New or Exchange Parts sold by Seller's Direct Customer Order Service (covered by a separate warranty).
- Partial System Hardware Upgrades identified in Seller's e-Pricebook as being eligible only for warranty credits for Seller's service contract customers.
- Certain Seller "book system" products (covered by a separate warranty).
- Products manufactured and sold by Seller's affiliates (such as GE OEC, GE Lunar and GEMS IT), unless otherwise specified in Seller's Quotation or the sales contracts used by Seller's affiliates.
- Gold Seal Exchange (MEE) Products (pre-owned equipment provided AS IS).
- Preferred Third Party Software and Equipment (Software or Equipment provided or manufactures by third parties, that GEHC commercializes with a limited warranty)

**Scope and Duration of Warranties**





**GE Medical Systems**
*General Electric Company*

**Product Warranties:** Seller warrants to Buyer that the Covered Products listed in Seller's Quotation will (1) be free from defects in material, workmanship, and title, under normal use and service, and (2) in all material respects conform to Seller's published Covered Product specifications in effect on the date of shipment of the Covered Products. Seller's published Covered Product specifications are available on request.

**Patent and Copyright Warranty:** Seller warrants to Buyer that when they are delivered, the Covered Products will not be subject to any valid patent or copyright infringement claim.

**Warranty Period:** The warranty period for all warranties listed above, except the warranty of title and the Patent and Copyright Warranty, is limited in time as shown in the Warranty Schedule below.

If Seller does not install the Covered Products, the warranty period begins on the date the Covered Products are delivered to Buyer. If Seller installs the Covered Products the warranty period begins on the earlier of (1) five days after the date Seller notifies Buyer that Seller has completed installation and the Covered Products are operating in accordance with Seller's published Covered Product specifications, or (2) the date Buyer first uses the Covered Products for patient use or for commercial or routine research operation. If installation is delayed for ninety days or more after the date of shipment from the factory for a reason beyond Seller's reasonable control, the warranty period will begin on the ninetieth day after the date of shipment of the Covered Product from the factory.

The warranty period for any Covered Product or part furnished to Buyer without a pro rata charge as a warranty remedy will be the remaining portion of the warranty period applicable to the repaired or replaced Covered Product. The warranty period for any replacement Covered Product or part furnished to Buyer with a pro rata charge as a warranty remedy will be the full period of the warranty applicable to the replacement Covered Product.

**Warranty Exclusions**

These warranties are exclusive and in lieu of all other warranties, whether written, oral, expressed, implied or statutory. EXCEPT AS PROVIDED HEREIN AND TO THE EXTENT PERMITTED BY LAW, NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, SYSTEM INTEGRATION AND DATA ACCURACY, WILL APPLY. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE DESCRIBED IN THIS DOCUMENT AND NO PRIOR STATEMENTS BY ANY OF Seller's REPRESENTATIVES SHALL MODIFY OR EXPAND THESE WARRANTIES.

The warranties do not cover:

A.   Any defect or deficiency (including failure to conform to Seller's published Covered Product specifications) which results, in whole or in part, from: (1) any improper storage, handling, use or maintenance of the Covered Products, or any alteration, extraordinary use, repair or service of the Covered Products, by anyone other than Seller, (2) failure to follow any of Seller's instructions or recommendations, inadequate back-up or virus protection (3) using or combining the Covered Products with any software, tools, hardware, equipment, supplies, accessories, or any other item, service or data except as specified in the Covered Product specifications or using or combining the Covered Products with any item or data that does not properly and unambiguously exchange data with the Covered Products in accordance with the Covered Products' specifications, (4) any of Buyer's designs, specifications or instructions, (5) any failure to use the Covered Products in accordance with their specifications, including upper and lower date limits, (6) any cause external to the Covered Products as furnished by Seller or beyond Seller's reasonable control, including, but not limited to, strikes, power failure, failure to keep Buyer's Site clean and free of dust, sand and other particles or debris, and, for MR systems, failure of any water chiller system supplied by Buyer; (7) the use of the Covered Product in a manner or environment or for any purpose for which Seller did not design or licence it, or in violation of Seller's recommendations or instructions on use; and (8) any alteration, modification or enhancement of the Covered Product by Buyer or any third party not authorized or approved by Seller.

B.   The payment or reimbursement of any facility costs arising from repair or replacement of the Covered Products or parts;

C.   Products sold to GEHC's international Channel Partners (covered by their own warranty);

D.   Covered Products installed in Latin America and the Caribbean.;

E.   Expendable supply items

F.   For MR systems, service to any water chiller systems supplied by Buyer;



Confidential
Copyright © GE 2012

rev. 04/12



**GE Medical Systems**
*General Electric Company*

G.  For MR systems with LHe/LN or shield cooler configured superconducting magnetsany cryogen supply, cryogenic service or service to the magnet, cryostat, coldhead, shield cooler compressor or superconductive or resistive shim coils unless the need for such supply or service is caused by a defect in material or workmanship covered by these warranties (Seller's MR Magnet Maintenance and Cryogen Service Agreement is available to provide supplemental coverage during the warranty period);

H.  Additionally, for MR systems with LCC/HFO magnets, any cryogen supply and cryogenic service unless the remote magnet monitor (such as SHEM, MM3) is connected to Insite and provided that the loss of any cryogens or damage to any parts of the MR system or magnet is not caused by Buyer's failure to provide adequate power or cooled water to the cryogen cooling system.

I.  For IIS systems, upgrades, updates - except for safety updates or those considered necessary by Seller for the good operation of the system - all media, any defect or deficiency caused by software, hardware or configuration changes in Modalities or non-GE RIS and any changes required due to an addition or removal of modalities or any other customer information system.

J.  For Proteus XR/a, Revolution XR/d and Precision 500D x-ray systems, collimator bulbs.

K.  Third Party Software and Equipment: This warranty statement does not cover Third Party Software and Equipment delivered with the Covered Products (commonly identified by NL or NW series numbers in Seller quotation. Third Party Software and Equipment means any non Seller software or equipment (i) delivered to customer in the third party manufacturer / supplier's packaging with its labeling or (ii) for which Seller expressly indicates (either in the Seller quotation or in the product documentation) that the software or equipment is provided with the third party manufacturer's / supplier's warranty in lieu of a Seller warranty. Such products are covered by a third party manufacturer / supplier's warranties to the extent available. Anesthesia monitor mounting solutions which are Third Party Software and Equipment purchased directly from Seller will not be treated as Third Party Software and Equipment.

L.  Collimator bulbs in Proteus XR/a, el Revolution XR/d and Precision 500D XR systems.

**Exclusive Warranty Remedies**

**Product Warranties:** In the event that any Covered Product fails to meet any warranty during the applicable warranty period, and if Buyer promptly notifies Seller of Buyer's warranty claim and makes the Covered Product available for service, Seller will at Seller's option, either repair, adjust or replace (with new or exchange replacement parts) the non-conforming Covered Product or parts of the Covered Product. Except as noted below for batteries, warranty service will be performed without charge during Seller's normal business hours (MON to FRI 8AM to 5PM), excluding Seller's holidays, and outside those hours at Seller's then prevailing service rates and subject to the availability of personnel. Warranty service may be performed by the Seller directly or through its authorized agents. Warranty service for batteries used with X-ray and Mammography systems will be performed without charge during the hours shown above only during the first twelve months of the warranty period.

**Patent and Copyright Warranty:** Seller will defend or settle any suit against Buyer to the extent it is based on an infringement claim that would be a breach of the Patent and Copyright warranty, provided Seller receives prompt written notice of the claim, Buyer's cooperation in its defense or settlement, and complete and exclusive control over its defense or settlement. If a court of competent jurisdiction renders a final judgment that the infringement claim is valid, Seller will pay all damages and costs awarded against Buyer due to the breach. In addition, Seller will either obtain a license for Buyer to continue using the infringing Covered Product, provide a non-infringing replacement, alter the Covered Product so that it is non-infringing, or remove the infringing Covered Product and refund the price (less reasonable depreciation) and any return transportation costs paid by Buyer.

**Exclusive Remedies and Sole Liability:** The above remedies in this EXCLUSIVE WARRANTY REMEDIES section are Buyer's exclusive remedies and constitute Seller's sole liability for any warranty claims. CUSTOMER AGREES THAT TO THE EXTENT PERMITTED BY LAW, Seller AND Seller's AFFILIATES AND REPRESENTATIVES HAVE NO LIABILITY TO CUSTOMER FOR (1) ANY PENAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS EXCESS COSTS INCURRED AND LOST PROFITS OR REVENUE, (2) ANY ASSISTANCE NOT REQUIRED UNDER Seller's QUOTATION, AND (3) ANYTHING OCCURRING AFTER THE WARRANTY PERIOD ENDS.

**Cyclotrons**

For cyclotrons, as part of the system warranty, Seller shall perform two (2) planned maintenance procedures ("Warranty PMs"). Buyers will be charged for the cost of consumable items replaced or replenished during the





**GE Medical Systems**
*General Electric Company*

Warranty PMs, but not for the associated labor.

**Broadband Connectivity**

Seller will provide Buyer with expanded warranty protection for eligible Seller's equipment covered by the Quotation, as identified in the Quotation ("Eligible Equipment"), in consideration of Buyer's commitment to provide a broadband network connection to enable Seller to better provide warranty service for the Eligible Equipment during the warranty period. The following provisions are Buyer's responsibilities and will apply only to Eligible Equipment and only during the warranty period:

1. If Buyer has not already done so, establishing a broadband network connection at Buyer's Site that connects to the Eligible Equipment. The broadband connection must be provided via Cisco, Nortel or Checkpoint-compatible VPN, with a minimum of 128k available bandwidth.

2. Providing Seller with access to the Eligible Equipment through Buyer's broadband network connection and maintaining security for Buyer's broadband network connection in accordance with appropriate industry best practices (e.g., appropriate internal and external firewalls, etc.).

3. Providing necessary support to maintain the broadband network connection for the Eligible Equipment, including designation of a primary contact person who will respond to Seller' broadband connection requests and inquiries within 24 hours.

4. Providing Seller with at least two (2) business days advance notice of any planned changes to Buyer's network that may impact the broadband connection for the Eligible Equipment, and providing Seller with notice of any unplanned changes (e.g., power outages, computer viruses, system crashes) to Buyer's network that may impact the broadband connection for the Eligible Equipment within two (2) business days after the occurrence of the unplanned changes, and cooperating with Seller in maintaining, as reasonable, the broadband connection during all such planned and unplanned changes.

5. Using all reasonable efforts to ensure that Buyer's connection to the Internet and LAN systems operate at a maximum of 75% of capacity and have an uptime rate of at least 98%.

**Warranty Schedule**

**12 months**

- MR systems
- CT systems, and full system hardware upgrades
- X-ray and mammography systems and full system hardware upgrades
- Nuclear systems
- PET systems (scanners, cyclotrons and chemistry labs)
- Ultrasound systems, modules, upgrade sand transducers (except for Ultrasound products listed below)
- IIS hardware or hardware and software (combined) (except for IIS products listed below)
- Gold Seal Preferred products (unless otherwise specified in Quotation)
- Invasive Cardiology Products

**6 months**

- MR partial system hardware upgrades (except for partial system hardware upgrades which according to the Seller's price list (e-Pricebook) are only available through Seller's service contract)
- CT partial system hardware upgrades (except for partial system hardware upgrades which according to the Seller's price list (e-Pricebook) are only available through Seller's service contract)
- X-ray partial system hardware upgrades; high voltage rectifiers o tubos analizadores de cámaras de televisión
- PET partial system hardware upgrades (scanners, cyclotrons and chemistry labs)
- Nuclear partial system hardware upgrades

**60 months, prorated**



**GE Medical Systems**
*General Electric Company*

- Nickel cadmium or lead acid batteries for X-ray and mammography systems (prorated as shown below)

**3 months**

- HealthNet Lan, Advantage Review — Remote Products
- IIS software only
- Ultrasound exchange probes and transducers, ultrasound water path attachment kit (Ultrasound products)

**90 days**

- Ultrasound Partial System Equipment Upgrades (Buyer will not be credited the value of this warranty against preexisting warranties or service agreements)

**Batteries**

90 days, except for (i) LogiqBook batteries which are warranted for 12 months, and (ii) for Nickel cadmium or lead acid batteries for X-ray and mammography systems. For X-ray and mommography systems, if nickel cadmium or lead acid batteries need replacement during their applicable warranty period, Buyer will pay the price of the replacement battery in effect on its delivery date less a Pro Rata Credit Allowance. The Pro Rata Credit Allowance for batteries that fail less than 12 months after the warranty begins is 100%. The Pro Rata Credit Allowance for batteries that fail more than 12 months after the warranty begins is:

$$\frac{1 - \# \text{ of Mos. After Warranty Commencement} \times 100\%}{60}$$

For the purpose of Pro Rata Credit Allowance, a fraction of a month less than 15 days will be disregarded, and a fraction of a month equal to or greater than 15 days will be regarded as a full month.



# IN THE CIRCUIT COURT OF THE
## ELEVENTH JUDICIAL CIRCUIT, IN AND
## FOR MIAMI-DADE COUNTY, FLORIDA

**X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,**

      **Plaintiff,**                  **CASE NO.:**

**vs.**

**GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,**

      **Defendants.**

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

    **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or in this action on Defendant:

GENERAL ELECTRIC COMPANY
c/o Registered Agent: CT Corporation System
1200 South Pine Island Road
Plantation, Florida 33324

    Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED _____           CLERK OF THE CIRCUIT COURT

                                     By: _____
                                         Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 73 W. Flagler St., Miami, FL 33130, (305) 349-5543, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

## IN THE CIRCUIT COURT OF THE
## ELEVENTH JUDICIAL CIRCUIT, IN AND
## FOR MIAMI-DADE COUNTY, FLORIDA

**X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,**

     **Plaintiff,**　　　　　　　　　　　**CASE NO.:**

**vs.**

**GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,**

     **Defendants.**

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

     **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or Petition in this action on Defendant:

GE HEALTHCARE, INC.

c/o Registered Agent: CT Corporation System

1200 S. Pine Island Road

Plantation, Florida 33324

     Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED _____　　　　　　CLERK OF THE CIRCUIT COURT

　　　　　　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 73 W. Flagler St., Miami, FL 33130, (305) 349-5543, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,

      Plaintiff,                         CASE NO.:

vs.

GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or in this action on Defendant:

GENERAL ELECTRIC COMPANY
c/o Registered Agent: CT Corporation System
1200 South Pine Island Road
Plantation, Florida 33324

      Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED _____            CLERK OF THE CIRCUIT COURT

                                       By: _____
                                            Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 73 W. Flagler St., Miami, FL 33130, (305) 349-5543, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

### IN THE CIRCUIT COURT OF THE
### ELEVENTH JUDICIAL CIRCUIT, IN AND
### FOR MIAMI-DADE COUNTY, FLORIDA

**X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,**

      **Plaintiff,**                      **CASE NO.:**

**vs.**

**GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,**

      **Defendants.**

_____/

### SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or Petition in this action on Defendant:

GE HEALTHCARE, INC.
c/o Registered Agent: CT Corporation System
1200 S. Pine Island Road
Plantation, Florida 33324

      Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED _____             CLERK OF THE CIRCUIT COURT

                                         By: _____
                                              Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 73 W. Flagler St., Miami, FL 33130, (305) 349-5543, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

## IN THE CIRCUIT COURT OF THE
## ELEVENTH JUDICIAL CIRCUIT, IN AND
## FOR MIAMI-DADE COUNTY, FLORIDA

X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,

      Plaintiff,                          CASE NO.:

vs.

GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,

      Defendants.

_____/

### SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or in this action on Defendant:

GENERAL ELECTRIC COMPANY
c/o Registered Agent: CT Corporation System
1200 South Pine Island Road
Plantation, Florida 33324

      Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED _____9/14/2020_____             CLERK OF THE CIRCUIT COURT

                                       By: _____
                                             Deputy Clerk

Case 1:20-cv-24492-DPG   Document 1-1   Entered on FLSD Docket 10/30/2020   Page 163 of 165

# IN THE CIRCUIT COURT OF THE
## ELEVENTH JUDICIAL CIRCUIT, IN AND
## FOR MIAMI-DADE COUNTY, FLORIDA

**X-RAY DIAGNOSTIC AND ULTRASOUND
CONSULTANTS LIMITED, a foreign corporation,**

   **Plaintiff,**        **CASE NO.:**

**vs.**

**GENERAL ELECTRIC COMPANY,
a foreign corporation, and
GE HEALTHCARE, INC., a
foreign corporation,**

   **Defendants.**

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

  **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or Petition in this action on Defendant:

GE HEALTHCARE, INC.
c/o Registered Agent: CT Corporation System
1200 S. Pine Island Road
Plantation, Florida 33324

  Each Defendant is hereby required to serve written defenses to the Complaint or Petition on Hanton H. Walters, Esq., Plaintiff's attorney, whose address is Dean, Ringers, Morgan and Lawton, P.A., Post Office Box 2928, Orlando, Florida 32802-2928, within 20 days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

DATED   9/14/2020       CLERK OF THE CIRCUIT COURT

            By: _____
                Deputy Clerk

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 73 W. Flagler St., Miami, FL 33130, (305) 349-7175, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

## AFFIDAVIT OF SERVICE

| | | |
|---|---|---|
| **State of Florida** | **County of Miami-Dade** | **Circuit Court** |

Case Number: 2020-0179291-CA-01

Plaintiff:
**X-RAY DIAGNOSTIC AND ULTRASOUND CONSULTANTS LIMITED, a foreign corporation**

vs.

Defendants:
**GENERAL ELECTRIC COMPANY, a foreign corporation, and GE HELATHCARE, INC., a foreign corporation**

LIN2020017233

For:
Hanton H. Walters
Dean, Ringers, Morgan & Lawton, P.A.
201 E. Pine Street
#1200
Orlando, FL 32801

Received by Lynx Legal Services, LLC on the 28th day of September, 2020 at 12:16 pm to be served on **GE Healthcare, Inc. c/o Registered Agent: CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324**

I, Anthony Ferrer, being duly sworn, depose and say that on the **30th day of September, 2020** at **2:45 pm, I:**

**CORPORATE** served by delivering a true copy of the **20-Day Summons, Complaint and Demand for Jury Trial and Exhibits** with the date and hour of service endorsed thereon by me, to: **Donna Moch** as **Manager at R/A Office** for GE Healthcare, Inc., at the address of: **1200 South Pine Island Road, Plantation, FL 33324**, and informed said person of the contents therein, in compliance with F.S. 48.081

I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under the penalty of perjury, I declare that I have read the foregoing proof of service, and I attest that the facts stated in it are true.

Subscribed and Sworn to before me on the _____ day of
_____, _____ by the affiant who is personally known to me.

_____
NOTARY PUBLIC

_____
**Anthony Ferrer**
Process Server

**Lynx Legal Services, LLC**
**201 E. Pine Street**
**Suite 740**
**Orlando, FL 32801**
**(407) 872-0707**

Our Job Serial Number: LIN-2020017233

## AFFIDAVIT OF SERVICE

**State of Florida**                    **County of Miami-Dade**                    **Circuit Court**

Case Number: 2020-0179291-CA-01

Plaintiff:
**X-RAY DIAGNOSTIC AND ULTRASOUND CONSULTANTS LIMITED, a foreign corporation**

vs.

Defendants:
**GENERAL ELECTRIC COMPANY, a foreign corporation, and GE HELATHCARE, INC., a foreign corporation**

LIN2020017234

For:
Hanton H. Walters
Dean, Ringers, Morgan & Lawton, P.A.
201 E. Pine Street
#1200
Orlando, FL 32801

Received by Lynx Legal Services, LLC on the 28th day of September, 2020 at 12:16 pm to be served on **General Electric Company c/o Registered Agent: CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324**

I, Anthony Ferrer, being duly sworn, depose and say that on the **30th day of September, 2020** at 2:45 pm, I:

**CORPORATE** served by delivering a true copy of the **20-Day Summons, Complaint and Demand for Jury Trial and Exhibits** with the date and hour of service endorsed thereon by me, to: **Donna Moch** as **Manager at R/A Office** for **General Electric Company**, at the address of: **1200 South Pine Island Road, Plantation, FL 33324**, and informed said person of the contents therein, in compliance with F.S. 48.081

I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under the penalty of perjury, I declare that I have read the foregoing proof of service, and I attest that the facts stated in it are true.

Subscribed and Sworn to before me on the _____ day of
_____, _____ by the affiant who is personally
known to me.

_____
NOTARY PUBLIC

_____
**Anthony Ferrer**
Process Server

**Lynx Legal Services, LLC**
**201 E. Pine Street**
**Suite 740**
**Orlando, FL 32801**
**(407) 872-0707**

Our Job Serial Number: LIN-2020017234

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1t