UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:20-cv-24492-DPG

X-RAY DIAGNOSTIC AND ULTRASOUND CONSULTANTS LIMITED, a foreign corporation,

       Plaintiff,

vs.

GENERAL ELECTRIC COMPANY, a foreign corporation, GE HEALTHCARE, INC., a foreign corporation.

       Defendants.

_____/

**JOINT PRETRIAL STIPULATION**

Pursuant to S. D. Fla. L. R. 16.1(e), Plaintiff, X-RAY DIAGNOSTIC AND ULTRASOUND CONSULTANTS LIMITED, a foreign corporation ("X-Ray" or "Plaintiff"), and Defendants, GENERAL ELECTRIC COMPANY ("GEC"), a foreign corporation, GE HEALTHCARE, INC. ("GEHI"), a foreign corporation (collectively referred to herein as the "Defendants" or the "GE Entities"), submit this Joint Pretrial Stipulation.

**(1)**     **Statement of the Case**

       *a. Plaintiff's Statement of the Case*

GE and X-Ray contracted for the acquisition, sale and purchase of certain equipment and services required to outfit a nuclear radiopharmaceutical laboratory—the first of its kind in Jamaica. As part and parcel of that relationship, and recognizing the limited availability of domestic and regional expertise in these types of projects, GE committed to X-Ray that it would be providing the necessary advice and guidance to ensure that the "Lab" would be successfully completed.

The overall transaction—building and commissioning Jamaica's first Radiopharmaceutical Laboratory—involved two principal "projects": The Construction Project – to design and construct an adequate building facility to house the laboratory that met the required safety, regulatory and technical specifications; and, the Equipment Project – to identify, acquire, install and commission all of the component parts to outfit the Radiopharmaceutical Laboratory. This second project also included the provision of certain services, for example training, which were packaged with the Equipment sold by and through the GE Entities in the Agreement.

X-Ray maintains that the GE Entities ultimately failed X-Ray in several aspects of this transaction including breaching their duties of care to X-Ray and breaching various components of the operative Agreement.

### b. *Defendants' Statement of the Case*

Plaintiff brings negligence and breach of contract claims arising from its purchase of sophisticated nuclear medical equipment it intended to use for a to-be-built nuclear diagnostic laboratory in Jamaica. As part of this purchase, GEC and Plaintiff executed equipment purchase agreements ("Agreements"), which set forth the respective responsibilities of GEC and Plaintiff, including by making clear that many of the acts complained of in this action were the sole responsibility of Plaintiff. GEC is in the business of selling medical equipment and the Agreements make clear that meeting the specifications and setting up its operation is on the Plaintiff. Indeed, Plaintiff itself recognized this in its testimony in the lawsuit in Jamaica where it sued its contractor successfully for allegedly failing to meet those requirements.

GEHI was not a party to these agreements or the equipment or services provided to Plaintiff pursuant to these agreements, and it is a separate entity that has not had any business dealings with X-Ray.

Despite these clear terms, Plaintiff seeks to shift the responsibility for some of the failures in contractual performance and its own preparation of the laboratory it was building to Defendants. Plaintiff cannot show that there has been any duty or breach of duty that would give rise to a negligence action nor a breach of contract action. Even more fatally, Plaintiff cannot establish that any of Defendants' actions caused the damages it complains of, nor what the quantum of such damages would be. Defendants accordingly deny that Plaintiff can assert any claim or is entitled to damages.

**(2)** **Basis of Federal Jurisdiction.** This is an action for damages in excess of $75,000.00, exclusive of interest, costs and attorneys' fees. Each party to this lawsuit is diverse for jurisdictional purposes, and therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**(3)** **Pleadings Raising the Issues.**

    **a.** Plaintiff filed its Second Amended Complaint on May 26, 2021 (ECF No. 32).[1]

    **b.** Defendants filed their Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint on June 2, 2021 (ECF No. 35).

**(4)** **Pending Motions / Other Matters Requiring Action by the Court.**

    **a.** Plaintiff's Position: None

    **b.** Defendants' Position: Defendant's Motion in Limine. ECF No. 173

**(5)** **Concise Statement of Undisputed Facts Which Will Require No Proof At Trial.**

    **a.** X-Ray and GEC entered into International Financed Sales Agreements (the "Agreements") for the sale and purchase of medical equipment and services, among other obligations.

    **b.** The Agreements specified that GEC was the seller of the Equipment, and X-Ray was the buyer.

---

[1] X-Ray sought leave to amend its Complaint on March 21, 2024 (ECF No. 120) which was denied by Order dated April 18, 2024 (ECF No. 127).

c.  The Agreements all included warranties for the Equipment.

d.  The Agreements provide that GEC would install the equipment directly or through their authorized service agents and entities and includes terms relating to installation obligations.

e.  In 2013, GEC was aware that the X-Ray nuclear radiopharmacy lab project was going to be the first of its kind in Jamaica.

f.  The Cyclotron sold by GEC to X-Ray under the Agreement is the first cyclotron purchased from GEC for installation and use in the country of Jamaica.

g.  Cyclotrons are used to accelerate charged particles that are used to obtain radioactive isotopes for medical and diagnostic purposes. These isotopes, when introduced into the human body, can reveal various abnormalities, such as cancer, heart disease, and degenerative/cognitive brain disorders, using Positron-Emission Tomography (PET)/CT technology.

h.  On or about February 9, 2016, X-Ray raised concerns to GEC that it was being asked to provide a 60-cycle voltage [i.e. 60Hz/120V], after confirming to GEC and their representatives the Jamaica power supply and environment was 50Hz–and 220V.

i.  On or about January 2018, X-Ray sent a notice letter to GEC raising multiple issues, including electrical issues with the Hot Cell Equipment, among others.

j.  For purposes of proper installation and operation of the Equipment, the facility was required to have adequate temperature, humidity and pressure control regulation.

k.  For the cyclotron to be installed, an epoxy floor had to be installed in the cyclotron room.

l.  GEC installed the epoxy floor, and at a minimum applied the epoxy on two (2) occasions: once in early December 2015 and once again on or around January 21, 2016.

m.  The installation in December 2015 failed which required the second installation in January 2016.

n.  Pursuant to the Agreements, GEC was required to provide X-Ray with a series of training sessions for each piece of Equipment sold to X-Ray under the Agreements.

o.  X-Ray contracted for an eight-day training for the GEC PET/CT equipment.

p.  Jamaica was included in the GE Latin America Division when the Equipment was sold.

    q. In the Jamaican Proceeding, X-Ray admitted that GEC and IQMS provided the specifications and drawings for the Equipment Project.

*With regard to the undisputed facts stated in Section (5), paragraphs (a), (b), (d), (e), (f), (h), (i), (l), (n) (o) and (q), X-Ray disputes the limitation of these facts as applicable solely to GEC, and submits that each of these undisputed facts equally apply to GEHI, and the GE Entities together.

**(6)** **Issues of Fact to be Litigated at Trial.**

    *A. X-Ray contends the following issues are to be tried:*

a. Whether for purposes of the Equipment Project, AREL was GE Entities' representative in Jamaica.

b. Whether GE Entities reasonably and adequately satisfy all tasks that it owed X-Ray.

c. Whether GE Entities reasonably and adequately ensured that the equipment/components parts installed within the Laboratory were designed and installed in a condition so that the specifications could be duly attained and consistently maintained to ensure proper operation.

d. Whether at the time the parties entered in the Agreement, the GE Entities were aware of the fact that X-Ray lacked the expertise necessary to build out a radiopharmaceutical laboratory outfitted with GE Equipment, and lacked the expertise required to properly install and operate the Equipment without guidance and training.[2]

e. Whether GE Entities failed to procure and install Equipment that could function properly on the 50hz/220-volt system.

f. Whether GE Entities instructed the electrical contractors to make changes to the electrical system in the Laboratory in a failed attempt to have the voltage reduced from 220-volt to 208-volt.

g. Whether GE provided X-Ray with the complete PET/CT training as outlined in the IFSA.

h. Whether GE Entities failed to procure specialized equipment such as, but not limited to, the specialized custom air compressor and specialized gases required for the Laboratory.

---

[2] See ECF Nos. 145 and 156 at ¶ 8.

    i. Whether GE Entities failed to choose and install an adequate and sufficient epoxy application for the required custom flooring

    j. Whether GE Project Manager Richard Wentz provided X-Ray with an *Epoxy Pad Installation for GE Self-Shielded Cyclotron* information sheet that provided an overview of the process that was to be used for the installation of the epoxy floor slab, and required that the HVAC should be operational at time of installation of the floor.[3]

    k. Whether the original specified HVAC design was for 100% outside air or fresh air to be used in the system. However, Mr. Wentz changed the 100% outside air requirement to a partial return air system of 65% outside air, causing AREL to revise the design reflected in the January 2016 quote.

    l. Whether based on the GE Entities' specifications and instruction, a sixty-five percent (65%) fresh air system was ultimately installed.

    m. Whether GE Entities was unable to install the Cyclotron for several additional months as a result of GE's inadequate and deficient epoxy application.

    n. Whether GE Entities removed and reinstalled the Cyclotron as a result of GE's inadequate and deficient epoxy application.

    o. Whether the completion of the Project was delayed due to GE Entities' inadequate and deficient epoxy application.

    p. Whether GE Entities' epoxy application remains inadequate and deficient.

    q. Whether the Project Management Guide (*PM Guide*")" contains "the physical, electrical, plumbing and magnetic data necessary for planning and preparing a site for [the Cyclotron] tracer production system." [4]

    r. Whether according to the *PM Guide,* GE Entities were responsible for providing the following site planning and site-specific specifications to their customer, X-Ray:
        -- Specifications related to following for building design and equipment layout:
            i. Dimension and weight of major components;
            ii. Air temperature and humidity requirements;
            iii. Heat dissipation to air from the delivered equipment;
            iv. Access requirements;
            v. Equipment layouts;

---

[3] See ECF Nos. 145 and 156 at ¶ 55.
[4] See ECF Nos. 145 and 156 at ¶ 16.

          vi. Needs for cable trays;
          vii. Water piping and lifting equipment;
          viii. Compressed air requirements and outlets.
    -- Inspection of the Site before *installation* (specifically, noting that the installation of equipment will not be started until GE has approved the site conditions).[5]

s. Whether during the pre-installation site readiness inspection, GE Entities were required to "check the temperature and humidity;" determine if there is access for the equipment, and confirm that "the room is ready and finished"; and "ready for the installation engineer to work on site."[6]

t. Whether a pre-installation inspection of only the cyclotron room and operation room – not the entire premises – was done by GE Entities.[7]

u. Whether on February 22, 2016, installation engineer Mr. Madi provided a Site Readiness Checklist for the next phase of the Cyclotron installation to GE's representative, AREL advising that *all items must be performed and confirmed* before the "start up" is scheduled. (Emphasis added).[8]

v. Whether the Cyclotron Site Readiness Checklist identifies pre-delivery construction requirements (Phase One) and mechanical installation requirements (Phase Two).[9]

w. Whether the Cyclotron Site Readiness Checklist requires that the floor be treated with an epoxy-coating.[10]

x. Whether Notwithstanding the various Phase One and Phase Two specifications that remained outstanding, GE Entities made multiple attempts to place the Cyclotron into the cyclotron room, the second attempt being on **February 4, 2016.**[62] Notwithstanding almost every item of the mechanical installation of Phase Two being notated as "NOT OK", GE Entities commenced week one of the mechanical installation on or about **February 9, 2016.**[11]

y. Whether on September 16, 2016, after the installation of the Cyclotron, GE Engineer Mr. Madi reported that the "room humidity is too high," and a further four

---

[5] See ECF Nos. 145 and 156 at ¶ 17.
[6] See ECF Nos. 145 and 156 at ¶ 47.
[7] See ECF Nos. 145 and 156 at ¶ 48.
[8] See ECF Nos. 145 and 156 at ¶ 49.
[9] See ECF Nos. 145 and 156 at ¶ 52.
[10] See ECF Nos. 145 and 156 at ¶ 54.
[11] See ECF Nos. 145 and 156 at ¶ 59.

   days later, on September 20, 2016, Mr. Madi reported that the "humidity issues remained."[12]

z. Whether approximately one year later in March 2017—six months after the startup of the Cyclotron— GE Engineer Mr. Hinojosa reported that during his visit to the laboratory, the humidity issues persisted; specifically noting that "humidity and temperature are having variations outside the specified range," and further "suggesting" that the local GE representative work with the customer to "confirm and guarantee their stability."[13]

aa. Whether during this visit, Mr. Hinojosa also reported in email correspondence to the GE Entities several other Equipment deficiencies that persisted and remained pending, including:
  i. that GE supplier/vendor needed to provide a solution for the receiving vial on the Althea,
  ii. that the outside power plug to the hot cell was not working properly,
  iii. that the pressure gauge and flow censor for the Cyclotron needed to be replaced, and
  iv. that the electrical power is unstable, recommending a power back up.[14]

bb. Whether for purposes of protocol validation and compliance with ISO (International Organization for Standardization) clean room standards, and other environmental standards, the Agreement provides that a Factory Acceptance Test and Site Acceptance Test will be supplied for the Hot Lab/Hot Cells Equipment.[15]

cc. Whether GE Healthcare expressly warranted to the public and more particularly to X-Ray that the services and Equipment it required X-Ray to purchase and that it had installed would perform and work in a commercial operational manner.[16]

dd. Whether TRACERcenter is "a customizable integration of equipment technologies, professional services, and cGMP (EU/FDA) regulatory support for the reliable production and delivery of PET tracers.[17]

ee. Whether internal correspondence between GE Entities and its agents confirm that the cyclotron system was down possibly due to being 'shorted' out, causing X-Ray

---

[12] See ECF Nos. 145 and 156 at ¶ 26.
[13] See ECF Nos. 145 and 156 at ¶ 27.
[14] See ECF Nos. 145 and 156 at ¶ 28.
[15] See ECF Nos. 145 and 156 at ¶ 40.
[16] See ECF Nos. 153 and 165 at ¶ 63.
[17] See ECF Nos. 153 and 165 at ¶ 64.

      to make many unsuccessful attempts to get the system up to run N13 and F18 without any good results.[18]

  ff.  Whether In the Jamaican Proceeding filed by X-Ray against Basil Nelson, its principle and AREL, Basil Nelson defended against the claims alleging that GEHC representative Richard Wentz advised that a return air HVAC system like the one Basil Nelson designed could be used.[19]

  gg.  Whether Basil Nelson also defended that GEHC was responsible for ensuring their own specifications were met.[20]

  **B.**  *The Defendants contend that there are no issues of fact that need to be tried and that X-Ray will not be able to prove a right to relief under the facts and law. Defendants further contend that many of the disputed issues of fact identified by Plaintiff are no longer at issue as a result of the summary judgment rulings.*

**(7)**  **Undisputed Issues of Law.**

  a.  This Court has subject matter jurisdiction, as well as jurisdiction over the parties based on diversity jurisdiction.

  b.  Venue is proper in this Court.

  c.  The negligence and breach of contract claims identified in the Court's Order dated January 26, 2025 (ECF No. 195) remain pending.

  d.  Florida law applies to all claims and defenses.

**Plaintiff further contends that the following is an undisputed issue of law, which Defendants contest:**

  a.  Expert testimony is not required for X-Ray to establish damages as reflected in the Court's Order dated January 26, 2025 (ECF No. 195).

**(8)**  **Issues of Law to be Determined by the Court**

  a.  Whether Defendants breached their duty of care to X-Ray.

  b.  Whether Defendants' breach of their duty of care, if any, caused X-Ray damages.

---

[18] See ECF Nos. 153 and 165 at ¶ 80.
[19] See ECF Nos. 142 and 153 at ¶ 26.
[20] See ECF Nos. 142 and 153 at ¶ 27.

     **c.** Whether Defendants breached the IFSA Agreement.

     **d.** Whether Defendants' breach, if any, caused X-Ray damages.

     **e.** Whether, if any damages are proven, Plaintiff failed to mitigate its damages.

     **f.** The liability of non-parties for Plaintiff's damages, if any.

*With regard to the issues of law in Section (8), GEC submits that paragraphs (a) and (c) are limited to the claims identified in the Court's Order dated January 26, 2025 (ECF No. 195).

**(9)** **List of Trial Exhibits.**

     **a.** The Parties are exchanging exhibit lists and have to mark objections. Accordingly, the Parties request until February 18, 2025 to submit their exhibit lists.

**(10)** **List of Trial Witnesses**.

     **a.** See Plaintiff's Witness List attached hereto as Exhibit [A].

     **b.** See Defendants' Witness List attached hereto as Exhibit [B].

**(11)** **Estimated Trial Time.** Plaintiff and Defendants anticipate that the length of the trial will take 3-4 days.

**(12)** **Attorneys' Fees.**

     **a.** The Parties dispute whether the Agreements provide for prevailing party attorneys' fees for the disputes raised in this case. However, both sides have propounded statutory proposals for settlement.

          **i.** *Plaintiff's Position*: Pursuant to Section 14.6 of the Agreements and Florida Statute Section 57.105(7), Plaintiff maintains that the Agreements include a reasonable attorney's fees and cost provision.

          **ii.** *Defendants' Position*: There is no applicable attorney fee provision in the Agreements for the disputes remaining in this litigation. However, if the Court determines that Plaintiff's position is correct, Defendants reserve the right to seek fees.

**(13)** **Proposed Findings of Fact and Conclusions of Law.** X-Ray requests additional time to submit its proposed findings of fact and conclusions of law. Defendants submit that the proposed findings of fact and conclusions of law should be submitted before calendar call, but do not oppose the relief requested and request that any extension apply to all Parties.

Dated: February 11, 2025

Respectfully submitted,

| | |
|---|---|
| By: /s/ *Anisha C. Atchanah* <br> Robert C.L. Vaughan (Fla. Bar No. 130095) <br> Anisha C. Atchanah (Fla. Bar No. 94630) <br> KIM VAUGHAN LERNER LLP <br> 312 SE 17th Street, Suite 300 <br> Fort Lauderdale, Florida 33316 <br> E-mail: rvaughan@kvllaw.com <br>          aatchanah@kvllaw.com <br>          emailservice@kvllaw.com <br> *Counsel for Plaintiff* | By: /s/ *Sujey Herrera* <br> Edward M. Mullins (FBN 863920) <br> Sujey Herrera (FBN 92445) <br> REED SMITH LLP <br> 200 South Biscayne Boulevard <br> Suite 2600 <br> Miami, Florida 33131 <br> E-mail: emullins@reedsmith.com <br>          sherrera@reedsmith.com <br> *Counsel for Defendants* |

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document was served via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on all counsel or parties of record.

By:/s/ *Anisha C. Atchanah*
        Anisha C. Atchanah